# Exhibit 1




# Background to "Assessing Russian Activities and Intentions in Recent US Elections": The Analytic Process and Cyber Incident Attribution

**6 January 2017**

# Background to "Assessing Russian Activities and Intentions in Recent US Elections": The Analytic Process and Cyber Incident Attribution

"Assessing Russian Activities and Intentions in Recent US Elections" is a declassified version of a highly classified assessment that has been provided to the President and to recipients approved by the President.

- The Intelligence Community rarely can publicly reveal the full extent of its knowledge or the precise bases for its assessments, as the release of such information would reveal sensitive sources or methods and imperil the ability to collect critical foreign intelligence in the future.

- Thus, while the conclusions in the report are all reflected in the classified assessment, the declassified report does not and cannot include the full supporting information, including specific intelligence and sources and methods.

**The Analytic Process**

The mission of the Intelligence Community is to seek to reduce the uncertainty surrounding foreign activities, capabilities, or leaders' intentions. This objective is difficult to achieve when seeking to understand complex issues on which foreign actors go to extraordinary lengths to hide or obfuscate their activities.

- On these issues of great importance to US national security, the goal of intelligence analysis is to provide assessments to decisionmakers that are intellectually rigorous, objective, timely, and useful, and that adhere to tradecraft standards.

- The tradecraft standards for analytic products have been refined over the past ten years. These standards include describing sources (including their reliability and access to the information they provide), clearly expressing uncertainty, distinguishing between underlying information and analysts' judgments and assumptions, exploring alternatives, demonstrating relevance to the customer, using strong and transparent logic, and explaining change or consistency in judgments over time.

- Applying these standards helps ensure that the Intelligence Community provides US policymakers, warfighters, and operators with the best and most accurate insight, warning, and context, as well as potential opportunities to advance US national security.

Intelligence Community analysts integrate information from a wide range of sources, including human sources, technical collection, and open source information, and apply specialized skills and structured analytic tools to draw inferences informed by the data available, relevant past activity, and logic and reasoning to provide insight into what is happening and the prospects for the future.

- A critical part of the analyst's task is to explain uncertainties associated with major judgments based on the quantity and quality of the source material, information gaps, and the complexity of the issue.

- When Intelligence Community analysts use words such as "we assess" or "we judge," they are conveying an analytic assessment or judgment.

- Some analytic judgments are based directly on collected information; others rest on previous judgments, which serve as building blocks in rigorous analysis. In either type of judgment, the tradecraft standards outlined above ensure that analysts have an appropriate basis for the judgment.

- Intelligence Community judgments often include two important elements: judgments of how likely it is that something has happened or will happen (using terms such as "likely" or "unlikely") and confidence levels in those judgments (low, moderate, and high) that refer to the evidentiary basis, logic and reasoning, and precedents that underpin the judgments.

**Determining Attribution in Cyber Incidents**

The nature of cyberspace makes attribution of cyber operations difficult but not impossible. Every kind of cyber operation—malicious or not—leaves a trail. US Intelligence Community analysts use this information, their constantly growing knowledge base of previous events and known malicious actors, and their knowledge of how these malicious actors work and the tools that they use, to attempt to trace these operations back to their source. In every case, they apply the same tradecraft standards described in the Analytic Process above.

- Analysts consider a series of questions to assess how the information compares with existing knowledge and adjust their confidence in their judgments as appropriate to account for any alternative hypotheses and ambiguities.

- An assessment of attribution usually is not a simple statement of who conducted an operation, but rather a series of judgments that describe whether it was an isolated incident, who was the likely perpetrator, that perpetrator's possible motivations, and whether a foreign government had a role in ordering or leading the operation.

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.



ICA

*INTELLIGENCE COMMUNITY ASSESSMENT*

# Assessing Russian Activities and Intentions in Recent US Elections



ICA 2017-01D | 6 January 2017

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

This page intentionally left blank.

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

# Scope and Sourcing

Information available as of 29 December 2016 was used in the preparation of this product.

**Scope**

This report includes an analytic assessment drafted and coordinated among The Central Intelligence Agency (CIA), The Federal Bureau of Investigation (FBI), and The National Security Agency (NSA), which draws on intelligence information collected and disseminated by those three agencies. It covers the motivation and scope of Moscow's intentions regarding US elections and Moscow's use of cyber tools and media campaigns to influence US public opinion. The assessment focuses on activities aimed at the 2016 US presidential election and draws on our understanding of previous Russian influence operations. When we use the term "we" it refers to an assessment by all three agencies.

- This report is a declassified version of a highly classified assessment. This document's conclusions are identical to the highly classified assessment, but this document does not include the full supporting information, including specific intelligence on key elements of the influence campaign. Given the redactions, we made minor edits purely for readability and flow.

We did not make an assessment of the impact that Russian activities had on the outcome of the 2016 election. The US Intelligence Community is charged with monitoring and assessing the intentions, capabilities, and actions of foreign actors; it does not analyze US political processes or US public opinion.

- New information continues to emerge, providing increased insight into Russian activities.

**Sourcing**

Many of the key judgments in this assessment rely on a body of reporting from multiple sources that are consistent with our understanding of Russian behavior. Insights into Russian efforts—including specific cyber operations—and Russian views of key US players derive from multiple corroborating sources.

Some of our judgments about Kremlin preferences and intent are drawn from the behavior of Kremlin-loyal political figures, state media, and pro-Kremlin social media actors, all of whom the Kremlin either directly uses to convey messages or who are answerable to the Kremlin. The Russian leadership invests significant resources in both foreign and domestic propaganda and places a premium on transmitting what it views as consistent, self-reinforcing narratives regarding its desires and redlines, whether on Ukraine, Syria, or relations with the United States.

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

# Assessing Russian Activities and Intentions in Recent US Elections

ICA 2017-01D
6 January 2017

## Key Judgments

**Russian efforts to influence the 2016 US presidential election represent the most recent expression of Moscow's longstanding desire to undermine the US-led liberal democratic order, but these activities demonstrated a significant escalation in directness, level of activity, and scope of effort compared to previous operations.**

**We assess Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the US presidential election. Russia's goals were to undermine public faith in the US democratic process, denigrate Secretary Clinton, and harm her electability and potential presidency. We further assess Putin and the Russian Government developed a clear preference for President-elect Trump.** We have high confidence in these judgments.

- **We also assess Putin and the Russian Government aspired to help President-elect Trump's election chances when possible by discrediting Secretary Clinton and publicly contrasting her unfavorably to him.** All three agencies agree with this judgment. CIA and FBI have high confidence in this judgment; NSA has moderate confidence.

- Moscow's approach evolved over the course of the campaign based on Russia's understanding of the electoral prospects of the two main candidates. When it appeared to Moscow that Secretary Clinton was likely to win the election, the Russian influence campaign began to focus more on undermining her future presidency.

- Further information has come to light since Election Day that, when combined with Russian behavior since early November 2016, increases our confidence in our assessments of Russian motivations and goals.

**Moscow's influence campaign followed a Russian messaging strategy that blends covert intelligence operations—such as cyber activity—with overt efforts by Russian Government agencies, state-funded media, third-party intermediaries, and paid social media users or "trolls."** Russia, like its Soviet predecessor, has a history of conducting covert influence campaigns focused on US presidential elections that have used intelligence officers and agents and press placements to disparage candidates perceived as hostile to the Kremlin.

- Russia's intelligence services conducted cyber operations against targets associated with the 2016 US presidential election, including targets associated with both major US political parties.

- We assess with high confidence that Russian military intelligence (General Staff Main Intelligence Directorate or GRU) used the Guccifer 2.0 persona and DCLeaks.com to release US victim data

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

obtained in cyber operations publicly and in exclusives to media outlets and relayed material to WikiLeaks.

- Russian intelligence obtained and maintained access to elements of multiple US state or local electoral boards. **DHS assesses that the types of systems Russian actors targeted or compromised were not involved in vote tallying.**

- Russia's state-run propaganda machine contributed to the influence campaign by serving as a platform for Kremlin messaging to Russian and international audiences.

**We assess Moscow will apply lessons learned from its Putin-ordered campaign aimed at the US presidential election to future influence efforts worldwide, including against US allies and their election processes.**

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

# Contents

Scope and Sourcing   i
Key Judgments   ii
Contents   iv

## CIA/FBI/NSA Assessment: Russia's Influence Campaign Targeting the 2016 US Presidential Election

Putin Ordered Campaign To Influence US Election   1

Russian Campaign Was Multifaceted   2

Influence Effort Was Boldest Yet in the US   5

Election Operation Signals "New Normal" in Russian Influence Efforts   5

## Annexes

A: Russia—Kremlin's TV Seeks To Influence Politics, Fuel Discontent in US   6
B: Estimative Language   13

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

# Russia's Influence Campaign Targeting the 2016 US Presidential Election

  

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

# Russia's Influence Campaign Targeting the 2016 US Presidential Election

## Putin Ordered Campaign To Influence US Election

We assess with high confidence that Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the US presidential election, the consistent goals of which were to undermine public faith in the US democratic process, denigrate Secretary Clinton, and harm her electability and potential presidency. We further assess Putin and the Russian Government developed a clear preference for President-elect Trump. When it appeared to Moscow that Secretary Clinton was likely to win the election, the Russian influence campaign then focused on undermining her expected presidency.

- We also assess Putin and the Russian Government aspired to help President-elect Trump's election chances when possible by discrediting Secretary Clinton and publicly contrasting her unfavorably to him. All three agencies agree with this judgment. CIA and FBI have high confidence in this judgment; NSA has moderate confidence.

- In trying to influence the US election, we assess the Kremlin sought to advance its longstanding desire to undermine the US-led liberal democratic order, the promotion of which Putin and other senior Russian leaders view as a threat to Russia and Putin's regime.

- Putin publicly pointed to the Panama Papers disclosure and the Olympic doping scandal as US-directed efforts to defame Russia, suggesting he sought to use disclosures to discredit the image of the United States and cast it as hypocritical.

- Putin most likely wanted to discredit Secretary Clinton because he has publicly blamed her since 2011 for inciting mass protests against his regime in late 2011 and early 2012, and because he holds a grudge for comments he almost certainly saw as disparaging him.

We assess Putin, his advisers, and the Russian Government developed a clear preference for President-elect Trump over Secretary Clinton.

- Beginning in June, Putin's public comments about the US presidential race avoided directly praising President-elect Trump, probably because Kremlin officials thought that any praise from Putin personally would backfire in the United States. Nonetheless, Putin publicly indicated a preference for President-elect Trump's stated policy to work with Russia, and pro-Kremlin figures spoke highly about what they saw as his Russia-friendly positions on Syria and Ukraine. Putin publicly contrasted the President-elect's approach to Russia with Secretary Clinton's "aggressive rhetoric."

- Moscow also saw the election of President-elect Trump as a way to achieve an international counterterrorism coalition against the Islamic State in Iraq and the Levant (ISIL).

- Putin has had many positive experiences working with Western political leaders whose business interests made them more disposed to deal with Russia, such as former Italian Prime Minister Silvio Berlusconi and former German Chancellor Gerhard Schroeder.

- Putin, Russian officials, and other pro-Kremlin pundits stopped publicly criticizing the US election process as unfair almost immediately

after the election because Moscow probably assessed it would be counterproductive to building positive relations.

We assess the influence campaign aspired to help President-elect Trump's chances of victory when possible by discrediting Secretary Clinton and publicly contrasting her unfavorably to the President-elect. When it appeared to Moscow that Secretary Clinton was likely to win the presidency the Russian influence campaign focused more on undercutting Secretary Clinton's legitimacy and crippling her presidency from its start, including by impugning the fairness of the election.

- Before the election, Russian diplomats had publicly denounced the US electoral process and were prepared to publicly call into question the validity of the results. Pro-Kremlin bloggers had prepared a Twitter campaign, #DemocracyRIP, on election night in anticipation of Secretary Clinton's victory, judging from their social media activity.

**Russian Campaign Was Multifaceted**

Moscow's use of disclosures during the US election was unprecedented, but its influence campaign otherwise followed a longstanding Russian messaging strategy that blends covert intelligence operations—such as cyber activity—with overt efforts by Russian Government agencies, state-funded media, third-party intermediaries, and paid social media users or "trolls."

- We assess that influence campaigns are approved at the highest levels of the Russian Government—particularly those that would be politically sensitive.

- Moscow's campaign aimed at the US election reflected years of investment in its capabilities, which Moscow has honed in the former Soviet states.

- By their nature, Russian influence campaigns are multifaceted and designed to be deniable because they use a mix of agents of influence, cutouts, front organizations, and false-flag operations. Moscow demonstrated this during the Ukraine crisis in 2014, when Russia deployed forces and advisers to eastern Ukraine and denied it publicly.

The Kremlin's campaign aimed at the US election featured disclosures of data obtained through Russian cyber operations; intrusions into US state and local electoral boards; and overt propaganda. Russian intelligence collection both informed and enabled the influence campaign.

***Cyber Espionage Against US Political Organizations.*** Russia's intelligence services conducted cyber operations against targets associated with the 2016 US presidential election, including targets associated with both major US political parties.

We assess Russian intelligence services collected against the US primary campaigns, think tanks, and lobbying groups they viewed as likely to shape future US policies. In July 2015, Russian intelligence gained access to Democratic National Committee (DNC) networks and maintained that access until at least June 2016.

- The General Staff Main Intelligence Directorate (GRU) probably began cyber operations aimed at the US election by March 2016. We assess that the GRU operations resulted in the compromise of the personal e-mail accounts of Democratic Party officials and political figures. By May, the GRU had exfiltrated large volumes of data from the DNC.

***Public Disclosures of Russian-Collected Data.*** We assess with high confidence that the GRU used the Guccifer 2.0 persona, DCLeaks.com, and WikiLeaks to release US victim data obtained in

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

cyber operations publicly and in exclusives to media outlets.

- Guccifer 2.0, who claimed to be an independent Romanian hacker, made multiple contradictory statements and false claims about his likely Russian identity throughout the election. Press reporting suggests more than one person claiming to be Guccifer 2.0 interacted with journalists.

- Content that we assess was taken from e-mail accounts targeted by the GRU in March 2016 appeared on DCLeaks.com starting in June.

We assess with high confidence that the GRU relayed material it acquired from the DNC and senior Democratic officials to WikiLeaks. Moscow most likely chose WikiLeaks because of its self-proclaimed reputation for authenticity. Disclosures through WikiLeaks did not contain any evident forgeries.

- In early September, Putin said publicly it was important the DNC data was exposed to WikiLeaks, calling the search for the source of the leaks a distraction and denying Russian "state-level" involvement.

- The Kremlin's principal international propaganda outlet RT (formerly Russia Today) has actively collaborated with WikiLeaks. RT's editor-in-chief visited WikiLeaks founder Julian Assange at the Ecuadorian Embassy in London in August 2013, where they discussed renewing his broadcast contract with RT, according to Russian and Western media. Russian media subsequently announced that RT had become "the only Russian media company" to partner with WikiLeaks and had received access to "new leaks of secret information." RT routinely gives Assange sympathetic coverage and provides him a platform to denounce the United States.

These election-related disclosures reflect a pattern of Russian intelligence using hacked information in targeted influence efforts against targets such as Olympic athletes and other foreign governments. Such efforts have included releasing or altering personal data, defacing websites, or releasing e-mails.

- A prominent target since the 2016 Summer Olympics has been the World Anti-Doping Agency (WADA), with leaks that we assess to have originated with the GRU and that have involved data on US athletes.

Russia collected on some Republican-affiliated targets but did not conduct a comparable disclosure campaign.

***Russian Cyber Intrusions Into State and Local Electoral Boards.*** Russian intelligence accessed elements of multiple state or local electoral boards. Since early 2014, Russian intelligence has researched US electoral processes and related technology and equipment.

- DHS assesses that the types of systems we observed Russian actors targeting or compromising are not involved in vote tallying.

***Russian Propaganda Efforts.*** Russia's state-run propaganda machine—comprised of its domestic media apparatus, outlets targeting global audiences such as RT and Sputnik, and a network of quasi-government trolls—contributed to the influence campaign by serving as a platform for Kremlin messaging to Russian and international audiences. State-owned Russian media made increasingly favorable comments about President-elect Trump as the 2016 US general and primary election campaigns progressed while consistently offering negative coverage of Secretary Clinton.

- Starting in March 2016, Russian Government–linked actors began openly supporting President-elect Trump's candidacy in media

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

aimed at English-speaking audiences. RT and Sputnik—another government-funded outlet producing pro-Kremlin radio and online content in a variety of languages for international audiences—consistently cast President-elect Trump as the target of unfair coverage from traditional US media outlets that they claimed were subservient to a corrupt political establishment.

- Russian media hailed President-elect Trump's victory as a vindication of Putin's advocacy of global populist movements—the theme of Putin's annual conference for Western academics in October 2016—and the latest example of Western liberalism's collapse.

- Putin's chief propagandist Dmitriy Kiselev used his flagship weekly newsmagazine program this fall to cast President-elect Trump as an outsider victimized by a corrupt political establishment and faulty democratic election process that aimed to prevent his election because of his desire to work with Moscow.

- Pro-Kremlin proxy Vladimir Zhirinovskiy, leader of the nationalist Liberal Democratic Party of Russia, proclaimed just before the election that if President-elect Trump won, Russia would "drink champagne" in anticipation of being able to advance its positions on Syria and Ukraine.

RT's coverage of Secretary Clinton throughout the US presidential campaign was consistently negative and focused on her leaked e-mails and accused her of corruption, poor physical and mental health, and ties to Islamic extremism. Some Russian officials echoed Russian lines for the influence campaign that Secretary Clinton's election could lead to a war between the United States and Russia.

- In August, Kremlin-linked political analysts suggested avenging negative Western reports on Putin by airing segments devoted to Secretary Clinton's alleged health problems.

- On 6 August, RT published an English-language video called "Julian Assange Special: Do WikiLeaks Have the E-mail That'll Put Clinton in Prison?" and an exclusive interview with Assange entitled "Clinton and ISIS Funded by the Same Money." RT's most popular video on Secretary Clinton, "How 100% of the Clintons' 'Charity' Went to…Themselves," had more than 9 million views on social media platforms. RT's most popular English language video about the President-elect, called "Trump Will Not Be Permitted To Win," featured Assange and had 2.2 million views.

- For more on Russia's past media efforts—including portraying the 2012 US electoral process as undemocratic—please see Annex A: Russia—Kremlin's TV Seeks To Influence Politics, Fuel Discontent in US.

Russia used trolls as well as RT as part of its influence efforts to denigrate Secretary Clinton. This effort amplified stories on scandals about Secretary Clinton and the role of WikiLeaks in the election campaign.

- The likely financier of the so-called Internet Research Agency of professional trolls located in Saint Petersburg is a close Putin ally with ties to Russian intelligence.

- A journalist who is a leading expert on the Internet Research Agency claimed that some social media accounts that appear to be tied to Russia's professional trolls—because they previously were devoted to supporting Russian actions in Ukraine—started to advocate for President-elect Trump as early as December 2015.

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

## Influence Effort Was Boldest Yet in the US

Russia's effort to influence the 2016 US presidential election represented a significant escalation in directness, level of activity, and scope of effort compared to previous operations aimed at US elections.  We assess the 2016 influence campaign reflected the Kremlin's recognition of the worldwide effects that mass disclosures of US Government and other private data—such as those conducted by WikiLeaks and others—have achieved in recent years, and their understanding of the value of orchestrating such disclosures to maximize the impact of compromising information.

- During the Cold War, the Soviet Union used intelligence officers, influence agents, forgeries, and press placements to disparage candidates perceived as hostile to the Kremlin, according to a former KGB archivist.

Since the Cold War, Russian intelligence efforts related to US elections have primarily focused on foreign intelligence collection.  For decades, Russian and Soviet intelligence services have sought to collect insider information from US political parties that could help Russian leaders understand a new US administration's plans and priorities.

- The Russian Foreign Intelligence Service (SVR) Directorate S (Illegals) officers arrested in the United States in 2010 reported to Moscow about the 2008 election.

- In the 1970s, the KGB recruited a Democratic Party activist who reported information about then-presidential hopeful Jimmy Carter's campaign and foreign policy plans, according to a former KGB archivist.

## Election Operation Signals "New Normal" in Russian Influence Efforts

We assess Moscow will apply lessons learned from its campaign aimed at the US presidential election to future influence efforts in the United States and worldwide, including against US allies and their election processes.  We assess the Russian intelligence services would have seen their election influence campaign as at least a qualified success because of their perceived ability to impact public discussion.

- Putin's public views of the disclosures suggest the Kremlin and the intelligence services will continue to consider using cyber-enabled disclosure operations because of their belief that these can accomplish Russian goals relatively easily without significant damage to Russian interests.

- Russia has sought to influence elections across Europe.

We assess Russian intelligence services will continue to develop capabilities to provide Putin with options to use against the United States, judging from past practice and current efforts.  Immediately after Election Day, we assess Russian intelligence began a spearphishing campaign targeting US Government employees and individuals associated with US think tanks and NGOs in national security, defense, and foreign policy fields.  This campaign could provide material for future influence efforts as well as foreign intelligence collection on the incoming administration's goals and plans.

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

# Annex A

### *Russia* -- Kremlin's TV Seeks To Influence Politics, Fuel Discontent in US[*]

*RT America TV, a Kremlin-financed channel operated from within the United States, has substantially expanded its repertoire of programming that highlights criticism of alleged US shortcomings in democracy and civil liberties. The rapid expansion of RT's operations and budget and recent candid statements by RT's leadership point to the channel's importance to the Kremlin as a messaging tool and indicate a Kremlin-directed campaign to undermine faith in the US Government and fuel political protest. The Kremlin has committed significant resources to expanding the channel's reach, particularly its social media footprint. A reliable UK report states that RT recently was the most-watched foreign news channel in the UK. RT America has positioned itself as a domestic US channel and has deliberately sought to obscure any legal ties to the Russian Government.*

In the runup to the 2012 US presidential election in November, English-language channel RT America -- created and financed by the Russian Government and part of Russian Government-sponsored RT TV (see textbox 1) -- intensified its usually critical coverage of the United States. The channel portrayed the US electoral process as undemocratic and featured calls by US protesters for the public to rise up and "take this government back."

- RT introduced two new shows -- "Breaking the Set" on 4 September and "Truthseeker" on 2 November -- both overwhelmingly focused on criticism of US and Western governments as well as the promotion of radical discontent.

- From August to November 2012, RT ran numerous reports on alleged US election fraud and voting machine vulnerabilities, contending that US election results cannot be trusted and do not reflect the popular will.



*Messaging on RT prior to the US presidential election (RT, 3 November)*

- In an effort to highlight the alleged "lack of democracy" in the United States, RT broadcast, hosted, and advertised third-party candidate debates and ran reporting supportive of the political agenda of these candidates. The RT hosts asserted that the US two-party system does not represent the views of at least one-third of the population and is a "sham."

---

[*] This annex was originally published on 11 December 2012 by the Open Source Center, now the Open Source Enterprise.

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

- RT aired a documentary about the Occupy Wall Street movement on 1, 2, and 4 November.  RT framed the movement as a fight against "the ruling class" and described the current US political system as corrupt and dominated by corporations.  RT advertising for the documentary featured Occupy movement calls to "take back" the government.  The documentary claimed that the US system cannot be changed democratically, but only through "revolution."  After the 6 November US presidential election, RT aired a documentary called "Cultures of Protest," about active and often violent political resistance  (RT, 1-10 November).



*RT new show "Truthseeker" (RT, 11 November)*

**RT Conducts Strategic Messaging for Russian Government**

RT's criticism of the US election was the latest facet of its broader and longer-standing anti-US messaging likely aimed at undermining viewers' trust in US democratic procedures and undercutting US criticism of Russia's political system.  RT Editor in Chief Margarita Simonyan recently declared that the United States itself lacks democracy and that it has "no moral right to teach the rest of the world" (*Kommersant*, 6 November).

- Simonyan has characterized RT's coverage of the Occupy Wall Street movement as "information warfare" that is aimed at promoting popular dissatisfaction with the US Government.  RT created a *Facebook* app to connect Occupy Wall Street protesters via social media.  In addition, RT featured its own hosts in Occupy rallies ("Minaev Live," 10 April; RT, 2, 12 June).

- RT's reports often characterize the United States as a "surveillance state" and allege widespread infringements of civil liberties, police brutality, and drone use (RT, 24, 28 October, 1-10 November).

- RT has also focused on criticism of the US economic system, US currency policy, alleged



*Simonyan steps over the White House in the introduction from her short-lived domestic show on REN TV (REN TV, 26 December 2011)*

Wall Street greed, and the US national debt.  Some of RT's hosts have compared the United States to Imperial Rome and have predicted that government corruption and "corporate greed" will lead to US financial collapse (RT, 31 October, 4 November).

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

RT broadcasts support for other Russian interests in areas such as foreign and energy policy.



- RT runs anti-fracking programming, highlighting environmental issues and the impacts on public health.  This is likely reflective of the Russian Government's concern about the impact of fracking and US natural gas production on the global energy market and the potential challenges to Gazprom's profitability (5 October).

- RT is a leading media voice opposing Western intervention in the Syrian conflict and blaming the West for waging "information wars" against the Syrian Government (RT, 10 October-9 November).

*RT anti-fracking reporting (RT, 5 October)*

- In an earlier example of RT's messaging in support of the Russian Government, during the Georgia-Russia military conflict the channel accused Georgians of killing civilians and organizing a genocide of the Ossetian people.  According to Simonyan, when "the Ministry of Defense was at war with Georgia," RT was "waging an information war against the entire Western world" (*Kommersant*, 11 July).

In recent interviews, RT's leadership has candidly acknowledged its mission to expand its US audience and to expose it to Kremlin messaging.  However, the leadership rejected claims that RT interferes in US domestic affairs.

- Simonyan claimed in popular arts magazine *Afisha* on 3 October: "It is important to have a channel that people get used to, and then, when needed, you show them what you need to show.  In some sense, not having our own foreign broadcasting is the same as not having a ministry of defense. When there is no war, it looks like we don't need it.  However, when there is a war, it is critical."

- According to Simonyan, "the word 'propaganda' has a very negative connotation, but indeed, there is not a single international foreign TV channel that is doing something other than promotion of the values of the country that it is broadcasting from."  She added that "when Russia is at war, we are, of course, on Russia's side" (*Afisha*, 3 October; *Kommersant*, 4 July).

- TV-Novosti director Nikolov said on 4 October to the Association of Cable Television that RT builds on worldwide demand for "an alternative view of the entire world."  Simonyan asserted on 3 October in *Afisha* that RT's goal is "to make an alternative channel that shares information unavailable elsewhere" in order to "conquer the audience" and expose it to Russian state messaging (*Afisha*, 3 October; *Kommersant*, 4 July).

- On 26 May, Simonyan tweeted with irony:  "Ambassador McFaul hints that our channel is interference with US domestic affairs.  And we, sinful souls, were thinking that it is freedom of speech."

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

**RT Leadership Closely Tied to, Controlled by Kremlin**

RT Editor in Chief Margarita Simonyan has close ties to top Russian Government officials, especially Presidential Administration Deputy Chief of Staff Aleksey Gromov, who reportedly manages political TV coverage in Russia and is one of the founders of RT.

- Simonyan has claimed that Gromov shielded her from other officials and their requests to air certain reports. Russian media consider Simonyan to be Gromov's protege (*Kommersant*, 4 July; Dozhd TV, 11 July).

- Simonyan replaced Gromov on state-owned Channel One's Board of Directors. Government officials, including Gromov and Putin's Press Secretary Peskov were involved in creating RT and appointing Simonyan (*Afisha*, 3 October).

- According to Simonyan, Gromov oversees political coverage on TV, and he has periodic meetings with media managers where he shares classified information and discusses their coverage plans. Some opposition journalists, including Andrey Loshak, claim that he also ordered media attacks on opposition figures (*Kommersant*, 11 July).



*Simonyan shows RT facilities to then Prime Minister Putin. Simonyan was on Putin's 2012 presidential election campaign staff in Moscow (Rospress, 22 September 2010, Ria Novosti, 25 October 2012).*

The Kremlin staffs RT and closely supervises RT's coverage, recruiting people who can convey Russian strategic messaging because of their ideological beliefs.

- The head of RT's Arabic-language service, Aydar Aganin, was rotated from the diplomatic service to manage RT's Arabic-language expansion, suggesting a close relationship between RT and Russia's foreign policy apparatus. RT's London Bureau is managed by Darya Pushkova, the daughter of Aleksey Pushkov, the current chair of the Duma Russian Foreign Affairs Committee and a former Gorbachev speechwriter (*DXB*, 26 March 2009; *MK.ru*, 13 March 2006).

- According to Simonyan, the Russian Government sets rating and viewership requirements for RT and, "since RT receives budget from the state, it must complete tasks given by the state." According to Nikolov, RT news stories are written and edited "to become news" exclusively in RT's Moscow office (Dozhd TV, 11 July; *AKT*, 4 October).

- In her interview with pro-Kremlin journalist Sergey Minaev, Simonyan complimented RT staff in the United States for passionately defending Russian positions on the air and in social media. Simonyan said: "I wish you could see...how these guys, not just on air, but on their own social networks, *Twitter*, and when giving interviews, how they defend the positions that we stand on!" ("Minaev Live," 10 April).

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

**RT Focuses on Social Media, Building Audience**

RT aggressively advertises its social media accounts and has a significant and fast-growing social media footprint.  In line with its efforts to present itself as anti-mainstream and to provide viewers alternative news content, RT is making its social media operations a top priority, both to avoid broadcast TV regulations and to expand its overall audience.

- According to RT management, RT's website receives at least 500,000 unique viewers every day.  Since its inception in 2005, RT videos received more than 800 million views on *YouTube* (1 million views per day), which is the highest among news outlets (see graphics for comparison with other news channels) (*AKT*, 4 October).

- According to Simonyan, the TV audience worldwide is losing trust in traditional TV broadcasts and stations, while the popularity of "alternative channels" like RT or Al Jazeera grows.  RT markets itself as an "alternative channel" that is available via the Internet everywhere in the world, and it encourages interaction and social networking (*Kommersant*, 29 September).

- According to Simonyan, RT uses social media to expand the reach of its political reporting and uses well-trained people to monitor public opinion in social media commentaries (*Kommersant*, 29 September).

- According to Nikolov, RT requires its hosts to have social media accounts, in part because social media allows the distribution of content that would not be allowed on television (*Newreporter.org*, 11 October).

- Simonyan claimed in her 3 October interview to independent TV channel Dozhd that Occupy Wall Street coverage gave RT a significant audience boost.

The Kremlin spends $190 million a year on the distribution and dissemination of RT programming, focusing on hotels and satellite, terrestrial, and cable broadcasting.  The Kremlin is rapidly expanding RT's availability around the world and giving it a reach comparable to channels such as Al Jazeera English. According to Simonyan, the United Kingdom and the United States are RT's most successful markets.   RT does not, however, publish audience information.

- According to market research company Nielsen, RT had the most rapid growth (40 percent) among all international news channels in the United States over the past year (2012).  Its audience in New York tripled and in Washington DC grew by 60% (*Kommersant*, 4 July).

- RT claims that it is surpassing Al Jazeera in viewership in New York and Washington DC (*BARB*, 20 November; RT, 21 November).

- RT states on its website that it can reach more than 550 million people worldwide and 85 million people in the United States; however, it does not publicize its actual US audience numbers (RT, 10 December).

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.



## TV News Broadcasters: Comparative Social Media Footprint

### YouTube Views
Millions of views

### YouTube Subscribers
Thousands of subscribers

### Twitter Followers
Thousands of followers

### Facebook Likes
Thousands of likes

### Facebook Chatter
Thousands of posts

170105101144_1-17

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

**Formal Disassociation From Kremlin Facilitates RT US Messaging**

RT America formally disassociates itself from the Russian Government by using a Moscow-based autonomous nonprofit organization to finance its US operations. According to RT's leadership, this structure was set up to avoid the Foreign Agents Registration Act and to facilitate licensing abroad. In addition, RT rebranded itself in 2008 to deemphasize its Russian origin.

- According to Simonyan, RT America differs from other Russian state institutions in terms of ownership, but not in terms of financing. To disassociate RT from the Russian Government, the federal news agency RIA Novosti established a subsidiary autonomous nonprofit organization, TV-Novosti, using the formal independence of this company to establish and finance RT worldwide (Dozhd TV, 11 July).

- Nikolov claimed that RT is an "autonomous noncommercial entity," which is "well received by foreign regulators" and "simplifies getting a license." Simonyan said that RT America is not a "foreign agent" according to US law because it uses a US commercial organization for its broadcasts (*AKT,* 4 October; Dozhd TV, 11 July).

- Simonyan observed that RT's original Russia-centric news reporting did not generate sufficient audience, so RT switched to covering international and US domestic affairs and removed the words "Russia Today" from the logo "to stop scaring away the audience" (*Afisha*, 18 October; *Kommersant*, 4 July).

- RT hires or makes contractual agreements with Westerners with views that fit its agenda and airs them on RT. Simonyan said on the pro-Kremlin show "Minaev Live" on 10 April that RT has enough audience and money to be able to choose its hosts, and it chooses the hosts that "think like us," "are interested in working in the anti-mainstream," and defend RT's beliefs on social media. Some hosts and journalists do not present themselves as associated with RT when interviewing people, and many of them have affiliations to other media and activist organizations in the United States ("Minaev Live," 10 April).

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

# Annex B

## ESTIMATIVE LANGUAGE

Estimative language consists of two elements: judgments about the likelihood of developments or events occurring and levels of confidence in the sources and analytic reasoning supporting the judgments. Judgments are not intended to imply that we have proof that shows something to be a fact. Assessments are based on collected information, which is often incomplete or fragmentary, as well as logic, argumentation, and precedents.

**Judgments of Likelihood.** The chart below approximates how judgments of likelihood correlate with percentages. Unless otherwise stated, the Intelligence Community's judgments are not derived via statistical analysis. Phrases such as "we judge" and "we assess"—and terms such as "probable" and "likely"—convey analytical assessments.

*Percent*



**Confidence in the Sources Supporting Judgments.** Confidence levels provide assessments of the quality and quantity of the source information that supports judgments. Consequently, we ascribe high, moderate, or low levels of confidence to assessments:

- **High confidence** generally indicates that judgments are based on high-quality information from multiple sources. High confidence in a judgment does not imply that the assessment is a fact or a certainty; such judgments might be wrong.

- **Moderate confidence** generally means that the information is credibly sourced and plausible but not of sufficient quality or corroborated sufficiently to warrant a higher level of confidence.

- **Low confidence** generally means that the information's credibility and/or plausibility is uncertain, that the information is too fragmented or poorly corroborated to make solid analytic inferences, or that reliability of the sources is questionable.

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.

This page intentionally left blank.

This report is a declassified version of a highly classified assessment; its conclusions are identical to those in the highly classified assessment but this version does not include the full supporting information on key elements of the influence campaign.



# Exhibit 2





ICA

*INTELLIGENCE COMMUNITY ASSESSMENT*

**Assessing Russian Activities and Intentions in Recent US Elections**

## ODNI Statement on Declassified Intelligence Community Assessment of Russian Activities and Intentions in Recent U.S. Elections

### January 6, 2017

On December 9, 2016, President Barack Obama directed the Intelligence Community to conduct a full review and produce a comprehensive intelligence report assessing Russian activities and intentions in recent U.S. elections.  We have completed this report and briefed President Obama as well as President-elect Trump and Congressional leadership.  We declassified a version of this report for the public, consistent with our commitment to transparency while still protecting classified sources and methods.

The Intelligence Community did not make an assessment of the impact that Russian activities had on the outcome of the 2016 election, and DHS assesses that the types of systems the Russian actors targeted or compromised were not involved in vote tallying.

This declassified version of the report is being released to the public and can be accessed via IC on the Record.

**Report:  Assessing Russian Activities and Intentions in Recent U.S. Elections**

Share

#declassified   #election   #Russia

6 months ago        300

# Exhibit 3


🏠 > Archive > News Archive > Joint Statement from the Department Of Homeland Security and Office of the Director of National Intelligence on Election Security

Share / Email

## News Archive

Blog Archive

Events & Media Advisories Archive

Fact Sheets Archive

Press Release Archive

Speeches Archive

### Archived Content

In an effort to keep DHS.gov current, the archive contains content from a previous administration or is otherwise outdated.

# Joint Statement from the Department Of Homeland Security and Office of the Director of National Intelligence on Election Security

**Release Date:** October 7, 2016



For Immediate Release
DHS Press Office
Contact: 202-282-8010

The U.S. Intelligence Community (USIC) is confident that the Russian Government directed the recent compromises of e-mails from US persons and institutions, including from US political organizations. The recent disclosures of alleged hacked e-mails on sites like DCLeaks.com and WikiLeaks and by the Guccifer 2.0 online persona are consistent with the methods and motivations of Russian-directed efforts. These thefts and disclosures are intended to interfere with the US election process. Such activity is not new to Moscow—the Russians have used similar tactics and techniques across Europe and Eurasia, for example, to influence public opinion there. We believe, based on the scope and sensitivity of these efforts, that only Russia's senior-most officials could have authorized these activities.

Some states have also recently seen scanning and probing of their election-related systems, which in most cases originated from servers operated by a Russian company. However, we are not now in a position to attribute this activity to the Russian Government. The USIC and the Department of Homeland Security (DHS) assess that it would be extremely difficult for someone, including a nation-state actor, to alter actual ballot counts or election results by cyber attack or intrusion. This assessment is based on the decentralized nature of our election system in this country and the number of protections state and local election officials have in place. States ensure that voting machines are not connected to the Internet, and there are numerous checks and balances as well as extensive oversight at multiple levels built into our election process.

Nevertheless, DHS continues to urge state and local election officials to be vigilant and seek cybersecurity assistance from DHS. A number of states have already done so. DHS is providing several services to state and local election officials to assist in their cybersecurity. These services include cyber "hygiene" scans of Internet-facing systems, risk and vulnerability assessments, information sharing about cyber incidents, and best practices for securing voter registration databases and addressing potential cyber threats. DHS has convened an Election Infrastructure Cybersecurity Working Group with experts across all levels of government to raise awareness of cybersecurity risks potentially affecting election infrastructure and the elections process. Secretary Johnson and DHS officials are working directly with the National Association of Secretaries of State to offer assistance, share information, and provide additional resources to state and local officials.

# # #

# Exhibit 4

# Hearing Transcripts

Back to Document View Page

(/congressional/result/congressional/pqpdocumentview?

## Title Info

**Title:**

SENATE SELECT COMMITTEE ON INTELLIGENCE HEARING ON RUSSIAN INTELLIGENCE ACTIVITIES, PANEL 1

**Date:**

March 30, 2017

**Location:**

WASHINGTON, D.C.

**Committee:**

Select Committee on Intelligence. Senate

**Permalink:**

https://congressional-proquest-com.stanford.idm.oclc.org/congressional/docview/t65.d40.03300003.u59?accountid=14026 (https://congressional-proquest-com.stanford.idm.oclc.org/congressional/docview/t65.d40.03300003.u59?accountid=14026)

---

## Speaker

SEN. RICHARD M. BURR

---

# Body

BURR: Let's call this hearing to order. I apologize to our witnesses, but we had a vote that was called at 10 o'clock and most members are in the process of making their way from there to here.

This morning, the committee will engage in an activity that's quite rare for us, an open hearing on an ongoing critical intelligence question, the role of Russian Active Measures past and present. As many of you know this committee is conducting a thorough independent and non-partisan review of the Russian Active Measures campaign conducted against the 2016 U.S. elections. Some of the intelligence provided to the committee is extremely sensitive and requires that most of the work be conducted in a secure setting to maintain the integrity of the information and to protect the very sensitive sources and methods that gave us access to that intelligence.

However the Vice Chairman and I understand the gravity of the issues that we're here reviewing and have decided that it's crucial that we take the rare step of discussing publicly an ongoing intelligence question. That's why we've convened this second open hearing on the topic of Russian Active Measures. And I can assure you to the extent possible that the committee will hold additional open hearings on this issue.
The American public, indeed all democratic societies, need to understand that malign actors are using old techniques with new platforms to undermine our democratic institutions. This hearing entitled, "Disinformation, a Primer in Russian Active Measures and Influence Campaigns" will consist of two panels and will provide a foundational understanding of Russian Active Measures and information operations campaigns.

The first panel will examine the history and characteristics of those campaigns. The second panel will examine the history and characteristics of those campaigns and the role and capabilities of cyber operations in support of these activities. Unfortunately, you will learn today that these efforts by Russia to discredit the U.S.

and weaken the west are not new. These efforts are in fact at the heart of Russian and previous Soviet Union intelligence efforts. You will learn today that our community has been a target of Russian information warfare, propaganda and cyber campaigns and still is.

The efforts our experts will outline today continue unabated. The takeaway from today's hearing, we're all targets of a sophisticated and capable adversary and we must engage in a whole of government approach to combat Russian Active Measures.

Today we'll receive testimony from experts who have in some cases worked directly to respond to Active Measures, who understand the history and the context of Active Measures and whose significant experience and knowledge will shed new light on the problem and provide useful context. Drs. Godson and Rumer, Mr. Watts, we're grateful to you for your appearance here today. This afternoon we will reconvene and welcome witnesses who will discuss the technical side of the question, cyber operations including computer network exploitation, social media and unwanted propaganda activities and how they enable and promote Russian influence campaigns and information operations.

We have a full day ahead of us, and I'm confident that the testimony you will hear today will help you to establish a foundational understanding of the problem as the community continues its inquiry into Russian activities.

Finally, I'd like to commend the Vice Chairman for his dedication to the goals of the committee's inquiry and to the integrity of the process. The Vice Chairman and I realize that if we politicize this process, our efforts will likely fail. The public deserves to hear the truth about possible Russian involvement in our elections, how they came to be involved, how we may have failed to prevent that involvement, what actions were taken in response if any, and what we plan to do to ensure the integrity to future free elections at the heart of our democracy.

Gentlemen, thank you again for your willingness to be here and I

turn to the Vice Chairman.

WARNER: Thank you, Mr. Chairman. I also want to welcome our witnesses today. Today's hearing is important to help understand the role Russia played in the 2016 presidential elections. As the U.S.intelligence community unanimously assessed in January of this year, Russia sought to hijack our democratic process and that most important part of our democratic process, our presidential elections. As we'll learn today, Russia's strategy and tactics are not new but their brazenness certainly was.

The hearing is also important because it's open, as the Chairman mentioned, which is sometimes unusual for this committee. Due to the classified nature of our work, we typically work behind closed doors. But today's public hearing will help I hope the American public writ large understand how the Kremlin made effective use of attacking skills to steal and weaponize information and engage in a coordinated effort to damage a particular candidate and to undermine public confidence in our democratic process.

Our witnesses today will help us to understand how Russia deployed this deluge of disinformation in a broader attempt to undermine America's strength and leadership throughout the world. We simply must, and we will, get this right. The Chairman and I agree it is vitally important that we do this as credible, bipartisan and transparent manner as possible. As we've said yesterday in our press conference Chairman Burr and I trust each other, and equally important we trust our colleagues on this committee that we are going to move together and we're going to get to the bottom of this and do it right.

As this hearing begins, let's take just one moment to review what we already know. Russia's President, Vladimir Putin, ordered a deliberate campaign carefully constructed to undermine our election. First Russia struck at our political institutions by electronically breaking into the headquarters of one of our political parties and stealing vast amounts of information. Russian operatives also hacked emails to steal personal messages and other information from individuals ranging from Clinton campaign manager John Podesta to

former secretary of state Colin Powell. This stolen information was then weaponized. We know that Russian intelligence used the "Guccifer 2" persona and others like WikiLeaks in seemingly choreographed times that would cause maximum damage to one candidate. They did this with an unprecedented level of sophistication about American presidential politics that should be a line of inquiry for us on this committee and candidly, while it helped one candidate this time, they are not favoring one party over another and consequently should be a concern for all of us.

Second, Russia continually sought to diminish and undermine our trust in the American media while blurring our faith in what is true and what is not. Russian propaganda outlets like RT and Sputnik successfully produced and peddled disinformation to American audiences in pursuit to Moscow's preferred outcome. This Russian propaganda on steroids was designed to poison the national conversation in America. The Russians employed thousands of paid Internet trolls and bot nets to push out disinformation and fake news at high volume focusing this material onto your Twitter and Facebook feeds and flooding our social media with misinformation. This fake news and disinformation was then hyped by the American media echo chamber and our own social media networks to reach and potentially influence millions of Americans.

This is not innuendo or false allegations. This is not fake news. This is actually what happened to us. Russia continues these sorts of actions as we speak. Some of our close allies in Europe are experiencing exactly the same kind of interference in their political process. Germany has said that its parliament has been hacked. French presidential candidates right now have been the subject of Russian propaganda and disinformation.

In the Netherlands, their recent elections, the Dutch hand-counted their ballots because they feared Russian interference in their electoral process. Perhaps most critically for us, there is nothing to stop them from doing this all over again in 2018 for those of you who are up or in 2020 as Americans again go back to the polls. In addition to what we already know, any full accounting must also find out what if any contacts, communications or connections occurred

between Russia and those associated with the campaigns themselves.

I will not prejudge the outcome of our investigation. We are seeking to determine if there is an actual fire, but there is clearly a lot of smoke. For instance, an individual associated with the Trump campaign accurately predicted the release of hacked emails weeks before it happened. The same individual also admits to being in contact with Guccifer 2, the Russian intelligence persona responsible for these cyber operations.

The platform of one of our two major political parties was mysteriously watered down in a way which promoted the interest of President Putin and no one seems to be able to identify who directed that change in the platform. A campaign manager of one campaign who played such a critical role in electing the president was forced to step down over its alleged ties to Russia and its associates. Since the election, we've seen the President's National Security Advisor resign and his attorney general refuse himself over previously undisclosed context with the Russian government.

And of course the other body on March 20th, the Director of the FBI publicly acknowledged that the bureau is "investigating the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russian efforts." I want to make it clear at least for me disinformation is not about whether you have a 'D' or an 'R' next to your name, it is not about re-litigating last fall's election, it is about clearly understanding and responding to this very real threat. It's also, I believe, about holding Russia accountable for this unprecedented attack on our democracy. And it is about arming ourselves so we can identify and stop it when it happens again and trust me, it will happen again if we don't take action.

I would hope that the president is as anxious as we are to get to the bottom of what happened, but I have to say editorially that the president's recent conduct with his wild and un-collaborated accusations about wiretapping and his inappropriate non-justified attacks on America's hardworking intelligence professionals does give

me grave concern. This committee has a heavy weight of responsibility to prove that we can continue to put our political labels aside to get us to the truth. I believe we can get there. I've seen firsthand and I say this to our audience how serious members on both side of this dais have worked on this sensitive and critical issue.

Mr. Chairman and I have said repeatedly, this investigation will follow the facts where they lead us. Butno time do I believe we're not going to be able to get those facts and we're working together very cooperatively to make sure we get the facts that we need from the intelligence community, we will get that done. Mr. Chairman, again, I thank you for your commitment to this serious work and your commitment to keeping bipartisan cooperation at least if not all across the Hill alive in this committee. Thank you very much.

BURR: I thank the Vice Chairman. Members should note that they will be recognized by seniority for five-minute questions. We'll go as expeditiously as we can. Let me introduce our witnesses today if I may,and then we will hear from those witnesses. Dr. Roy Godson, Emeritus Professor of Government, Georgetown University. Dr. Godson has specialized in security studies and international relations at Georgetown University for more than four decades. Thank you for that. As a scholar he helped pioneer intelligence studies in American higher education editing the seven volume series intelligence requirements for the 1980s, 1990s and co-founding the Consortium for Study of Intelligence. He's directed, managed and published with other scholars and practitioners innovative studies on adapting American security paradigm,intelligence dominance consistent with the rule of law practices, and strategies for preventing and countering global organized crime. Dr. Godson has served as a consultant to the United States Security Council, the President's Foreign Intelligence Advisory Board and related agencies of the U.S. government. Thank you for your service and thank you for being here.

Dr. Rumer is a Senior Fellow and Director of Russian and Eurasian Programs to Carnegie Endowment for International Peace. Prior to joining Carnegie, Dr. Rumer served as the National Intelligence Officer for Russia and Eurasia at the U.S. National Intelligence Council from 2010 to 2014. Earlier, he held research appointments at

the National Defense University, the International Institute for Strategic Studies and the RAND Corporation. He has served on the National Security Council staff and at the State Department, taught at Georgetown University and George Washington University and published widely. Welcome, Dr. Rumer.

Clint Watts, Clint Watts is a Robert Fox Fellow for the Foreign Policy Research Institute and a Senior Fellow at the Center for Cyber and Homeland Security at George Washington University. Clint is a consultant and researcher, modeling and forecasting threat actor behavior and developing countermeasures for disrupting and defeating state and non-state actors. As a consultant, Clint designs and implements customized training and research programs for the military, intelligence, law enforcement organizations at the federal, state and local levels. Clint serviced as a United States Army infantry officer, an FBI agent on a Joint Terrorism Taskforce, as the Executive Officer of the Combating Terrorism Center at West Point and as a consultant to the FBI's Counter Terrorism Division and National Security Branch. Clint, welcome and thank you for your service.

With that, I will recognize our witnesses from my left to right and Dr. Godson, you are recognized.

GODSON: Thank you, Mr. Chairman and Vice Chairman and members of the committee for inviting me to this hearing. I'd like to begin with just a minute or two on the long history of Soviet Active Measures and then talk a little bit about some of the major advantages that the Soviets have and the Russians have reaped from their history of using this instrument. Finally I'd like to come to what we have done in the past to reduce the effectiveness of Soviet behavior and what we might want to consider for the future.

I think if one looks at the history of the last hundred years you're going to find that Russians and the Soviet predecessors had believed that Active Measures is a major tool for their advancement. They actually believe, whatever we think about it, that this gives them the possibility of achieving influence well beyond their economic and social status and conditions in their country. I think when you look at what they say now, what they do now and with the way they act

and practice and talk about their Active Measures, they take this subject very seriously. Sometimes we in the United States have been aware of this, but for many, many decades we did not take this subject seriously and they were able to take enormous advantage.

I think today that they basically believe they can use these techniques rather similarly to many of the ways they did this in the past. I do think that they are repeating many of the same practices that they did in the past. Yes, there may be some new techniques that are being used now, in fact there are, and some of my colleagues on the panel and this afternoon are more expert on those techniques, particularly the use of the Internet and particularly cyber space.

Well we can sort of more or less be rest assured that the Soviets will be looking at other techniques and will be seeking to adapt and make their Active Measures much more productive for them in the future. Yes, the activities in the United States that you're particularly interested in do seem to be exceptional. We don't have very many other examples of where they interfered with election machinery, electoral apparatuses. What we do have are many, many examples of where the Soviets working together were able, with their allies abroad, their agents of influence abroad, to actually effect the elections in many, many countries in the 20th and early 21st century.

The Soviets and their Russian successors took the view and take the view that they are able to hit above their weight. They can fight above their weight if they use Active Measures. They don't want to go to war, neither of us wants to go to war, but they take the view that they can actually achieve a lot of what they want to do through their Active Measures, and that is the combination of overt and covert techniques and resources. Overt and covert combined together, in one pattern and that they have the authority and the responsibility as leaders of the country to be able to do that. And they put this into practice.

In the '20s and '30s they created an enormous apparatus in the world. Russia was a poor, weak country and yet Russia in the '20s and

'30s set up whole organizations overt and covert throughout the world that were able to challenge one of the major powers of Europe and the United States. We may not have realized that these organizations were being set up, but they were considerable and it took a lot of effort and skill on their part to do this.

In the war of -- Second World War, they used this apparatus to be able to influence the politics of Europe after the war. Yes, they also used it during the war to help them and sometimes us in fighting the Nazis and the Italian Fascists, but in this sort of -- in a major way, they were also preparing for being able to influence the outcome of the struggle for the balance of power in Europe during World War II. So while they were an ally, they were also planning to undermine democratic and liberal parties including in the United States at that time.

In fact, they were able to take advantage of the fact that we were friendly and that we were working together, that Uncle Joe was a friend of the United States at that time they thought, and they were able to use that very successfully. And so as a result they were nearly able to take over the balance of power in Western Europe. It was a closely run contest. And of course we're all glad that they lost, but it was a very closely run conflict and we did emerge successfully from it.

In the 1980s they were on another roll. They used their apparatus which was built up in the 19 -- let's say '20s and '30s, to '40s, '50s and '60s to be able to achieve a great deal in the late '70s and '80s. They nearly were able to split Europe, split NATO in Europe in the 1980s. They started that in the last years of the Carter Administration and continued it into the Reagan years. And fortunately we noticed this in time and a rearmament of NATO went ahead and it wasn't because the Soviets wanted it, but because we were able to outmaneuver them.

The '90s were sort of chaotic there and so it was their Active Measures apparatus wasn't very effective and it didn't have the kind of leadership that it had had before, and the kind of leadership that

has gained since Vladimir Putin came to power. It's maybe a little bit too soon to do an assessment of their effectiveness. So far as was pointed out earlier by the Chairman and the Vice Chairman, we do think that they were effective in an important way to us and we understand that the committee is going to be looking into this and studying this.

But in any event, they have this apparatus, they have modernized it. They were spending billions of dollars a year before. They have maybe 10,000 to 15,000 people in this apparatus, at least worldwide in addition to the trolls and other kinds of cyber capabilities they have. But Soviets are not --

BURR: Dr. Godson, I'm going to interrupt you for just a second just to make members aware that the second vote has started and it's out intent to work through the second vote. So I'd ask members as they feel comfortable to leave for the vote, come right back if you will. As soon as we get through panel, we'll start questions. And Dr. Godson, I'd just ask you to summarize as quickly as you can because we want --

(UNKNOWN): Mr. Chairman, (inaudible).

BURR: Oh, five-minute recognitions.

GODSON: Well, they're not 10 feet tall. They have used their capabilities effectively, but they don't always win out. United States for the first time responded in a major way to them in the late 1940s through the 1960s. We did in fact cauterize their Active Measures apparatus and they were not able to successfully use this in Western Europe and other parts of the world. We did some things pretty well from the '40s to the '60s. Unfortunately in the '60s there was, the coalition between liberals and conservatives, the consensus between the Congress and the Administration started to fall apart and then with the criticisms that the intelligence community had to take in that time, our countermeasures started to fall apart and we were sort of disarming ourselves if I can say that.

And so from the '60s through the late 1970s, we did not have a very effective counteractive measures capability and the Russians of course took advantage of that in numerous places in the world. In the '80s though that changed, late '70s and '80s it changed and we did start to do things well again. I'll just summarize the fact that we started to develop a strategic approach to countermeasures. It wasn't a bit here and a bit there and so on. It was actually a strategic approach with warning and anticipation of Active Measures. We actually would study them so well that we were able to often anticipate what they were going to do with Active Measures, and so therefore we could then use other measures to limit them and avoid the effectiveness of these Active Measures.

We also started to support liberal elements abroad that we thought would be helpful to us in preventing Soviet Active Measures from furthering Soviet objectives in those societies. So we were fairly successful in the '80s in doing this, and in both using overt and covert methods to do this.

As in other sort of victories that we've had after World War I or after World War II, after the Cold War we thought that this wasn't such an important thing to be doing anymore. And so our activities waned. They didn't stop, but they waned. We had some units that remained in the government that were concerned with this, but on the whole the government actually disarmed itself.

And so although there were some in the government and outside the government who warned about the Soviet use of Active Measures, and I do know when looking over the website of your committee that some of the people in this room actually went to the government and asked the government to be more mindful of Soviet Active Measures starting in 2016 and presumably that we should be mindful of it afterwards. Unfortunately the government did not take the warnings as seriously as it could have and made this known to the public in a useful fashion so we would not be so surprised when this took place in the or it appears to have taken place in 2016.

But the Soviets could not have done this and the Russians could

not have done this without having an Active Measures apparatus. It's visible. One can find it. You can't find everything about it, but we have historically from what we know that we can find it, we could anticipate it and we can take a number of measures. So I hope you will have time to consider maybe in the questioning some of the measures we could now take to do that. Thank you.

BURR: Thank you, Dr. Godson. Dr. Rumer.

RUMER: Chairman Burr, Vice Chairman Warner, distinguished members of the committee, I'm honored to be here today. Russian Active Measures and interference in our presidential campaign is one of the most contentious issues in our national conversation. I believe that Russian intelligence services and their proxies intervened in our election in 2016.

I have not seen the classified evidence behind the Intelligence Community Assessment published a few weeks ago. Some have criticized it for not sharing the evidence of Russian intrusions. They miss the mark. It is the totality of Russian efforts in plain sight to mislead, to misinform, to exaggerate that is more convincing than any cyber evidence. RT, Russian Today broadcasts,Internet trolls, fake news and so on are an integral part of Russian foreign policy to date. We need to put this in the context of the quarter century since the end of the Cold War.

World War II in Europe or the Great Patriotic War, as Russians call it, is integral to the formative experience of every living Russian. The country's national narrative is impossible without it. In 1941, Hitler's armies were stopped just outside the gates of Moscow, in 1945, Stalin's armies entered Berlin. That was Russia's greatest generation. Generations of Russians since then have been taught that their country was at its most secure then because it was protected by a buffer, the Warsaw Pact and the Soviet empire. In 1991, Russians lost that buffer, the legacy of their greatest generation.

With their country falling apart, Russian leaders had no choice

but to accept this loss for as long as Russia would remain weak. The '90s were a terrible decade for Russia, but a great decade for the West. For Russian leaders and many regular Russians, the dominance of the West came at the expense of Russia's loss in the Cold War. But Russia would not remain weak indefinitely. Its economic recovery led to a return to a much more assertive posture, aggressive posture some would say, on the world stage.

We saw it in the crushing of Georgia in 2008, in the annexation of Crimea in 2014 and we see it to the present day in the ongoing war in eastern Ukraine. For the West, Russia's return to the world stage has been nothing more than pure revanchism where Russia is restoring some balance in the relationship with the West.

The narrative of restoring the balance, correcting the injustice and the distortions of the 1990s has been the essential -- has been absolutely essential to Russian propaganda since the beginning of the Putin era. Those Russians would disagree are branded as foreign agents and enemies of the people. But Russia's capabilities should not be overestimated. Its GDP is about $1.3 trillion versus U.S. GDP of over $18 trillion. Russian defense spending is estimated at about $65 billion, that's a little more than President Trump's proposed increase in U.S. defense spending for FY 2018.

The Russian military is undeniably stronger than its smaller and weaker neighbors yet the balance does not favor Russia when compared to NATO. A NATO-Russia war would be an act of mutual suicide and the Kremlin is not ready for it. Russian leaders have embraced a different toolkit, information warfare, intimidation, espionage, economic tools and so on. This toolkit it meant to make up for Russia's conventional shortcoming vis-a-vis the West. The Kremlin has a number of advantages here, the circle of deciders is limited to a handful of Putin associates with similar worldviews. They have considerable resources at their disposal especially since most of their tools are quite cheap. A handful of cyber criminals costs a lot less than an army brigade but can do a lot of damage.

The Russian meddling in our presidential election most likely is

viewed by the Kremlin as an unqualified success. The payoffs include but are not limited to, one, a major distraction to the United States, for the United States, damage to U.S. leadership in the world and perhaps most importantly, the demonstration effect. If the Kremlin can do this to the world's sole remaining global super power imagine how other countries see it. The differences between Russia and the United States are profound and will not be resolved soon. This is not a crisis, not something that will pass soon. It is the new normal. We will see Russia relying on this toolkit in the months and years to come, in the upcoming elections in France and in Germany this year and in our own future political campaigns. Deception and Active Measures have long been and will remain a staple of Russia dealings with the outside world for the foreseeable future. Thank you.

BURR: Dr. Rumer, thank you. Mr. Watts?

WATTS: Mr. Chairman, members of the committee, thank you for inviting me here today. In April 2014, Andrew Weisburd, J.M. Berger and I noticed a petition in the Whitehouse.gov website. Alaska back to Russia appeared as a public campaign to give America's largest state back to the nation from which it was purchased. Satirical or nonsensical petitions appearing on the White House website are not out of the norm, but this petition was different, having gained more than 39,000 online signatures in a short period. Our examination of those sign-in posts in this petition revealed an odd pattern. The accounts varied considerably from other petitions and appeared to be the work of bots.

A closer look of those bots tied in closely with other social media campaigns we had observed pushing Russian propaganda months before. Hackers proliferated the networks and could be spotted amongst recent data breaches and website defacements. Closely circling those hackers were honeypot accounts, attractive looking women, political partisans that were trying to social engineer other users. Above all we observed hecklers, those synchronized trolling accounts you see on Twitter that would attack political targets using similar talking patterns and points. Those accounts, some of which overtly support the Kremlin, promoted Russian foreign policy positions

targeting key English-speaking audiences throughout Europe and North America.

Soviet Active Measures strategy and tactics have been reborn and updated for the modern Russian regime in the digital age. Today, Russia hopes to win the second Cold War through the force of politics as opposed to the politics of force. While Russia certainly seeks to promote western candidates sympathetic to their world view and foreign policy objectives, winning a single election is not their end goal. Russian Active Measures hope to topple democracies through the pursuit of five complimentary objectives.

One, undermine citizen confidence in democratic governance, two, foment and exacerbate divisive political fissures, three a road trust between citizens and elect officials in their institutions, four, popularize Russian policy agendas within foreign populations and five, create general distrust or confusion over information sources by blurring the lines between fact and fiction, a very pertinent issue today in our country. From these objectives, the Kremlin can crumble democracies from the inside out achieving two key milestones.One, the dissolution of the Europe Union and two, the break-up of NATO, achieving these two victories against the West will allow Russia to reassert its power globally and pursue its foreign policy objectives bilaterally through military, diplomatic and economic aggression.

In late 2014 and throughout 2015 we watched Active Measures on nearly any disaffected U.S. audience whether it be claims of the U.S. military declaring martial law during the Jade Helm exercise, chaos amongst the Black Lives Matters protests or the standoff at the Bundy Ranch, Russia's state sponsored outlets of RT and Sputnik News characterized as white outlets churned out and manipulated through its false news stories and conspiracies. They generally lined up under four themes.

One, political messages designed to tarnish democratic leaders and institutions, two, financial propaganda, created to weaken confidence in financial markets and capitalist economies, three, social unrest crafted to amplify divisions amongst democratic populaces and four, global calamity pushed inside fear of global

demise such as nuclear war or catastrophic climate change.

From this overt Russian propaganda outlets, a wide range of English speaking conspiratorial websites which we refer to as gray outlets, some of which mysteriously operate from Eastern Europe and are curiously led by pro-Russian editors of unknown financing sensationalize these conspiracies and fake news published by white outlets.

American-looking social media accounts, the hecklers, honeypots and hackers I described earlier are working along automated -- aside automated bots further amplify this Russian propaganda amongst unwitting westerners. Through the end of 2015 and start of 2016, the Russian influence system began pushing themes and messages seeking to influence the outcome of the U.S. presidential election. Russian's overt media outlets and covert trolls sought to sideline opponents on both sides of the political spectrum with adversarial views towards the Kremlin. They were in full swing during both the Republican and Democratic primary season that may have helped sink the hopes of candidates more hostile to Russian interests long before the field narrowed. Senator Rubio, in my opinion, you anecdotally suffered from these efforts.

The final piece of Russia's modern Active Measuressurfaced in the summer of 2016 as hacked materials were strategically leaked. The disclosures of WikiLeaks, Guccifer 2.0 and DC Leaks demonstrated how hacks would power the influence system Russia had built so successfully in the previous two years.

As an example, on the evening of 30th July 2016, my colleagues and I watched as RT and SputnikNews simultaneously launched false stories of the U.S. air base in Incirlik, Turkey being overrun by terrorists. Within minutes, pro-Russian social media aggregators and automated bots amplified this false news story. More than 4,000 tweets in the first 78 minutes after launching this false story, going back to the Active Measures accounts we've tracked in the previous two years.

These previously identified accounts almost simultaneously appearing from different geographic locations and communities amplified the fake news story in unison. The hashtags pushed by these accounts were nuclear, media, Trump, Benghazi. The most common words found in English-speaking Twitter user profiles were God, military, Trump, family, country, conservative, Christian, America and constitution.

These accounts and their messages clearly sought to convince Americans a U.S. military base has been overrun in a terrorist attack. In reality, a small protest gathered outside a gate and the increased security at the airbase sought to secure the arrival of the Chairman of the Joint Chiefs.

Many of the accounts we watched push the false Incirlik story today focus on the elections in Europe, promoting fears of immigration or false claims of refugee criminality.They've not forgotten about the U.S. either. This past week, we observed social media accounts discrediting Speaker of the House Paul Ryan hoping to further foment unrest inside U.S.democratic institutions.

The implications of Russia's new Active Measures model will be twofold. The first is what the world is witnessing today, a Russian challenge to democracies throughout the West. But more importantly over the horizon, Russia has provided any authoritarian dictator or predatory elite equipped with hackers and disrespectful of civil liberties a playbook to dismantle their enemies through information warfare.

The U.S., in failing to respond to Active Measures, will surrender its position in the world's -- as the world's leader, forgo its role as chief promoter and defender of democracy and give up on over 70 years of collective action to preserve freedom and civil liberties around the world.

Russia's strategic motto for America and the West is "divided they stand and divided they will fall." It's time the United States reminds the world that despite our day-to-day policy debates and

political squabbles, we stand united alongside our allies in defending our democratic system of government from the meddling of power-hungry tyrants and repressive authoritarians that prey on their people and suppress humanity.

I'll close here with my opening remarks, but I have many recommendations which are in my written testimony. Mr. Chairman, I ask that my full written statement which includes these recommendations be submitted to the record and I hope that during the question-and-answer session we can further discuss how we might counter these Active Measures. Thank you for inviting me.

BURR: Mr. Watts, thank you for your testimony, and all written testimony will be included as part of the record.

The Chair and Vice-Chairman are going to exit and vote. I'm going to recognize Senator Risch for his questions and in our absence he'll allow back and forth based upon seniority.

Senator Risch?

RISCH: Thank you, Mr. Chairman.

Gentlemen, it always impresses me the fact that when we hear people talking about Russian policy and what they want, first of all, how uniform it is. Everybody seems to agree on where they're going, what they do and what they're doing to get there. But after processing that over a long period of time, one's got to come to the thought process of what happens in a post-Putin Russia, because everyone's got a shelf life and his has -- his has been extended it looks to me well beyond what normally would happen under these circumstances. So give me your thoughts briefly each of you, if you would, as to what happens. Do they stay on the same track they're on or do they come to the realization that there's bigger and better things in life to pursue than what they're doing right now?

Mr. Godson?

GODSON: Thank you for the question. There's, as you know, a lot of variables here at work, one would be what we or how we respond to Putin and the behavior of the apparatus that they have, do we let them continue to do this or do we start to develop some sort of a strategic response to that? That would be one of the variables.

Do they find that they can get away with use of Active Measures as they have in the past? And if so, then the elite that has taken power in Russia would be inclined to continue. They found that even when they sometimes have not been as effective as they expected, that Active Measures still is a capability that enables them to use the example of being able to fight above their economic and political capabilities.

So unless there was a dramatic change in the regime, there's little reason to believe that they would cease the Active Measures policy and strategy they have barring that we don't actually cauterize it and limit its effectiveness. If we don't then they'll have an incentive to continue.

RISCH: Dr. Rumer?

RUMER: Thank you, sir. Well, Mr. Putin, I believe, is 62, a man in his prime. He's positioned to run in 2018 again for another six-year term. So I think what we see today is going to be with us for a long time, by the looks of it for the next two presidential terms in his country and so we should base our policy accordingly.

I think it would be incorrect and counterproductive to tar all Russians with the same brush, but there's something there in Russian traditional security perceptions that transcend party lines, that transcend regimes, and Russian perceptions of security don't really change all that much over time. So I think we should be thinking about the drivers of Russian foreign and security policy in terms of continuity rather than radical change. After all, we already saw radical change in 1991 and things in the end didn't really change that much.

And as long as, you know, Russians, Russian elites will see

themselves -- as long as they see themselves as being inferior and struggling against a more advanced and a more powerful Western alliance, they will be relying on all tools in their toolkit, and information warfare will be part -- disinformation will be part of it. We may hope that if someday someone like the corruption fighter Alexei Navalny gets elected and rises to the leadership of the country having been a victim of salacious information, he may be more restrained in it. But I would say that the basic parameters of Russian policy are generally set in place.

RISCH: Thank you, Doctor. I've only got a short time left. I want to hear from Mr. Watts.

WATTS: Yes. Regarding Mr. Putin, I would -- I would look to these two gentlemen primarily. But my thoughts are, one, he's not going away anytime soon. Two, he will definitely shape some sort of a successor in his place to continue on with that he's doing right now.

I think the third big thing that we can't discount is the connection with criminality. There is -- between these elites and their sort of predatory capitalist practices, what we see in cyberspace with cybercrime and how they've used hackers very, very well as part of their Active Measures, we can't discount that we'll see a predatory elite emerge that will be something we have to deal with.

And I think the fourth thing which goes to the first point is I'm not sure what our policy or stance is with regards to Russia at this point in the United States. I think that's the number one thing we have to figure out, because that will shape how they interface with us. Having watched the end of the Soviet Union as a cadet at West Point and then fast-forwarding to today, I'm a little bit lost as to what our U.S. interests are or how they're coalescing. I know what I would recommend, but I think that will have a major impact on how we will be able to interface and maybe I see opportunity in Putin's departure.

RISCH: Thank you, Mr. Watts.

Senator Feinstein?

FEINSTEIN: Oh, thank you, Senator Risch.

Gentlemen, thank you very much for being here and thank you for your testimony. I'm sorry I was out to vote while I missed some of it. But I've been on this committee for 16 years and the intelligence community report which is the report of all of our major intelligence agencies which was released on January the sixth is among the strongest I've read. It covers the motivation and the scope of Russia's actions regarding our elections as well as the cyber tools and the media campaigns they use to influence public opinion.

The report makes a key judgment and here it is. Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the United States presidential election, the consistent goals of which were to undermine public faith in the United States democratic process, denigrate Secretary Clinton, and harm her electability and potential presidency. It further assesses that, and these are quotes,"Putin and the Russian Government developed a clear preference for President-elect Trump."

Here's two questions. Do you believe the Intelligence Community Assessment accurately characterized the goals of Russian influence activities in the election? And I'd like to go down the line with a Yes or No answer. If you want to explain it, that would be fine. Who would like to go first?

GODSON: Well, thank you for a difficult question. The -- I personally don't sort of find myself at odds with the ICA study that you identified. However, the statement that this was developed in 2016 needs to be parsed a bit. The Russians could not do this if they started in 2016. They wouldn't have had the capability, in the Active Measures world, one can want to do many things. But one has to have the means to do this as well.

FEINSTEIN: When would you estimate it was started by your

statement?

GODSON: Well, it's not that I have a specific date, but that one needs to have an infrastructure abroad to be able to do this. Now, you can use some of the infrastructure in your own country especially with cyber capabilities.

FEINSTEIN: Which they had.

GODSON: Which they had. But Active Measures usually involves people as well as machines and it would be extraordinary if they hadn't prepared a lot of the ground to be able to do this not only in the United States but in other countries as well. They have this apparatus and this apparatus is well-staffed, well-trained. The training of the people who work in this apparatus is quite surprising to us. It's -- we've known about it, but we don't really take it very seriously. It's not three months or six months training or a year's training. They have much longer training periods and they are -- some of them are pretty good, not 10 feet tall, of course, but pretty good.

FEINSTEIN: OK. I got the point.

Next person?

WATTS: Yes.

FEINSTEIN: Thank you. Appreciate it.

WATTS: Yes, and I can give you the timeline of their development if you would like it.

FEINSTEIN: Please.

WATTS: We have the accounts dating back to 2009 that are tied to Active Measures. 2014 was their capability development based on my assessment where they started working on their influence campaigns. 2015 was when they tied hacking and influence together for the first item, specifically during the DNC breaches. I was notified in

November of 2015 that I had been targeted by a cyber attack. 2016 was the push into the U.S. audience landscape to build audience. August 2016 was when I witnessed them pushing towards the election and that was in full or August of 2015 all the way through 2016 so one year buildup to the election.

FEINSTEIN: Thank you.

Has Russia ever -- I think I know the answer to this, but if you will elaborate on it -- conducted other similar campaigns in other countries to this level of impact with the goal of tilting the playing field to increase one candidate's chance of winning?

Mr. Watts, if you could go first?

WATTS: Yes. I believe you need to look back to 2014 in both Ukraine and another Eastern European country that's escaping me. In 2015, '16 the Brexit campaign should be examined. I can't prove it one way or another. And then today all of the European elections that they're choosing to meddle in, France, Germany, Netherlands, Czech Republic.

FEINSTEIN: Thank you.

Would you like to respond?

RUMER: Yes. They have conducted such campaigns in Ukraine in 2004 and 2014, in Georgia. They've intervened heavily in domestic political campaigns in the Baltic States. So there are ample of examples of that.

FEINSTEIN: Thank you.

Would you please respond, Doctor?

GODSON: Yes, they have a history of doing this well before this and they find it a successful use of their resources so it does not surprise me.

RISCH: Thank you, Doctor.

Thank you, Senator Feinstein.

FEINSTEIN: Thank you.

RISCH: Senator Rubio?

RUBIO: Thank you.

Thank you, all, for being here. I'm concerned that in our inquiry and I certainly think it's important for us to know what happened, we are focusing so much on the tactics, that we're not focusing on the broader strategy that's at play here. I want to briefly go through a number of instances and have the panel comment on whether or not they believe these are indicative of the efforts that are being targeted against the United States and the rest of the world by Vladimir Putin.

We all know that Angela Merkel has taken a tough line on Ukraine against Russia. We know that there's a lot of controversy in Germany around migrants. In early 2016, a 13-year old knows only as Lisa F., a dual Russian-German citizen whose family had moved to Germany from Russia in 2004 told police she had been kidnapped in East Berlin by what appeared to be Middle Eastern migrants and raped for over 30 hours. There was outrage in Germany and obviously protests against Merkel.

The Russian Foreign Minister almost immediately jumped on the story talking about the need to defend "our Lisa," quote, unquote. And, of course, this story was spread far and wide by Russian-speaking entities and Russian media outlets.

Subsequently, the prosecutors in Berlin announced that they had clear evidence that during those 30 hours she was missing, Lisa F. was actually, in fact, with people that she knew and a medical examination showed that she had not been the victim of a rape.

Earlier this year, a little known news outlet published on a website an article that claim that the United States was deploying 3,600 tanks to Eastern Europe to prepare for war with Russia. 3,600 tanks would represent about 40 percent of our entire tank force. Within days, the story was republished by dozens of outlets in the United States and throughout Europe. As it turns out, the truth is we deployed 87 tanks.

There is -- in going all the way back to September 11th of 2015, residents in Louisiana woke to a message, many of them did, on a Twitter - on a Twitter feed that said toxic fume hazard warning in this area until 1:30 P.M., take shelter, check local media and columbiachemical.com.

On Twitter accounts, there were hundreds of accounts documenting a disaster right down the road from the people. One account said a powerful explosion heard from miles away happened at a chemical plant in Centerville, Louisiana, a man named Jon Merritt tweeted. @annerosela (ph) shared an image of flames engulfing the plant. @ksarah12 (ph) posted a video of surveillance footage from a local gas station capturing the explosion. Another Twitter account posted a screenshot of CNN's homepage showing the story had already made national news claiming that ISIS had claimed credit for the attack according to one YouTube video.

A woman named @zopoc09 Anna McLaren is her name I guess tweeted to Karl Rove, "Karl, is this really ISIS responsible for the #columbianchemicals? Tell Obama we should bomb Iraq."

Had anyone have taken the trouble to check CNN as this article in the New York Times outlines there was no such attack. It was a hoax. Not some simple prank as the article goes on to say, but a highly coordinated disinformation campaign involving dozens of fake accounts that posted hundreds of tweets for hours targeting a list of figures precisely chosen to generate maximum attention.

The perpetrators didn't just doctor screenshots from CNN and I'm

reading from the New York Times article, they also created functional clones of the websites of the Louisiana TV stations and the like. The list goes on and on. We should fully document it in our report to the American people of false stories spreading claiming that Germany's oldest church had been burnt down by a thousand Muslims chanting Allahu Akbar. Another story claiming that the European Union was planning to ban snowmen as racist. All of this and on and on and we should begin to document them for the American people.

Isn't this the larger problem? Let me just rephrase that.
Aren't we in the midst of a blitzkrieg, for lack of a better term, of informational warfare conducted by Russian trolls under the command of Vladimir Putin designed to sow instability, pit us against each other as Americans? In the same article -- I don't have enough time -- it goes on that they posted false stories about a police shooting in Atlanta that never happened, about a series of things. In essence, are we in danger here because we are focused on a very important tactical move that happened in the election 2016 to miss a broader point, and that is that this is a coordinated effort across multiple spectrums to sow instability and to pit Americans against one another politically, socioeconomically, demographically and the like?

WATTS: So I think the two lines of effort you brought up there that the Russians use are social dynamics that they play on, ethnic divisions and global calamity or inciting fear. These two lines haven't been discussed much. The third one is financial. They oftentimes put out fake stories about U.S. companies which then cause stock dips which allow all sorts of predatory trading and other things to happen.

What's -- we focused on disinformation around the political scene, but misinformation across the board particularly from the Russia propaganda networks has incited fear inside the United States on multiple occasions as you noted.

One last year was there was a JFK terminal shutdown about alleged gunshots. We watched social media trolls and gray outlets pumped fake stories out which ramped up that fear which caused mass panic. So

they have created the ability by gaining audience in the United States to steer Americans unwittingly in many different directions that could cause all sorts of danger and even violence in certain cases.

I think that Pizzagate scandal that we saw last fall is another such example of misinformation, maybe not attributed to Russia, but we have a problem writ large right now with our information sources.

RISCH: Senator Rubio, do you--

GODSON: No. I think you hit the nail on the head and I don't really have a lot to add to it. We are faced with a strategic attack. It's not a kinetic attack usually. It's a political attack. And then the question comes what sort of strategic response are we going to be able to develop to that? If we could elaborate on that.

RISCH: Senator Warner?

WARNER: Again, thank all the witnesses for their testimony.

Dr. Rumer, I want to start with you. We've heard a lot recently about the role of Oleg Deripaska, the head of Russia's largest aluminum company and the role he may have played in helping to support the goals of President Putin. Can you characterize Mr. Deripaska's role in this area? And the more broadly, are there any of the oligarchs in Russia, at least those not in exile, that aren't somehow caught up in the Kremlin's foreign policy activities? Or are there any of them that are truly independent?

RUMER: Thank you, Senator Warner. I can't add anything to the conversation about Mr. Deripaska beyond what's appeared in public domain. So I don't think I have any special insights here and, you know, I feed off the same reporting that's appeared in the papers.

I would be careful to describe all Russian oligarchs and oligarch itself is a fairly ill-defined term. There's a sort of handful of some of most prominent ones but it's a much bigger class of major Russian businessmen.

I would be reluctant to describe them all as, you know, tools of the Kremlin. Obviously, Russian businessmen who do business in Russia have to be mindful of Kremlin political preferences and the Kremlin has considerable influence over them. But I don't have -- I can't speak from concrete information about them being, you know, directly instruments of the Kremlin foreign policy. That's not something that I have evidence to back up. So I think I'll stop at that.

WARNER: OK.

Mr. Watts, one of the things that your testimony had been talking a lot about, the use of the Internet trolls and their ability to then exponentially gain more power through creating these botnets. I'd love for you to kind of comment about what we can do to preclude that on a going-forward basis and perhaps you can explain this technique better than I have in my various public statements.

WATTS: Sure. The first thing that I think we need to understand is it's not all automated and it's not all human. There's a combination of the two. So you have a series of humans at work in their psychological warfare groups that command both bots at the same time. And I'd like to -- it's an analogy. You can look at it like artillery. So you have someone who's engaging with you as individual and at the same time they can launch a bot to amplify that story forward. When we...

WARNER: Obviously, the bot, for those, it's an ability for a computer to take over other computers that are not being used and, in fact, magnify the number of hits they might hit to a particular social media site, correct?

WATTS: Exactly or you can create more personas in Twitter, for example, which makes it look like there are more people than there really are. It's a Potemkin village strategy essentially that amplifies your appearance. So what they do is they launch those simultaneously as they begin the engagement or push of false new stories usually from RT and Sputnik news. They do that in unison which games the social media systems such that such a high volume of

content being pushed at the same time raises that into the trends that you'll see if you look at Facebook or Twitter or whatever it might be. You'd see the top 10 stories that are out right now. It pushes that up there. As soon as it pushes that into that top 10 feed, mainstream media outlets then are watching that and they start to examine that content.

So, for example, the Incirlik attack I talked about, one of the key hashtags they pushed is media. The goal is to get that into the top of Twitter stream so that mainstream media has to respond to that story. When mainstream media responds to it or just looks at it without even commenting on it, it takes over organically and you'll see it move around the Internet like a virus.

WARNER: One thing and I'm going to spend a lot of time on this this afternoon, there have been reports that their ability to target this information, some reports at least saying that in the last week of the campaign in certain precincts in Wisconsin and Michigan and Pennsylvania there was so much misinformation coming talking about Hillary Clinton's illnesses or Hillary Clinton stealing money from the State Department or other. It completely blanked out any of the back and forth that was actually going on in the campaign.

One of the things that seems curious is would the Russians on their own have that level of sophisticated knowledge about the American political system, if they didn't at least get some advice from someone in America?

WATTS: Yes. I know this from working on influence campaigns in the counterterrorism context. If you do appropriate target audience analysis on social media, you can actually identify an audience in a foreign country or in the United States, parse out all of their preferences. Part of the reason those bios had conservative Christian, you know, America, all those terms in it is those are the most common ones. If you inhale all the accounts of people in Wisconsin, you identify the most common terms in it, you just recreate accounts that look exactly like people from Wisconsin.

So that way whenever you're trying to socially engineer them and convince them that the information is true it's much more simple because you see somebody and they look exactly like you even down to the pictures. When you look at the pictures, it looks like an American from the Midwest or the South or Wisconsin or whatever the location is. And they will change those, they can reprogram them.

Where they tend to show their hand is the problem is once they build an audience, they don't want to get rid of it. So you'll see them build an audience and try to influence one segment, let's say, of the English-speaking media and then they will reprogram it to try and influence a different story. It's the same problem any cable news outlet will have. Once you build an audience and you've changed your content to some other topics, you still want to keep your old audience or otherwise you can't gain any traction.

WARNER: And, again, my time is up, but I just want to know this can be used -- it was used in 2016 towards one candidate but obviously Russia's interests are Russia's interests.

WATTS: Well, it's used right now against people on both sides of the aisle. So we'll watch them play both sides. They might go after a Republican person in this room tomorrow and then they'll switch. It's solely based on what they want to achieve in their own landscape, whatever the Russian foreign policy objectives are.

So if they want to achieve one candidate, but let's say President Trump, for example, wins and now turns against, they will turn on President Trump as well. They'll play -- they win because they play both sides and the audience will go with them once they have them.

BURR: I do know that the Vice Chairman hates Russia just to make that public.

Senator Collins?

COLLINS: Thank you, Mr. Chairman.

Dr. Godson, you make the point that the Russians don't always win with their Active Measures and you mentioned the period of the 1940s and the 1950s. In your judgment, how successful have the Russians been in the last year in achieving their goal of sowing doubt, polarization, trying to disrupt and cast out on the validity of the election, putting aside the issue for the moment of the critical question of whether there was any collusion between any campaign and the Russian efforts?

GODSON: Well, from the information that we have in the public sector and the private sector, I would say that they must be rather pleased with the results of their investment, whatever date they started to develop this campaign.

I think though, however, they -- and the fact is that they are seeming to prepare to do the same thing in other campaigns abroad. And so looking at the way they've behaved over the long course of time that they've used Active Measures, I think they will continue to do this and to reap some benefits from it unless there is a considerable response from the democratic societies. And at the moment, I would say that our response is too restrained and that unless they see that there is a cost to this that makes this not a very attractive thing to do, I don't see why they won't continue it. I hope that's responsive.

COLLINS: Thank you.

Dr. Rumer, Mr. Watts made a point that the Russians will go after either side, that they're trying to disrupt society, cast out our western democracies. And one largely overlooked part of the intelligence committee or the intelligence community's report last fall was information in the annex that suggested that Russia Today, which most people view as an organ of the Russian government, was instrumental in trying to advance the protest of Occupy Wall Street. Could you comment on that and is that an example of Russia working to promote the far left versus the far right that we hear so much about?

RUMER: Yes, ma'am. It's a perfect example in that Occupy Wall Street was a genuine movement on the left. But it certainly serves

the interest of Russian propaganda to play it up as a major challenge, as something representing a major fault line in our society because, you know, it drives the message that the United States is in decline, the United States is in crisis, plays up to audiences at home in Russia and abroad that the United States is not the perfect society, something that they further like to emphasize. So that's an excellent example and I think it deserves the attention that you -- or the spotlight that you cast on it.

Mr. Watts referred to the minor protest outside our base in Incirlik in Turkey. Well, there's another example that there was a protest, but again it's blown out of all proportions. And as you know, you know, the best propaganda is that which has a grain of truth to it that then gets played up and up and up.

COLLINS: Thank you, Mr. Chairman.

BURR: Senator Wyden?

WYDEN: Thank you, Mr. Chairman. And let me say thank you to our witnesses.

Gentlemen, here's where we are now. The American people are worried about what's ahead with regard to Russia. The public now gets most of its information from leaks, from daily press stories and apparently inaccurate tweets from the president. These feeds distrust and causes Americans to question the legitimacy of our government.

So I believe the committee needs to lift the fog of secrecy about what really happened to our democracy, that's why it's so important we have open hearings of the Intelligence Committee, the FBI, Homeland Security and Treasury. And I believe the key to a successful investigation is following the money.

Yesterday, I wrote a letter to the Chairman and the Vice-Chair urging the committee to look into any and all financial relationships between Russia and Donald Trump and his associates. I'm also taking this issue on as a Ranking Member of the Finance Committee of which

Senator Burr and Senator Warner are also members. I and other members of the Finance committee have already urged that the committee exercise its authority to obtain and review Donald Trump's tax returns. This review ought to include the Trump organization and its partnerships.

Senate investigators should also look into any violations of the Foreign Corrupt Practices Act which ensures that investors are not paying bribes overseas. The Treasury Department's responsible for other program and investigations that may uncover suspicious financial activities by Donald Trump and his associates. It is already a matter of public record that entities associated with Donald Trump have been the subject of millions of dollars of fines for willful, repeated and longstanding violations of anti-money laundering laws.

Information about Donald Trump's finances, his family and his associates may lead to Russia. We know that in 2008 the president's son said that Russians make up a pretty disproportionate cross-section of a lot of our assets. Since then, we've got mostly smoke and mirrors. The committee needs to follow the money wherever it leads because if money laundering, corruption of any kind or fishy real estate deals point to the Russian oligarchs and criminal elements, then the Russian government may only be a step or two away from us.

So now, my question. There is an extraordinary history of money laundering in Russia. Billions of dollars from corruption and other illegal activities have been moved out of the country. What that means is that Russia's corruption problem may also be our corruption problem.

So here's my question for the three of you as experts on Russia. I'd like you three to tell us about corruption in Russia so as to help us follow the money in our investigation. And here's my specific question. I'm going to start with you, Mr. Watts. How can the committee track this fuzzy line between the Russian oligarchs, Russian organized crime and the Russian government?

WATTS: Thanks, Senator. I would first start off with I'm not

the foremost Russian expert. I came to this through the Islamic State and ISIS. I'm really a counterterrorism person for the most part and came to Active Measures mostly because Active Measures came after me.

The second part that I would add to this discussion though is there is a money trail to be searched for and discovered and we've focused very heavily on elites in our public discussion, what are elite people doing. But this influence action has both a virtual component and a physical component that's happened. I would say what I can't see which I would want to know is what is happening in Eastern Europe. There's a disproportionate number of fake news outlets, conspiratorial websites that are run from there that are English-speaking editors, that are pro-Russian, trained in Russia sometimes. How are they funded? That would be one component.

I would -- my guess or my estimate, my hypothesis working in the intelligence field is that there is some sort of Russian intel asset that is funding them in one way or another through some sort of scheme.

The other part that I think we should be looking at is follow the trail of dead Russians. There's been more dead Russians in the past three months that are tied to this investigation who have assets in banks all over the world. They are dropping dead even in Western countries. We've seen arrests in I believe it's Spain in different computer security companies that are based in Russia which provides services to the United States. These are all huge openings to understand how they are funded by the Russian government.

I only have the capability to do that from where I sit, but I think that's a huge angle. If you can prove that part of it, I have to say on the influence side we can see it. The one thing that's been misconstrued in the public discussion about Russian influence is that it's covert. You can hack stuff and be covert, but you can't influence and be covert. You have to ultimately show your hand and that's why we've been able to discover it online.

But the missing part is how did they conduct this influence?

There are newspapers. There are media outlets. The Balkans are littered right now with these sorts of outlets and that's where I would start to dig on the financial space.

WYDEN: I'm almost out of time, Dr. Rumer, same thing, this fuzzy line is what I'm particularly interested in, organized crime, oligarchs in the government. I heard you talk about one person you couldn't comment on him, but just give me the -- your analysis about this fuzzy line because I keep coming back to that.

RUMER: Yes, sir. It is definitely a fuzzy line and I think those relationships are probably best discussed not in an open session because...

WYDEN: You're saying they ought to be discussed?

RUMER: I believe they ought to be discussed.

WYDEN: Good. Fair enough.

RUMER: But I do believe that it is something for our intelligence community to take up rather than for us to in open--

WYDEN: I'm probably unequipped on the head.

BURR: Senator Blunt?

WYDEN: You got -- Mr. Chairman, can Mr. Godson just finish that question?

BURR: Dr. Godson, quickly. Turn your mic on.

GODSON: I'm very pleased that you're having this open session. I think it's very useful, but I do think that this is a sensitive subject and so that...

WYDEN: Fine.
GODSON: ... it will require skill and care on the part of our

society so we don't overreact which in our history we sometimes have to being surprised. And so I do think if there was more time to discuss--

WYDEN: Thank you, Mr. Chairman.

BURR: Senator Blunt.

BLUNT: Dr. Godson, let's just start right there. Why do you think we -- I've got about four questions so they don't need to be exhaustive and I call follow up with more written questions later. Mr. Watts, I'm going to come to you next. Why do you think there was this element of surprise? I mean this is not new. Russian activity in other places in the world, I think Mr. Watts said it had to start before 2016 but it does seem that the intel community, the U.S. government, the media is surprised that they have this level of involvement. You just said we shouldn't have been surprised. Why do you think we were surprised?

GODSON: I do think it has something to do with our culture that we don't expect people to behave in this particular way. We've been surprised many times in our history so I don't think it's...

BLUNT: We expected it to do it everywhere else but not do it here?

GODSON: Well, we just are sort of surprised when somebody takes a concerted effort to be involved in our affairs. We know that sometimes this happens abroad but we don't really sort of think this is a major tool or instrument that people use. So we found ourselves surprised in the '40s and in the '70s, in the '80s, and so on. And so I'm not too surprised we are surprised.

BLUNT: Mr. Watts, why do you think we seem to have been so unready for this?

WATTS: One, our intelligence community has been over-focused on terrorism in the Islamic State and there was much resources or

bandwidth to focus on it. The second one is our traditional methods for detecting and counterintelligence, things like that, Active Measures, are based on humans. We run spies versus counterspies.

Most of this influence came online. They essentially duplicated the old Active Measures system without setting foot inside the United States. I think the third part of it is, the intel community in the United States is very biased against open source information. And they've been -- they've been surprised repeatedly.

ISIS, the Arab Spring, you can go back over the past six to seven years. We worry a lot about security clearances, and badges, and who gets access to doors, and does the break room have a shredder, but when it comes to the open source, we miss what's right in front of our nose. My two colleagues and I use three laptops and we do this at our house.
But for some reason, the entire intel apparatus with billions of dollars will miss a tweet or a Facebook post that's right in front of them but will be highly focused on the security system in these closed sources, which are super useful but we have not changed that orientation on our intel community.

BLUNT: Mr. Rumer, in Europe, do you think the interventions there were so obviously different that we wouldn't have caught on or how do you see the difference in what the Russians have done particularly in the last 15 years in Europe and what they did here?

RUMER: Well, there was an element of unpreparedness on our part. I agree with my colleagues. I would say that -- well, I can speak from personal experience and that is, I just didn't believe that any one intervention, any one agent can swing our election across 50 states. I think -- I thought nobody in their right mind would try to take on the challenge of such expense and complexity.

But then when you think about it more carefully, as we have now with the benefit of hindsight, if you look at the election of 2000 when the Florida vote was decided by a very small number of votes when we now know some of the votes were decided -- some states were decided

by a small margin, you realize that, you know, a more sophisticated actor that has, as my colleagues had pointed out, years and decades of experience of playing in this field can actually aspire to make a meaningful difference.

BLUNT: Let me ask another question about. I know the vice chairman mentioned hand counting of ballots in the recent elections in one European country, you said that the Russian intelligence services directly intervened. We don't have any reason to believe -- any of you can answer this, that they intervened in any election counting system this time.

I think we should be concerned that that never be allowed to happen and one of our -- one of our goals here should be to be sure we're protecting that part of the process. But when you said directly intervened in the elections, no indication, Mr. Rumer, of directly intervening anywhere in the counting of votes on election day?

RUMER: Right. There are public statements from our intelligence community and law enforcement and DHS that our counting systems have not been affected. I can only go on the strength of that and I fully believe that statement. But we certainly should be aware of that and concerned about it.

BLUNT: Absolutely. Thank you, Mr. Chairman.

BURR: Senator Heinrich.

HEINRICH: Thank you, Chairman. And I want to start out by just thanking the Chairman and the Vice Chairman for their willingness to work so closely together on leading this investigation. I certainly think that today's hearing is helpful in setting a baseline for the intentions and the techniques of Russia's Active Measures campaigns but I also look forward to public hearings in which we can dig even deeper into the substance of what happened specifically in the 2016 election.

Similarly, I believe it's critical that we dig into the financial

aspects involved. And that we follow the money to determine whether and how the Russians have used financial leverage to achieve their strategic goals. I think we need to do everything possible to get to the truth. The American people certainly deserve no less. And I think if we do not take this seriously, it is -- it is not hyperbolic to say that our fundamental democratic institutions are at risk.

Dr. Godson said something in his statement for the record about the history of relying on agents of influence. In other words, recruiting and co-opting sympathetic groups or individuals in the U.S. and in the west to advance the Russian agenda. Do you all agree that financing is one of the methods often used by Russia to recruit sympathetic agents?

RUMER: Yes. There's publicly available evidence of a Moscow-based bank financing one of the presidential candidates in France.

HEINRICH: So when they use financial resources to recruit agents of influence like the example you just made, is it always as simple as exchange of money for assistance or -- does Russia sometimes attempt to buy influence more subtly through access to lucrative business deals and contracts and those kinds of arrangements?

GODSON: Yes. I think all of the above. We can show examples of in the past.

RUMER: Yes. They have used their considerable financial business leverage in Eastern Europe to cut favorable energy deals, to offer lucrative deals to local companies and governments.

WATTS: I think the key point in this is comparing it to Soviet Active Measures to today is we didn't do business transactions with the Soviet Union so they have so many more access points to compromise people financially or to influence them on the financial space that they couldn't have done during the Cold War.

HEINRICH: This next question is for any of you. I'm curious if you see money in politics as an opening for Russia to be able to

potentially manipulate our elections especially given their expertise at moving financial resources through networks and the change in our environment in which there's now a lack of transparency in the current U.S. campaign finance environment where oftentimes you have elections where a majority of the dollars spent are not even originating from the individual candidates themselves. Have any of you given than some thought?

WATTS: So I think it's a little bit overstated based on the public part of it. The Russians aren't stupid. They know that if they are ever caught directly putting money into what looks like a Manchurian Candidate kind of scenario, this could be a provocation for war or it could be sanctions, it could be a host of different things.

At the same point, I would also offer you from an intelligence perspective, why not look at it as a way to compromise somebody. So if you have a candidate that's doing well and you have very open campaign finance, why not slip them some money where they don't know the original source of it such that if it's really revealed later, they're discredited. So it can go both ways. It's not just promotion, it can also be used as a tool and a weapon.

HEINRICH: You, Mr. Watts, I think did a really good job of laying out for us how these influence operations actually have the impact of sort of organically changing the trends on media and end up being sort of a self-reinforcing mechanism. Are there analytic or digital tools that can discount the impact of those bots and of that manufactured forcing mechanism within the way that information travels on the web today and impacts the media?

WATTS: So I think all the social media companies are starting to realize that their ad revenue mechanisms can be manipulated for this. There are more than just Russian fake news out there. You've got profiteers. You've got political groups that do that. And you've got, you know, satire which is thrown in the mix of it.

You're seeing the social media companies try and regulate this now or deem things as fake news, but that's going to fail.

Ultimately, any attempt to deem things as fake or not fake is going to lead to freedom of speech violations, freedom of the press violations, because how do you do that? How do you determine who's being fair or not?

I think a better way to do it and what we propose is to create the version of information consumer reports, which is an independent agency which is funded by the social media companies, has no government involvement, no government funding that provides a rating in terms of the news that shows up on your feed, such that much like nutrition labels on food, you know what you're consuming.

Right now, part of the reason this is so effective is a fake news outlet can pop up one day, pump out stories that are sensational and fall down the next. The consumer, an American, on their Facebook feed, which is curated to the things that they like to click on, and even in their Google searches, which is curated to things other people like to click on like them, end up clicking on these things because they're popular.

If they had a score or a rating, some sort of symbol there that said you're more than welcome to click on this. But this is the National Inquirer, you know, you can evaluate how much of it is truth and how much is manipulate truth and how much is false. And just like we saw with Consumer Reports when I was growing up, it had 15 variables. It's rated over time and it becomes a trusted integer that you can go to.

I think that's a better way to do it. We're not restricting Americans' freedom of speech and press. And at the same point -- or if they want to look at fake news, they can look at it but they know what they're getting into.

HEINRICH: Thank you, Mr. Chair.

BURR: Senator Lankford.

LANKFORD: It's hard to believe we're even having this hearing

today discussing this topic since Putin already cleared this up earlier today. He came out with a public statement just hours ago saying, "Watch my lips. No." And then followed up with, all these things are fictional, illusory provocations, lies used for domestic American political agendas. The anti-Russian card is played by different political forces inside the United States to trade on and consolidate their positions inside. Well, he certainly consolidated us.

It is painful to watch the Russian people trapped in a regime that is doing this worldwide. They'd like to be able to watch the Olympics and know their athletes weren't doped ahead of time. They would like to believe their own news when the Russians proclaim we're not in Ukraine and we're not in Syria, and they are. And it'd be nice if we could -- as he said, watch my lips, and know that he's not trying to deceive our audiences.

My question is, first, why did he think he could get away with it this time? This is not new for the Russians. They've done this for a long time across Europe, but it was more engaging this time in our election. Why now? Mr. Watts?

WATTS: I think this answer is very simple and is what no one is really saying in this room, which is part of the reason Active Measures have worked in this U.S. election is because the commander-in-chief has used Russian Active Measures at times against his opponents. On 14 August 2016, his campaign chairman, after a debunked...

LANKFORD: When you say his, who's...

WATTS: Paul Manafort...

LANKFORD: Okay.

WATTS: ...cited the fake Incirlik story as a terrorist attack on CNN and he used it as a talking point. On 11 October, President Trump stood on a stage and cited a -- what appears to be a fake news story

from Sputnik News that disappeared from the Internet. He denies the intel from the United States about Russia.

He claimed that the election could be rigged. That was the number theme pushed by RT Sputnik News white outlets all the way up until the election. He made claims of voter fraud. That President Obama is not a citizen. That, you know, Congressman Cruz is not a citizen. So part of the reason Active Measures works and it does today in terms of Trump Tower being wiretapped is because they parrot the same lines.

So Putin is correct. He can say that he's not influencing anything because he's just putting out a stance but until we get a firm basis on fact and fiction in our own country, get some agreement about the facts whether it be, do I support the intelligence community or a story I read on my Twitter feed, we're going to have a big problem.

I can tell you right now today, gray outlets that are Soviet pushing accounts tweet at President Trump during high volumes when they know he's online and they push conspiracy theories. So if he is to click on one of those or cite one of those, it just proves Putin correct, that we can use this as a lever against the Americans.

LANKFORD: So this started in 2008, '09 time period as you've cited before with your previous timeline even before this rose up, even when there were 16 Republican candidates on the stage. This was a long time coming and it seemed to be very well-organized this time.

Part of my question is -- I get that completely. Why this time? They look to be more prepared, probing, evaluating states, trying to get into voter records. Trying to be more active in the process.

WATTS: They have plausible deniability. If you wanted to run this during Cold War, you would have had to put agents inside the United States. They would have been stalked by counterintelligence professionals. They would have been rundown. You couldn't have gained an audience on a communist newspaper, for example.

Today, you can create the content, gain the audience, build the bots, pick out the election and even the voters that are valued the most in swing states and actually insert the right content in a deliberate period. They pre-planned it. They were based a year and a half out. They're doing it today on the European elections.

And here's the other thing that needs to come up. They try all messages. You know, we've been very focused on, you know, our presidential election, the Republicans, you know, tend to come up, but the Democrats, they were there, too. They were with Bernie Sanders supporters trying to influence them in different directions.

So they play all sides. They -- much like I learned in infantry school about how they use artillery. They fire artillery everywhere and once they get a break in the wall, that's where they swarm in and they focus. And they do that very well today. You'll see them in Europe supporting people on left or right, whichever will dismantle the democratic function that they're after.

So I think the important point moving forward is, we have to educate our public and even our institutions. And the mainstream media is right to be taking some on the chin right now. They've fallen for a lot of these fake news stories. They've amplified it and they've not gone back and done good fact checking.

The media needs to improve. Our U.S. government institutions need to improve and we got to help Americans understand what the facts are, because if we don't, we are lost. We'll become two separate, maybe three separate worlds in the United States just because of this little bitty pinprick that was put in by a foreign country.

LANKFORD: Which is their goal on that. Mr. Chairman, I yield back.

BURR: Senator Manchin.

MANCHIN: Mr. Chairman, thank you so much. I want to thank

Senator King for allowing me. I have another meeting I've got to attend. But any -- I wanted to ask this question. I've been around long enough to -- I remember that my school desk at home protected me if I jumped underneath of it, held my head during a nuclear attack from Russia.

I'm not sure that my United States Senate desk, if I jumped underneath of it and hold my head will protect me this time. And that's putting it mildly. With that being said, much has been written about the new hybrid style of warfare practiced by the Russians recently in Georgia, Crimea, and Ukraine.

To be brief, Russia believes the lines between war and peace are blurred. Wars are no longer declared and no longer fought in a traditional manner. And the power of non-military means to achieve objectives exceeds the power of weapons in effectiveness. Some label it the Gerasimov Doctrine which is a combination of political, military, economic, social and media means to achieve Russian strategic objectives. In the United States, we would call this a whole of government approach.

So my question would be to any of you and I'll start with you, Mr. Watts, if possible, is Russia's meddling in our 2016 election proof the United States is dealing with a nation that is acting in its own war-like manner?

WATTS: Yes. Would you like me to comment on some of the things we can do?

MANCHIN: Please.

WATTS: Yes. So we -- there are seven or eight things we could do immediately that are not very...

MANCHIN: My desk is not going to save me this time, right?

WATTS: No. And I'll tell you right now. I'm going to walk out of here today. I'm going to be cyber attacked. I'm going to be

discredited by trolls. You know, my biggest fear isn't being on Putin's hit list or a psychological warfare targeting. I've been doing that for two years. My biggest concern right now is I don't know what the American stance is on Russia and who's going to take care of me.

I mean after years in the Army and the FBI, working in the intel communities today, I'm going to walk out of here and ain't nobody going to be covering my back. I'm going to be on my own. And so that's very disconcerting. I think that speaks to what we need to do.

One, in terms of falsehoods. We need to do two things. We need a State Department and a DHS website that immediately refute when falsehoods are put out. These seem silly when they come out. Incirlik terrorist attack, for example. But the quicker they're refuted, the faster they die in social media.
We caught the Incirlik attack because it was refuted quickly. When the Russians fake it, it gets exposed. If it gets -- goes on too long, it gets into mainstream media and it runs out of control. The other part is the FBI. They're doing a great job in terms of investigating hacking but the hacking power is influence.

Whenever there's a hack, we should immediately go in and look at what was stolen and figure out what is the anticipated smear campaign, discrediting, how is this going to be weaponized and influenced? That's what I think is super important which is educating U.S. businesses.

Treasury and Commerce right now need to be doing awareness campaigns. Their companies suffer smear campaigns from foreign countries right now which change their stock prices. Their employees are in social media and are being picked off through social engineering and hacked at.

The other part really is in the private sector and the public sector that we need to look at. Mainstream media companies, we need to be working with them. What if they boycotted WikiLeaks collectively? What if they all didn't race to publish too quickly?

If those damaging stolen information that is misconstrued oftentimes doesn't get into the mainstream media, if all of them block it out, Russia's influence dies on the vine.

And the last thing I think is the social media companies. Whether we like it or not, social media has become the news provider for almost all Americans. Our preferences shape what we see and our friends share stuff with us and it reinforces our views. And so I think that for them they're worried about these state-sponsored groups in their systems and how it's going to erode their company.

MANCHIN: Thank you. Dr. Godson, I'd like to ask you if possible. When the Iron Curtain fell and Russia fell out of the world power status -- superpower status some might say, how long was that hiatus? And when it came back, did they come back with a vengeance because of Putin's leadership and determination not to be shelved? Turn your mic on, sir.

GODSON: I wish we knew -- had more information about this. Some areas we know a lot and some areas...

MANCHIN: Do you all see basically see a dropoff of their -- during the '90s when...

GODSON: We did see a bit of a drop off, yes. However, the training, the development of the cadre continues. The hierarchy wasn't well-established in terms of controlling all of the various...

MANCHIN: But then under Putin, basically all this came back. Can anybody say that, Dr. Rumer?

RUMER: Yes, sir. In the 1990s, Russia was flat on its back. It just didn't have the resources and a lot of the capital in this area that it had accumulated basically fell apart. I think they were very, very frustrated during the Balkan Wars when they really couldn't counter what they saw as our information domination of the airwaves. So in the early 2000s, when their economy came back, the apparatus came back with it, too. Could I just add one...

MANCHIN: Can I just ask one thing because my time is running out here? Under Putin, do you believe it's impossible to build a relationship to basically bring this back into some type of civility or order? Is he just absolutely, totally committed to the direction he's been going and will continue to go no matter what?

GODSON: Can I just add in answer to that quickly? It depends on what the costs are. In other words, what are we going to do in response?

MANCHIN: He only reacts to power.

GODSON: Beg your pardon?

MANCHIN: He only reacts if we have strength.

GODSON: Well, most of us react to power and strengths, too. But in this case, we don't yet have enough information. I mean the committee and the study that you're doing is very important for us, not just scholars studying the subject.

It's very important because we can't really answer the question about what -- why this time and why it's successful. We're not even sure what happened here. Now, we have the ICA statement of January but I just sort of wanted to put in a note of caution in here.

We sometimes in the United States think we know things and we have also group think and we all express certain views. And then we find out that later on maybe, the sources of our evidence, the way we put the evidence together didn't really make as much sense as we thought it did at the time.

Now, we've had that in our recent experience. I mean in the '90s and 2002 and '03 and so on. So I would just say we need a little bit of caution here to be able to know exactly what happened. There's so much information out in the real and false and mixture...

MANCHIN: Sir, I want to thank you so much. I'm really exceeding my time. You've been so kind to me. But thank you.

BURR: Senator Cotton.

COTTON: Thank you, gentlemen, for your appearance this morning. I want to return to the topic Senator Lankford broached which is why Vladimir Putin and Russia's leaders thought they could get away with such a brazen set of actions last year. And doing so in a "noisy" fashion as Director Comey testified last week.

Dr. Godson, I'd like to hear your point on this and specifically I'd like to hear your thoughts about the context in which Vladimir Putin did this in 2015 and 2016. In the previous eight years, Russia had invaded Georgia. It had invaded and seized Crimea. Its rebels had been supported and back in Eastern Ukraine to occupy The Donbass. They've been provided missiles that have shot a civilian aircraft out of the sky.

Russians had repeatedly violated the INF Treaty and the Obama administration had come into office proclaiming a reset. And then in 2012, Barack Obama mocked his opponent for claiming that Russia was our number one foe and promised Dmitri Medvedev that more could be done after the election when we had more flexibility. Would that series of events have emboldened Vladimir Putin to think he might be able to get away with such a noisy intrusion into our political system?

GODSON: Well, I would suggest that you're right. I think that this does not help in restraining Russian interest in expanding in the near abroad and as far abroad as they can. And so that the train of actions that you described there didn't exactly persuade him that we would take his intervening in other matters such as elections seriously.

And so that it's going to take -- it's going to take I think some time and some activity by the United States and some important activity to be able to establish our reputation in this arena. And I

know it's beyond the sort of the -- just the agreement of the Intelligence Committee but intelligence can play a major role in this but I think that this is a, you know, this is a whole of government issue, this is a policy issue. And this stuff's going to be more than intelligence but I would hope though that we are in fact gaining the kinds of information we need to have an informed judgment about what you are asking about. In other words, was he tempted by our lack of action?

I hope -- I presume that the intelligence community has a tasking that identifies the Soviet responses and their perceptions. And that if we don't have such a tasking on this subject then we won't be in a very good position to ask it. But I think in general, yes, I agree with it, just -- the points we're making. I think the evidence is strong but we need stronger information to keep us -- to give us a better judgment on this kind of issue.

COTTON: Dr. Rumer, I don't think you've had a chance to opine on this question yet.

RUMER: Thank you, sir. I believe that the biggest factor in Putin's decision to pursue this aggressive line of intervention in our domestic politics has been the realization on their part as Mr. Watts has suggested that this is a very lucrative environment in which they can achieve a lot with even a remotely plausible claim of deniability. So I think they just took advantage of the environment here.

COTTON: Mr. Watts?

WATTS: Yes, I'd like to add two things to what I said before. One, I don't think they thought their hand was going to be exposed as much as it is today. I think they thought they could do it a more subtle fashion and so my belief is, right now in Russia, they're probably trying to figure out how do I manage this situation now where I have extended myself?

But the overriding issue with why Russia did this to the United States and does it now to Europe is we are weak. We do not respond.

We have no organized response as a country or even policy towards Russia right now. So I think until we set the boundaries about how we are going to either push/pull with them, they're going to move as far as they can, pushing. And then when we set our policy positions which we don't have right now, they'll move in kind based on whatever that is.

COTTON: I have one final question about Active Measures. Dr. Godson, you talked in your testimony or in your opening statement about some of the history of Russian Active Measures that's been going on for a long time.

Bob Gates, former Director of CIA and Secretary of Defense, wrote in his first memoir, From the Shadows, about Russia's campaign against the NATO deployment of intermediate-range nuclear forces in European in 1983, quote, "During the period, the Soviets mounted a massive covert action operation aimed at thwarting INF deployments by NATO. We at the CIA devoted tremendous resources and effort at the time to uncovering the Soviet covert campaign," end quote.

The United States is currently undergoing a long delayed, deeply needed nuclear modernization campaign, upgrading our bombers, our dual-capable aircraft, our ground-based missiles, long-range strategic -- standoff cruise missile, and our submarine capability as well. Do you believe there's any chance that Russia is not currently engaged in an Active Measures campaign to try to thwart that modernization effort in the United States?

GODSON: I think you -- I think you're right. I do believe almost certainly that they are, if not, already engaged in it, they will be.

COTTON: Because that is simply what Russia does.

GODSON: Yes. That is simply what this particular leadership -- the successor to the previous generations, yes, I believe they do. I don't think it's inevitable the Russians will do this but I think these fellows will do it.

COTTON: I apologize, gentlemen, my time is expired.

BURR: Senator King.

KING: Thank you, Mr. Chair. Just to sort of sum up what I've heard this morning. Number one, it appears that we're engaged in a new form of aggression, if not, war, that the Soviet Union and now Russia has been utilizing for many years but is now taking it to a much higher level. It strikes me that Vladimir Putin is playing a weak hand very well.

A couple of questions to try to -- very, very short. I would say that what we've seen and what you've told us this morning is that we saw in the 2016 election is absolutely consistent with prior Russian practice and current Russian practice in other parts of Europe and the world. Is that correct, Mr. Watts?

WATTS: Yes, it's still going on today.

KING: Secondly, is it your opinion that this is going to continue? In other words, 2016 is not a one-off.

WATTS: No, I mean they're going to continue until something meets their challenge. And right now, there's nothing meeting their challenge. Any European effort I've seen is very small in comparison.

KING: And Mr. Rumer, would you say that -- Dr. Rumer, that Putin is a Democrat, a Republican, or an opportunist?

RUMER: I think it's -- he's an opportunist and even if we counter this or when we counter his efforts, he will continue anyway. It's going to be a dynamic, not a sort of static situation where we deploy countermeasures and it stops. It will keep going on.

KING: I think it's very important though that we realize that he is neither a Democrat nor a Republican because it means that everybody on this dais and everybody in political life in America regardless of

their party is at risk. In 2016, it happened to tilt because of his interest toward the presidential candidate of the Republican Party but it could very well be the opposite in 2020 or 2022. Mr. Watts, you're nodding but I can't record that.

WATTS: Yes. They will shift to whichever one supports or is most amenable to their foreign policy position or who they think is weak for manipulation. They will go with whichever one it is.

KING: And one thing that was mentioned today somewhat briefly but it came up in some of the questions is not only did they hack the Democratic National Committee and misinformation and disinformation and all of that, but they also pushed and probed into our state election systems in a number of states.

Apparently, the information that we have thus far is it didn't work but they tried. And Mr. Watts, would you agree that they weren't trying for fun, this wasn't entertainment, they were looking for a place to make changes in election results.

WATTS: What no one is talking about is the information nukes that Russia sits on right now because they hacked 3 to 4,000 people. I think this afternoon you're going to hear on the cyber more technical side, this hacking was pervasive. We focused on the DNC, I've been targeted, some other people have been targeted that I know. They have our information.

So anytime anyone rises up that they choose against whether it's Republican or Democrat, Congress or executive branch, or a state official they've got the ability to do the same thing they just did over the past year.

KING: And I want to touch on that in a minute but I do want--do you believe that they will try again to compromise state level election voting machines, registration rolls--but they tried this time.

WATTS: I don't think it's about breaking into the election

machines. The goal is to create the perception that the vote may not be authentic. And so that's why it's smart to target voter rolls because just the act of hitting the voter roll doesn't change the votes, but then you can run an influence story that says there is voter fraud in the United States, that the election's rigged, that the count wasn't accurate and you can traction with it. It's a pinprick perception that they're trying to create.

KING: You've mentioned several times and I think the Russian term is "kompromat" and I think it's interesting that they have a Russian term which is compromising information. And this is active in the sense that not only can they take things off your computer, they can put things on your computer that will compromise you.

And I think that should send a shudder through all Americans that this isn't only taking--you can be very careful in your emails but something can show up on your computer that's fake and you could be in a lot of trouble. This is one of their techniques, is it not?

WATTS: Yes. American should look to Europe where this has happened quite a bit more frequently.

KING: And finally we talk a bit about--you talked about a bit about defenses and I think this is something that our committee in its report is going to have to look at, cyber strategy is one. We have no cyber strategy in this country. There's no knowledge around the world of how we will react to a cyber attack and I think that's part of what we have to do.

Digital literacy and that is people understanding the limitations of what they on the Internet. My wife has a sign in our kitchen that says, "The problems with quotes on the Internet is you can't determine whether they're authentic. Abraham Lincoln." We have to educate our people that they can't believe everything that they read on the Internet.

And part of that is I think your very creative suggestion of a kind of snopes, expanded snopes to check the validity so people at

least know, "OK. There is some likelihood that that is untrue. " And finally, public awareness which is what this hearing is all about.

Thank you, Mr. Chairman, I appreciate it.

BURR: Thank you, Sen. King. Sen. Cornyn.

CORNYN: Mr. Chairman, let me start by complimenting you and the vice chairman again for your leadership. And it's really important. I saw Sen. Lankford, Sen. King, thank you, I'm at a blank--on TV this morning talking about why this is so important to our country and why it's so important we have a bipartisan investigation and follow the facts wherever they may lead.

But Mr. Watts, let me follow up on some of what Senator King was alluding to, I remember of course it wasn't that long ago where the Office of Personnel Management was hacked and 21 million records, personnel records were stolen of U.S.government workers. Of that, about five million plus fingerprints included.

I'm also remembering that a few years ago there was a story, I think, it was in 2016, a story about the tactics that Putin uses to discredit political opponents in Russia and elsewhere. The New York Times story I pulled up said, "foes of Russia say child pornography is planted to ruin them." The sort of tactics that are being used both domestically and internationally against foes of the Putin administration, the sort of hacks, the cyber attacks, and the access to personnel records, the computers of all of us, all of these render us susceptible to this sort of influence campaigns, correct?

WATTS: Yes. Americans need to understand that anything they do on the computer can be public at some point.

CORNYN: And just because it appears on the computer doesn't necessarily mean it's true?

WATTS: Correct. Fact and fiction had been wildly blurred over the past few years.

CORNYN: Regarding the last election and Putin's Active Measures effort, is it reasonable to conclude that any efforts made to weaken the candidacy of Hillary Clinton by doing damage to her reputation, credibility, and political standing would've been a desirable outcome for Russia even if she were elected president?

WATTS: Yes. The goal was either to get your candidate elected that you approved of or just totally discredit and undermine the mandate of whoever does win should it be your opponent.

CORNYN: Mr. Rumer?

RUMER: Yes, sir. I agree.

CORNYN: So do we have any reason to believe that Putin knew more than the pundits and pollsters did here in American about the outcome of the election before it occurred?

WATTS: No.

CORNYN: The electoral result is what I'm referring to. I didn't think so. Dr. Godson, you mentioned earlier and I believe several of you alluded to this about a strategic approach to countermeasures. Would you briefly describe what some of those might be and I would like to have a more extended conversation at some point about what each of you would recommend for the United States government to do to engage in a strategic approach of countermeasures to this sort of campaign. Dr. Godson?

GODSON: Well, we have had a historical precedent for developing that strategic approach, this is actually what happened in the Reagan years that we decided that we have to--it was a major Active Measures offensive much higher than people had expected and we had to respond. And so there were a couple of things that were done then which seemed to be quite effective and I would recommend we take those things that worked and put them in our strategic approach.

CORNYN: Can you give us a few examples?

GODSON: Yes. Well, one is what we're sort of starting to do now and what you're starting to do is educating the American and other populations about the threat of Active Measures and the price one can pay for successful Active Measures.

So when they know and hear about it, they're not taken by it, it doesn't influence. So one is education. A second capability that we would need would be then ways of reducing the effectiveness of the Active Measures. First is warning, anticipating, education, and then what can be done to reduce the effectiveness of the Active Measures. And one of the things that worked in the past was exposing the perpetrators of the Active Measures. Preferably in real time but anyway, exposure.

CORNYN: As Mr. Watts pointed out the advent of the social media and the use of social media to move fake stories around the Internet and to get mainstream media to pay attention to them and without authenticating the source of the information then repeating it successfully amplifying that message, strikes me as a huge challenge.

All of us who run for elections and had to deal with the changes in the way we communicate with each other and it is a huge challenge. I don't know how we get to the bottom of this and find some site, some trusted site, government or otherwise that says this is the truth, this is not the truth, don't believe what you're being told.

GODSON: We did, senator. We did have some good experience with it. Even though we didn't have the machines, they didn't have those capabilities, the mechanical capabilities but we still were able to discredit a lot of their Active Measures and the apparatus, and so it was effective for a while.

The third part of this though is really the hard part, is what kind of whole of government responses are we going to develop to actually deal with the problem. We sort of have to come to grips with this, and as I said this may not be the only committee that has to

deal with this.

But we have to say what are we willing to tolerate? Are there any red lines for us that if they go over this line then there will be these kinds of responses. We develop this kind of deterrence in deterrence policy, we have rules of the road in deterrence. So both sides don't get too close to each other on these--on nuclear weapon issues.

But we're going to have to start to figure out what it is we're going to do, and what we're going to accept, and what we're going to tolerate, and what kinds of responses we're going to have not just once in a while but consistently in this arena. Thank you though for the question.

CORNYN: Thank you, Mr. Chairman.

BURR: Senator Harris.

HARRIS: Thank you. And I want to thank the chairman and vice chairman for this open hearing. As this committee conducts it's investigation into Russia's interference with our 2016 United States Election, the American people need to fully understand the threat that we face and what we must do to protect ourselves in the future.

And let's all be clear about what happened, we know as has already been determined by the CIA, the FBI, and the NSA, a foreign country, Russia, attacked the heart of our democracy. An American election for the president of the United States. And they can and will do so again if we do not act urgently. We must get to the bottom of this. We must be thorough. We must proceed with urgency. And we must transparent. That is vital to protect the public's trust in us and it's what the American people deserve.

And I know we can do so while protecting classified sources and material, items that must remain classified in order to protect our national security, the sources of our intelligence, and the sensitive methods by which we collect it.

This hearing is a first step to understand Russia's interference but it cannot end here, we must build on today's hearing with future open hearings as much as possible. And I strongly believe an informed public is one of our best weapons against future attacks.

That being said, I have a question for all of you and I'll start with Mr. Watts. Earlier this week, former president vice Cheney--Vice President Cheney said Russia's interference in our election should be considered an act of war. Assuming this was an act of war, Russia is investing in cyber weapons and cyber soldiers which we call trolls while we continue to invest in conventional weapons.

As we invest in fighter jets and aircraft carriers, Russia is investing in state-run media from which it can push out fake news. As we consider investing more than $600 billion in our defense budget, Russia has approximately one tenth of that amount in their budget and is developing its cyber warfare capabilities.

I strongly believe cyber maybe the new frontier of war. And so my question for you is was this an act of war, and are we prepared for this new form of warfare, and equally important, given the everyday challenges of Americans in their everyday lives, why should they be concerned about this?

WATTS: On the first part an act of war, on the scale of warfare, it's not kinetic but it's definitely part of the Cold War system that we knew 20-30 years ago. Americans should be concerned because right now a foreign country whether they realize it or not is pitting them against their neighbor, other political parties, ramping up divisions based on things that aren't true.

They're trying to breakdown the trust they had in you as a senator, the congress, the legislature, the court system. They're trying to breakdown all faith in those institutions. And if they can do that, if Americans don't believe that their vote counts they're not going to show up to participate in democracy.

If they don't believe that what they're doing is part of a government system that actually represents them, they're not going to go to jury duty. If they don't believe in those institutions everything breaks down. And when that breakdown occurs, we are focused internally and Russia is focused externally achieving their goals.

In terms of investments, part of the reason we don't invest well in cyber and we don't invest in information is because we're not buying big pieces of equipment. If you can't buy a big piece of equipment then it's really hard to invest your dollars. We need to invest in people.

The reason Russians win in cyber and information space is they have great propagandists and they have the best hackers that are out there that they can either enlist because they're criminals and sort of bring under their umbrella or train themselves.

We, on the other hand, worry a lot about who we're going to bring into the cyber field because they might have smoked weed one day or they can't pass a security clearance or they didn't get a score on their ASVAB but there's millions, I mean, millions of talented Americans out there that can support these roles inside our government. We need to invest in humans moving forward in the space.

It's hard to get Americans to understand that or even the Department of Defense because you're talking about cyber and computers and so you think of tech. But the truth is that tech only works if you've got the smartest brains behind it, we do but we don't put them against our fight.

HARRIS: Thank you. Dr. Rumer?

RUMER: I think we should be careful using terms such as an act of war, it's definitely a continuation of warfare by other means. But when you declare something to be an act of war it calls for certain responses that we may not be ready to take on.

I do agree with Mr. Watts on the need to be much more creative and much more resourceful in the way we approach the question of, call it cyber warfare. Again, with caution that--Russians has a very different standard here in using their offensive tools than we use in using our cyber tools with a great deal of responsibility. And I think we should be very careful not to cross certain lines.

We should, however, be using tools that are available to us in platforms that are available to us just from a somewhat different domain. I think that our own spokesmen, our own information projected, delivered from our platforms should be the gold standard of accuracy and objectivity. So from that standpoint, let me just say that we're not using, for example, that platform of the State Department effectively, the practice of not sustaining our regular briefings for the media, for the world is something that only hurts our interest.

HARRIS: Thank you.

GODSON: I agree with my colleagues, so I won't repeat the same conclusions they reached. I would though like to introduce the idea though that cyber is now important. Cyber wasn't considered so important 20 years ago, now considered important. But there are other technologies coming on board now, some are visible to us, some, they're not very salient, they haven't risen above the horizon.

There are a whole number of technologies that are not Internet dependent. And as we look at Active Measures now and into the future, I would think that would be on the agenda. I'll give just one example, virtual reality. Anybody who can set up the reality is going to have a very decided advantage in politics and other areas. And so as we're looking at cyber and you are going to have a hearing and other studies of this, I would say just that we should broaden the concept of technologies that are going to be available, coming online and it would be extremely unlikely that the Russian would ignore those technologies. And so maybe that would be something to add to the already busy agenda that you have. And thank you.

BURR: Thank you, Sen. Harris.

HARRIS: Thank you.

BURR: Thank you to all of our witnesses. All the questions have been asked except from my end. So let me, if I could, spend just a couple of minutes.

And I agree with you Dr. Godson. The ability to impersonate online is the next phase that we will go through and I think it's safe to say we don't have our best and brightest yet focused on that. We're still trying to triage what happened to us versus to be creative and look forward and say what could happen.

Mr. Watts, I heard you talk about intent and physically the intent of the Russians and their effectiveness, and how preplanning played a large part of the '16 effort. Here's my disconnect, is that when you--at least on the surface as we've gotten in this investigation, as you look at the emails that were captured either out of the DNC or out of the Podesta account that were then the source of Russia's effort through WikiLeaks to publicly play this out.

That seemed to be an average ordinary Russian fishing expedition that we captured maybe 3,000 efforts at the same period in time. So are you suggesting that they had an effort to mess with the elections and just happened to be lucky enough to stumble across a volume of emails?

WATTS: They go widespread, whatever the best nuggets that come out of that is what they run with. They hit a goldmine and they were able to successfully find ammunition they wanted.

What you see in other cases is they do compromise other accounts, I'm not going to talk about them, I don't want to amplify them, but they're less successful. We'll hear dumps and you'll be like oh, this isn't really anything other than what I expected a politician to say. And so they hit a whale whenever they went fishing.But I would also say that somewhere in their cache right now there's tremendous amounts

of information laying around they can weaponize against other Americans.

BURR: We will agree with you on that. And very quickly as you sort of summarized how fake news and how coordinated social media efforts push stories to the top ten and they get picked up automatically. What is the takeaway for U.S. media outlets from what you've just said?

WATTS: They have to improve their editorial processes and they also have to take a step back from the I've got to get it out first competitive environment. Part of the reason this Russian system works is every outlet races to get the story out first, when they do that they put themselves at risk to fall for these sort of schemes.

And until they improve that or until they collectively we have some sort of standard that the public or the media holds to itself, we're going to keep seeing them fall for these campaigns. Whether it's Russia by the way or others. You're going to see many other nations take this on now, the playbook's been thrown out there.

BURR: Dr. Rumer, would you like to take the opportunity to address in greater detail what the Russians are doing in the French and German elections?

RUMER: Well, sir, there's a wide effort in the German elections to build up this far right party alternative for Germany, ADF to use them as sort of a credible challenger to Chancellor Angela Merkel.

There are countless stories that are being spread through fake news sites, proliferating media about the failures of Chancellor Merkel. They as others have pointed out have exploited the story about the girl that was not raped but to, again, to discredit her in the eyes of the general public so as to point out her failure to protect Germany against a flood of refugees. That's one of the major policy initiatives that she took when the Syria crisis broke out.

In the French election, we just saw something that really was

staggering and that is President Putin hosted in the Kremlin the leading far right candidates and almost with a smirk said that "We don't interfere in French elections but we have the right to engage any candidate in the public domain--in that contest."Also, Russian disinformation sources have spread malicious stories about one of the leading candidates, Emmanuel Macron, about his personal life.

BURR: So for the first time we're really beginning to see an effort to build up and to absolutely destroy the character of others having a double impact on the--potentially, on the outcome of the election?

RUMER: Yes, sir.

BURR: Good. Dr. Godson, just quickly, how did we respond differently when we overcame this Active Measures by Russians pre '80 and is there a lesson for us to learn from that in our actions now? GODSON: I think there a number of lessons, but one was the exposure business that we learn how to put out information into the public domain that not only was it relevant for Americans but for foreigners. And we briefed that and we developed teams that could go out and talked about these things, and so it neutralized a lot. That was one of the methods that we could replicate.

A second was support to elements abroad who are trying to maintain the democratic process. We developed some capabilities to do it, we still have some, one of the outstanding examples is the National Endowment for Democracy, bipartisan, able to do quite a lot but it's also limited in various ways, and so one could look back and see how we were able to do this in different ways abroad that had an effect in the past. It's not that expensive, financially. And those methods are available.

BURR: Thank you. Mr. Watts, just very briefly, has anybody taken you up on your list of recommendations?

WATTS: No.

BURR: OK. That did not go unnoticed by the committee, I want you to know that. And nor did the comment that there was agreement around the table that America's response to date has been woefully short of what it should be. If anything it should be interpreted and probably was interpreted by the Russians that they can doubledown and in fact do it unscathed.

So, Mr. Watts, we heard you when you said fact and fiction have become wildly blurred. Let me just assure you that this committee's mission everyday is to do the oversight on the intelligence community, 17 agencies that assures the American people we do everything within the letter of the law. We first assure that to 85 other members of the Senate.

So when it came time for a look inside what Russia Active Measures did and what our response was and how our intelligence community came to the assessments that they would, this fell right in our wheelhouse. This is what our professional staff does on a daily basis, this is a little more granular than what we do. It will take some time and it means triage and a tremendous amount of documents.

But I also heard from all three of you that if there was ever a time to get it right, it's now. And we have methodically built a process that builds a foundation of fact, to build an investigation on those--that foundation that can hopefully come to a bipartisan finding where the conclusions are matched with the facts that we find. In some cases, as all three of you know, that might be intelligence product that can't be made public.

But in every place that we can, I have pledged to the Vice Chairman and he has pledged to his members and I had pledged to mine, where we can make it public so that the American people understand it and feel that this is been credible and thorough and if the conclusions are valid, we're going to try to do that.
But I also believe that the American people expect us to protect sources and methods. They expect us to work with the intelligence community in a way that strengthens what they do and how they do it, not by sharing that with everybody but by certifying that they're

doing it within the letter of the law to keep America safe.

I look at this investigation as one extension of that and it's to, once again, certify to the American people what we've done has been through, to hopefully provide some actionable conclusions for this administration and to look back on the work that we do and believe that in 2018 and 2020 we're going to be less concerned with Russia's involvement in our elections and that the United States of America should like we do on terrorism, work with any country in the world that might be the target of an aggressor like Vladimir Putin.

So I'm grateful to you for what you've contributed to our investigation. This hearing is now adjourned.

END

---

## Copyright

Copyright 2017 Roll Call, Inc. All Rights Reserved.

# Exhibit 5

## S INTEL HEARING ON RUSSIAN INTERFERENCE IN 2016 ELECTION, PANEL 1

**Publication info:** Political Transcript Wire ; Lanham [Lanham]21 June 2017.

ProQuest document link

**Links:** Check SFX for Availability

**Full text:** (CORRECTED COPY - CORRECTIIONS THROUGHOUT TEXT)

S Intel Hearing on Russian Interference in 2016 Election, Panel 1

JUNE 21, 2017

SPEAKERS: SEN. RICHARD M. BURR, R-N.C. CHAIRMAN SEN. JIM RISCH, R-IDAHO SEN. MARCO RUBIO, R-FLA. SEN. SUSAN COLLINS, R-MAINE SEN. ROY BLUNT, R-MO. SEN. TOM COTTON, R-ARK. SEN. JAMES LANKFORD, R-OKLA. SEN. JOHN CORNYN, R-TEXAS SEN. MARK WARNER, D-VA. VICE CHAIRMAN SEN. RON WYDEN, D-ORE. SEN. MARTIN HEINRICH, D-N.M. SEN. JOE MANCHIN III, D-W.VA. SEN. KAMALA HARRIS, D-CALIF. SEN. DIANNE FEINSTEIN, D-CALIF.

SEN. ANGUS KING, I-MAINE

SEN. JACK REED, D-R.I.

WITNESSES: SAM LILES, ACTING DIRECTOR, OFFICE OF INTELLIGENCE AND ANALYSIS CYBER DIVISION DEPARTMENT OF HOMELAND SECURITY

JEANETTE MANFRA, UNDERSECRETARY OF HOMELAND SECURITY, AND ACTING DIRECTOR, NATIONAL PROTECTION AND PROGRAMS DIRECTORATE

BILL PRIESTAP, ASSISTANT DIRECTOR, FBI COUNTERINTELLIGENCE DIVISION

[*] BURR: Today the committee -- committee convenes it's sixth open hearing of 2017, to further examine Russia's interference in the 2016 elections. This is yet another opportunity for the committee and the American people to drill down on this vitally important topic.

In 2016 a hostile foreign power reached down to the state and local levels to touch voter data. It employed relatively sophisticated cyber tools and capabilities and helped Moscow to potentially build detailed knowledge of how our elections work. It was also another example of Russian efforts to interfere into a democracy with the goal of undermining our system.

In 2016, we were woefully unprepared to defend and respond and I'm hopeful that we will not be caught flatfooted again.

Our witnesses are here to tell us more about what happened in 2016, what that tells us about Russian intentions, and what we should expect in 2018 and 2020. I'm deeply concerned that if we do not work in lockstep with the states to secure our elections, we could be here in two or four years talking about a much worse crisis.

The hearing will feature two panels.

First panel will include expert witnesses from DHS and FBI to discuss Russian intervention in 2016 elections and U.S. government efforts to mitigate the threat.

The second panel will include witnesses from the Illinois State Board of Elections, the National Association of State Elections and Directors, National Associations of Secretary of States and an expert on election security to give us their on-the-ground perspective on how federal resources might be brought to bear on this very important issue.

For our first panel, I'd like to welcome our witnesses today: Dr. Samuel Liles, acting director of Cyber Division within the Office of Intelligence and Analysis at the Department of Homeland Security; Jennifer (sic) Manfra, acting deputy undersecretary, National Protection and Programs Dictorate (sic), also at DHS.

And Jeanette, I think I told you next time you came I did not want "acting" in front of your name. So now I've

publicly said that to everybody at DHS. Hopefully next time that will be removed.

And Bill Priestap. Bill's the assistant director for Counterintelligence Division at the Federal Bureau of Investigation.

Bill, I want to thank you for the help that you have personally provided to the investigative staff of this committee, as we've worked through, so far, over five and a half months of our investigation into the 2016 elections.

As you're well aware, this committee is in the midst of a comprehensive investigation on the specific issue: the extent to which Russian government under the direction of President Putin conducted intelligence activities, also known as Russian active measures, targeted at the 2016 U.S. elections. The intelligence community assesses that, while Russian influence obtained and maintained access to elements of multiple U.S. state and local election boards, those systems were not involved in vote tallying.

During the first panel, I would like to address the depth and the breadth of Russian government cyber activities during the 2016 election cycle, the efforts of the U.S. government to defend against these intrusions, and the steps that DHS and FBI are taking to preserve the foundation of our democracy's free and fair elections in 2018 and beyond.

I thank all three of our first witnesses.

I turn to the vice-chairman.

WARNER: Thank you, Mr. Chairman.

And welcome to the witnesses.

And, Bill, thank you again for all the work you've done with us.

WARNER: We all know that in January, the entire intelligence community reached the unanimous conclusion that Russia took extraordinary steps to intervene in our 2016 presidential elections. Russia's interference in our elections in 2016 I believe was a watershed moment in our political history.

This was one of the most significant events I think any of us on this dais will be asked to address in our time as senators. And only with a robust and comprehensive response will we be able to protect our democratic processes from even more dramatic incursions in the future.

Much of what the Russians did at this point, I think at least in this room, is -- was well known: spreading fake news, flooding social media, hacking personal e-mails and leaking them for maximum political benefit.

Without firing a shot and at minimal cost, Russia sowed chaos in our political system and undermined faith in our democratic process. And as we've heard from earlier witnesses, sometimes that was aided by certain candidates, in terms of their comments about the legitimacy of our democratic processes.

Less well understood, though, is the intelligence community's conclusion that they also secured and maintained access to elements of multiple U.S. state and local electoral boards.

Now, again, as the chairman has said, there's no reason to doubt the validity of the vote totals in the 2016 election. However, DHS and the FBI have confirmed -- and I'm going to come back to this repeatedly -- only two intrusions into the voter registration databases, in both Arizona and Illinois, even though no data was modified or deleted in those two states.

At the same time, we've seen published reports that literally dozens -- I've seen one published report that actually said 39 states -- were potentially attacked.

Certainly is good news that the attempts in 2016 did not change the results of that election. But the bad news is this will not be their last attempt. And I'm deeply concerned about the danger posed by future interference in our elections and attempts by Russian to undermine confidence in our whole electoral system.

We saw Russian -- we saw recently -- and this was just not happening here, obviously -- we saw recently Russian attempts to interfere in the elections in France. And I thank the chairman that next week we'll be having a hearing on some of these Russian efforts in Europe.

We can be sure that Russian hackers and trolls will continue to refine their tactics in the future -- future,

especially if there's no penalty for these malicious attacks.

That's again, one reason I think that the Senate voted so overwhelmingly last week, and I thank all my colleagues for that 97-2 vote to strengthen our sanctions on Russia. I hope that that action sends a strong message to Mr. Putin that there will be a heavy price to pay for attacks against the fundamental core of our democratic system.

Make no mistake, it's likely that we'll see more of these attacks not just in America but against our partners. I heard this morning coming on the radio that the Russians are already actively engaged in the German election cycle, which takes place this fall.

Now, some might say, "Well, why -- why the urgency?"

I can assure you, you know, we have elections in 2018, but in my home state of Virginia, we have statewide elections this year. So this needs a sense of urgency.

The American electoral election process, the machinery, the Election Day manpower, the actual counting and reporting primarily is a local and state responsibility. And in many states, including my own, we have a very decentralized approach, which can be both a strength and a weakness.

WARNER: In Virginia, for instance, decentralization helps deter large-scale hacking or manipulation, because our system is so diffuse. But Virginia localities use more than a dozen different types of voting machines, none of which are connected to the internet while in use, but we have a number of machine-read -- machine -- reader (ph) machines, so that they -- the tabulations actually could be broken into on an individual machine basis.

All this makes large cyber-attacks on electoral system, because of the diffusion, more difficult. But it also makes maintaining consistent, coordinated cyber defenses more challenging as well.

Furthermore, states may be vulnerable when it comes to the defense of voter registration and voter history databases. That's why I strongly believe that that the threat requires us to harden our cyber defenses and to thoroughly educate the American public about the danger.

Yesterday, I wrote to the secretary of homeland security. I urged DHS to work closely with state and local election officials to disclose publicly -- and I emphasize publicly -- which states were targeted. Not to embarrass any states, but how can we put the American public on notice when we've only revealed two states, yet we have public reports that there are literally dozens? That makes absolutely no sense.

I know it is the position of DHS that since the states were victims, it is their responsibility. But I cannot believe that this was an attack on physical infrastructure in a variety of states, there wouldn't be a more coordinated response.

We are not making our country safer if we don't make sure that all Americans realize the breadth and the extent of what the Russians did in 2016, and, frankly, if we don't get our act together, what they will do in an -- a even more dramatic form in 2018 and 2020.

And candidly, the idea of this kind of bureaucratic, "Well, it's not my responsibility, not my job," I don't believe is an acceptable decision.

So, I'm going to hope from our witnesses, particularly our DHS -- DHS witnesses, that we hear a plan on how we can get more information into the bloodstream, how we can make sure that we have better best practices, so that all states are doing what's needed.

I'm not urging or suggesting that in any way the federal government intervenes in what is a local and state responsibility. But to not put all Americans on notice, not -- and to have the number of states that were hacked into or attempt to be hacked into still kept secret is -- is just crazy in my mind.

So, my hope is that we will get some answers. I -- I do want to thank the fact that in January, DHS did designate the nation's electoral infrastructure as critical infrastructure. That's important. But if we call it critical infrastructure but then don't tell the public how many states were attacked or potentially how many could be attacked in the next cycle, I don't think we get to where we need to be.

So, we're going to have -- see more of this. This is the new normal. I appreciate the chairman for holding this

hearing. And I'm going to look forward very much to getting my questions answered.

Thank you.

BURR: Thank you, Vice Chairman.

With that, Dr. Liles, I understand you're going to go first. The floor is yours.

LILES: Chairman Burr, Ranking Member Warner and distinguished members of the committee, thank you for the invitation to be here.

My name is Sam Liles. I represent the Cyber Analysis Division of the Department of Homeland Security's Office of Intelligence and Analysis. Our mission is to produce cyber-focussed intelligence, information and analysis, represent our operational partners like the NCCIC to the intelligence community, coordinate and collaborate on I.C. products, and share intelligence and information with our customers at the lowest classification possible.

We are a team of dedicated analysts who take threats to the critical infrastructure of the United States seriously. I'd like to begin by clarifying and characterizing the threat we observed to the election infrastructure in the 2016 election.

LILES: Prior to the election, we had no indication that adversaries or criminals were planning cyber operations against the U.S. election infrastructure that would change the outcome of the coming U.S. election.

However, throughout spring and early summer 2016, we and other -- others in the I.C. began to find indications that the Russian government was responsible for widely reported compromises and leaks of e-mails from U.S. political figures and institutions.

As awareness of these activities grew, DHS began in 2016 to receive reports of cyber-enabled scanning and probing of election- related infrastructure in some states.

From that point on, I&A began working to gather, analyze and share additional information about the threat. I&A participated in red team events, looking at all possible scenarios, collaborated and co-authored production with other intelligence community members and the National Intelligence Council. We provided direct support to the department's operational cyber center, the National Cyber Security and Communications Integration Center and worked hand-in-hand with the state and local partners to share threat information related to their networks.

By late September, we determined that internet-connected election-related networks in 21 states were potentially targeted by Russian government cyber actors.

It is important to note that none of these systems were in involved in vote tallying. Our understanding of that targeting, augmented by further classified reporting is that's still consistent with the scale and scope.

This activity is best characterized as hackers attempting to use commonly available cyber tools to exploit known system vulnerabilities. This vast majority of the -- the activity we observed was indicative of simple scanning for vulnerabilities, analogous to somebody walking down the street and looking to see if you are home.

A small number of systems were unsuccessfully exploited, as though somebody had rattled the doorknob but was unable to get in, so to speak.

Finally a small number of the networks were successfully exploited. They made it through the door. Based on activity we observed, DHS made a series of assessments. We started out with, we had no indication prior to the election that adversaries were planning cyber operations against election infrastructure that would change the outcome of the 2016 election. We also assessed that multiple checks and redundancies in U.S. election infrastructures, including diversity of systems, non-internet- connected voting machines, pre-election testing and processes for media, campaign and election officials to check, audit and validate the results -- all these made it likely that cyber manipulation of the U.S. election systems intended to change the outcome of the national election would be detected.

We also finally assessed that the types of systems Russian actors targeted or compromised were not involved in vote tallying.

While we continue to evaluate any and all new available information, DHS has not altered any of these prior assessments. Having characterized the threat as we observed it, I'll stop there to allow my NPPD colleague

Jeanette Manfra to talk about more about DHS is working with election systems to add security and resiliency. I look forward to answering your questions.

BURR: Thank you.

Ms. Manfra?

MANFRA: Thank you, sir.

Chairman Burr, Vice Chairman Warner, members of this committee, thank you for today's opportunity to represent the men and women that serve in the Department of Homeland Security.

Today I'm here to discuss the department's mission to reduce and eliminate threats to the nation's critical physical and cyber infrastructure, specifically as it relates to our election.

Our nation's cyber infrastructure is under constant attack. In 2016, we saw cyber operations directed against U.S. election infrastructure and political entities. As awareness of these activities grew, DHS and its partners provided actionable information and capabilities to help -- help election officials identify and mitigate vulnerabilities on their networks.

MANFRA: Actionable information led to detection of potentially malicious activity affecting internet-connected election-related networks, potentially targeted by Russian cyber actors in multiple states. When we became aware of detected activity, we worked with the affected entity to understand if a successful intrusion had in fact occurred.

Many of these detections represented potentially malicious vulnerability scanning activity, not successful intrusion. This activity, in partnership with these potential victims and targets, enhanced our situational awareness of the threat and further informed our engagement with state and local election officials across the country.

Given the vital role that elections have in a free and democratic society, on January 26 of this year, the former secretary of homeland security established election infrastructure as a critical infrastructure sub-sector. As such, DHS is leading federal efforts to partner with state and local election officials, as well as private sector vendors, to formalize the prioritization of voluntary security- related assistance, and to ensure that we have the communications channels and protocols, as Senator Warner discussed, to ensure that election officials receive information in a timely manner and that we understand how to jointly respond to incidents.

Election infrastructure now receives cybersecurity and infrastructure protection assistance similar to what is provided to other critical infrastructure, such as financial institutions and electric utilities. Our election system is run by state and local governments in thousands of jurisdictions across the country. Importantly, state and local officials have already been working individually and collectively to reduce risks and ensure the integrity of their elections. As threat actors become increasingly sophisticated, DHS stands in partnership to support their efforts.

Safeguarding and securing cyberspace is a core mission at DHS. Through out National Cybersecurity and Communications Center, or NCCC, DHS assists state and local customers such as election officials as part of our daily operations. Such assistance is completely voluntary. It does not entail regulation or federal oversight. Our role is limited to support.

In this role, we offer three types of assistance: assessments, information and incident response. For the most part, DHS has offered two kinds of assistance to state and local officials: first, the cyber hygiene service for internet facing systems provides a recurring report identifying vulnerabilities and mitigation recommendations; second, our cybersecurity experts can go on-site to conduct risk and vulnerability assessments and provide recommendations to the owners of those systems for how best to reduce the risk to their networks.

DHS continues to share actionable information on cyber threats and incidents through multiple means. For example, we publish best practices for securing voter registration databases and addressing potential threats to election systems. We share cyber-threat indicators, another analysis that network defenders can use to secure their systems.

We partner with the multistate Information Sharing and Analysis Center to provide threat and vulnerability

information to state and local officials. This organization is partially grant-funded by DHS and has representatives that sit on our NCCC floor and can interact with our analysts and operators on a 24/7 basis. They can also receive information through our field-based personnel stationed throughout the country and in partnership with the FBI.

Finally, we provide incident response assistance at request to help state and local officials identify and remediate any possible cyber incident. In the case of an attempted compromise affecting election infrastructure, we will share that technical information with other states to assist their ability to defend their own systems from similar malicious activity.

Moving forward, we must recognize that the nature of risk facing our election infrastructure will continue to evolve. With the establishment of an election infrastructure sub-sector, DHS is working with stakeholders to establish these appropriate coordinating councils and our mechanisms to engage with them. These will formalize our mechanisms for collaboration and ensures long-term sustainability of this partnership. We will lead the federal effort to support election officials with security and resilience efforts.

MANFRA: Before closing, I want to reiterate that we do have confidence in the overall integrity of our electoral system because our voting infrastructure is fundamentally resilient. It is diverse, subject to local control and has many checks and balances built in. As the risk environment evolves, the department will continue to support state and local partners by providing information and offering assistance.

Thank you very much for the opportunity to testify, and I look forward to any questions.

BURR: Thank you very much.

Mr. Priestap?

PRIESTAP: Good morning.

Chairman Burr, Vice Chairman Warner, and members of the committee, thank you for the opportunity to appear before you today.

My statement for the record has been submitted. And so rather than restating it, I'd like to step back, and provide you a description of the broader threat as I see it. My understanding begins by asking one question. What does Russia want?

As you well know, during the Cold War, the Soviet Union was one of the world's two great powers. However, in the early 1990's, it collapsed and lost power, stature and much territory. In a 2005 speech, Vladimir Putin, referred to this as a major catastrophe. The Soviet Union's collapse left the U.S. as the sole super power. Since then, Russia has substantially rebuilt, but it hasn't been able to fully regain its former status or its former territory. The U.S. is too strong and has too many alliances for Russia to want a military conflict with us. Therefore, hoping to regain its prior stature, Russia has decided to try to weaken us and our allies.

One of the ways Russia has sought to do this is by influence, rather than brute force. Some people refer to Russia's activity, in this regard, as information warfare, because it is information that Russia uses as a weapon. In regards to our most recent presidential election, Russia used information to try to undermine the legitimacy of our election process. Russia sought to do this in a simple manner. They collected information via computer intrusions and via their intelligence officers, and they selectively disseminated e-mails they hoped would disparage certain political figures and shed unflattering light on political processes.

They also pushed fake news and propaganda. And they used online amplifiers to spread the information to as many people as possible. One of their primary goals was to sow discord and undermine a key democratic principle, free and fair elections.

In summary, I greatly appreciate the opportunity to be here today to discuss Russia's election influence efforts. But I hope the American people will keep in mind that Russia's overall aim is to restore its relative power and prestige by eroding democratic values. In other words, its election-related activity wasn't a one-time event. Russia will continue to pose an influence threat.

I look forward to your questions. Thank you.

BURR: Thank you very much to all of our witnesses. For members, we will proceed by seniority for recognition for up to five minutes. And the chairman will tell you when you have used all your time if you proceed that far. Chair would recognize himself for five minutes.

Yes or no to all three of you. Most important question.

BURR: Do you have any evidence that the votes themselves were changed in any way in the 2016 presidential election?

Dr. Liles?

LILES: No, sir. There was no detected change in the vote.

BURR: Ms. Manfra?

MANFRA: No, sir.

BURR: Mr. Priestap?

PRIESTAP: No, sir.

BURR: Bill, to you. This adversary is determined. They're aggressive and they're getting more sophisticated by the day. The diversity of our election system is a strength, but the intrusions in the state systems also show that Moscow is willing to put considerable resources towards an unclear result.

In 2016, we saw voter data stolen. How could Moscow potentially use that data?

PRIESTAP: They could use the data in a variety of ways. Unfortunately in this setting, I can't go into all of them. I think -- first of all, I think they took the data to understand what it consisted of; what's there, so that they can effect better understand and plan accordingly.

And when I say "plan accordingly," plan accordingly in regards to possibly impacting future elections and/or targeting of particular individuals, but also by knowing what's there and studying it. They can determine is it something they can manipulate or not, possibly, going forward. And there's a couple of other things that wouldn't be appropriate in this setting as well.

BURR: To any of you, you've heard the vice chairman talk about the frustration of publicly talking about how many states. Can you tell the American people why you can't disclose which states and the numbers?

I'll turn to Ms. Manfra first.

MANFRA: Thank you for the question, sir. There are -- through the long history that the department has in working with the private sector and state and local on critical infrastructure and cybersecurity issues, we believe it is important to protect the confidentiality that we have and the trust that we have with that community. So when the entity is a victim of a cyber incident, we believe very strongly in protecting the information around that victim.

That being said, what we can do is take the technical information that we learn from the engagement with that victim and anonymize it so it is not identified as to what that entity or individual is. We can take all the technical information and turn that around and share that broadly with -- whether it's the affected sector or broadly across, you know, the entire country. And we have multiple mechanisms for sharing that.

We believe that this has been a very important key to our success in developing trusted relationships across all of these 16 critical infrastructure sectors.

BURR: Are we prepared today to say publicly how many states were targeted?

MANFRA: We, as of right now, we have evidence of 21 states -- election-related systems in 21 states that were targeted.

BURR: But in no case were actual vote tallies altered in any way, shape or form?

MANFRA: That is correct.

BURR: How did the -- how did the French respond to the Russian involvement in the French elections a month ago? Is that something we followed?

Bill?

PRIESTAP: Senator, from the bureau's standpoint, it's something we followed from afar. We did have

engagement with French officials, but I'm just not at liberty to go into what those consisted of.

BURR: OK, we've -- we've talked about last year. Russia's intent, their target. Let's talk about next year. Let's talk about the '17 elections in Virginia. Let's talk about the '18 elections, congressional, and -- and -- and gubernatorial elections. What are we doing to prepare ourselves with this November and next November? Ms. Manfra?

MANFRA: Yes, sir.

As we noted, we are taking this threat very seriously. And part of that is identifying this community's critical infrastructure subsector. That's allowed us to prioritize and formalize the engagement with them.

Similar to the 2016 elections, we are identifying additional resources, prioritizing our engagement with them through information sharing products, identifying in partnership, again, with the state and local community, those communication protocols -- how do we ensure that we can declassify information quickly should we need to, and -- and get it to the individuals that need it.

We're also -- have committed to working with state and local officials on incident response playbooks. So, how do they understand where to engage with us, where do we engage with them, and how do we -- are we able to bring the entire resources of the federal government to bear in helping the state and local officials secure their election systems?

BURR: Great.

Vice Chairman?

WARNER: Thank you for the answer. At 21 -- 21 states is almost half the country. We've seen reports that were even higher. I concur with the chairman that the vote totals were not changed. But can you explain to me how we're made safer by keeping the identity of 19 of those states secret from the public? Since Arizona and Illinois have acknowledged they were -- they were attacked?

LILES: Well, sir, I'd bring it back to the earlier points you made about the future elections. One of the key pieces for us within I&A is our ability to work with our partners because of how our collection mechanisms work, it's built on a high level of trust...

(CROSSTALK) WARNER: And if this was -- if this was water systems or power systems, would it be -- would the public be safer by not knowing that their water system or power system in their respective state was attacked?

MANFRA: Sir, I can -- in -- for other sectors, we apply the same principles. When we do have a victim of an incident in the electric sector, or the water sector, we do keep the name of that entity confidential. Some of these sectors do have breach reporting requirements that -- that requires the victims...

(CROSSTALK)

WARNER: Are -- are all 21 of the states that were attacked, are they aware they were attacked?

MANFRA: All of the system owners within those states are aware of the targeting. Yes, sir.

WARNER: At the state level, you could have local registrars and other local officials that -- that there may have been an attempt to penetrate at the state level. And you may have local registrars in the respective state that would not even know that their state had been the subject of Russian activities?

MANFRA: We are currently working with state election officials to ensure communication between the local and the -- and the state...

(CROSSTALK)

WARNER: But at this moment in time, there may be a number of state, local -- state, local election officials that don't know their state were targeted in 2016. Is that right?

MANFRA: The -- the owners of the systems that were targeted do know that they were targeted...

(CROSSTALK)

WARNER: The owners may know, but because we have a decentralized system, many local elective -- I just -- I...

MANFRA: I -- I cannot...

WARNER: ...fundamentally disagree. I understand the notion of victimization.

MANFRA: Yes, sir.

WARNER: But I do not believe our country is made safer by holding this information back from the American public. I got -- I have no interest in trying to embarrass any state.

WARNER: But, you know, if -- if this -- because we -- we've seen this for too long in cyber. We've seen it in the financial industry, and others, where people simply try to sweep this under the rug, and assume they'll go along their way. When we're talking about -- I go back to Liles' initial comments.

We had no idea -- we had no ability to predict this before hand. We had 21 states that were tapped. We've got two that have come forward. While no election results were changed, we do know there were a number of states, perhaps you'll answer this. How many states did the Russians actually exfiltrate data, such as voter registration lists?

MANFRA: Prefer not to go into those details in this forum, sir. I can tell you that we're tracking 21 states that were targeted...

(CROSSTALK)

WARNER: Do the states that had their data exfiltrated by the Russians -- are they aware of that?

MANFRA: Yes, sir.

WARNER: And is there any coordinated response on how we're going to prevent this going forward?

MANFRA: Yes, sir.

WARNER: How do we make sure, if states are not willing to acknowledge that they had vulnerabilities that they were subject to attack -- again, we're in a brave new world here and I understand your position. I'm not trying to -- I'm very frustrated, but I'm not -- I -- I -- I get this notion.

But I think we need a re-examination of this policy. You know, the designation by former Secretary Johnson as critical infrastructure. What does that change in terms of how our operations are going forward? By that designation in January, I appreciated it, but what does that really mean in practical terms, in terms of assistance or information sharing?

MANFRA: What it means for -- it means three things, sir. The first is a statement that we do recognize that these systems are critical to the functioning of American life, and so that is an important statement. The second is, that it formalizes and the -- and sustains, the department's prioritization of engagement with this community. And the last is, it provides a particular protection for sharing of information, in particular, with vendors within the election community. That allows us to have conversations to discuss vulnerabilities with potential systems, that we would not have to disclose.

WARNER: I -- I talked to Secretary Kelly last week, and I hope you'll take this -- at least this Senator's message, back to him. I would like us to get more information. What I've heard today is that, there were 21 states, I appreciate that information, but within those 21 states I have no guarantee that local election officials are aware that their state system may have been attacked, number one.

Number two, we don't know how many states actually had exfiltration. And the final question is, have you seen any stoppage of the Russian activities after the election? Or are they continuing to ping and try to feel out our various election systems?

MANFRA: On the first two questions, sir, I will be happy to get back to you. I spoke to the Secretary this morning and look forward to responding to your letter. On the third question, I'll defer to the FBI.

PRIESTAP: Vice Chairman, I just can't comment on our pending investigations related to the cyber...

(CROSSTALK)

WARNER: You can't say whether the -- so, should the public take away a sense of confidence that the Russians have completely stopped, as of November of 2016, trying to interfere or tap into our electoral systems. Is that what you're saying?

PRIESTAP: That's not what I'm saying, sir. I believe the Russians will absolutely continue to try to conduct influence operations in the U.S., which will include cyber intrusions.

WARNER: Thank you, Mr. Chairman.

BURR: Thank you, Vice Chairman.

To DHS and to the Bureau, a quick question, and if you can't answer it, please go back and get us an answer. Would your agency be opposed to the chair and vice chair sending a letter to the 19 states that have not been publicly disclosed, a classified letter, asking them if they would consider publicly disclosing that they were a target of the last election?

PRIESTAP: Sir, I'd be happy to take that question back to my organization, but I would just add that the role your committee is playing in regards to highlighting the Russian' aims and activities, I think, is critically important for this country.

The Bureau is just trying to balance what -- we'll call it the messaging end of that with doing things that hopefully don't impact what we can learn through our investigations. I know it's a fine -- it's a fine balance but -- but the bottom line is you play a key role in raising awareness of that, and I thank you.

BURR: Fair -- fair -- fair concern, and if both of you would just go back and get back with us, we'll proceed from there.

Senator Risch?

RISCH: Thank you much.

So that the American people can have solid confidence in what you've done, and thank you for what you've done, could you give -- could you give the American people an idea -- if you feel the numbers are classified and that sort of thing, you don't have to go into it.

But the number of people that were involved on DHS and the FBI in this investigation -- can you give us a general idea about that? Whichever one of you want to take that question.

Ms. Manfra?

MANFRA: From a DHS perspective, we did amass quite a few resources both from our intelligence and analysis and our operations analysis. To put a number on it is -- is somewhat challenging but, you know...

(CROSSTALK)

RISCH: Would you say it was substantial?

MANFRA: It was a substantial level of effort.

RISCH: You -- you're confident that you got where you wanted to go when you set out to -- to make this investigation?

MANFRA: Yes, sir. One of our key priorities was developing relationships with that community and getting information out, whether it was to specific victims or broader indicators, that we could share.

We accomplished that. We held multiple sessions. We sent over 800 indicators to the community and so we do believe that -- that we accomplished that. We don't want to let that down at all. We want to continue that level of effort and we intend to continue.

RISCH: And I'm focusing on not what you did after you got the information, but how you got the information. You're confident you got what you needed to appropriately advise everyone in this -- what was going on?

MANFRA: Yes, sir. Yes, we did.

RISCH: Mr. Priestap?

PRIESTAP: This -- the FBI considered this a very grave threat and so we dedicated substantial resources to this effort as well. RISCH: OK. Thank you. To both of you, both agencies again, everyone in this committee knows the specificity and identity of the Russian agencies involved. Are you comfortable in identifying them here today, or do you feel -- still feel that's classified?

PRIESTAP: Yeah. Other what was mentioned in the unclassified version of the intelligence community assessment, I'd rather not go into any of those details.

RISCH: And -- and -- were there any of those agencies identified, any of the Russian intelligence agencies, identified in that?

PRIESTAP: It's my understanding that GIU was identified.

RISCH: Homeland Security, same answer?

LILES: Yes, sir.

RISCH: OK. Thank you much. Let me -- let me ask this question and I come at this from a little different perspective, and I think the American people have the right to know this. From all the work that either of your agencies did, all the people involved, all the digging you did through what -- what the Russians had done and their attempts.

RISCH: Did you find any evidence, direct or circumstantial, to any degree, down to a scintilla of evidence, that any U.S. person colluded with, assisted or communicated with the Russians in their efforts?

Mr. Priestap?

PRIESTAP: And sir, I -- I just can't comment on that today. That falls under the special counsel's purview. And I have to defer to him.

RISCH: Are you aware of any such evidence?

PRIESTAP: And I'm sorry, sir, I just can't comment on that.

RISCH: Ms. -- Ms. Manfra?

MANFRA: Sorry, sir. I cannot also comment on that.

RISCH: Thank you.

Thank you, Mr. Chairman.

BURR: Senator Feinstein?

FEINSTEIN: Thanks very much, Mr. Chairman.

Candidly, I'm very disappointed by the testimony. I mean, we have learned a great deal. And the public has learned a great deal. And it seems to me we have to deal with what we've learned.

Mr. Priestap, is that correct? You have said, and I think quite pointedly, that Russia has decided to weaken us through covert influence rather than brute force. And I think that's a correct assessment, and I think you for having the courage to make it.

Here's a question. To the best of the FBI's knowledge, have they conducted covert influence in prior election campaigns in the United States? If so, when, what and how?

PRIESTAP: Yes, absolutely, they've conducted influence operations in the past. What -- what made this one different, in may regards, was of course, the degree, and then with what you can do through electronic systems today.

When they did it in the past, it was doing things like trying to put in biased or -- or half-true stories, get -- getting stories like that into the press or pamphlets that people were -- will -- would read, so on and so forth. The -- the internet is just -- has allowed Russia to do so much more today than they've even been able to do in the past.

FEINSTEIN: So, you're saying prior campaigns were essentially developed to influence one campaign above another, to denigrate a candidate if she was elected and to support another candidate subtly?

PRIESTAP: Yeah, I -- I'm saying that Russia, for years, has conducted influence operations targeting our elections, yes.

FEINSTEIN: Equal to this one?

PRIESTAP: Not equal to this one. No, ma'am.

FEINSTEIN: OK, here we go. What made this one different?

PRIESTAP: Again, I -- I think the -- the scale -- the scale and the aggressiveness of the effort, in my opinion, made this one different. And again, it's -- it's because of the electronic infrastructure, the internet, what have you, today that -- it allowed Russia to do things that in the past they weren't able to do.

FEINSTEIN: Would you say that this effort was tailored to achieve certain goals?

PRIESTAP: Absolutely.

FEINSTEIN: And what would those goals have been?

PRIESTAP: I think the primary goal in my mind was to sow discord and to try to delegitimize our free and fair election process. I also think another of their goals, which the entire United States intelligence community stands behind, was to denigrate Secretary Clinton and to try to help then -- current President, Trump.

FEINSTEIN: Have they done this on -- in prior elections in which they've been involved?

PRIESTAP: Have they...

(CROSSTALK)

FEINSTEIN: Denigrated a specific candidate and or tried to help another candidate?

PRIESTAP: Yes, ma'am, they have.

FEINSTEIN: And which elections were those?

PRIESTAP: Oh -- I'm sorry, I know there -- I -- I'm sorry, I can't think of an example off the top of my head, but even though -- all the way through the Cold War, up to our most recent election -- in my opinion, they have tried to influence all of our elections since then, and this is a common practice.

FEINSTEIN: Have they ever targeted what is admitted here today to be 21 states?

PRIESTAP: If they have, I am not aware of that. That's a -- that scale is different than what I'm aware of what they tried to do in the past. So again, the scale and aggressiveness here, separates this from their previous activity.

FEINSTEIN: Has the FBI looked at how those states were targeted?

PRIESTAP: Absolutely, ma'am.

FEINSTEIN: And what is your finding?

PRIESTAP: We have a number of investigations open in regards to that. In this setting -- I guess, because they're all still pending investigations, I'd rather not go into those details. The other thing I'd ask you to keep in mind is that we continue to learn things. So, there was some activity we were looking at prior to the election. It's not like when the election was finished our investigation stopped. So as we learn more, we share more.

FEINSTEIN: Do you know if it's the intent of the FBI to make this information public at some point?

PRIESTAP: I -- I think this gets back to an -- an issue the vice-chairman raised, and I -- I guess I want to be clear on my position on it. I think it is critically important to raise awareness about Russia's aims to undermine our democracy, and then their tradecraft and how they do it.

My organization -- part of understanding that tradecraft is -- is conducting our investigations where we learn more and more about tradecraft. So we try to balance, what do we need to provide to partners so they can best protect themselves, versus not interrupting our investigations if the information were to made -- be made public.

FEINSTEIN: Thank you very much. PRIESTAP: A balancing act.

FEINSTEIN: My time is up. Thank you.

BURR: Thanks, Senator Feinstein.

The Vice-Chairman and I have already decided that we're going to invite the bureau in for a classified briefing to update all members on the open investigations, and any that we see that might warrant, on their minds, an opening of a -- a new investigation.

In addition, let me remind members that one of the -- one of the mandates of -- of our investigation is that we will, at the end of this, work with bureau and other appropriate agencies to make a public report in as graded public detail as we can, our findings on Russia's involvement in our election.

So, it is the intent of the chair, at least, to make sure that as much as we can declassify, it's done and the public gets a -- a true understanding when we put out a final report.

Senator Rubio?

RUBIO: Thank you, Mr. Chairman.

And that's -- that's critically important. I think the most important thing we're going to do in this report is tell the

American people how this happened, so we're prepared for the next time. And what -- it begins, I think, by outlining what their goals were, what they tried to do, in this regard.

And we know what they tried to do, because they've done it in other countries around the world for an extensive period of time. The first is, undermine the credibility of the electoral process. To be able to say, that's not a real democracy. It's filled with all kinds of problems. The second is, to undermine the credibility of our leaders, including the person who may win.

They want that person to go into office hobbled by scandal and all sorts of questions about them. And the third, ideally, in their minds, I imagine, is to be able to control the outcome in some specific instances. If they think they could, either through public messaging, or even in a worst case scenario by actually being able to manipulate the vote -- which I know has now been repeatedly testified did not happen here.

RUBIO: And, by the way, these are not mutually exclusive. You can do all three, you can only take one. They all work in conjunction. I think you can argue that they have achieved quite a bit, if you think about the amount of time that we have been consumed in this country on this important topic and the political fissures that it's developed.

And the way I always kind of point to it -- and if anyone disagrees I want you to tell me this -- but, you know, we have something in American politics. It's legitimate; both sides do it. It's called opposition research. You find out about your opponent. Hopefully it's embarrassing or disqualifying information if you're the opposition research person. You package it. You leak it to a media outlet. They report it. You run ads on it.

Now imagine being able to do that with the power of a nation state, illegally acquiring things like e-mails and being able to weaponize by leaking -- leaking it to somebody who will post that and create all sorts of noise. I think that's certainly one of the capabilities. The other is just straight-out misinformation, right? The ability to find a site that looks like a real news place, have them run a story that isn't true, have your trolls begin to click on that story. It rises on Facebook as a trending topic. People start to read it. By the time they figure out it isn't true, a lot of people think it is.

I remember seeing one in early fall that President Obama had outlawed the Pledge of Allegiance, and I had people texting me about it. And I knew that wasn't true, but my point is that we have people texting about it, asking if it was. It just tells you -- and I don't know if that was part of that effort, or it was just somebody with too much time on their hands.

And then the third, of course, is the access to our voting systems, and obviously people talk about effecting the tallies. But just think about this -- even the news that a hacker from a foreign government could have potentially gotten into the computer system is enough to create the specter of a losing candidate arguing, the election was rigged. The election was rigged.

And -- and because most Americans, including myself, don't fully understand all the technology that's around voting systems per se. You give that "election is rigged" kind of narrative to a troll and a fake news site, and that stuff starts to spread. And before you know it, you have the specter of a political leader in America being sworn in under the cloud of whether or not the election was stolen because vote tallies were actually changed.

So I don't know why they were probing these different systems, because obviously a lot of the information they were looking at was publicly available. You can buy it -- voter roles. Campaigns do it all the time. But I would speculate that one of the reasons potentially is because, they wanted these stories to be out there. That someone had pinged into these systems creating a specter of being able to argue, at some point, that the election was invalid because hackers had touched election systems in key states.

And that is why I really, truly believe, Mr. Chairman, it is so important that, to the extent possible, that part of it, the systems part, as much of it be available to the public as possible. Because the only way to combat misinformation is with truth and with facts, and explain to people, and I know some of it is proprietary. I know some of it we weren't trying to protect methods and so forth, but it is really critical that people have confidence that when they go vote that vote is going to count and someone's not going to come in electronically and

change it.

And I think they're -- I -- I just really hope we err on the side of disclosure about our systems so that people have full confidence that when they go vote.

Because I can tell you, I was on the ballot in November, and I remember people asking me repeatedly, is my vote going to count? I was almost afraid people wouldn't vote because they thought their vote wouldn't count.

So I just hope as we move forward -- I know that's not your decisions to make in terms of declassifications and the like -- but it is really, really, really important that Americans understand how our voting systems work, what happened, what didn't and that -- be able to communicate that in realtime in the midst of an election.

So that if in 2018 these reports start to emerge about our voting systems being pinged again, people aren't -- we can put out enough information in October and early November so people don't have doubts. And I know that's not your decisions to make, but I just really hope that's part of -- of what we push on here, because I think it's critical for our future.

BURR: Senator Wyden.

WYDEN: Thank you, Mr. Chairman.

Let me say to the three of you, and I say it respectfully, that on the big issue, which is which states were affected by Russian hacking in 2016, the American people don't seem to be getting more information than what they already had before they showed up. We want to be sensitive to security concerns, but that question has to be answered sooner rather than later. I want to send that message in the strongest possible way. We obviously need to know about vulnerabilities, so that we can find solutions, and we need better cybersecurity to protect elections from being hacked in the first place. And that means solutions like Oregon's vote-by-mail system, that has a strong paper trail, error-gapped (ph) computers and enough time to fix the problems if they pop up.

But now to my question: You all mentioned the January intelligence assessment, saying that the types of systems we observed Russian actors targeting or compromising are not involved in vote tallying. Your prepared system -- your prepared testimony today makes another point that I think that is important. You say it is likely that cyber-manipulation of U.S. election systems intended to change the outcome of a national election would be detected. So, that is different what we have heard thus far.

So I have two questions for you, Ms. Manfra, and you, Dr. Liles: What level of confidence does the department have in its assessment that 2016 vote tallying was not targeted or compromised? And second, does that assessment apply to state and local elections?

LILES: Thank you, sir, for the question.

So, the level of effort and scale acquired to change the outcome of a national election would make it nearly impossible to avoid detection. This assessment's based on the diversity of systems, the need for physical access to compromise voting machines themselves, the security of pre-election testing employed by the state and local officials. There's a level -- a number of standards and security protocols that are put in place. There's a -- addition, the vast majority of localities engage in logic and accuracy testing, which work to insure voting machines are operating and tabulating as expected.

Before, during, and after the election, there has been an immense amount of media applied to this, which also brings in the idea of people actually watching in and making sure that the election results represent what they see. And plus there's just this statistical anomalies that would be detected, so we have a very high confidence in our assessments.

WYDEN: What about state and local elections? Do you have the same level of confidence?

LILES: So, from the standpoint of a nation-state actor operating against a state and local election system, we would have the same -- for an Internet-connected system, we would have the same level of confidence.

WYDEN: Ms. Manfra?

MANFRA: Yes, sir.

And I think this also gets to Senator Rubio's point about the difficulty in the general public understanding the

variety of systems that are used in our election process.

MANFRA: And so, we broke our level of engagement and concern down a couple of different areas. The voter registration systems, which are often -- can -- usually connected to the internet. We also were looking at the voting machines themselves, which, by best practice and by the voluntary voting standards and guidelines that the Department of Commerce works with the Election Assistance Commission on, is, by best practice -- those are not connected to the internet.

WYDEN: So can Homeland Security assure the public that the Department would be able to detect an attempted attack on vote tallying?

MANFRA: What I would suggest, sir, is that the ability, as has been demonstrated by security researchers, to access remotely, a voting machine to manipulate that vote, and then to be able to scale that across multiple different voting machines made by different vendors, would be virtually impossible to occur in an undetected way within our current election system.

WYDEN: Has the department conducted any kind of post-election forensics on the voting machines that were used in 2016?

MANFRA: We are currently engaged with many vendors of those systems to look into conducting some joint forensics with them. The vendor community is very interested in engaging with us. We have not conducted...

(CROSSTALK)

WYDEN: So there's no -- there's been no analysis yet?

MANFRA: We have not -- our department has not conducted forensics on specific voting machines.

WYDEN: Do you believe it's important to do that? In terms of being able to reassure Americans that there was no attack on vote tallying?

MANFRA: Sir, I would say that we do currently have voluntary standards in place that vendors are enabled -- and in approximately 35 states, actually require, some level of certification of those voting machines that they are complying with those standards. We would absolutely be interested in working with vendors to conduct that level of analysis.

WYDEN: Let me ask one last question. Obviously, the integrity of elections depends on a lot of people. State and local election officers, equipment vendors, third party contractors.

Are you all, at Homeland Security and the FBI, confident that the federal government has now identified all of the potential government and private sector targets?

MANFRA: Yes, sir. I'm confident that we've identified the potential targets.

WYDEN: OK.

Thank you, Mr. Chairman.

BURR: Senator Collins?

COLLINS: Mr. Priestap, let me start by saying that it's a great pleasure to see you here again. I remember back in 2003, you were detailed to the Homeland Security Committee when I was the chairman and how helpful you were in our drafting the Intelligence Reform and Terrorism Prevention Act. So, thank you for your continued public service.

You testified this morning and answered the question of, what does Russia want? And you said that the Russians want to undermine the legitimacy of our elections and sow the seeds of doubt among the American public.

Despite the exposure and the publicity given to the Russian's efforts in this regard, do you have any doubt at all that the Russians will continue their activities in subsequent elections?

PRIESTAP: I have no doubt. I just can't -- I just don't know the scale on aggressiveness, whether they'll repeat that, if it'll be less or if it'll be more. But I have no doubt they will continue.

COLLINS: Is there any evidence that the Russians have implanted malware or backdoors or other computer techniques to allow them the easier access next time to our election systems?

PRIESTAP: I'm sorry, Senator. I just can't comment on that because of our impending investigations.

COLLINS: Secretary Manfra, the secretaries of state who are responsible for the election systems have a pretty blistering attack on the Department of Homeland Security, in the testimonies that will be given later this morning. And I want to read you part of that and have you respond.

They say, yet nearly six months after the designation -- and they mean the designation of election systems as critical infrastructure -- and in spite of comments by DHS, that they are rushing to establish election protections. No secretary of state is currently authorized to receive classified threat information that would help them to protect their election systems. Why not?

MANFRA: Thank you, ma'am, for that question. I would note that this community -- the secretaries of state, and for those states where they have a state election director, is not one that the department has historically engaged with. And what we have done in the process of building the trust and learning about how they do their work and how we can assist, we have identified the need to provide clearances to that community. And so we have committed to them to work through that process between our department and the FBI.

COLLINS: Let me ask you about your own agency, which is the agency that focuses on critical infrastructure, including our election systems. Now, NPPD is not an official element of the intelligence community that would have routine access to especially sensitive classified information.

So how do you know with any certainty whether you and others in the agency are read into all the relevant classified information that may exist regarding foreign threats to our critical infrastructure, including our election system?

MANFRA: Yes, ma'am. I would say, despite the fact that we're not a part of the intelligence community -- and our focus is on network defense and operations, in partnership with the critical infrastructure and the federal government -- we feel very confident that with the partnership with our own intelligence and analysis division, that serves as an advocate for us within the intelligence community, as well as our direct relationships with many of those individuals in organizations such as the FBI, NSA and others, that we receive information quickly. And when we ask to declassify that, there are responses, and we work through our partners at the intelligence analysis office to ensure that that happens quickly. So is there room for improvement? Absolutely, of course, but we have the full commitment of the intelligence community to support us and get us the information that we need and our stakeholders need.

COLLINS: And, finally, how many states have implemented all the best practices recommended in the document developed by DHS regarding the protection of election systems?

MANFRA: Ma'am, I'd have to get back to you on a specific number of states. I don't have them.

COLLINS: Do you think most states have?

MANFRA: In our informal engagement, many of them noted that they had already adopted some of these and to the extent that they weren't -- they were incorporating them.

COLLINS: I would ask for a response for the record.

MANFRA: Yes, ma'am.

COLLINS: That's a really important point.

BURR: Senator Heinrich?

HEINRICH: Mr. Priestap, I want to thank you for just how seriously you've taken this and how you've answered the questions this morning in your testimony. I think you hit the nail on the head when you said we need to step back and ask the fundamental question, what do the Russians want?

And by outlining that they want to undermine legitimacy in our system, that they want to sow discord, that they want to undermine our free and fair elections, we really have a better lens with which to understand the -- the specifics of what happened in 2016. In -- in your view, were the Russians successful at reaching their goals in their activities in our 2016 elections?

PRIESTAP: I don't know for certain whether the Russians would consider themselves successful. In many

ways, they -- they might argue that because of the time and energy we're spending on this topic, maybe it's distracting us from other things. But, on the other hand, exactly what this committee is doing as far as raising awareness of their activities, their aims, for the American people, to me they've done -- in my opinion, they've done the American public a service in that regard. And so, I guess I don't know but could argue either way.

HEINRICH: Yes. I -- I think the -- the jury's certainly out for the future, but when you look at the amount of discord that was sown and the impact on 2016, I hope that the outcome of what we're doing here is to make sure that in 2018, and in 2020, and 2022, that by no metric will they have been successful.

Mr. Priestap, you stated, very correctly, that one of their primary goals was to delegitimize our democracy. Are -- are you familiar with the term unwitting agent?

PRIESTAP: Yes, I am.

HEINRICH: Can you kind of summarize what that is for us?

PRIESTAP: In an intelligence context, it would be where an intelligence service is trying to advance certain names and they reach out to a variety of people, some of which they might try to convince to do certain things. And the -- the people, person or persons they contact might actually carry those out, but for different reasons than the intelligence service that actually wanted them to carry them out. In other words, they do it unwittingly.

HEINRICH: By effectively reinforcing the Russian narrative and -- and publicly saying that our system is rigged, did then candidate Trump -- now President Trump, become, what intelligence officials call, an unwitting agent?

PRIESTAP: I -- I can't give you a comment on that.

HEINRICH: I -- I don't blame you for not answering that question. We've got about a minute 46 left. Can you talk about the relationship between the election penetration that we saw and the coincident Russian use of, what Senator Rubio very aptly described, of trolls, of bots, of social media, all designed to manipulate the American media cycle and how those two things fit together?

PRIESTAP: I'm sorry. To clarify, fit together the intrusions with the...

(CROSSTALK)

HEINRICH: What's the relationship between what they were doing in our elections, from a technical point of view, and what they were seeking to do in our media cycle, by using trolls, and bots and manipulation to the media cycles.

PRIESTAP: The -- the -- I guess the best way I can describe it is that this was a, my opinion, a well planned, well coordinated, multi-faceted attack on -- on our election process and democracy. And, while that might sound complicated, it was actually really straight forward. They want to collect intelligence from a variety of sources, human and cyber means.

They want to evaluate that intelligence, and then they want to selectively -- they might selectively disseminate some of it. They might use others for more strategic discussions, but at the end of the day, it's all about collecting intelligence that would give them some type of advantage over the United States and/or attempt to influence things. And then, coordinated -- well coordinated, well funded, diverse ways to disseminate things to hopefully influence American opinion.

HEINRICH: This is a very sophisticated, highly resourced...

(CROSSTALK)

PRIESTAP: Absolutely.

HEINRICH: Thank you.

BURR: Senator Blunt?

BLUNT: Thank you. Thank you, Chairman.

Let's talk a little bit about once -- let's start with a comment that DHS made in it's written comment which -- which says, in excess, that the systems Russian actors targeted or compromised were not involved in vote tallying. Now is that because the vote tallying systems are a whole lot harder to get into than the voter registration systems?

MANFRA: I can't make a statement as to why different systems were targeted. What we can assess that is that those vote tallying systems, whether it was the machines or a kiosk that a voter uses at the polling station, or the systems that are used to tally votes, were very difficult to access, and particularly, to access them remotely. And -- and then given the level of observation of -- for vote tallying at every level of the process that adds into, you know, that we would have identified issues there and there were no identified issues. So those two are...

(CROSSTALK)

BLUNT: OK. I -- I would think that if you could get into the vote tallying system, and you did want to impact the outcome of an election, obviously, the vote tallying system is the place to do that. And I would also suggest that all of your efforts -- most -- a lot of your efforts should be to continue to do whatever DHS thinks they need to advise. I don't think we should centralize this system to give advice to state and local election officials to be sure that that that vote tallying system is protected at a level above other systems.

You know, the voter registration system is public information. It is generally accessible in lots of ways. It's not nearly as protected, for that reason. You have lots of them put from lots of sources into that system. And I think, Ms. Manfra, you made the point that you said that in a -- the best practice would be to not have the vote tallying system connected in any unnecessary way to the internet. Is that right?

MANFRA: Both the kiosks themselves and vote tallying systems, to not connect them to the internet and to also have, ideally, paper auditing trails as well.

BLUNT: Well, I certainly agree with that. The paper trail is significant and -- and I think more prevalent as people are looking at new systems. But also, I think any kind of third party monitoring, the third -- the first two parties would be the voter and the counting system, just creates another way into the system. So, my advice would be that DHS doesn't want to be in a situation where somehow you're connected to all the voting systems of the country.

And Mr. Liles, I think you said the diversity of our voting system is a great strength of the system. Do you want to comment on that any more?

LILES: Yes, sir. When we were setting it as part of our red teaming activities, we looked at the diversity of the voting system as actually a great strength. And the fact that there were not connected in any one kind of centralized way. So we evaluated that as -- when we were looking at the risk assessment with OCIA, the Office of Cyber Intelligence Analysis -- Infrastructure Analysis, we looked at that as one of the great strengths and our experts at DIC we worked with also said the same thing.

BLUNT: Well, I would hope you'd continue to think about that as one of the great strengths, as you look at this critical infrastructure, because every -- every avenue for federal monitoring is also just one more -- one more avenue for somebody else to figure out how to get into that system.

And again, the voter registration system dramatically different in what it does. All public information accessible, printed out, given to people to use, though you are careful of what information you give and what you don't. But almost all election officials that have this system now, have some way to share that with the public, as a system.

There is no reason to share the security of the vote counting system with the public, or to have it available or accessible. And I would hope that the DHS, or nobody else, decides that you're going to save this system by having more avenues -- more avenues into the system.

MANFRA: Absolutely not, sir. We're fully supportive of the voluntary standards process, and we are engaging with that process with our experts and we continue, again, with the voluntary partnership with the state and local. And we intend to continue that.

BLUNT: Thank you. Thank you, Mr. Chairman.

BURR: Senator King?

KING: Thank you, Mr. Chairman.

Starting with a couple of short questions, Mr. Priestap.

Number one, you've stated this was a very grave threat, that Russia -- the attempts to probe and upset our local election systems. Any doubt it was the Russians?

PRIESTAP: No, sir.

KING: Any doubt that they'll be back?

PRIESTAP: No, sir.

KING: To our DHS witnesses, have the 21 states that you've mentioned, that we know where we had this happen, been notified officially?

MANFRA: Sir, the owners of the systems within those 21 states have been notified.

KING: How about the election officials in those states?

MANFRA: We are working to ensure that election officials as well understand. I'll have to get back to you on whether all 21 states...

(CROSSTALK)

KING: Have you had a conference of all state election officials, secretaries of state here in Washington on this issue?

MANFRA: I have had at least two teleconferences, and in-person conferences -- we will be engaging with them in July, I believe.

KING: Well, I would urge you to put some urgency on this. We've got another election coming in 18 months and if we're talking about systems and registration rules, the time is going by. So, I believe, this is -- as we've already heard characterized, is a very grave threat. It's going to be back and shame on us if we're not prepared.

MANFRA: Yes, sir. We have biweekly -- every other week, we hold a teleconference with all relevant election officials, the national associations that represent those individuals have nominated bipartisan individuals to engage with us on a regular basis.

This is of the utmost urgency for the department and this government to ensure that we have better protections going forward. But the community -- the election community is similarly committed and has been so for years.

KING: And just to be clear, nobody's talking about a federal takeover of local election systems or the federal rules. What we're talking about is technical assistance in information and perhaps some funding, at some point.

MANFRA: Sir, this is similar to our engagement with all critical infrastructure sectors, whether it's the electrical sector, the nuclear sector, the financial sector, is completely voluntary, and it is about this department providing information, both to potential victims, but to all network defenders, to ensure that they have access to what we have access to and can better defend themselves.

KING: Thank you.

Mr. Liles, I'll take issue with something that you said -- that we have a national election and it was just too large, too diverse, to really crack. We don't have a national election. What we have are 50 state elections. And each election in the states can depend upon a certain number of counties.

There are probably 500 people within the sound of my voice who could tell you which ten counties in the United States will determine the next presidential election. And so you really -- a sophisticated actor could hack a presidential election, simply by focusing on particular counties. Senator Rubio, I'm sure, remembers Dade County in the year 2000 and the significance that had to determining who the next president of the United States was.

So, I don't think it works to just say, oh, it's a big system and the very diversity will protect us because it really is county by county, city by city, state by state and a sophisticated actor, which the Russians are, could easily determine where to direct their attack. So I don't want to rely on the diversity.

Second -- a separate point is, what do we recommend? And we've talked about paper backups. The Dutch just had an election where they just decided to make it all paper and count the ballots by hand, for this very reason. So what would you tell my elections clerk in Brunswick, Maine, Ms. Manfra, would be the top three things he or she should think about in protecting themselves in this situation?

MANFRA: Sir, I would say, to first, as previous senators mentioned, prioritize the security of your voting machines and the vote tallying system, ensure that they are not connected to the internet -- even if that is enabled on those particular devices.

Second, ensure that you have an auditing process in place where you can identify anomalies throughout the process, educate polling workers to look for suspicious activity, for example.

KING: But does -- doesn't auditing mean a paper trail, a paper backup?

MANFRA: Yes, sir. I would recommend a paper backup.

KING: And one of the worrisome things, again, on the issue of the national, we talk about how diverse it is, but aren't we seeing a consolidation in terms of the vendors who are producing these machines? MANFRA: Yes, sir. It is my understanding that we are seeing some consolidation in the vendor community. Again, many of them are committed and have engaged on the voluntary voting standards and guidelines, which partly include security.

We will be updating those security guidelines in 2018, and yes, while there is some concern about consolidation, we do look forward to engaging with them, and as of now, they are a very engaged community.

KING: I think this aspect of this question that we're -- this committee is looking at is one of the most important, and frankly, one of the most daunting, because we pretty well determined that they weren't successful in changing tallies and changing votes but they weren't doing what they did, in at least 21 states, for fun.

And they are going to be back, and they're going to be back with knowledge and information that they didn't have before. So I commend you for your attention to this and certainly hope that this is treated with the absolute utmost urgency.

KING: Thank you, Mr. Chairman.

BURR: Senator Lankford?

LANKFORD: Thank you, Mr. Chairman.

Thanks to all of you for being here as well today.

So, Senator King, just as a heads up, there are some states that are like that. For 25 years the Oklahoma election system has had a paper ballot, and an optical scan and it's been a very good back-up for us. We -- we quickly count because of the optical scan, but we're able to go back and verify because of paper.

This is such a big deal and it's such an ongoing conversation that I'm actually in two simultaneous hearings today, I'm running back and forth with. In the Department of Homeland Security, and what we're dealing with with state elections, and with state systems, is also happening in the HSGAC hearing that I'm also at, including my own Oklahoma CIO that's there testifying today, on this same issue.

How we are protecting state systems, state elections and what's happening? I brought this with me today, you all are probably -- this group is very, very familiar with this e-mail. This is the famous e- mail that Billy Rinehart got, from the DNC, while he happened to be on vacation. He was out in Hawaii enjoying some quality time away from his work at the DNC, and he gets a -- an e-mail from Google, it appears, that says someone has used your password, someone just tried to sign-in to your Google account.

Sent it to him and told him someone tried to do it from the Ukraine, and recommended that he go in and change his password immediately. Which, as the New York Times reported, he groggily at 4 a.m., when he saw that e-mail was frustrated by it, went in, clicked on the link, changed his password and went back to bed.

But what he actually did, was just gave the Russian government access to the DNC, and then it took off from there. Multiple other staff members of the DNC got an e-mail that looked just like this. Now, for everyone who has a Google account, will know that really looks like a Google account warning.

It looked like the real thing when you hovered over the changed password, it showed a Google account connection, where it was going to, but it wasn't. It was going to the Russians. About 91 percent, my understanding is, about 91 percent of the hacks that come into different systems, start with a spear phish attack that looks just like this.

So let's -- let's talk about, in practical terms, for our state election folks and what happens in my state and other states. First, for you, Mr. Priestap, how does Russia identify a potential target? Because this is not just a random e-mail that came to him, this was targeted directly at him, to his address. It looked very real, because they knew who he was and where he works. So, how were the Russians that savvy to be able to track this person and how does this work in the future for an election system for a state?

PRIESTAP: So I can't go into great detail in this forum, but I'd say what intelligent services do, not just Russia there, is they're looking for vulnerabilities. That -- that would begin in the cyber sense with computer vulnerabilities. As far as targeting specific individuals, I -- I don't know all the facts surrounding that e-mail and all the e-mails were sent, but my guess is, they didn't just send it to one person. They send it -- sent it the e-mail like that to a whole variety of -- just hoping that one would click on it.

LANKFORD: Right. But how are they getting that information? Are they going to their -- their website, for instance, and gathering all the e-mails for it? I'm trying to figure out, are they tracking individuals to get more information, so they get something that looks like something they would click on?

PRIESTAP: Yes. You hit on it, but a whole variety of ways. They might get it through reviewing open source material, either online or otherwise, but they also collect a lot of information through their -- through human means.

LANKFORD: So, Ms. Manfra, let me ask you this question. When someone, at any location, clicks on a link like this, what access to information do they get typically?

MANFRA: Well, sir, it depends on -- on the system itself. I -- I imagine that's probably a frustrating response, but given the -- and I think this is important for the public to understand, is, as the -- the threat evolves they're going to continue as we educate the public, don't click on certain things. Look at, you know, make sure you know the sender, for instance before you click on it and as our defense gets better the offense is going to look for other means.

And so we look, you know, in this case, ideally, we want people to look and see what -- what is it that they're actually clicking on before they click it. Some organization to -- to say when an individual clicks on that link, they choose to not allow that to go to that destination, because they know it's suspicious or they have some mechanisms in place to put that into a container and look at it. Other organizations don't take those steps and it really depends on your risk management and the technical control that you put in place.

LANKFORD: Let me ask you a quick question. Who has primary responsibility for Federal election integrity? Which agency is the prime mover in that? Obviously, states oversee their own, but which Federal entity is working with the state to say they're the prime person -- or the prime agency to do it? MANFRA: For election cybersecurity, our -- our department, in coordination with the FBI and others, is leading the partnership with state and locals.

LANKFORD: Great. Thank you.

BURR: Senator Manchin?

MANCHIN: Thank you, Mr. Chairman.

And thank all of you for your appearance here today and your testimony. Being a former Secretary of state of the -- my great state of West Virginia, and also being a former governor, my utmost concern was voter fraud. Every time that we would have a report of a fraud, I would see the election participation decrease, the next election cycle, thinking their vote didn't count.

Is there any reason, at all, that any person that has the knowledge that you all have, or anyone that you've -- on our committee here, from the intelligence community, would give you any doubt that Russia was involved, and Russia was very much involved with the intent of doing harm to our election process, as far as the confidence level that voters would have? Do any of you have any concerns, whatsoever, any doubts, that the Russians were behind this and involved in a higher level than ever? All three of you.

PRIESTAP: No -- no doubt from the FBI's end as far as the -- as far as Russia's involvement.

MANCHIN: And you've all interacted with all the intelligence community right?

PRIESTAP: Yes, sir.

MANFRA: Similar, sir. I have no doubt.

MANCHIN : There's not an American right now that should have a reasonable doubt whatsoever that the Russians were involved? Were all 50 states notified on Russia's intentions and activities during the '20 (sic) election cycle? Had you all put an alert out? So if I'd have been secretary of state in charge of my elections in West Virginia, would you have notified me to be on the lookout?

MANFRA: Sir, I can discuss our products that we put out and I'll defer to the FBI on -- on what they put out. We did put out products, not public products, but we did put out products, primarily leveraging our multi-state information sharing analysis center, which has connections to all 50 states CIOs.

And we engaged with the Election Assistance Commission and other national associations that represent those individuals to ensure that we were able to reach, again this was a community that we had not historically engaged with, and so, we relied on those, that we did put out multiple products prior to the election.

MANCHIN: And you're really not sure if these national associations, like (ph) the secretary of states, dispersed that information, put everybody on high alert?

MANFRA: I -- I believe that they did, sir. We also held a conference call, where all 50 secretaries of state, or an election director, if the -- if the secretary of state didn't have that responsibility. In August, and September and again in October, both high level engagement and network defense products.

MANCHIN: And if I could ask this questions to whoever, maybe Mr. Priestap, what was Russia's intention, and do you think they were successful in what they desired to do, even thought they didn't alter -- as you all have said, you can see no alterations of the election results. Do you believe that it had an effect in this election outcome -- in the outcome of this 2016 election?

PRIESTAP: As far as Russia's intention, again, the broader being to undermine democracy and one of the ways they sought to do this, of course, here, was to undermine the legitimacy of our free and fair election.

MANCHIN: Do you believe they were successful in the outcome?

PRIESTAP: No, I -- the FBI doesn't look at that, as far as, did Russia achieve its aims in that regard.

MANCHIN: Let me ask this question. Are there counter actions the U.S. can take to subvert or punish the Russians for what they have done, and their intention to continue? And what's your opinion of the sanctions that we have placed on Russia?

PRIESTAP: Sure. As you know, the FBI doesn't do policy. I'm here today to provide you an overview of the threat picture, at least, as I understand and see it. But obviously the U.S. government did take action post-election in regards to making a number of Russian officials...

(CROSSTALK)

MANCHIN: Have you seen them subside, at all, any of their activities since we have taken some actions?

PRIESTAP: Subside? They have less people to carry out their activities, so it's certainly had an impact on the number of people.

MANCHIN: And finally, with the few seconds I have left, have we shared this with our allies, our European allies, who are going through election processes and have they seen the same intervention in their election process that we have seen from the Russians in ours? PRIESTAP: Sure. I can't speak for DHS, but the FBI is sharing this information with our allies, absolutely.

MANCHIN: How about DHS?

MANFRA: We are also sharing information with our allies.

MANCHIN: Are they seeing a high -- an overaggressive, high activity, from the Russians that they haven't seen at this level before, such as we did during the 2016 election?

LILES: Sir, there is immediate reporting that suggests that. We don't have direct government-to-government relationships from a DHS perspective. There is definitely immediate reporting that they're seeing an increased

activity.

MANCHIN: Thank you.

BURR: Senator Cotton?

COTTON: Thank you all for your appearance today.

Mr. Priestap, in response to Mr. Heinrich's question about whether Donald Trump had become an unwitting agent of Russia, and their efforts to sow discord and discontent about our elections, you said that you decline to answer, which is understandable.

Let's look at this from a different perspective. Since her election defeat, Hillary Clinton has blamed her loss on the Russians, Vladmir Putin, the FBI, Jim Comey, fake news, Wikileaks, Twitter, Facebook and my personal favorite, content farms in Macedonia. In her blaming her loss on these actors, has Hillary Clinton become an unwitting agent of Russian's goals in the United States?

PRIESTAP: And I'm sorry, sir, but I'd rather not comment. It's just something...

(CROSSTALK)

COTTON: I understand. I just wanted to point out that you can look at it from two different...

(CROSSTALK)

PRIESTAP: ...it's just something I haven't given any thoughts to.

COTTON: Let's turn to other matters, then. Would you advise states and localities in the conduct of their elections, or more broadly, in their government services, not to use, or not to do business with Kaspersky Labs, companies that do business with Kaspersky or companies that use Kaspersky products in their systems?

PRIESTAP: Sir, I can't really comment on that in this setting.

COTTON: Miss Manfra, would you advise them not to use Kaspersky products?

MANFRA: I also cannot comment on that in this forum, sir.

COTTON: I don't even have to ask, Dr. Liles. You're reaching for your microphone.

LILES: Yes, sir. I can't comment either.

COTTON: OK. Senator Risch says he'll answer, but I'll let him speak for himself at a later time. Mr. Priestap, we've talked a lot about Russia's intent and activities in our elections but I think it's important that the American people realize that it goes much farther than just elections and the 2016 campaign, as well.

Isn't it true that Russian cyber actors have been probing U.S. critical infrastructure for years?

PRIESTAP: Yes, sir. I can't go into specifics but they probe a lot of things of critical importance to this country.

COTTON: And as the head of counter intelligence, you write in your statement, that quote, "Russia's 2016 presidential election influence effort was its boldest, to date, in the United States" which implies there have been previous efforts. You also say that the FBI had to strengthen the intelligence community assessment because of our history investigating Russia's intelligence operations within the United States. Both of which suggest that this keeps you pretty busy in your portfolio and counterintelligence, is that right?

PRIESTAP: That's correct.

COTTON: And this is -- Russian intelligence threat is not just a cyber threat either. It also is a threat from traditional human intelligence, or what a layman might call spies, is that right?

PRIESTAP: Yes, sir.

COTTON: Do so called diplomats who work down at the Russian embassy in Washington D.C. have a requirement to notify our state department in advance if they plan to travel more than 25 miles, and give that notification 48 hours in advance?

PRIESTAP: They do.

COTTON: And the State Department's supposed to notify the FBI in advance of those travel arrangements, correct?

PRIESTAP: Yes.

COTTON: Is it true that the Russian nationals often fail to give that notification, at all, or they give it at, say, 4:55

on a Friday afternoon before a weekend trip?

PRIESTAP: I'd prefer not to go into those details here, but -- I'll leave it at that. COTTON: Does it complicate you and your agents' efforts to conduct your counterintelligence mission, to have Russian nationals wandering around the country more than 25 miles outside their duty assignment?

PRIESTAP: Sure. If that were to happen, that would absolutely complicate our efforts.

COTTON: The Secretary of Defense recently indicated, at a Armed Services Committee hearing, that Russia is in violation of something called the Open Skies Treaty, a treaty we have with Russia and other nations that allow us to overfly their territory and take pictures and they do the same here. Do we see so called Russian diplomats traveling to places that are in conjunction with open skies flights that Russia's conducting in this country?

PRIESTAP: I'm sorry, I just can't comment on that here.

COTTON: OK. Is it -- so last summer, a American diplomat in Moscow was brutally assaulted on the doorstep of our embassy in Moscow. Did we take any steps to retaliate against Russia for that assault in Moscow? Did we declare persona non grata any of their so called diplomats here in the United States?

PRIESTAP: If I recall correctly, we didn't immediately do anything in that regard.

COTTON: OK. This committee passed, unanimously, in committee last year, something that just passed as part of the (inaudible) in April a provision that would require one, the State Department to notify the FBI of any requests for Russian diplomats to travel outside their embassy and to report violations to you.

It further requires the State Department to report those violations, regularly, to this committee. What's the status of that provision, now that it's been in law for about two months? Is the State Department cooperating more fully with you?

PRIESTAP: I guess I'd rather not comment on that here. We're still working through the implementation of that.

COTTON: Well, I certainly hope they start. Thank you.

BURR: Senator Harris?

HARRIS: Thank you. Ms. Manfra, you mentioned that you notified the owners. I'm not clear on who the owners are. Are they the vendors?

MANFRA: What I meant to clarify is, in some case, it may not be the secretary of state or the state election director who owns that particular system, so in some cases it could be a locality or a vendor.

HARRIS: So is there a policy of who should be notified when you suspect that there's a threat?

MANFRA: We are working through that policy with the secretaries of state, that is one of the commitments that we made to them, as election directors, in order to ensure that they have appropriate information, while preserving the confidentiality of the victim, publicly.

HARRIS: And can you tell us which states - in which states you notified the vendor instead of notifying the secretary of state?

MANFRA: We keep the vendor information confidential as well.

HARRIS: Are there states that you notified where you did not notify the person who was elected, by the people of that state, to oversee elections?

MANFRA: I don't believe that's the case but I will get back to you with a definitive answer.

HARRIS: And how specific was the warning that you sent? What exactly is it that you notified the states or the vendors of?

MANFRA: Depending on the scenario, and the information that we had, and more generally what we do, is when we get classified information, we look to declassify as much as possible to enable...

(CROSSTALK)

HARRIS: Let's talk about the election, yeah.

MANFRA: So for this particular one, what we took was technical information that we had, that we believed was suspicious, and that was emanating from Russia, and was targeting their system, we asked them to look at their

system. We asked, and this was part of the broader dissemination, as well, we asked all states to look at their system, to indentify whether they had an intrusion, or whether they blocked it. In most cases, they blocked it.

HARRIS: Do you have a copy with you of the notification you sent to these various vendors or states?

MANFRA: I do not, ma'am, but we can get back to you.

HARRIS: OK, and will you provide this committee with a copy of the notification you sent to those states or vendors?

MANFRA: Many of them were done in person, but what I can show you is the technical information. That was also rolled up in the information that we published in December, but I can show you what we provided to the states and localities.

HARRIS: And did you notify each of them the same way? Or did you tailor the notification to each state?

MANFRA: We tailor the notification. It's a process for all victim, or potential victim, notification -- us and the FBI, so sometimes it may be an FBI field agent that goes out there, sometimes it may be a department official that goes out there.

HARRIS: OK, so in your follow-up to the committee, please provide us with, specifically, who notified each state, and then who in that state was notified, the vendor or the state election official, and also what specifically they were notified of. I have, in 2007, California worked with leading security researchers, the secretary of state at the time was Deborah Bowen, and they instituted some of the best practices, we believe, for election security. And my understanding is that it is considered a gold standard. So my question is, does DHS have the technical capability and authority to coordinate a study like that for all of the states?

MANFRA: We do have the technical capability and authority to conduct those sorts of studies, ma'am, yes.

HARRIS: Have you pursued that as a viable option to help the states do everything they can to secure their system?

MANFRA: That is one of the areas that we're considering, yes, ma'am.

HARRIS: So have you taken a look at that study that was commissioned in California, in 2007? And if not, I'd encourage that you do.

MANFRA: I have not personally, but I will read it, ma'am.

HARRIS: And I'm also concerned that the federal government does not have all the information it needs in these situations where there's been a breach. Is there any requirement that a state notify the federal government when they suspect there's been a breach?

MANFRA: No, ma'am.

HARRIS: And in terms of the American public and voters in each of these states, can you tell me is there any requirement that the state notify its residents when the state suspects there may be a breach?

MANFRA: I cannot comment. I know that multiple states have different sunshine laws, et cetera, that apply to data breaches within the state, so I couldn't make a general statement about what their requirements are at the state level.

HARRIS: And do any of you have any thoughts about whether there should be such requirements, both in terms of states reporting to the federal government, and also states reporting to their own residents and citizens about any breaches of their election system?

MANFRA: Required data breach reporting is a complicated area. We prefer, and we've had a fair amount of success with, voluntary reporting and partnerships, but we'd be happy to work with your staff in further understanding how that might apply here.

HARRIS: OK, I appreciate that. Any other thoughts, as we think about how we can improve notification and sharing of information? No. OK, thank you.

BURR: Before I move to Senator Reed, let me just say that since a number of members have questioned the agencies, especially those that are here, and the sharing with Congress of the investigation, I'll just say that the Chair and the Vice Chair were briefed at the earliest possible time, and continued to be briefed throughout the

process, and then it was opened up to all the members of the committee. I'm not sure that I had ever shared that with everybody but I just want to make sure that everybody's aware of that.

Senator Reed?

REED: Thanks very much, Mr. Chairman.

Thank you very much, ladies and gentlemen. Let's start with Mr. Priestap. Are you aware of any direction or guidance from President Trump to conduct this investigation about the Russian cruising (ph) in our elections?

PRIESTAP: Sir, I can't comment on that. It could be potentially related to things under the special councils purview.

REED: Thank you.

Ms. Manfra, in terms of home security, are you aware of any direction by the president to conduct these types of operations, or your investigations?

MANFRA: Sir, to clarify the question, direction from the president to...

(CROSSTALK)

REED: The President of the United States has directed that we, the Department of Homeland Security, and other federal agencies conduct a - the activities that you're conducting, essentially investigation, in to Russian hacking in the election.

MANFRA: I can't comment on the president's directions, specifically, but our secretary is committed to understanding what happened, ensuring that we are better protected in the future, so our activities are fully supported.

REED: He has not communicated that this is at the direction of the President of the United States?

MANFRA: No, sir.

REED: Director Liles?

LILES: Sir, this comes directly written down from the IC (ph) who has been working on this for quite a while, and so, and the secretary has completely supported it.

REED: But again, no...

(CROSSTALK)

LILES: Nothing from the president directly, sir.

REED: Thank you. I thought Senator King raised some very interesting issues, in terms of most election - national elections, as much you like to think about it, particularly from Rhode Island, are not decided in certain states, but decided even in certain cities and counties. Which raised an interesting question -- you were very assertive about that you'd be able to diagnose an intrusion that was altering voter -- votes, literally. When could you do that? Within weeks of an election, on Election Day, after Election Day?

LILES: Sir, from an IEC perspective, the way we would do that is by looking at the threats themselves that were targeting specific entities. And the other element that we would look at is, as the reporting itself was coming in, if there was any statistical anomalies we were seeing. And I'd also point out, that we're talking about internet-connected systems here, and not all of the key counties that you would represent would be those internet-connected systems.

REED: But, effectively, like -- I think what you've said is, that you'd really have to wait for confirmation until the results started coming in on election day, which raises the issue of -- even if you detect it on Election Day, what do we do?

The votes have already been cast. Are you -- is anyone planning on -- what's the -- what reaction we take? How do we notify people? What are -- what steps do they take?

LILES: I'd have to defer to other (OFF-MIKE).

MANFRA: Yes, sir. And I do want to clarify, when we say that that activity would be difficult to detect, it would be -- or difficult to go on undetected, it would -- that we're discussing both at the polling station or the jurisdiction -- that it would be hard for somebody to do that without anybody -- not necessarily that the department would --

would have that immediate insight.

And, to answer your question, yes, that is absolutely something that is a part of our planning and -- and what we would look forward to partnering with the state and local officials on understanding.

REED: So we're, again, about 18 months away from election. We have to be able to develop a -- not technical infrastructure, but an organizational infrastructure that could react, maybe on very short notice, to discovery that actual votes were being tampered. Is that accurate?

MANFRA: Absolutely, sir. It is both technical and organizational.

REED: And do you think there's enough emphasis in terms of the resources and support to do that, the collaboration? I -- you've got 50 states, and among those states, many of the voting jurisdictions are not at the state level -- they're the city and town canvasser. Are we taking it serious enough? I guess that's the issue.

MANFRA: Absolutely, sir. This is one of our highest priorities. And I would also note that we're not just looking ahead to 2018, as election officials remind me, routinely, that elections are conducted on a regular basis. And so -- highest priority, sir. Yes.

REED: Let me ask Mr. Priestap, if I've pronounced it incorrectly., forgive me. But you -- you testified today, and your colleagues, that information was exfiltrated by the Russians. What type of information was taken, and what could it be used for?

PRIESTAP: Yes, sir. I don't want to get into the -- the details of which -- what victim information was taken. Again, we've got a variety of pending investigations.

But it -- it -- again, it could be used for a variety of purposes. Could have been taken to understand what's in those systems. It could have been taken to use to try to target -- learn more about individuals, so that they could be targeted.

It could -- it could have been taken in a way to then publicize, just to send a message, that a foreign adversary has the -- ability to take things and to sow doubt in our voters' minds.

REED: Let me ask you this question, as a judgment. Given the activities that the Russians have deployed, significant resources, constant effort over -- as you -- the intelligence community -- probably a decade, do you think they have a better grasp of the vulnerabilities of the American voting system than you have?

PRIESTAP: I hope not. I think it's a -- I think it's an excellent question and I can -- well, first of all, I hope not and I don't think so, but if they did, I don't think they do anymore.

REED: Thank you very much.

BURR: Thank you, Senator Reed.

Before we move to the second panel, one last question, Mr. Priestap, for you.

Is there any evidence that the attempt to penetrate the DNC was for the purposes of launching this election year intrusion process that they went on? Or was this at the time one of multiple fishing expeditions that existed by Russian actors in the United States?

PRIESTAP: In my opinion, it was one of many efforts. You'd call it a fishing expedition, but to determine again, what's out there, what intelligence can they collect. So they don't go after one place. They go after lots of places and then...

BURR: Tens? Hundreds? Thousands?

PRIESTAP: Hundreds. . At least hundreds.

BURR: OK.

I want to wrap up the first panel with just a slight recap.

I think you have thoroughly covered that there's no question that Russia carried out attacks on state election systems. No vote tallies were affected or affected the outcome of the elections. Russia continues to engage in exploitation of the U.S. elections process and elections are now considered a critical infrastructure, which is extremely important and does bring some interesting potential new guidelines that might apply to other areas of critical infrastructure that we have not thought of because of the autonomy of each individual state and the

control within their state of their election systems.

So I'm sure this will be further discussed as the appropriate committees talk about federal jurisdiction, where that extends to. And clearly, I think it's this committee's responsibility as we wrap up our investigation to hand off to that committee somewhat of a road map from what we've learned or areas that we need to address, and we will work very closely with DHS and with the bureau as we do that.

With that, I will dismiss the first panel and call up the second panel.

END

**Subject:** Intelligence gathering; Committees; Local elections; State elections; Presidential elections; National security; Democracy; Politics;

**Location:** Russia United States--US

**Company / organization:** Name: Federal Bureau of Investigation--FBI; NAICS: 922120;

**Publication title:** Political Transcript Wire; Lanham

**Publication year:** 2017

**Publication date:** Jun 21, 2017

**Publisher:** CQ Roll Call

**Place of publication:** Lanham

**Country of publication:** United States

**Publication subject:** Political Science

**Source type:** Wire Feeds

**Language of publication:** English

**Document type:** News

**ProQuest document ID:** 1912737473

**Document URL:** https://search.proquest.com/docview/1912737473?accountid=14026

**Copyright:** 2017 Bloomberg Government

**Last updated:** 2017-06-23

**Database:** Global Newsstream,ABI/INFORM Trade & Industry

---

Contact ProQuest

Copyright © 2017 ProQuest LLC. All rights reserved. - Terms and Conditions

# Exhibit 6

# Hearing Transcripts

Back to Document View Page

(/congressional/result/congressional/pqpdocumentview?

## Title Info

**Title:**

HOUSE PERMANENT SELECT COMMITTEE ON INTELLIGENCE HEARING ON RUSSIAN ACTIVE MEASURES INVESTIGATION

**Date:**

March 20, 2017

**Location:**

WASHINGTON, D.C.

**Committee:**

Permanent Select Committee on Intelligence. House

**Permalink:**

https://congressional-proquest-com.stanford.idm.oclc.org/congressional/docview/t65.d40.03200003.s62?accountid=14026 (https://congressional-proquest-com.stanford.idm.oclc.org/congressional/docview/t65.d40.03200003.s62?accountid=14026)

## Speaker

REP. DEVIN NUNES

# Body

NUNES: The committee will come to order.

I would like to welcome our witnesses, director of the FBI, Jim Comey and director of the National Security Agency, Admiral Rogers. Thank you both for being here today.

Before we begin, I would like to remind our members and witnesses that this is an open hearing. I recognize the challenge of discussing sensitive national security issues in public. However, as part of this committee's investigation into Russian active measures during the 2016 election, it is critical to ensure that the public has access to credible unclassified facts and to clear the air regarding unsubstantiated media reports.

To our guests in the audience, welcome. We appreciate you being here. I also expect that the proper decorum will be observed at all times today and that disruptions during today's proceedings will not be tolerated. I now recognize myself for five minutes for the purpose of an opening statement.

The Putin regime has a long history of aggressive actions against other countries, including the outright invasion of two of its neighbors in recent years, as well as its brutal military action in Syria to defend the Assad regime. But it's hostile acts take many forms, aside from direct military assaults.

For example, the Kremlin is waging an international disinformation campaign through the RT propaganda network which traffics in anti-American conspiracy theories that rivaled the extravagant untruths of Soviet era Pravda (ph). Russia also has a long history of meddling in other countries, election systems and launching cyber attacks on a wide range of countries and industries.

The Baltic's and other Russian neighbors have long decried these attacks. But their warnings went unheeded in far too many nations'

capitals, including our own. The fact that the Russia -- that Russia hacked U.S. election-related databases comes as no shock to this committee. We have been closely monitoring Russia's aggression for years.

A year ago, I publicly stated that our inability to predict Putin's regime plans and intentions has been the biggest intelligence failure that we have seen since 9/11 and that remains my view today. However, while the indications of Russian measures targeting the U.S. presidential election are deeply troubling, one benefit is already clear. It has focused wide attention on the -- on the pressing threats posed by the Russian autocrat.

In recent years, committee members have issued repeated and forceful pleas for stronger action against Russian belligerents. But the Obama administration was committed to the notion against all evidence that we could reset relations with Putin. And it routinely ignored our warnings. I hope today's hearing will shed light on three important focus points of the committee's investigation on Russia active measures.

First, what actions did Russia undertake against the United States during the 2016 election campaign and did anyone from political campaign -- a political campaign conspire in these activities? Number two, were the communications of officials or associates of any campaign subject to any kind of improper surveillance? The intelligence community has -- has extremely strict procedures for handling information pertaining to any U.S. citizens who are subject even to incidental surveillance. And this committee wants to ensure all surveillance activities have followed all relevant laws, rules and regulations.

Let me be clear, I've been saying this for several weeks. We know there was not a physical wiretap of Trump Tower. However, it's still possible that other surveillance activities were used against President's Trump and his associates. Number three, who has leak classified information? Numerous current and former officials have leak purportedly classified information in connection to these

questions. We aim to determine who has leaked or facilitated leaks of classified information so that these individuals can be brought to justice.

I hope that this committee's bipartisan investigation will result in a definitive report on the Russian actions taken during the election campaign. To that end, we encourage anyone who has information about these topics to come forward and speak to the House Intelligence Committee. I again think the witnesses for helping shed light on these issues.

And I will let recognize Ranking Member Schiff. He's asked for 15 minutes for his opening statement, so I will go ahead and give him 15 minutes for his opening statement.

Mr. Schiff?

SCHIFF: Mr. Chairman, I thank you. And I also want to thank Director Comey and Admiral Rogers for appearing before us today as the committee holds its first open hearing into the interference campaign waged against our 2016 presidential election.

Last summer at the height of a bitterly contested and hugely consequential presidential campaign, a foreign adversarial power intervened in an effort to weaken our democracy and to influence the outcome for one candidate and against the other. That foreign adversary was of course Russia and it activated through its intelligence agencies and upon the direct instructions of its autocratic ruler Vladimir Putin, in order to help Donald J. Trump become the 45th president of the United States.

The Russian active measures campaign may have begun as early as 2015, when Russian intelligence services launched a series of spear fishing attacks designed to penetrate the computers of a broad array of Washington based Democratic and Republican party organizations, think tanks and other entities. This continued at least through the winter of 2016.

While at first the hacking may have been intended solely for the collection of foreign intelligence. In mid-2016 the Russians weapon eyes the stolen data and used platforms established by the Intel services, such as D.C. leaks in existing third-party channels like WikiLeaks to dump the documents. The stolen documents were almost uniformly damaging to the candidate Putin despised, Hillary Clinton. And by forcing her campaign to constantly respond to the daily drip of disclosures, the releases greatly benefited Donald Trump's campaign.

None of these facts is seriously in question. And they're reflected in the consensus conclusion of our intelligence agencies. We will never know whether the Russian intervention was determinative in such a close election. Indeed, it is unknowable in a campaign to which so many small changes could have dictated a different result. More importantly, and for the purposes of our investigation, it simply does not matter.

What does matter is this, the Russians successfully meddled in our democracy and our intelligence agencies have concluded they will do so again. Ours is not the first democracy to be attacked by the Russians in this way. Russian intelligence has been simile interfering in the internal and political affairs of our European and other allies for decades.

SCHIFF: What is striking here is the degree to which the Russians were willing to undertake such an audacious and risky action against the most powerful nation on Earth. That ought to be a warning to us that if we thought that the Russians would not dare to so blatantly interfere in our affairs, we were wrong.

And if we do not do our very best to understand how the Russians accomplished this unprecedented attack on our democracy and what we need to do to protect ourselves in the future, we will only have ourselves to blame. We know a lot about the Russian operation, about the way they amplified the damage their hacking and dumping of stolen documents was causing through the use of slick propaganda like R.T., the Kremlin's media arm. But there is a lot we don't know.

Most important, we do not yet know whether the Russians have the help of U.S. citizens including people associated with the Trump campaign. Many of the Trump's campaign personnel, including the president himself, have ties to Russia and Russian interests. This is of course no crime. On the other hand, if the Trump campaign or anyone associated with it aided or abetted the Russians, it would not only be a serious crime, it would also represent one of the most shocking betrayals of democracy in history.

In Europe, where the Russians have a much longer history of political interference, they've used a variety of techniques to undermine democracy. They employed the hacking and dumping of documents and slick propaganda as they clearly did here. But they've also used bribery, blackmail, compromising material, and financial entanglement to secure needed cooperation from individual citizens of targeted countries.

The issue of U.S. person involvement is only one of the important matters that the chairman and I have agreed to investigate and which is memorialized in the detailed and bipartisan scope of investigation that we have signed. We'll also examine whether the intelligence community's assessment of the Russian operation is supported by the raw intelligence, whether the U.S. government responded properly or missed the opportunity to stop this Russian attack much earlier and whether the leak of information about Michael Flynn or others is indicative of a systemic problem.

We have also reviewed whether there is any evidence to support President Trump's claim that he was wiretapped by President Obama in Trump Tower and found no evidence whatsoever to support that slanderous accusation. And we hope that Director Comey can now put that matter permanently to rest.

Today, most of my Democratic colleagues will be exploring with the witnesses the potential involvement of U.S. persons in the Russian attack on our democracy. It is not that we feel the other issues are less important; they are very important, but rather because this issue is least understood by the public. We realize of course that the

witnesses may not be able to answer many of the questions in open session.

They may or may not be willing to disclose even whether there is an investigation. But we hope to present to you directors and the public why we believe this is a matter of such gravity that it demands a thorough investigation not only by us as we intend to do but by the FBI as well.

Let me give you a short preview of what I expect you'll be asked by our members. Whether the Russian active measures campaign began as nothing more than an attempt to gather intelligence or was always intended to be more than that, we do not know and is one of the questions we hope to answer. But we do know this; the months of July and August 2016 appear to have been pivotal.

It was at this time the Russians began using the information they had stolen to help Donald Trump and harm Hillary Clinton. And so the question is, why? What was happening in July, August of last year and were U.S. persons involved? Here are some of the matters drawn from public sources alone since that is all we can discuss in this setting that concern us and we believe should concern all Americans.

In early July, Carter Page, someone candidate Trump identified as one of his national security advisors, travels to Moscow on a trip approved by the Trump campaign. While in Moscow, he gives a speech critical of the United States and other western countries for what he believes is a hypocritical focus on democratization and efforts to fight corruption.

According to Christopher Steele, a British -- a former British intelligence officer, who is reportedly held in high regard by US intelligence, Russian sources tell him that Page has also had a secret meeting with Igor Sechin, CEO of the Russian gas giant, Rosneft. Sechin is reported to be a former KGB agent and close friend of Putin's.

According to Steele's Russian sources, Page is offered brokerage

fees by such an on a deal involving a 19 percent share of the company. According to Reuters, the sale of a 19.5 percent share of Rosneft later takes place with unknown purchasers and unknown brokerage fees. Also, according to Steele's Russian sources, the campaign has offered documents damaging to Hillary Clinton which the Russians would publish through an outlet that gives them deniability like WikiLeaks.

The hacked documents would be in exchange for a Trump administration policy that deemphasizes Russia's invasion of Ukraine and instead focuses on criticizing NATO countries for not paying their fair share. Policies which even as recently as the President's meeting last week with Angela Merkel have now presently come to pass. In the middle of July, Paul Manafort, the -- the Trump campaign manager and someone who was a long on the payroll of Pro Russian-Ukrainian interests attends the Russian -- the Republican Party Convention. Carter Page, back from Moscow, also attends the convention. According to Steele, it was Manafort who chose Page to serve as a go-between for the Trump campaign and Russian interests.

Ambassador Kislyak, who presides over a Russian Embassy in which diplomatic personnel would later be expelled as likely spies, also attends the Republican Party Convention and meets with Carter Page, and additional Trump advisors J.D. Gordon and Walid Phares. It was J.D. Gordon who approved Page's trip to Moscow.

Ambassador Kislyac also meets with Trump national campaign chair, National Security Campaign Chair and now attorney general, Jeff Sessions. Sessions would later deny meeting with Russian officials during his Senate confirmation hearing. Just prior to the convention, the Republican Party platform is changed, removing a section that supports the provision of lethal defensive weapons to Ukraine, an action that would be contrary to Russian interests.

Manafort categorically denies involvement by the Trump campaign and altering the platform, but the Republican Party delegate who offered the language in support of providing defensive weapons to Ukraine states it was removed at the insistence of the Trump campaign. Later, J.D. Gordon admits opposing the inclusion of the provision of

the time it was being debated and prior to its being removed.

Later in July and after the convention, the first stolen e-mails detrimental to Hillary Clinton appear on WikiLeaks. A hacker who goes by the moniker, Guccifer 2.0, claims responsibility for hacking the DNC and giving the documents to WikiLeaks. A leading private cyber security firms including Crowdstrike, Mandiant and ThreatConnect review the evidence of the hack and conclude with high certainty that it was the work of APT 28 and APT 29 who are known to be Russian intelligence services.

The U.S. intelligence committee also later confirms that the documents were in fact stolen by Russian intelligence and Guccifer 2.0 acted as a front. Also in late July, candidate Trump praises WikiLeaks, says he loves them and openly appeals to the Russians to hack his opponents e-mails telling them that they will be richly rewarded by the press.

On August 8th, Roger Stone, a long time Trump political advisor and self-proclaimed political dirty trickster, boasts in his speech that he has communicated with Assange and that more documents would be
coming, including an October surprise. In the middle of August, he also communicates with the Russian cut out Guccifer 2.0 and authors a Breitbart piece denying Guccifer's links to Russian intelligence.

Then later, in August, Stone does something truly remarkable. When he predicts that John Podesta's personal e-mails will soon be published, trust me he says, it will soon be Podesta's time in the barrel, #crookedHillary. In the weeks that follow, Stone shows remarkable prescience. I have total confidence that WikiLeaks and my hero, Julian Assange will educate the American people soon, he says, #LockHerUp. Payload coming, he predicts and two days later it does.

WikiLeaks releases its first batch of Podesta e-mails. The release of John Podesta's e-mails would then continue on a daily basis, up until the election. On Election Day in November, Donald Trump wins. Donald Trump appoints one of his high-profile surrogates,

Michael Flynn, to be his national security advisor. Michael Flynn has been paid by the Kremlin's propaganda outfit RT in the past, as well as another Russian entity.

In December, Michael Flynn has a secret conversation with Ambassador Kislyak, about sanctions imposed by President Obama on Russia over attacking designed to help the Trump campaign. Michael Flynn lies about the secret conversation. The vice president unknowingly then assures the country that no -- no such conversation ever happened. The president is informed that Flynn has lied and Pence has misled the country. The president does nothing.

Two weeks later, the press reveals that Flynn has lied and the president is forced to fire Mr. Flynn. The president then praises the man who lied, Mr. Flynn, and castigates the press for exposing the lie.

Now, is it possible that the removal of the Ukraine provision from the GOP platform was a coincidence? Is it a coincidence that Jeff Sessions failed to tell the Senate about his meetings with a Russian ambassador, not only at the convention, but a more private meeting in his office and at a time when the U.S. election was under attack by the Russians?

Is it a coincidence that Michael Flynn would lie about a conversation he had with the same Russian Ambassador Kislyak, about the most pressing issue facing both countries at the time they spoke, the U.S. imposition of sanctions over Russian hacking of our election designed to help Donald Trump? Is it a coincidence that the Russian gas company, Rosneft, sold a 19 percent share after former British intelligence officer Steele was told by Russian sources that Carter Page was offered fees on a deal of just that size?

Is it a coincidence that Steele's Russian sources also affirmed that Russian had stolen documents hurtful to Secretary Clinton that it would utilize in exchange for Pro Russian policies that would later come to pass? Is it a coincidence that Roger Stone predicted that John Podesta would be a victim of a Russian hack and have his private

e-mails published and did so even before Mr. Podesta himself, was fully aware that his private e-mails would be exposed?

Is it possible that all of these events and reports are completely unrelated and nothing more than a entirely unhappy coincidence? Yes, it is possible. But it is also possible, maybe more than possible, that they are not coincidental, not disconnected and not unrelated and that the Russians use the same techniques to corrupt U.S. persons that they employed in Europe and elsewhere. We simply don't know, not yet. And we owe it to the country to find out.

Director Comey, what you see on the dais in front of you in the form of this small number of members and staff is all we have to commit to this investigation. This is it. We are not supported by hundreds or thousands of agents and investigators with offices around the world. It is just us and our Senate counterparts.

In addition to this investigation we still have our day job which involves overseeing some of the largest and most important agencies in the country. Agencies which by the way are trained to keep secrets. I point this out for two reasons and I'm -- I'm wrapping up Chairman. First because we cannot do this work alone and nor should we. We believe these issues are so important that the FBI must devote its resources to investigating each of them thoroughly, to do any less would be negligent in the protection of our country.

We also need your full cooperation with our investigation so that we may have the benefit of what you know and so that we may coordinate our efforts in the discharge of both our responsibilities. And second, I raise this because I believe that we would benefit from the work of an independent commission that can devote the staff resources to this investigation that we do not have. And it can be completely removed from any political considerations.

This should not be a substitute for the work that we, in the intelligence committee, should and must do. But as an important complement to our efforts, just as was the case after 9/11. The stakes are nothing less than the future of our democracy and liberal

democracy. Because we're engaged in a new war of ideas, not communism versus capitalism, but authoritarianism versus democracy and representative government. And in the struggle, our adversary sees our political process as a legitimate field of battle.

Only by understanding what the Russians did can we inoculate ourselves from further Russian interference that we know is coming. Only then can we protect our European allies, who are as we speak, enduring similar Russian interference in their own elections.

And finally, I want to say a word about our own committee investigation. You will undoubtedly observe in the questions and comments that our members make during today's hearing that the members
of both parties share a common concern over the Russian attack on our democracy. But bring a different perspective on the significance of certain issues or the quantum of evidence we have seen in the early -- earliest stages of this investigation. This is to be expected.

The question most people have is whether we can really conduct this investigation in the kind of thorough and nonpartisan manner that the seriousness of the issues merit or whether the enormous political consequences of our work will make that impossible.

The truth is, I don't know the answer, but I do know this, if this committee can do its work properly, if we can pursue the facts wherever they lead, unafraid to compel witnesses to testify, to hear what they have to say, to learn what we will. And after exhaustive work reach a common conclusion, it would be a tremendous public service and one that is very much in the national interest. So let us try.

I thank you, Mr. Chairman and I yield back.
NUNES: Thank you. Gentleman yields back.

With that that, Admiral Rogers, you're recognized for five minutes.

ROGERS: Thank you sir.

Chairman Nunes, Ranking Member Schiff and members of the committee. Thank you for the opportunity to appear before you today on behalf of the men and women of the National Security Agency.

I'm honored to appear besides my teammate Director Comey to discuss Russia's activities and intentions regarding the 2016 U.S. election. And want to assure the committee that my team is doing its best to fulfill the various requests of this committee to support your ongoing investigations into this subject.

ROGERS: Over the past weeks, NSA has been working closely with the committee to provide you the information that you require for your investigation and I can assure you we will continue to do so. When we last met in January, we discussed the classified version of the January intelligence committee -- community's assessment on assessing Russian activities and intentions in the recent U.S. elections.

Today, more than two months after we issued this assessment, we stand by it as issued. There is no change in our confidence level on the assessment. Of course, the specifics of this assessment need to remain classified to protect sensitive sources and methods so today I will limit my discussion to information in the public domain, that of the publicly released intelligence community assessment.

I hope you will understand that there are some issues I cannot discuss in an open session, nor will I be able to provide specifics in some areas. As the committee fully knows, the intelligence community has a longstanding policy of not discussing surveillance targeting information, in particular cases, as to do so would invariably open the door to compel further disclosures and litigation or the release of classified information, all of which would be harmful to our national security.

Like the committee, we are also greatly concerned about leaks of classified information as they can reveal the sources and methods we

employ to provide intelligence to American policymakers and warfighters and generate advantage for our nation while protecting its citizens and interest and their privacy. I also want to assure the committee that we take very seriously that obligation to protect U.S. persons' privacy. This applies to all stages of the production of foreign intelligence, but I'd like to emphasize one area in particular; the dissemination of U.S. person information.

We at NSA have strict procedures in place to make sure that our reporting and the contents of our reporting are disseminated only to those that have strict need-to- know for valid purposes which primarily means support of the development of foreign policy and to protect national security. I do want to specifically mention that among the collection and authorities that we have to target foreign actors in foreign spaces, FISA Section 702 and Executive Order 12333 have been instrumental in our ability to produce the intelligence made available to the committee and others in gathering the SIGINT facts of foreign activity in this election cycle.

It would be difficult to overstate the breadth and scale of malicious cyber activity occurring today. Our adversaries including nation states have not rested in trying to penetrate government systems, steal our private industries' intellectual property, and make even greater strides towards the development and achievement of cyber attack capabilities. We have a hardworking and dedicated team at NSA that works every day to generate insights on this activity and to thwart its effectiveness. But cyber defense is a team sport and one of NFA -- NSA's strongest partners in this effort is Director Comey's team at the FBI.

And I'm glad to be able to describe here today how we are working together to help protect the nation and our allies to include providing a better understanding of Russian intentions and capabilities. In light of the I.C. assessment and findings, I welcome your investigation into overall Russian activities targeting the previous U.S. elections. NSA continues to employ rigorous analytic standards, applying them in every aspect of our intelligence reporting.

Our analysts have consistently proven to be reliable and thorough in their technical and analytic efforts and providing our policymakers and warfighters with SIGINT ammunition to make informed decisions to protect our nation's freedom and ensure the safety of its citizens. They are diligently continuing to monitor for additional reflections of Russian targeting of U.S. systems and those of our friends and allies around the world to share that information with our I.C. colleagues and foreign counterparts and to share that information with our I.C. colleagues and foreign counterparts and to produce unbiased, unprejudiced and timely reporting of SIGINT facts in their entirety.

I look forward your questions. Thank you, sir.

NUNES: Thank you, Admiral Rogers.

Director Comey, you're recognized for five minutes.

COMEY: Mr. Chairman, Ranking Member Schiff, members of the committee, thank you for including me in today's hearing. I'm honored to be here representing the people of the FBI.

I hope we have shown you through our actions and our words how much we at the FBI value your oversight of our work and how much we respect your responsibility to investigate those things are important to the American people. Thank you for showing that both are being taken very seriously.

As you know, our practice is not to confirm the existence of ongoing investigations, especially those investigations that involve classified matters, but in unusual circumstances where it is in the public interest, it may be appropriate to do so as Justice Department policies recognize. This is one of those circumstances.

I have been authorized by the Department of Justice to confirm that the FBI, as part of our counterintelligence mission, is investigating the Russian government's efforts to interfere in the 2016 presidential election and that includes investigating the nature

of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts. As with any counterintelligence investigation, this will also include an assessment of whether any crimes were committed.

Because it is an open ongoing investigation and is classified, I cannot say more about what we are doing and whose conduct we are examining. At the request of congressional leaders, we have taken the extraordinary step in coordination with the Department of Justice of briefing this Congress' leaders, including the leaders of this committee, in a classified setting in detail about the investigation but I can't go into those details here. I know that is extremely frustrating to some folks. I hope you and the American people can understand. The FBI is very careful in how we handle information about our cases and about the people we are investigating.

We are also very careful about the way we handle information that may be of interest to our foreign adversaries. Both of those interests are at issue in a counterintelligence investigation. Please don't draw any conclusions from the fact that I may not be able to comment on certain topics. I know speculating is part of human nature, but it really isn't fair to draw conclusions simply because I say that I can't comment.

Some folks may want to make comparisons to past instances where the Department of Justice and the FBI have spoken about the details of some investigations, but please keep in mind that those involved the details of completed investigations. Our ability to share details with the Congress and the American people is limited when those investigations are still open, which I hope makes sense.

We need to protect people's privacy. We need to make sure we don't give other people clues as to where we're going. We need to make sure that we don't give information to our foreign adversaries about what we know or don't know. We just cannot do our work well or fairly if we start talking about it while we're doing it. So we will try very, very hard to avoid that, as we always do.

This work is very complex and there is no way for me to give you a timetable as to when it will be done. We approach this work in an open-minded, independent way and our expert investigators will conclude that work as quickly as they can but they will always do it well no matter how long that takes. I can promise you, we will follow the facts wherever they lead. And I wanna underscore something my friend Mike Rogers said, leaks of classified information are serious, serious federal crimes for a reason...

(AUDIO GAP)

COMEY: ... they should be investigated and where possible prosecuted in a way that reflects that seriousness so that people understand it simply cannot be tolerated.

And I look forward to taking your questions.

NUNES: Thank you, Director Comey.

Admiral Rogers, first I wanna go to you. On January 6th, 2017, the intelligence community assessment assessing Russian activities and intentions in recent U.S. elections, stated that the types of systems Russian actors targeted or compromised were not involved in vote tallying.

So my question as of today, Admiral Rogers, do you have any evidence that Russia cyber actors changed vote tallies in the state of Michigan?

ROGERS: No I do not, but I would highlight we are a foreign intelligence organization, not a domestic intelligence organization. So it would be fair to say, we are probably not the best organization to provide a more complete answer.

NUNES: How about the state of Pennsylvania?

ROGERS: No, sir.

NUNES: The state of Wisconsin?

ROGERS: No, sir.

NUNES: State of Florida?

ROGERS: No, sir.

NUNES: The state of North Carolina?

ROGERS: No, sir.

NUNES: The state of Ohio?

ROGERS: No, sir.

NUNES: So -- so you have no intelligence that suggests, or evidence that suggests, any votes were changed?

ROGERS: I have nothing generated by the national security industry, sir.

NUNES: Director Comey, do you have any evidence at the FBI that any votes were changed in the states that I mentioned to Admiral Rogers?

COMEY: No.

NUNES: Thank you. Admiral Rogers, I know that there was a leak of information regarding Director Clapper and Former Secretary of Defense Carter, were looking at relieving you of your -- of your duty.

Are you aware of those stories?

ROGERS: I'm aware of media reporting to that.

NUNES: And those stories were leaked as soon as you had visited

with President-elect Trump. Is that correct?

ROGERS: Yes sir, I was asked if I would be prepared to interview with the Trump administration for a position, which I did.

NUNES: Did the leak of that information at all -- at all impact your ability and your assessment that you did for the intelligence community's assessment on January 6th?

ROGERS: No sir, if I spent time in this job worrying about un-sourced media reporting, I'd never get any work done.

NUNES: Thank you, Admiral.

Director Comey, I remain extremely concerned about the widespread illegal leaks that you just referenced in your -- in your testimony. Just for the record though, I wanna get this on the record.

Does the unauthorized disclosure of classified information to the press violate 18 USC 793, a section of the Espionage Act that criminalizes improperly accessing handling or transmitting national defense information?

COMEY: Yes.

NUNES: Would an unauthorized disclosure of FISA-derived information to the press violate 18 USC 798, a section of the Espionage Act that criminalizes the disclosure of information concerning the communication and intelligence activities of the United States?

COMEY: Yes, in addition to being a breach of our trust with the FISA Court that oversees our use of those authorities.

NUNES: Thank you, Director.

At this time, I'm gonna yield to Mr. Rooney, who chairs our NSA cyber committee, for questions.

ROONEY: Thank you, Mr. Chairman.

I'd like to direct my questions, first and foremost, to Admiral Rogers to convey my thanks to the many men and women for their dedication at the NSA for keeping our country safe. As well as I want to talk about the recent media stories, it may have led to confusion in the public about what the NSA is and is not legally collecting in. And the safeguards the NSA has put into place to protect personal data.

So I'd like to clarify is the chairman of the subcommittee on the NSA, I recently got to meet your deputy admiral last week out at the NSA and we visited and spoke of some of these things. And what -- what we can talk about your today publicly, if you could go into, if you can't, you can't. But I think that this is important for the people in the room and -- and listening outside understand.

Is it true that the NSA would need a court order based on probable cause to conduct electronic surveillance on a U.S. person inside the United States?

ROGERS: Yes sir.

ROONEY: And just to be clear, the section of the FISA that is expiring later this year, that's 702, which will be talking about a little bit, cannot be used to target U.S. persons or persons in the United States, is that correct?

ROGERS: Yes sir.

ROONEY: Section 702 focuses on non-U.S. persons outside the United States, primarily correct?

ROGERS: Yes sir.

ROONEY: Do you believe that the section 702 is important and valuable for U.S. national security?

ROGERS: Yes sir.

ROONEY: So it's safe to say that without having this tool, it would be a threat to our national security?

ROGERS: It would significantly impact my ability to generate the insights that I believe this nation needs.

ROONEY: In the media, there's a lot of reporting about something called incidental collection. Can you talk about what incidental collection is?

ROGERS: Yes sir. Incidental collection is when we are targeting a valid foreign target, for example, in the course of that targeting we either get a reference to a U.S. person or suddenly a U.S. person appears as part of the conversation. That's what we call incidental collecting.

ROONEY: And -- and what you do when it went something like that happens, if there's a U.S. person part of an incidental collection, what kind of safeguards are put in place to make sure that...

ROGERS: So it depends specifically on the legal authority that we're using to execute the collection in the first place. But in broad terms, realizing again, it varies little bit by the specific authority that we're using to conduct the collection. We step back and we ask ourselves first, are we dealing with a U.S. person here? Is there something that we didn't expect to encounter that we've now encountered?

We'll ask ourselves what leads us to believe that it is a U.S. person. If we come to the conclusion that it is a U.S. person and we ask ourselves are we -- are we listening to criminal activity, are we seeing something of imminent threat or danger, for example, or are we just receiving something that has nothing to do with any of our valid collection authority? Based on that, we'll then take a series of actions.

In some case, we will just purge the collect, make no reporting on it, not retain the data. It's incidental collection, it has no intelligence value and it wasn't the purpose of what we were doing. In some cases then if we believe that there is intelligence value, for example, whether it's a reference to a U.S. person, as an example in a scenario.

In our reporting then we will mask the identity of the individual. We use a phrase like U.S. person one or U.S. person two. And I would remind everyone that for our purposes, U.S. person is defined very broadly. That is not just a U.S. citizen, that is a U.S. corporation, that is a ship or aircraft that is registered in the United States, that is an internet protocol address, for example.

So it's not just a particular individual, if that makes sense. The term for us is much broader because designed to ensure our protections of U.S. persons.

ROONEY: And this -- the procedures and protections you talked about are required and approved by the FISA court, is that correct?

ROGERS: Yes sir, and the attorney general.

ROONEY: And you mentioned in your opening statement that for that kind of information to be disseminated outside of your agency and the NSA that that dissemination would be strictly on a need-to-know basis, is that -- is that correct?

ROGERS: We use two criteria; is there a need to know in the course of the person or group that is asking for the identification, is there a valid need to know in the course of the execution of their official duties?

ROONEY: So like, who would that be?

ROGERS: It could be another element with the intelligence

community, it could be another element within NSA, it could be a military customer, for example, who's reading some of our reporting. It could be a policymaker.

I apologize, there was one other point I wanted to make, but I've lost the thread in my mind. I apologize if I jump in at a moment...

ROONEY: I'm sorry, I cut you off.

ROGERS: I'll try to make...

ROONEY: Let's get back to masking briefly.

You spoke about masking and trying to keep a U.S. person's identity concealed. And when it is disseminated, you -- we often talk about in the intelligence community about the exceptions to how -- if somebody's masks, how you unmask them. What would the exceptions to that masking be before it's disseminated?

ROGERS: So again, we use two criteria; the need to know on the person requesting us in the execution of their official duties and the second part was, is the identification necessary to truly understand the context of the intelligence value that the report is designed to generate? Those are the two criteria we use.

ROONEY: Is that identity of a U.S. person communicating with a foreign target? Is that ordinarily disseminated in a masked or unmasked form?
ROGERS: No. It is normally disseminated, if we -- if we make the decision that there's intelligence value and we're going to report on it, it is normally disseminated in a masked form. I would -- again, as I said, we use a reference, U.S. person one, U.S. person two...

ROONEY: Right.

ROGERS: I would highlight, if you look at the total breadth of our reporting, reporting involving U.S. persons at all is an

incredibly small subset in my experience of our total reporting.

ROONEY: Who normally in the NSA would make the decision to unmask?

ROGERS: There are 20 individuals including myself who I have delegated this authority to approve unmask requests.

ROONEY: And does the level of approval change depending on the reason for unmasking? If it was something or somebody, say, really important would that matter or could it be...

ROGERS: Not -- it's not necessarily designated in writing that way, but certainly by custom and tradition, at times requests will be pushed up to my -- I'm the senior-most of the 20 individuals. Requests will be pushed to my level, say "hey, sir, we just want to make sure that you're comfortable with this."

ROONEY: Right. So 20 people, that -- you know, what procedures or safeguards are put in place to make sure that those 20 people are not unmasking wrongly?

ROGERS: So they retrieve specific training, there are specific controls put in place in terms of our ability to disseminate information out of the databases associated with U.S. persons.

ROONEY: OK. Let's run through the exceptions quickly through a following hypothetical. If the NSA collects a communication where a target under surveillance is talking to a U.S. person, how would the NSA determine whether disseminating the U.S. person information is necessary to understanding the foreign intelligence or assess its importance?

ROGERS: So first of all, try to understand the nature of the conversation. Is this truly something that involves intelligence or a national security implication for the United States or is this just very normal, reasonable conversations, in which case we have no desire to have any awareness of it, it's not applicable to our mission.

In that case, normally we'll purge the data. We'll ask ourselves, is there criminal activity involved, is there a threat, potential threat or harm to U.S. individuals being discussed in a conversation for example.

ROONEY: If there was criminal activity involved, what would you do then?
ROGERS: If when we disseminate -- if we decide we need -- if it's criminal activity, we'll disseminate the information and if the FBI or other criminal activities are on the reporting stream, in some cases I also will generate a signed letter under my signature in specific cases to Department of Justice highlighting that what we think we have is potential criminal activity, but because we are not a law enforcement or justice organization we're not in a place to make that determination.

ROONEY: OK. Based on that, again, hypothetically, if the NSA obtained the communication of General Flynn while he was communicating with the surveillance target legally, would you please explain how General Flynn's identity could be unmasked based on the exceptions that we discussed?

ROGERS: Sir, I'm not going to discuss even hypotheticals about individuals, I'm sorry.

ROONEY: If I could make reference to a Washington Post article that I have here from February 9 which states -- do you -- let me say what it is and I'll ask if you've read it or -- or -- or if you've seen it. Which states national security under Michael Flynn privately discussed U.S. sanctions against Russia with the country's ambassador to the United States during the month before President Trump took office.

Contrary to public assertions by Trump officials current and -- and former U.S. officials said. The article goes on to say that nine current or former -- former officials who were in senior positions at multiple agencies at the time of the call spoke under the condition of

anonymity to discuss intelligence matters. Did you read this article?

ROGERS: I apologize, sir. It's not -- an article that references nine particular individual -- it doesn't necessarily ring a bell. I've certainly seen plenty of media reporting that but again, I'm not going to comment on specifics.

ROONEY: Just basically under the breath of that article, when we when we hear that nine former, current -- or current officials had spoken to the press under the condition of anonymity, and we heard our director Comey and the Chairman speak of this is a potential crime -- a serious crime -- under the Espionage Act, assuming if this article is accurate, who would have the -- who would be in a position to request the unmasking of General Flynn's identity? Would that be you?

ROGERS: I would have the authority to do that.

ROONEY: Who else would?

ROGERS: The 19 other individuals.

ROONEY: Would that include director Comey?

ROGERS: I'm talking about...

ROONEY: In the NSA...
ROGERS: ... within the National Security Agency and we're talking about NSA reporting.

ROONEY: But -- but would people like Director Comey also be able to request that?

ROGERS: Yes.

ROONEY: And the attorney general and Director Clapper, are those type of people also on this list?

ROGERS: Again, I'm not going to -- in general, yes, they would

be...

ROONEY: Generally speaking, not with regard to...

ROGERS: I'm not going to talk about...

ROONEY: OK.

ROGERS: ... of an individual or hypothetical scenarios.

ROONEY: Well, here's what I'm trying to get at. If -- if -- if what we're talking about is a serious crime as has -- as has been alleged, in your opinion, would leaking of an -- a U.S. person who has been unmasked and disseminated by intelligence community officials, would that leaking to the press hurt or help our ability to conduct national security matters?

ROGERS: Hurt.

ROONEY: OK. If -- if it hurts -- so this leak, which through the 702 tool, which we all agree is vital -- or you and I at least agree to that -- do you think that that leak actually threatens our national security? If it's a crime and if it's unveiling a masked person, and this tool is so important that it can potentially jeopardize this tool when we have to try to reauthorize it in a few months.

If this is used against the ability of us to reauthorize this tool and we can't get it done because whoever did this leak, or these nine people that did this leak, create such a stir, whether it be, you know, in our legislative process or whatever, that they don't feel confident that a U.S. person under the 702 program can be masked successfully and not leaked to the press, doesn't that hurt, that leak hurt our national security?

ROGERS: Yes, sir.

ROONEY: Can you think of any reason why somebody would -- would

want to leak the identity of a mass person?

ROGERS: No sir, I -- I mean I have raised this directly with my own workforce over the -- over the course of the last few months to remind everyone, part of the ethics of our profession, not just the legal requirement but the ethics of our profession as intelligence professionals is we do not engage in this activity.

And I've also reminded the men and women of the National Security Agency, if I become aware of any such conduct, there is no place for you on this team. It's unacceptable to the citizens of the nation that one would engage in this.

ROONEY: Well, I think that, you know, as we move forward, obviously, you know, I think that what you're speaking of is this sacred trust that the intelligence community has with the American people and with the people that are representing them here on this dais.

And if we -- I think that it's vital that for those who break that sacred trust, if they are not held accountable whether it by the NSA internally or by the FBI through conviction or investigations/prosecution and conviction through the attorney general's office of that crime, it is very difficult for us to be able to keep that sacred trust to know that what we're doing is -- is -- is valid and what we're doing has no nefarious motivations. And -- and -- and to us to be able to keep America safe without violating the constitutional protections that we all enjoy.

Mr. Chairman, I'm not sure how much more time I have left. I just wanted to...

ROGERS: Congressman, can I make one comment if I could, I apologize.

ROONEY: Yes, sir.

ROGERS: It comes to my mind based on your question, I just wanna

remind everyone and in general. FISA collection on targets in the United States has nothing to do with 702, I just wanna make sure we're not confusing the two things, here, 702 is collection overseas against non-U.S. persons.

ROONEY: Right and -- and what -- and what we're talking about here, is incidentally, if a U.S. person is talking to a foreign person that we're listening to, whether or not that person is unmasked...

ROGERS: I just wanna make sure we all understand the context, that's all.

ROONEY: Right, right, and -- and whether or not somebody in the intelligence community that we put the trust in, is going to leak that information to the press, for whatever reason. And I'm not even gonna get into the gratuitous, you know, what that reason may be.

But it's really gonna hurt the people on this committee and you all on the intelligence community, when we try to retain this tool this year. And try to convince some of our colleagues that this is really important for national security, when somebody in the intelligence community says you know what? The hell with it, I'm gonna release this person's name because I'm gonna get something out of it.

We're all gonna be hurt by that if we can't reauthorize this tool, do you agree with that?

ROGERS: Yes, sir.

ROONEY: Mr. Chairman, do I -- do I have enough time to talk about the letter the committee sent?

NUNES: Sure.

ROONEY: The committee sent to you on March 15th, a letter -- yeah, to Admiral Rogers and to Director Comey. Have you had a chance to look at this letter? I think that you've actually...

(CROSSTALK)

ROGERS: Yes sir, I in fact have given you a reply on the 17th.

ROONEY: Just real -- real quickly because I don't want to take up any more time. Can you give us a sense of how many unmasked U.S. persons identities were disseminated by the NSA from June 2016 to June 2017?

ROGERS: No sir. As I have indicated where the process of compiling that information. I will provide it to the committee. But until that work is done, I am not gonna comment.

ROONEY: Can you tell us whether any of those disseminations broadly were involved U.S. people relating to presidential candidates Donald J. Trump or Hillary Clinton, and their associates in 2016?

ROGERS: I won't answer until I complete the research sir.

ROONEY: Assuming that the NSA disseminated unmasked U.S. persons information relating to the Trump or Clinton campaigns, would that have been a reason for such unmasking?

ROGERS: I apologize. I don't truly understand the question.

ROONEY: Let me just move on to the next one.

Along those lines, if the NSA had wanted disseminate unmasked U.S persons information related to either the presidential campaign, who in the NSA would have approved such dissemination's?

ROGERS: Again, it would've been one of the 20 and I provided that in my initial response to the committee. I have outlined the procedures, I've outlined the specific 20 individuals.

ROONEY: Thank you, Admiral. I appreciate your -- your answers. I look forward to working with you on the subcommittee moving forward.

And Mr. Chairman, I yield back.

NUNES: Gentleman yields back.

Mr. Gowdy is recognized.

GOWDY: Thank you, Mr. Chairman.

Director Comey, we will begin on this line of questioning, then we'll finish it the next round. FISA and other similar related counterterrorism programs have been described, even this morning, as vital, critical and indispensable to our national security. And many of us on both sides of the aisle believe FISA and similar counterterrorism programs prevent terrorist attacks and save American lives.

But FISA and other surveillance programs are intentionally designed to preserve the privacy of U.S. citizens. They are intentionally designed to ensure the information is collected and used only for legitimate national security and criminal investigative purposes.

There are statutory safeguards, there are warrants based on probable calls, there is a FISA court that is involved, there are audits on the backend and we think so highly of this material. It is a felony, punishable by up to 10 years in federal prison to unlawfully disseminate it. All of this was done to make sure this information gathered remains protected as it relates to U.S. citizens.

The way I view it, Director Comey, the American people have an agreement with their government. We are going to give you the tools to keep us safe, even if it infringes on our privacy Psalm (ph). We're going to give you the tools. And government in return promises to safeguard the privacy of U.S. citizens. And when that deal is broken, it jeopardizes American trust in the surveillance program.

So let me ask you, do you agree FISA is critical to our national

security?

COMEY: I do.

GOWDY: Do you agree programs like FISA were intentionally designed to safeguard the identity of U.S. persons?

COMEY: Yes, there are other -- other important elements of it but that's a primary goal, I believe.

GOWDY: It wasn't an afterthought, it wasn't an accident. These are intentional safeguards that we put in place to protect U.S. citizens, is that correct?

COMEY: Correct.

GOWDY: Do you agree much of what is learned from these programs is classified or otherwise legally protected?

COMEY: All FISA applications review by the court collection by us pursuant to our FISA authority is classified.

GOWDY: The dissemination of which is a felony punishable by up to 10 years in prison?

COMEY: Sure, dissemination -- unauthorized dissemination.
GOWDY: Unauthorized dissemination of classified or otherwise legally protected material punishable by a felony up to 10 years in federal prison.

COMEY: Yes. Yes, as it should be.

GOWDY: All right.

In January of this year, the Washington Post reported, according to a senior U.S. government official, a named U.S. citizen -- and I will not use the name -- a named U.S. citizen phoned the Russian ambassador several times on December 29.

In February of this year, the Washington Post reported nine, nine current and former officials who were in senior positions at multiple agencies at the time of the call, spoke on the condition of anonymity to discuss intelligence matters and that officials began pouring over intelligence reports, intercepted communications, and diplomatic cables.

In February of this year, the New York Times reported a U.S. citizen, whose name I will not use, discusses sanctions with the Russian ambassador in a phone call according to officials who have seen a transcript of the wiretapped conversation. And again in February of this year, the New York Times reported on a phone call involving a U.S. citizen including significant discussions of phone records, intercepted calls, intercepted communications, and reported the NSA captured calls and then asked the FBI to collect as much information as possible.

My time is up so I will say this for this round. I thought it was against the law to disseminate classified information. Is it?

COMEY: Yes, sir. It's a serious crime. I'm not going to comment on those particular articles because I don't want to, in any circumstance, compound a criminal act by confirming that it was classified information but in general, yes, it's a serious crime and it should be for the reasons you said.

GOWDY: We'll take it back up next round, Mr. Chairman.

NUNES: Gentleman yields back.

I'll now yield 15 minutes to Mr. Schiff.

SCHIFF: Director Comey, I want to begin by attempting to put to rest several claims made by the president about his predecessor, namely that President Obama wiretapped his phones. So that we can be precise, I want to refer you to exactly what the president said and ask you whether there is any truth to it.

First, the president claimed, quote, "Terrible. Just found out that Obama had my wires tapped in Trump Tower just before the victory. Nothing found. This is McCarthyism," unquote.

Director Comey, was the president's statement that Obama had his wires tapped in Trump Tower a true statement?

COMEY: With respect to the president's tweets about alleged wiretapping directed at him by the prior administration, I have no information that supports those tweets and we have looked carefully inside the FBI. The Department of Justice has asked me to share with you that the answer is the same for the Department of Justice and all its components. The department has no information that supports those tweets.


SCHIFF: The president accused Mr. Obama and presumably the FBI of engaging in McCarthyism. As you understand the term McCarthyism, do you think President Obama or the FBI was engaged in such conduct?

COMEY: I'm not to try and characterize the tweets themselves. All I can tell you is we have no information that supports them.

SCHIFF: Were you engaged in McCarthyism, Director Comey?

COMEY: I try very hard not to engage in any isms of any kind, including -- including McCarthyism.

SCHIFF: The president second stated quote "Is it legal for a sitting president to be wiretapping a race for president prior to an election? Turned down by a court earlier, a new low," unquote.

Director Comey, can you answer the president's question? Would it be legal for present Obama to have ordered a wiretap of Donald Trump?

COMEY: I'm not going to characterize or respond to the tweets

themselves.

I can tell you in general, as -- as Admiral Rogers and I were just saying, there is a statutory framework in the United States under which courts grant permission for electronic surveillance either in a criminal case or a national security case based on a showing of probable cause, carefully overseen. It's a rigorous, rigorous process that involves all three branches of government, and it's one we've lived with since the late 1970s. That's how it works.

So no individual in the United States can direct electronic surveillance of anyone, it has to go through an application process, ask a judge, the judge can I make the order.

SCHIFF: So President Obama could not unilaterally order a wiretap of anyone?

COMEY: No president could.

SCHIFF: Mr. Trump also asserted in that tweet that he was -- that the application -- or the president's order was turned down by a court. Was there any request made by the FBI or Justice Department to wiretap Donald Trump turned down by a court?

COMEY: That's one of those subjects I can't comment on one way or another. Please don't interpret that in any way other than I just can't talk about anything that relates to the Pfizer process in an open setting.

SCHIFF: Third, the president stated, I bet a good lawyer could make a great case out of the fact that President Obama was tapping my phones in October just prior to the election.

Director Comey, you're a good lawyer. Can you make out a great case that president Obama wiretapped Mr. Trump's phones just prior to the election in light of the fact you've said there is no evidence of that?

COMEY: All I can say is what I said before, that we don't have any information that supports those tweets.

SCHIFF: Well, in my view then, you would not be a great, but very unethical lawyer to make up such a case. And finally, the president made the following accusation. How low has president Obama gone to tap my phones during the very sacred election process? This is Nixon-Watergate. Bad or sick guy.

Director Comey, the president has compared Mr. Obama to Nixon and purported wiretap of Trump phones as another Watergate. What was the gravamen of the offense by Nixon and his operatives during Watergate? A lot of people who may be watching may be too young.

SCHIFF: To understand what Watergate was about, what was the gravament of that offense?

COMEY: Well, as I recall it then, I was a kid, but I've studied it quite a bit in school. The gravament of it was an abuse of power including break-ins, unlawful wire taps, obstruction of justice, sort of the cycle of criminal conduct.

SCHIFF: There was a break-in of the democratic headquarters by operatives of the president, was it not?

COMEY: That's my understanding is that's how it began -- the investigation began.

SCHIFF: It also involve the cover up by the president.

COMEY: Yes, as I said.

SCHIFF: Now here, I think you've said there's been no evidence of an illegal wiretap by president Obama, is that right?

COMEY: I've said the FBI and the Department of Justice have no information to support those tweets.

SCHIFF: But there is evidence, is there not, of a break in of the democratic headquarters by a foreign power using cyber means?

COMEY: Yes there was, as the -- as the intelligence community report, the un-class report, said in January, the Russian intelligence services hacked into a number of enterprises in the United States, including the Democratic National Committee.

SCHIFF: And there was an effort by the Russians to cover up their break-in of the Democratic Party headquarters, by using cutouts like WikiLeaks to publish the stolen material, isn't that right?

COMEY: Certainly to cover up their -- that they were the ones releasing it.

SCHIFF: Director Rogers, in an effort to explain why there was no evidence supporting the president's claim that Obama had wiretapped him, the president and his spokesman, Sean Spicer, have suggested that British intelligence through its NSA or GCHQ wiretapped Mr. Trump on President Obama's behalf.

Did you ever request that your counterparts in GCHQ should wiretap Mr. Trump on behalf of President Obama?

ROGERS: No sir, nor would I, that would be expressly against the construct of the Five Eyes agreement that's been in place for decades.

SCHIFF: And the Five Eyes are some of our closest intelligence partners and Britain -- Britain is one of them?

ROGERS: Yes, sir.

SCHIFF: Have you seen any evidence that anyone else in the Obama administration made such a request?

ROGERS: No sir, and again, my view is the same as Director Comey, I've seen nothing on the NSA side that we engaged in any such activity, nor that anyone ever asked us to engage in such activity.

SCHIFF: And if you were to ask the British to spy on America, that would be a violation of U.S. law, would it not?

ROGERS: Yes, sir.

SCHIFF: Our relationship with British intelligence is one of the closest we have with any foreign services, isn't that true?

ROGERS: Yes, sir.

SCHIFF: Now, the British allies -- our British allies have called the president's suggestion that they wiretapped him for Obama nonsense and utterly ridiculous. Would you agree?

ROGERS: Yes, sir.

SCHIFF: Does it do damage to our relationship with one of our closest intelligence partners for the president to make a baseless claim that the British participated in a conspiracy against him?

ROGERS: I think it clearly frustrates a key ally of ours.

SCHIFF: Certainly wouldn't endear the British intelligence services to continue working with us, would it?
ROGERS: I believe that the relationship is strong enough, this is something we'll be able to deal with.

SCHIFF: But it's not helpful...

ROGERS: Yes, sir...

SCHIFF: ... you would agree?

ROGERS: ... that -- that...

SCHIFF: Director Rogers, President Trump recently met with German Chancellor Angela Merkel during a joint press conference, the

president suggested that they both had something in common, that they had both been wiretapped by President Obama.

Director Comey has just demonstrated why the claims by the president about his being wiretapped by Obama were unsupported by any evidence. But the claim he made about wiretapping directed at Merkel referred to something that came up in the context of the Snowden disclosures.

I'm not going to ask you to comment on whether the Chancellor was the subject of any eavesdropping. But I would like to ask you whether the Snowden disclosures did damage to our relationship with our German ally and whether the Chancellor herself expressed her concern at the time.

ROGERS: Yes, sir.

SCHIFF: In light of this, is it helpful to our relationship with the Chancellor or our relationship with German intelligence, to bring this up again in a public forum?

ROGERS: It certainly complicates things. But again, I'd like to think that our relationship is such we're gonna be able to deal and keep moving forward.

SCHIFF: So our relationships with the British and the Germans, you hope, are strong enough to withstand any damage done by these comments?

ROGERS: By anything in general, sir. We have foundational interest with each other, we need to keep working together.

SCHIFF: This time, Director Comey, let me ask you a few questions you may or may not be able to answer. Do you know who Roger Stone is?

COMEY: Generally, yes.

SCHIFF: Are you aware that he was a partner of Paul Manafort?

COMEY: Mr. Schiff, I'm worried we're going to a place I don't want to go, which is commenting on any particular person. And so I -- I don't think I should comment. I'm aware of public accounts but I don't want to talk more than that.

SCHIFF: Are you aware that he has publicly acknowledged having directly communicated with (inaudible), someone that the intelligence community has assessed was a person of Russian intelligence?

COMEY: I've read media accounts to that effect. I don't wanna hurt anybody's feeling in the media. I don't know whether that's accurate or not.

SCHIFF: If Mr. Stone acknowledged Mr. Podesta's time in the barrel was coming in August 2016, would that have been prior to the public release of stolen e-mails of Mr. Podesta's?

COMEY: I believe that's the correct chronology.

SCHIFF: Do you know how Mr. Stone would've known that Mr. Podesta's e-mails were going to be released?

COMEY: That's not something I can comment on.

SCHIFF: Do you know that Mr. Podesta has said that at the time he was not even aware whether his e-mails had been stolen would be published?

COMEY: That's nothing something I comment on.

SCHIFF: At this point Mr. Chairman, I'm going to yield to Mr. Himes.

HIMES: Thank you to the ranking member. And gentlemen, thank you for being with us today.

Let me -- when I get my own time I'll -- I'll -- I'll have some follow-up questions. But let me start with a point that the chairman brought out I think very specifically which is that there's no evidence that votes were technically changed in any of the jurisdictions that he named.

Admiral Rogers, thanks for confirming that, but am I correct, that the -- when we say Russian hacking what we are referring to is the fact that the intelligence community believes that the Russians penetrated the networks of the DNC, of John Podesta, and other individuals, stole information and then disseminated that information. Is that a fair characterization of the -- of the conclusions of the intelligence community?

ROGERS: Yes sir.

HIMES: And did the intelligence community ever do an analysis as to whether the dissemination of that adverse information in a closely fought election had any effect on the American electorate?

ROGERS: No sir. The U.S. intelligence community does not do assessments ...

HIMES: Of course not.
(CROSSTALK)

ROGERS: ... U.S. opinion.

HIMES: That's -- that's -- that's not your job.

ROGERS: No sir.

HIMES: The fact is, those of us who go through campaigns know that's actually something we probably have a little bit more understanding of. Let me just ask this question then. Was there any equivalent dissemination of adverse information stolen from the RNC or individuals associated with the Trump campaign?

COMEY: No.

HIMES: Thank you.

Director Comey, in -- in the remaining minutes here. I appreciate your frankness on the topic of an ongoing investigation and appreciate your inability to go too much further than you went. But I do want to ask you a question to try to clear up some confusion.

This committee, of course, is engaged in investigation about links, as you said, between the Trump campaign and the Russians, should there be any possible collusion. We've had a number of statements very early in the investigation that there was no evidence of collusion. This is still very early in our investigation, is it fair to say that you're still relatively early in your investigation?

COMEY: It's hard to say because I don't how much longer it will take. But we've been doing this -- this investigation began in late July, so for counterintelligence investigation that's a fairly short period of time.

HIMES: So, you used the word coordination which to me suggests that you are in fact investigating whether there was coordination between U.S. persons and the Russians. Is it fair for me to assume that we shouldn't simply dismiss the possibility that there was coordination or collusion between the Russian efforts and U.S. persons as an investigatory body?

COMEY: Well all I can tell you is what we're investigating which includes whether there was any coordination between people associated with the Trump campaign and the Russians.

HIMES: OK. Thank you, I'll yield the remaining time to the ranking member.

SCHIFF: I will yield the remaining time this period to Representative Sewell.

SEWELL: Thank you.

So, with respect to the coordination, Director Comey, I just wanted to continue this line of questioning, can you say with any specificity what kinds of coordination or contacts you're looking at in your investigation generally when confronted with something like this?

COMEY: I can't.

SEWELL: Can you discuss whether or not there was any knowledge by any Trump- related person and the Russians?

COMEY: I can't.

SEWELL: So with respect to any ongoing investigation, whether the specificity of the person, U.S. person or otherwise, you can't comment on any of that.

COMEY: Correct.

SEWELL: OK. Can you characterize what the nature of your investigation generally, wouldn't -- when you do an investigation of this sort, can you talk a little bit about the process, generally?

COMEY: Not a whole lot. I can tell you we use our great, great people, we coordinate with our brothers and sisters in other parts of the intelligence community to see what they may know from around the world that might be useful to us and we use all the different tools and techniques that we use in all of our investigations. That's probably the most -- I'm not sure that's useful to you, but that's the most I can say.

SEWELL: How long does a counterintelligence investigation like this usually take? You said that it started in July.

COMEY: There is no usually. It's hard -- it's impossible to say, frankly.

SEWELL: I yield back my time.

NUNES: Thank you, Ms. Sewell. We'll go back to -- I'll yield myself 15 minutes and we'll go back to Mr. Gowdy.

GOWDY: Thank you, Mr. Chairman.

Director Comey, you and I were discussing the felonious dissemination of classified material during the last round. Is there an exception in the law for current or former U.S. officials who request anonymity?

COMEY: To release classified information?

GOWDY: Yes sir.

COMEY: No.

GOWDY: Is there an exception in the law for reporters who want to break a story?

COMEY: Well that's a harder question as to whether a reporter incurs criminal liability by publishing classified information and one probably beyond my ken. I'm not as good a lawyer as Mr. Schiff said I used to be.

GOWDY: Well, I don't know about that but the statute does use the word published, doesn't it?

COMEY: It does, but that's a question I know the Department of Justice has struggled with through administration after administration.

GOWDY: I know the department struggled with it, the 4th Circuit struggled with it, lots of people have struggled with it but you're not aware of an exception in the current dissemination of classified information statute that carves out an exception for reporters.

COMEY: No, I'm not aware of anything carved out in the statute. I don't think a reporter's been prosecuted certainly in my lifetime though.

GOWDY: Well, there've been a lot of statutes that bore on this investigation for which no one's ever been prosecuted or convicted and that does not keep people from discussing those statutes, namely the Logan Act. In theory, how would reporters know a U.S. citizen made a telephone call to an agent of a foreign power?

COMEY: How would they know legally?

GOWDY: Yes.

COMEY: If it was declassified and then discussed in a judicial proceeding or congressional hearing. Something like that.

GOWDY: And assume none of those facts are at play, how would they know?

COMEY: Someone told them who shouldn't have told them.

GOWDY: How would a reporter know about the existence of intercepted phone calls?

COMEY: Same thing. In a -- in a legitimate way, through a appropriate proceeding where there's been declassification. In any other way, in an illegitimate way.

GOWDY: How would reporters know if a transcript existed of an intercepted communication?

COMEY: Same answer. It -- it -- the only legitimate way would be through a proceeding -- appropriate proceeding, the illegitimate way would be somebody told him who shouldn't have told them.

GOWDY: What does the term mask mean in the concept of FISA and other surveillance programs?

COMEY: As Director Rogers explained, it's our practice, approved by the FISA court, of removing the names of U.S. persons to protect their privacy and their identity unless it hits certain exceptions. So masking means, as Mike Rogers said -- I'll often see a intelligence report from NSA that will say U.S. person number one, U.S. person number two, U.S. person number three and there's no further identification on the document.

GOWDY: Admiral Rogers said there are 20 people within the NSA that are part of the unmasking process. How many people within the FBI are part of the unmasking process?

COMEY: I don't know for sure. As I sit here, surely more, given the nature the FBI's work. We come into contact with U.S. persons a whole lot more than the NSA does because we may be conducting -- we only conduct our operations in the United States to collect electronic surveillance -- to conduct electronic surveillance, so I don't -- I can find out the exact number, I don't know it as I sit here.

GOWDY: Well, I think, Director Comey, given the fact that you and I agree this is critical, vital, indispensable, a similar program is coming up for reauthorization this fall with a pretty strong head wind right now. It would be nice to know the universe of people who have the power to unmask a U.S. citizen's name. Because that might provide something of a roadmap to investigate who might've actually disseminated a masked U.S. citizen's name.

COMEY: Sure. The number is relevant but what I hope the U.S. -- the American people realize is the number's important, but the culture behind it is in fact even more important. The training, the rigor, the discipline. We are obsessive about FISA in the FBI for reasons I hope make sense to this committee but we are -- everything that's FISA has to be labeled in such a way to warn people this is FISA, we treat this in a special way.

So we can get you the number, but I want to assure you the culture of the FBI and the NSA around how we treat U.S. person information is obsessive and I mean that in a good way.

GOWDY: Director Comey, I am not arguing with you and I do agree that culture is important, but if there are 100 people who have the ability to unmask and the knowledge of a previously masked name, then that's 100 different potential sources of investigation and the smaller the number is, the easier your investigation is.

So the number is relevant. I can see the culture is relevant. NSA, FBI, what other U.S. government agencies have the authority to unmask a U.S. citizen's name?

COMEY: I think all agencies that collect information pursuant to FISA have what are called standard minimization procedures, which are approved by the FISA court that govern how they will treat U.S. person information. So I know the NSA does, I know the CIA does, obviously the FBI does. I don't know for sure beyond that.

GOWDY: How about the department of -- how about Main Justice?

COMEY: Main Justice, I think does have standard minimization procedures.

GOWDY: All right, so that's four. The NSA, FBI, CIA, Main Justice. Does the White House have the authority to unmask a U.S. citizen's name?

COMEY: I think other elements of the government that are consumers of our products can ask the collectors to unmask. The unmasking resides with those who collected the information.

And so if Mike Rogers's folks collected something and they sent it to me in a report and it says U.S. person number one and it's important for the FBI to know who that is, our request will go back to them. The White House can make similar requests of the FBI or of NSA but they can't on their -- they don't own their own collect and so

they can't on their own unmask. I got that about right?
ROGERS: No, that's correct.

COMEY: Yeah.

GOWDY: I guess what I'm getting at, Director Comey, is you say it's vital, you say it's critical, you say it's indispensable. We both know it's a threat to the reauthorization of 702 later on this fall. And by the way, it's also a felony punishable by up to 10 years.

So how would you begin your investigation, assuming for the sake of argument that a U.S. citizen's name appeared in the Washington Post and the New York Times unlawfully. Where would you begin that investigation?

COMEY: Well, I'm not gonna talk about any particular investigation...

GOWDY: That's why I said in theory.

COMEY: You would start by figuring out, so who are the suspects? Who touched the information that you've concluded ended up unlawfully in the newspaper and start with that universe and then use investigative tools and techniques to see if you can eliminate people, or include people as more serious suspects.

GOWDY: Do you know whether Director Clapper knew the name of the U.S. citizen that appeared in the New York Times and Washington Post?

COMEY: I can't say in this forum because again, I don't wanna confirm that there was classified information in the newspaper.

GOWDY: Would he have access to an unmasked name?

COMEY: In -- in some circumstances, sure, he was the director of national intelligence. But I'm not talking about the particular.

GOWDY: Would Director Brennan have access to an unmasked U.S. citizen's name?

COMEY: In some circumstances, yes.

GOWDY: Would National Security Adviser Susan Rice have access to an unmasked U.S. citizen's name?

COMEY: I think any -- yes, in general, and any other national security adviser would, I think, as a matter of their ordinary course of their business.

GOWDY: Would former White House Advisor Ben Rhodes have access to an unmasked U.S. citizen's name?

COMEY: I don't know the answer to that.

GOWDY: Would former Attorney General Loretta Lynch have access to an unmasked U.S. citizen's name?
COMEY: In general, yes, as would any attorney general.

GOWDY: So that would also include Acting AG Sally Yates?

COMEY: Same answer.

GOWDY: Did you brief President Obama on -- well, I'll just ask you. Did you brief President Obama on any calls involving Michael Flynn?

COMEY: I'm not gonna get into either that particular case that matter, or any conversations I had with the president. So I can't answer that.

GOWDY: Well, Director Comey, there's been some speculation this morning on motive. I'm not all that interested in motive -- first of all, its really hard to prove.

Secondarily, you never have to prove it. But I get that people

wanna know, I get the jury all wants -- always wants to know why. I think you and I can agree there are a couple of reasons that you would not have to unlawfully, feloniously, disseminate classified material. It certainly wasn't done to help an ongoing criminal investigation, because you already had the information, didn't you?

COMEY: Again, I can't answer in the context of this particular matter.

GOWDY: How about in theory? Is -- is -- is there something a reporter would have access to that the head of the FBI would not?

COMEY: It's hard for me to answer, I would hope not when it relates to the FBI...

GOWDY: I would hope not too, since its part of our surveillance programs. I would hope that you had access to everything as the head of the world's premier law-enforcement agency. I would hope that you had it all. So if you had it all, the motive couldn't have been to help you, because you already had it. And Admiral Rogers, the motive couldn't have been to help you, because you already had it.

So in the universe of possible motives for the felonious dissemination of classified material, we could rule out wanting to help the intelligence and the law enforcement communities. Those are two motives are gone now. That leaves some more nefarious motives. Is the investigation into the leak of classified information -- has it begun yet?

COMEY: I can't say because I don't want to confirm that that was classified information.

GOWDY: Well, I'm -- I don't want to quarrel with you Director Comey and I -- I do understand that you cannot ordinarily confirm or deny the existence of an investigation. But you did it this morning, citing DOJ policy given the gravity of the fact pattern.
Would you not agree that surveillance programs that are critical, indispensable, vital to our national security, some of which are awful

reauthorization this fall, that save American lives and prevent terrorist attacks also rises to the level of important?

COMEY: I think those programs are vital and leaks of information collected pursuant to court order under those programs are terrible. And as I said in my opening statement should be taken very, very seriously.

What I don't ever want to do is compound what bad people have done and confirm something that's in the newspaper. Because sometimes newspaper get it right, there's a whole lotta wrong information about --allegedly about classified activities that's in the newspaper. We don't call them and correct them either. That's another big challenge but we just don't go anywhere near it because we don't want to help and compound the offense that was committed.

GOWDY: I understand that Director Comey. And I'm trying really hard not to get you to discuss the facts at bar (ph). But some of the words that appeared in this public reporting, include the word transcript which has a very unique use in the matters that you and I are discussing this morning. That is a very unique use of that word, wiretap has a very specific meaning. The name of a U.S. citizen that was supposed to statutorily be protected, is no longer protected.

So some of this reporting -- let's assume 90 percent of it is inaccurate, that other 10 percent is still really, really important. And to the extent that you can rely on the dates in either the Washington Post or the New York Times, we are talking about February of this year is when the reporting first took place. So we are -- we're a month and a half or two months into something that you and I agree, is incredibly important and also happens the felony.

So I'm just simply asking you to assure the American people, you've already assured them you take it really seriously. Can you assure them that it is going to be investigated?

COMEY: I can't but I hope -- I hope people watching know how seriously we take leaks of classified information. But I don't want

to confirm it by saying that were investigating it. And I'm sorry I have to draw the line, I just think that's the right way to be.

GOWDY: Well I'm not argue with you Director Comey but it is -- we're going to discuss a lot of important things today. Whether Russia attempted to influence our democratic process is incredibly important. Whether they sought to influence it as a separate analysis, incredibly important.

The motive behind that interference and influence, incredibly important. Our U.S. response, incredibly important. Some of that may rise to the level of the crime, some of it does not rise to level of a crime. One thing you and I agree on is the felonious dissemination of class -- classified material most definitely is a crime.

So I would ask you and I understand some of the procedures that you are up against. I would -- I would humbly ask you to -- to seek authority from whomever you need to seek authority from. Because I'm going to finish the same way I started. This is an agreement between the American people and its government. We are going to -- we the American people give certain powers to government to keep us safe.

And when those powers are misused and the motive is not criminal investigations or national security, then I'll bet you my fellow citizens are rethinking their side of the equation. Because that U.S. citizen could be them next time. It could be you. It could be me. It could be anyone until we start seriously investigating and prosecuting what Congress thought was serious enough to attach a 10-year felony to.

With that, I would yield back, Mr. Chairman.

COMEY: Can I -- can I just add a response to what you said? I agree with you, Mr. Gowdy. Two things folks at home should know; first, an unauthorized disclosure of FISA is an extraordinarily unusual event so be assured we're going to take it very seriously because our trust, the American people, and the federal judges that oversee our work, is vital.

And second, that this conversation has nothing to do with 702. Folks often mix them together. 702 is about targeting non-U.S. persons overseas. Pursuant to the FISA statute, the FBI can apply to collect electronic surveillance in the United States but it's a different thing from 702. The conversation you and I are just having is about this which is vital and important, but I just didn't want to leave folks confused.

GOWDY: Director Comey, you are 100 percent correct and I am 100 percent correct in saying that that is a distinction that doesn't make a difference to most of the people watching television. You are exactly correct. What we are reauthorizing this fall has nothing to do with what we are discussing other than it is another government program where the people consent to allow government to pursue certain things with the explicit promise it will be protected.

So you're right, they're different but in the eyes of people watching, it is the U.S. government officials' leaking the name of a U.S. citizen and if it can happen here, it may happen there. Trust me, you and I both want to see it reauthorized. It is in jeopardy if we don't get this resolved.

NUNES: Our time is expired, I'll yield 15 minutes to Mr. Schiff.

SCHIFF: Thank you, Mr. Chairman.

I just want to follow up with a few questions about Roger Stone that I had started with earlier before I passed it to my colleagues. Director Comey, are you aware that Roger Stone played a role in the Trump campaign?

COMEY: I'm not going to talk about any particular person here today, Mr. Schiff.

SCHIFF: I'm going to continue to ask these questions because among other things, I want to make sure you are aware of these facts whether you're able to comment on them political dirty tricks?

COMEY: I'll give you the same answer, sir.

SCHIFF: I mentioned before that Mr. Stone was in direct communication with a creature of Russian GRU, Guccifer 2.0 and that's something the intelligence assessment talked about, the role of Guccifer 2.0.

Mr. Stone on August 17, are you aware, received communication from Guccifer 2.0 that said, quote "I'm pleased to say that you are great. Please tell me if I can help you any how. It would be a great pleasure to me." Are you aware of that communication from essentially Russian GRU through Guccifer to Mr. Stone?

COMEY: I have to give you the same answer.

SCHIFF: Are you aware that Mr. Stone also stated publicly that he was in direct communication with Julian Assange and WikiLeaks?

COMEY: Same answer.

SCHIFF: Are you aware that Mr. Stone also claimed that he was in touch with an intermediary of Mr. Assange?

COMEY: Same answer.

SCHIFF: This is a question I think you can answer. Do you know whether the Russian intelligence service has dealt directly with WikiLeaks or whether they too used an intermediary?

COMEY: We assessed they used some kind of cutout. They didn't deal directly with WikiLeaks. In contrast to D.C. Leaks and Guccifer 2.0.

SCHIFF: In early October, are you aware that Mr. Stone tweeted I have total confidence that my hero, Julian Assange will educate the American people soon. Are you aware of that tweet?

COMEY: I'm back to my original same answer.

SCHIFF: And are you aware that it was only days later that WikiLeaks released the Podesta e-mails?

COMEY: Same answer.

SCHIFF: I'm going to yield now to Mr. Himes.

HIMES: Thank you, Mr. Schiff.

I know that we're going through the 90 minute mark in this hearing so let me step back a second and just review the topics because there's a lot on the table and I think my friends on the Republican side will get no argument from this side on the importance of investigating, prosecuting leaks.

Leaks are a threat to our national security whether they're perpetrated by Edward Snowden, whether they're perpetrated by people outside the White House or perhaps as we have seen in the last 60 days, maybe from people inside the White House.

But Mr. Comey, if I can use your phrase, intense public interest. There is intense public interest in the fact that our new president will attack anyone and everyone. He will attack the cast of Hamilton, he will attack Chuck Schumer, he will attack our allies, Mexico, Australia, Germany, he will attack the intelligence community, which you lead. Associating you with McCarthyism and Nazism.

But there's one person in one country which is immune, which is inoculated from any form of presidential attack no matter what the behavior. No matter if there's a violation of the INF nuclear treaty, no matter if Vladimir Putin kills political opponents, the new president defends, obfuscates, does not attack. And the people around the president, Michael Flynn, Jeff Sessions, Carter Page, Paul Manafort, have an odd connection to Russia. A series of odd connections. We all campaigned.

I don't think any of our campaign people have connections with a

foreign power, much less one that is an adversary of the United States. And further, apart from these weird links, without exception, the individuals I've quoted have dissembled or misled, maybe even lied about the nature of those -- those connections until the political pressure has gotten to a point where they have been fired or recused, in the case of the Attorney General.

So I want to look briefly at one of these individuals -- and Director Comey, I understand your constraints but -- but let me ask a couple of questions regardless. Paul Manafort, who is Roger Stone's business partner and former -- and Trump's former campaign manager, I want to ask you a few questions about him.

First, Director Comey, can you tell me what the Foreign Agents Registration Act is?

COMEY: Sure. Not in an expert way, but it's a statute that requires people who are acting as agents of a non-U.S. government to register with the United States.

HIMES: Right. So the National Security Division of the Department of Justice writes -- this is their manual. The purpose of FARA, as it is known, is to ensure that the U.S. government and the people of the United States are informed of the source of information and the identity of persons attempting to influence U.S. public opinion, policy, and laws. Unquote.

Would you agree that guarding against foreign espionage or foreign influence measures falls under this heading?

COMEY: Yes.

HIMES: In general, is willful violation or failure to register pursuant to this law in some circumstances a crime?

COMEY: I believe it is. I'm not an expert on FARA, but I believe it is.

HIMES: And it could lead, certainly, to counterintelligence concerns, right?

COMEY: Yes.

HIMES: Now, Paul Manafort, as reported in the New York Times and other outlets and his deputy, Rick Gates ran a campaign in Washington to lobby government officials and push positive press coverage of pro Russian-Ukrainian officials. Paul Manafort began officially working for former Ukrainian President Yanukovych at least as far back as 2007, according to the Washington Post.

The lobbying was only discovered by Ukraine's new National Anti-Corruption Bureau, which found secret ledgers in Kiev, indicating almost $13 million in undisclosed cash payments from Ukrainian government coffers (ph), to Paul Manafort for lobbying done between 2007 and 2012, for Mr. Yanukovych -- Yanukovych.

Director Comey, did Paul Manafort ever register as a foreign agent under FARA?

COMEY: That's not something I can comment on.

HIMES: Whether he registered or not is not something that you can comment on?

COMEY: No.

HIMES: OK. Paul Manafort was, however, Donald Trump's campaign manager in July of 2016, correct?

COMEY: Mr. Himes, I really don't wanna get into answering questions about any individual U.S. person.

HIMES: OK...

COMEY: Look, I'm -- it's obvious from the public record. But I don't wanna start down the road of answering questions about somebody.

HIMES: OK. Well, I think the facts would show that he never did register. But as the ranking member pointed out, it perhaps should come as no surprise that the Republican platform, which was drafted at the Republican Convention in July of 2016, underwent a pretty significant change with respect to the American response to Russia's illegal invasion of Ukraine and their aggression in that country.

It appears, from our standpoint, that we had -- we had perhaps somebody who should've registered under FARA pulling the strings, there. There's more though and I don't know how much you'll be able to comment on this. But I wanna just explore for a second, the nature of the Russian government, because oftentimes the question becomes, was there contact with Russian officials.

And I want to read you a brief quote from a book on Putin's government. This is by Professor Karen Dawisha who wrote, "Instead of seeing Russian politics as an inchoate democratic system being pulled down by history, accidental autocrats, popular inertia, bureaucratic incompetence, or poor Western advice, I conclude that from the beginning Putin and his circle sought to create an authoritarian regime ruled by a close-knit cabal -- who used democracy for decoration rather than direction."

Mr. Comey, is it fair to say that the line that exists in the United States between government officers and government officials, is blurred in Russia? That there may be oligarchs or other individuals who on the surface appear to be private citizens, but who have connections to this close-knit cabal who might be agents of influence or might be doing the Kremlin's bidding in contact with others?

COMEY: That's fair to say and one of our counterintelligence missions is to try to understand who are those people and are they acting on behalf of the Russian government, those Russian citizens.

HIMES: Is it generally true that there is a category of Russian oligarchs that are likely part of this close-knit cabal?

COMEY: In a general sense.

HIMES: And if they go way back with Vladimir Putin, do the chances increase that they might be connected with the KGB, as is asserted by Professor Dawisha?

COMEY: The longevity of the association can be a consideration.

HIMES: And the KGB was the Russian intelligence service under the Soviet Union, right?

COMEY: Correct, former...

HIMES: And the Ukraine was part of the Soviet Union?

COMEY: Correct.

HIMES: Right. I'll just observe, Renault Akhmetov, a steel and iron (ph) or a magnate or oligarch, is the richest man in Ukraine and a strong Putin ally. He was the one who reportedly recommended Paul Manafort to Yanukovych.

Mr. Comey, last set of questions from me, I have a report that appeared in CNN yesterday. The headline is, "Former Trump Campaign Chief Paul Manafort Wanted for Questioning in Ukraine Corruption Case." And I -- I raise this with you because the story is told of Paul Manafort acting on behalf of Ukraine's former justice miniature -- minister Oleksandr Lavrynovych, which who was the justice minister under the previous pro-Russian regime who -- and I'll just read a segment from the story here.

Who was involved in jailing the former Prime Minister Tymoshenko who was the main political rival of the Kremlin backed President Viktor Yanukovych who Manafort advised until he was deposed in 2014. Tymoshenko was released from jail at the same time that Yanukovych was ousted. Many saw her sentencing as politically motivated by the pro-Russian government.

In response to the deterioration international climate, Ukrainian

prosecutors say Manafort drafted a public relations strategy that included hiring Skadden Arps, an American law firm, to review the Tymoshenko case. And show the conviction had a sound legal basis. The story goes on to talk about the transfer of over $1 million, potentially, illegally from Ukrainian coffers (ph) to Skadden Arps.

And the reason I bring all this up with you is because the story also says and it appears to have been confirmed by the Department of Justice that the current Ukraine regime, hardly a friend of the Russians. And very much targeted by the Russians has made seven requests to the United States government's -- the United States government for assistance under the MLA treaty in securing the assistance of Paul Manafort as part of this on anti-corruption case. And in fact, the story says that you were presented personally with a letter asking for that assistance.

So my question Director Comey is, is that all true? Have you been asked to provide assistance to the current Ukrainian government with respect to Paul Manafort? And how do you intend to respond to that request?

COMEY: It's not something I can comment on. I can say generally, we have a very strong relationship and cooperation in the criminal and national security areas with our Ukrainian partners, but I can't talk about the particular matter.

HIMES: The story says that the DOJ confirmed that there have been requests for assistance on this matter. You can't go as far as -- as confirming that in fact there have been these requests made?

COMEY: If they've done that, I would need them to do it again. I -- I can't comment on it.

HIMES: OK. Well, I appreciate that and with that I will yield back the remainder of my time to the ranking member.

SCHIFF: And I yield to Terri Sewell.

SEWELL: Thank you Mr. Ranking Member.

My questions this morning really revolve around the resignation of the former national security adviser Michael Flynn.

Director Comey, much as been made about Russia's historical interference with political elections around the world meant to cause discord and -- and -- and disunity especially in Western alliance's. Does the FBI generally assume that Russian ambassadors to the United States like Ambassador Kislyak, are at least overtly, collecting intelligence on influential Americans, especially political leaders.

COMEY: Ms. Sewell, that's not something I can answer in an open setting.

SEWELL: Am I right that in the -- that in the Russian playbook -- that it's in the Russian playbook to use diplomats and business people and Russian intelligence officers, whether declared or not to, collect intelligence on influential Americans for the purpose of affecting U.S. policy?

COMEY: I can answer as a general matter. Nation states that are adversaries of United States use traditional intelligence officers, sometimes used intelligence officers operating under diplomatic cover, use people we call co-opties (ph), maybe a private citizens, students, academics, business people, all manner of human beings can be used in a -- in an intelligence collection operation. But I'm not gonna talk about the particular.

SEWELL: Would someone like Ambassador Kislyak Play that type of role for Russia?

COMEY: I can't say here.

SEWELL: The declassified January intelligence community assessment report that your agency helped to draft, the report that's entitled assessing Russian activities and intentions in the recent U.S. elections specifically states that, quote, "Since the Cold War,

Russian intelligence efforts related to the United States elections have primarily focused on foreign intelligence collections that could help Russian leaders understand a new U.S. administration's plans and priorities," end quote.

So knowing what we know about Russia's efforts and the role of the Russian ambassador, Director Comey, would you be concerned if any one of your agents had a private meeting with the Russian ambassador?

COMEY: If an FBI agent had a private meeting with a Russian government employee of any kind, it would be concerning and I assume by private, one that's not disclosed or part of their operational activity, yes.

SEWELL: That's right. And would you expect that agent to report that meeting?

COMEY: Yes.

SEWELL: Admiral Rogers, similar question. If -- would you be concerned if one of your intelligence officers had a private meeting with the Russian ambassador? And would you expect that intelligence officer to report that meeting?

ROGERS: Disclosures of interactions with foreign governments is a requirement for all our employees to include myself, for example.

SEWELL: I ask these questions because on at least four occasions that I can count, Mr. Flynn, a three-star general and a former intelligence officer, someone with influence over the U.S. policy and someone with knowledge of state secrets and the incoming national security advisor, communicated with and met with the Russian ambassador and failed to disclose it.

So I ask you directors, if you wouldn't stand for your own staff to do this, why should we, the American people accept Michael Flynn doing it?

COMEY: Ms. Sewell, I'll let Mike Rogers take it next but I -- I don't -- I can't speak to what the disclosure obligations are for other people in the government so it's hard for me to answer that. I can answer and I answered, I hope accurately with respect to one of the FBI special agents.

ROGERS: And I likewise would answer the same way in terms of the NSA.

SEWELL: I yield back...

NUNES: ... gentleman's time -- gentleman's time has expired. I'll yield myself 15 minutes.

Director Comey, you announced this morning that there'll be an investigation into Trump associates possible and President Trump and anyone around the campaign and any association with the Russian government.

If this committee or anyone else for that matter, someone from the public, comes with information to you about the Hillary Clinton campaign or their associates or someone from the Clinton Foundation, will you add that to your investigation? They have ties to Russian intelligence services, Russian agents, would that be something of interest to you?

COMEY: People bring us information about what they think is improper unlawful activity of any kind, we will evaluate it. Not just in -- not just in this context. Folks send us stuff all the time. They should keep going that.

NUNES: Do you think it's possible that the Russians would not be trying to infiltrate Hillary Clinton's campaign, get information on Hillary Clinton and try to get to people that are around that campaign or the Clinton Foundation?

COMEY: I'm not prepared to comment about the particular campaigns but the Russians in general are always trying to understand

who the future leaders might be and what levers of influence there might be on them.

NUNES: I just hope that if -- if information does surface about the other campaigns, not even just Hillary Clinton's but any other campaigns, that you would take that serious also if the Russians were trying to infiltrate those campaigns around them.

COMEY: Of course we would.

NUNES: OK. I yield to Mr. Conaway.


CONAWAY: Thanks, Chairman. Gentlemen, thanks for being here.

Admiral Rogers, you'd mentioned analytic standards earlier in the conversation. Are those standards the same for all intelligence analysts across the various agencies?

ROGERS: There's a broad set of intelligence community promulgated standards for all of us and then there are specific issues associated, for example, with a particular authority that you're using to collect the information in the first place.

CONAWAY: So, gentleman, same thing your -- your agency -- your analysts would have I think similar type standards?

COMEY: Correct. That's one of the really good things that's happened since 9/11, especially since 2004 is the adoption of a common set of tradecraft provisions.

CONAWAY: So, on a CPA and we have generally astounded -- generally accepted accounting standards which are promulgated across a variety of things. Are those same standards publicly promulgated as -- but generally disseminated through all of your analysts, I would assume would have some sort of a test that they know those standards?

ROGERS: I think the specifics of the IC promulgated standards

are classified but I could take that one for the record.

CONAWAY: When the IC attributes a hacking to a particular actor, you do that through generally forensic evidence. But when it comes to try to determine intent foreign leaders, can you walk us through how the NSA does that or the FBI does that?

ROGERS: We assess the range of information that we've collect -- collected in an attempt to generate understanding as to not only what has occurred, but part of the intelligence professional -- profession is also trying to understand why, what was the intent. We'll use the range of information we have available to us, while we're primarily a single source organization.

It's one reason why organizations like CIA, the Defense Intelligence Agency, which take multiple sources try to put together a complete picture. So we're just one component of a broader effort.

CONAWAY: Director Comey, anything different than that?

COMEY: No, it's about putting together a puzzle. Sometimes from forensics alone, you can get a pretty good indication as to what they must be intending to accomplish, other times requires human sources and additional a signals intelligence to give you that sense.

CONAWAY: So both you agree, though, it's rarely a precise art -- or a precise science of determining intent of any foreign leader.

ROGERS: That's correct.

COMEY: All of intelligence work requires judgment. That's at the at the center of it.

ROGERS: But I will say in some cases, it's a much clearer case than in others. There are some...

(CROSSTALK)

CONAWAY: It depends on the sources you have inside a particular foreign leader's shop.

ROGERS: I'm not going to get into specifics.

CONAWAY: Just in general. If you have somebody whose next door neighbor -- never mind. Pivoting to the January 7 -- January 6 intelligence community assessment, both your agencies agree with the assessment that the Russian's goal was to undermine the public faith in U.S. democratic process. Is that still your assessments?

COMEY: Yes.

ROGERS: Yes.

CONAWAY: Same assessment said that the Russian's goal was to -- wanted to denigrate Secretary Clinton and harm her electability and potential presidency and that Putin wanted to discredit Secretary Clinton because he publicly blamed her since 2011 for insighting mass protests against his regime in late 2011, early 2012. You both still agree with that assessment?

COMEY: Yes.

ROGERS: Yes.

CONAWAY: And then finally, Admiral Rogers, that assessment went on to say that president Putin and the Russian government aspired to help president -- I guess he would have been candidate Trump at the time -- but president-elect Trump's election chances when possible by discrediting Secretary Clinton. You had a lower...

ROGERS: Confidence level.

CONAWAY: ... confidence level. Is that still the case?

ROGERS: Yes, sir.

CONAWAY: Can you tell the group why you were...

ROGERS: I'm not going to get into specifics in an unclassified forum but for me, it boiled down to the level and nature of the sourcing on that one particular judgment was slightly different to me than the others.

COMEY: To be clear, Mr. Conaway, we all agreed with that judgment.

ROGERS: We all agreed with the judgment.

CONAWAY: Right, right, right. But you really agreed and he almost really agreed.

COMEY: Not term out folks use, but I...

(CROSSTALK)

CONAWAY: Director Comey, in terms of laying out those three assessment and whether or not the IC was consistent in its view of those three assessments across the entire campaign. And we walked through kind of the FBI's walk down that path.

Did -- as of early December of '16, did the FBI assess that the active measures were to undermine -- by the Russians were to undermine the faith in U.S. Democratic process as you come to that conclusion by early December?

COMEY: I think that's right, December of last year.

CONAWAY: Sixteen, yes sir.

COMEY: I think we're at that point, yes.

CONAWAY: And then active measures conducted against Secretary Clinton, to denigrate her, hurt her campaign and also undermined her presidency?

COMEY: Correct.

CONAWAY: All right. And then, the conclusion that active measures were taken specifically to help President Trump's campaign, you had that -- by early December, you already had that conclusion?

COMEY: Correct, that they wanted to hurt our democracy, hurt her, help him. I think all three we were confident in, at least as early as December.

CONAWAY: OK. The -- the paragraph that gives me a little concern there, in terms of just the timing of when all of that occurred because I'm not sure if we went back and got that exact same January assessment six months earlier, it would've looked the same. Because, you say, when we further assessed Putin and the Russian government developed a clear preference for President-elect Trump.

Any idea when that clear preference in the analysis, when did that get into the lexicon of whether you talk back and forth among yourselves on a -- on a classified basis?

COMEY: I don't know for sure, but I think that was a fairly easy judgment for the community. He -- Putin hated Secretary Clinton so much, that the flipside of that coin was he had a clear preference for the person running against the person he hated so much.

CONAWAY: Yeah and that and that my work on Saturday afternoon when the -- my wife's Red Raiders are playing the Texas Longhorns. She really likes the Red Raiders. But all the rest of the time, I mean the logic is that because he really didn't like president -- the Candidate Clinton, that he automatically liked Trump. That assessment's based on what?

COMEY: Well, it's based on more than that. But part of it is and we're not getting into the details of it here, but part of it is the logic. Whoever the Red Raiders are playing, you want the Red Raiders to win, by definition, you want their opponent to lose.

CONAWAY: I know, but this says that -- that you wanted both of them -- you wanted her to lose and wanted him to win. Is that what you were saying?

COMEY: Right, they're inseparable -- right, it's a two -- it's a two person...

CONAWAY: Right, right.

COMEY: ... event.

CONAWAY: I got you. So I'm just wondering when you decided you wanted him to win?

COMEY: Well, logically when he wanted her to lose, wanted...

CONAWAY: No, no, no, I'm not talking about him, Putin, I got that. I got that. But the question is, we're on this clear -- well let me finish up then.

So we go through that sentence about the clear preference for Donald Trump. And we don't know exactly when you guys decided that was the case. Then it says, when it appeared to Moscow that Secretary Clinton was likely to win the election, the Russian influence campaign then focused on undermining her expected presidency.

So -- and then election then says, the government -- the Russian government aspired to help President-elect Trump election chances. So when did they not think she was going to win?

COMEY: Well, the assessment of the Intelligence Committee was, as the summer went on and the polls appeared to show that Secretary Clinton was gonna win, the Russians sort of gave up and simply focused on trying to undermine her, it's your Red Raiders, you know they're not going to win.

COMEY: So you kind of hope key people on the other team get hurt

so they're not such a tough opponent down the road. And so there was at some point...

(CROSSTALK)

CONAWAY: Sir, do you believe that the FBI was consistent through early December and on that that was the case. That they -- they assessed that they really wanted Trump to win it and were working to help him win and her lose.

COMEY: Yes, our analysts had a view that I don't believe changed, from late fall through to the report on January 6 that it had those three elements.

CONAWAY: All right. So then on December the 9th, well in advance of the January 6th deal, the -- the Washington Post, put out an article. Their least sentence was that this -- and again, CIA, they're not here today but we'll hopefully have them next week, concluded in a secret assessment that Russia intervened in the '16 election to help Donald Trump win the presidency rather than to undermine the confidence in the electoral system. Rather than just undermine it, they don't mention Mrs. Clinton at all.

And then it says to help Trump elected, the U.S. senior briefed on the intelligence position -- that the U.S. -- that U.S. official briefed by -- briefed on intelligence presentation to U.S. Senators said that's the consensus view. How much did it -- this is written by name Adam Intas Elaine (ph) something and Greg Miller. Do they have drafted you last -- the January 6th document for the Intel Committee.

COMEY: I'm sorry.

CONAWAY: Did those writers from the Washington Post help you write the January 6 assessment?

COMEY: No, they did not.

CONAWAY: I wonder how they got almost the exact language on

December the 9th.

COMEY: It hadn't been written yet. I don't know. This is the peril of trying to comment on newspaper articles that report to report classified information. I can't say much about them, they're often wrong.

CONAWAY: You mentioned earlier in one of our hearings that when anybody uses -- the I can't talk because I'm bound by position anonymity or whatever, that really is code for breaking the law generally, right?

When somebody says I'm talking to a reporter, I'm declassifying secret information, you can't tell -- the reporter can't tell who it is because, as Mr. Gowdy was saying earlier, speaking on condition of anonymity. That really should be interpreted because I'm breaking the law and I don't want to be ousted. It that a fair statement?

COMEY: Sometimes. I think there are other motives behind people requesting anonymity but that can be one of them.

CONAWAY: So it's you're statement to us then that the FBI was consistent in it's assessment that they integrate the U.S. electoral process, hurt Hillary and her potential and current across all of that across all of that, that they intended to help Trump, that's your testimony this morning?

COMEY: Correct.

CONAWAY: Thank you. I yield back.

NUNES: Mr. King?

KING: Thank you Mr. Chairman.

If you could yield me a few minutes into the next round -- I'll just start with this -- make the comment.

First of all, let me thank Director Comey and Admiral Rogers for

being here today. And for what I believe it's been the cooperative you've always given this committee. So thank you very much for that, for your service.

Director Comey, I think we're in a predicament here today. I understand your situation where you can't comment on the investigation. And yet we've can have various scenarios laid out which can go on for months and months and months without anyone be able to disprove them until the investigation is completed.

I just like to use the example, for instance we could've said that in 2012 President Obama was overheard on microphone telling Medvedev that I'm reelected, tell Vladimir we can work out better arrangements. We know that he ridiculed candidate Romney in the 2012 election when Romney said that he thought Russia still a threat.

And then in 2013 we saw that basically President Obama invited the Russians into Syria when they've been pretty much removed from the Middle East 40 years before. And also as far as aid to Ukraine, far as I recall, the Obama administration always refuse to give the lethal aid to Ukraine and it can be argued that the Republican platform in 2016 was actually stronger than the Democratic platform on that.

So again if we -- if there was investigation going on with the Obama administration, we can lay out all these scenarios and say well that proves something or it might prove something. Until the investigation was completed, that type of almost possibly slanderous comments could be made.

So I would just, again, if -- I'm not asking you to hurry the investigation along, you have to do what you have to do. But I guess I could ask you just in the remaining moments I have in this round, I know that -- I guess it was just two weeks ago that Director Clapper said that as far as he knows, all the evidence he's seen, there's no evidence of any collusion at all between the Trump campaign and the Russians.

Now obviously a detailed, exhaustive report was put out talking

about Russian influence in the campaign along with the intelligence apparatus had input into that. Do either you or Admiral Rogers have any reason to disagree with the conclusion of General Clapper that there's no evidence of collusion between the Russians and the Trump campaign.

COMEY: Mr. King, it's not something I can comment on.

ROGERS: Likewise, I'm not going to comment on an ongoing investigation's conclusions.

KING: But again, you're not going to disagree with General Clapper, you're just not going to comment. And the reason I'm pointing that out is, that's sort of the situation, you know, the other way around that you can't comment on something, often there's inference out there that because a person's name is brought up, because he may have worked with somebody at a certain time, that there's a guilt implied in that so that's one problem.

I'm not in any way being critical of either of you, I'm just saying this is a situation I think can be damaging to the country and does advance the Russian interest of trying to destabilize democracy and cause a lack of confidence in our system.

And with that, I yield back, Mr. Chairman.

NUNES: Gentleman yields back.

I recognize Mr. Schiff for 15 minutes.

SCHIFF: Thank you, Mr. Chairman.

I just have a couple of follow-up questions before I pass to Representative Sewell. It wasn't simply that the Russians had a negative preference against Secretary Clinton, they also had a positive preference for Donald Trump, isn't that correct?

COMEY: Correct.

SCHIFF: And I won't ask you to say whether this is an accurate characterization of Mr. Trump, I won't put you in that spot, but would it be logical for the Kremlin to prefer a candidate that disparaged NATO to be president of the United States?

COMEY: You're not going to put me in that spot, you said?

SCHIFF: Yes.

(LAUGHTER)

COMEY: I'm happy with that. I'm happy with that.

SCHIFF: I'm not going to put you in the spot of answering whether this is an accurate characterization of Mr. Trump's views, but it would be logical for the Kremlin to want someone who had a dim view of NATO. Is that right?

COMEY: All kidding aside, I don't think that's something I should be answering. That's beyond my responsibilities.

SCHIFF: Well, what is the Russian view of NATO. Do they like NATO? Do they want to see NATO strong?

COMEY: Again, I'm sure you have already spoken to people who are greater experts than I but yes, they don't like NATO. They think NATO encircles them and threatens them.

SCHIFF: And would they have a preference for a candidate that expressed an openness to repealing the sanctions over Ukraine?

COMEY: Again, I don't want to get into business of commenting on that. I know...

SCHIFF: Then let me ask you this way, Director. Would they like to see the sanctions on Ukraine go away?

COMEY: Yes.

SCHIFF: Would they have a preference for a candidate who expressed open admiration for Putin?

COMEY: Can I help you reformulate the question? Mr. Putin would like people who like him.

SCHIFF: Would they have a preference for a candidate who encouraged Brexit and other departures from Europe? Would they like to see more Brexits?

COMEY: Yes.

SCHIFF: And have the Russians in Europe demonstrated a preference for business people as political leaders with the hope that they can entangle them in financial interests or that they may allow their financial interests to take precedence over the interests of the countries in Europe they represent?

COMEY: In our joint report, we recount that the Russians -- that President Putin has expressed a preference for business leaders in leading other governments and mentions Gerhard Schroder and -- I'm going to forget one. Berlusconi because he believes they're people that are more open to negotiation, easier to deal with.

SCHIFF: At this point, let me yield to Representative Sewell.

SEWELL: I'd like to continue my questioning -- the line of questioning on Michael Flynn.

I'm sure you can understand my concern that Mr. Flynn not only failed to disclose the contacts with the Russian ambassador, but he said he did not remember whether he discussed sanctions against Russia with that ambassador and I find that really hard to believe. And wouldn't you think that at the height of our concern about Russian hacking, that Mr. Flynn would have remembered meeting with the Russian ambassador and would have been --and would have told him to stop meddling in our affairs, but that didn't happen, did it?

COMEY: Mrs. Sewell, that's not something I can answer.

SEWELL: Not only did Mr. Flynn not remember talking to the Russian ambassador and not only did he not remember what they talked about, he also appeared to have lied to Vice President-elect Mike Pence all about it.

Now, Mr. Comey, do you think that Mr. Flynn's failure to disclose the communication and contact he had with the Russian ambassador and their topic of conversation along with a blatant lie to Vice President Pence meet the standard for an investigation by the FBI?

COMEY: I have to give you the same answer, I'm not going to comment.

SEWELL: Now, I know, Director Comey, that you probably can't comment on this as well but I think it's really important that we review a short timeline and -- that's based on press reportings because we need to get this for the public record, I think.

So on December 25, 2016, Mr. Flynn reportedly exchanged text messages with the Russian ambassador. On December 28, 2016, Mr. Flynn reportedly spoke on the phone with the Russian ambassador. By then, it was pretty clear that the Obama administration was going to take actions against Russia. On December 29, 2016, Mr. Flynn reportedly spoke on the phone with the Russian ambassador again.

That day, the Obama administration expelled 35 Russian operatives from the United States and announced new sanctions. We also know from press reportings that sometime in December, Mr. Flynn met in person with the Russian ambassador at Trump Tower and that Mr. Trump's son-in-law, Jared Kushner was also there. The purpose of the meeting was to quote "Establish a line of communication" end quote, with the Kremlin.

I should add that the White House and Mr. Flynn didn't disclose this December face-to-face meeting until this month. On January 20 --

January 12, sorry -- 2017, press reported that Mr. Flynn contacted the Russian ambassador again.

And on January 15, 2015 vice President-elect, Mike Pence stated on several Sunday morning shows regarding Mr. Flynn's conversation with ambassador quote, "What I can confirm, having spoken to him about it, is that those conversations that happened to occur around the time that the United States took action to expel diplomats had nothing whatsoever to do with those sanctions," end quote.

On January 26, the -- the acting Attorney General, Sally Yates reportedly told president Trump's White House counsel, who immediately told President Trump that Mr. Flynn was vulnerable to Russian blackmail because of discrepancies between Vice President-elect Pence's public statement and Mr. Flynn's actual discussions.

On February 10, President Trump denied knowledge of this, telling reporters on Air Force One, quote, "I don't know about that," end quote, in response to questions about Mr. Flynn's conduct. The White House also publicly denied that Mr. Flynn and the Russian ambassador discussed sanctions. And of course on February 13, 2017, Mr. Flynn resigned as national security advisor.

Now, Director Comey, all of these accounts are open source press reportings. Given Russian's long-standing desire to cultivate relations with influential U.S. persons, isn't the American public right to be concerned about Mr. -- Mr. Flynn's conduct, his failure to disclose that contact with the Russian ambassador, his attempts to cover it up and what looks like the White House's attempts to sweep this under the rug.

Don't we, as the American people, deserve the right to know and shouldn't our FBI investigate such claims?

COMEY: I can't comment. I -- I understand people's curiosity about our work and intense interest in it, and as Mr. King said, oftentimes, speculation about it. But we can't do it well or fairly to the people we investigate if we talk about it. So I can't comment.

SEWELL: I'd like to turn to another topic about Mr. Flynn, his failure to disclose until pressured last week, by my colleagues on the House Oversight and Government Relations Committee, Government Reforms
Committee, payments he received from Russia for his 2015 trip to the 10th anniversary Gala of RT, the Russian owned propaganda media outlet.

According to the January 2017 declassified IC assessment report, RT's criticism of the United States was quote, "The last facet of its broader and long-standing anti-U.S. messaging likely aimed at undermining viewer's trust in the U.S. Democratic procedures," end quote. This January assessment points out that this was a strategy that Russia employed, going back to before, the 2012 elections, according to the IC assessment.

So Admiral Rogers, am I right that the RT is essentially owned by the Russian government? And how long has the intelligence community been looking at RT as an arm of the Russian government?

ROGERS: So we're certainly aware and have been for some period of time of the direct connections between Russian government and RT individuals, we're aware of monetary flow and other things. We have been...

(CROSSTALK)

SEWELL: And how long have you known about that, a few months, a few years, I mean how long has the United States...

(CROSSTALK)

ROGERS: Some number of years, I apologize ma'am, I just don't know off the top of my head.

SEWELL: Aren't I right to assume then, that the former Director of DIA, the Defense Intelligence Agency Mr. Flynn, would have been

aware that RT's role as an anti-U.S. Russian propaganda outlet when he agreed to speak at their anniversary Gala in 2015. Isn't it reasonable to assume that he would know?

ROGERS: I'm not in a position to comment on the knowledge of something else from another person, ma'am.

SEWELL: Director Comey, would be unusual for a foreign government official to be -- to get paid by a foreign adversary to attend such an event? And would it be unusual and raise some questions at the FBI, if that person failed to disclose the payments received for that trip?

COMEY: I don't know in general and as to the specific, I'm -- I'm just not gonna comment.

SEWELL: Yes, sir. I understand that you can't comment. But I'd like to read an exchange between Mr. Flynn and a Yahoo news correspondent from July 2016 regarding his trip to Russia, during the RT event. The correspondent asked, "Were you paid for that event?" Then, there was back and forth for a bit. And then Mr. Flynn said, quote, "Yeah. I didn't take any money from Russia if that's what you're asking me," end quote.

So Director Comey, isn't it true that the House Oversight Committee last week, received information and released publicly that Mr. Flynn accepted nearly $35,000 in speaking fees and traveling fees from RT, this government -- Russian government owned media outlet.

COMEY: I believe I've seen news accounts to that effect.

SEWELL: Moreover, isn't it also true that according to the emoluments clause of the United States Constitution, a person holding any office of profit or trust cannot accept gifts or payments from a foreign -- from a foreign country.

And doesn't the DOD, the Department of Defense prohibit retired military officers from taking any consulting fees, gifts, traveling

expenses, honorariums, a salary from a foreign government, including commercial enterprises owned by or controlled by a foreign government like RT?

COMEY: That's not something I can comment on.

SEWELL: Can you -- can you speak to whether or not the emoluments clause would apply to someone like Mr. Flynn, a retired three-star general?

COMEY: I can't.

SEWELL: So isn't is -- I just find be really hard to believe that given the emoluments clause does apply to retired officers like Mr. Flynn. I can't believe that Mr. Flynn, a retired military officer would take money from the Russian government in violation of the United State Constitution. And I believe that such violations worthy of a criminal investigation by the FBI.

What level of proof do we need in order for us to have a criminal investigation by the FBI of Mr. Flynn?

COMEY: I can't comment on that.

SEWELL: Shouldn't the American people be concerned what -- I think that it's really hard for us to fathom that he wouldn't know that he should've disclosed that he received $30,000 as a part of -- of a speaking engagement to RT, the Russian U.S. anti-propaganda outlet.

COMEY: I can't comment on that Ms. Sewell.

SEWELL: My final line of questioning is in regard to Mr. Flynn working as an agent of a foreign power.

Now Director Comey, following on Mr. Himes's line of questioning, am I correct that the Foreign Agents Registration Act requires that individuals who lobby on behalf of a foreign government must register

with the United States government?

COMEY: I believe that's correct. I know keep saying I'm not an expert. The reason I'm saying that is, I don't know exactly how they define things like lobbying in the statute. But as a general matter, if you're going to represent a foreign government here in the United States, touching our government, you should be registered.

SEWELL: And isn't it true that just last November 2016, Mr. Flynn was working as a foreign agent doing work that principally benefited the government of Turkey and yet reported until just last week?

COMEY: I can't comment on that.

SEWELL: Isn't it true that Mr. Flynn was reportedly paid over half $1 million for this work?

COMEY: Same answer.

SEWELL: And isn't it true that the Trump White House, on at least two occasions, was asked by Mr. Flynn's lawyers whether he should report that work, the work that he was doing on behalf of the Turkish government. And yet the administration didn't give him any advice to the contrary.

Do you know anything about that?

COMEY: I have to give you the same answer.

SEWELL: So Director Comey, I know you I cannot discuss whether any investigations are ongoing with U.S. persons, and I respect that. I think it's important though that the American people understand the scope and breath of what, in public open source press reportings of Mr. Flynn's actions that led to his resignation.

And while we can't talk about whether there are an investigation, I believe that we here at HPSCI, at the House Permanent Select

Committee on Intelligence must put those facts into the public domain. And they are one, that Mr. Flynn lied about his communication with the -- with the Russian ambassador.

Secondly, That Mr. Flynn lied about taking money from the Russian government and thirdly, that Mr. Flynn at a minimum did not disclose work as an agent of a foreign -- of a foreign power and that the White House did not help in this concern.

So gentlemen, it's clear to me that Mr. Flynn should be under criminal investigation. And I know you cannot comment but I believe it is my duty as a member of this committee to comment to the American people that this -- that his engagement of lying and failure to disclose really important information and contacts with a foreign ambassador do rise to the level of -- of disclosure and to me, criminal intent.

So I say this to say that the American people deserve to know the full extent of Mr. Flynn's involvement with the Russians and the extent to which it influenced the 2016 election. I believe our democracy requires it.

Thank you, I yield back to my ranking member.

NUNES: Time's expired. Recognize myself for 15 minutes.

Mr. Comey and Mr. Rogers, you both said that the Russians had -- they favored Donald Trump, the selection. And you made that change, from the beginning of December it was not that they were trying to help Donald Trump, but that changed by early January. Mr. Conaway talked about that. Do -- do Russians...

COMEY: I don't -- I don't agree with that. I want to make sure I didn't misspeak earlier. We didn't change our view from December to early January. We, the FBI -- and I don't know that anybody else did on the I.C. team.

ROGERS: Me, from my perspective, we didn't have a fully formed

view until the end of December...

NUNES: At some point -- at some point, the assessment -- at some point, the assessment changed from -- from going from just trying to hurt Hillary Clinton to no, that they were actually trying to help Donald Trump get elected. That was early December as far as I know and then by January, you had all changed your mind on that.

COMEY: Well that's not my recollection.

ROGERS: That's not my recollection either, sir.

NUNES: OK. So is it -- do Russians historically prefer Republicans to win over Democrats?

COMEY: I don't know the answer to that. I don't know the answer to that.

NUNES: Did the Russians prefer Mitt Romney over Barack Obama in 2012?

ROGERS: I don't know that we ever did -- drew a formal analytic conclusion.

NUNES: Did the Russians prefer John McCain in 2008 over Barack Obama?

ROGERS: I never saw a U.S. intelligence community analytic position on that issue.

NUNES: Don't you think it's ridiculous to say that -- for anyone to say that the Russians prefer Republicans over Democrats?

ROGERS: I didn't think that that's what you just heard us say, I apologize, sir.

COMEY: I hope you didn't hear us to say that. We don't know in those particular races and I'm not qualified enough...

NUNES: I'm just asking a general question. Wouldn't it be a little preposterous to say that historically, going back to Ronald Reagan and all that we know about maybe who the Russians would prefer, that somehow the Russians prefer Republicans over Democrats?

COMEY: There is -- I'm not going to discuss in an unclassed forum, in the classified segment of the reporting version that we did, there is some analysis that discusses this because remember this did come up in our assessment on the Russian piece. I'm not going to discuss this unclassified forum.

NUNES: Mr. -- Mr. King.

KING: Thank you, Mr. Chairman.

And I would just say on that because again, we're not going into the classified sections, that indicating that historically Russians have supported Republicans, and I know that language is there, to me puts somewhat of a cloud over the entire report. It seems to indicate the direction it was going in, but anyway, let me just say this for the record, and I know what your answer's going to be, but I have to get this statement on the record.

On March 15, former acting director of CIA, Mike Morell, who was the acting director under President Obama and put on the record I've had differences with Mike Morell in the past but he was asked about the question of the Trump campaign conspiring with the Russians and his answer was there's smoke but there is not fire at all. There's no little camp fire, there's no little candle, there's no spark.

COMEY: I can't comment, Mr. King.

KING: Admiral Rogers.

ROGERS: I'm not going to comment on an ongoing investigation.

KING: I understand that. That was my way of getting on the

record, so I appreciate that. You were talking about the significance of leaks and how important it is we stop them. And to me -- and I've been here a while -- I've never seen such a sustained period of leaks.

Going back to December where, not the Intelligence Committee, but the Washington Post was told the conclusion of the report -- a similar one -- what it was going to be. We have situations in the New York Times where they talk of meetings, they talk about transcripts, they talk about conversations.

There was one in particular that spoke about Trump campaign individuals meeting with Russian intelligence agents and again, Director Comey, I don't know if you can comment on this, but the White House chief of staff, said against that day, on the next day that Mr. McCabe from your office you went to him at the White House and told him that that story was BS.

Is there any way you can comment on whether or not Mr. McCabe told that to Mr. Priebus?

COMEY: I can't, Mr. King, but I can agree with your general premise. Leaks have always been a problem. I read over the weekend something from George Washington and Abraham Lincoln complaining about
them. But I do think in the last six weeks, couple of months, there's been at least -- apparently a lot of conversation about classified matters that's ending up in the media.

Now, a lot of it is just dead wrong, which is one of the challenges because we don't correct it, but it does strike me there's been a lot of people talking or at least reporters saying people are talking to them in ways that have struck me as unusually active.

KING: I fully understand the media's fascination with palace intrigue, with which faction of the White House is trying to outdo the other, that's all -- to me, that's all legitimate, that goes with the game. But if you're talking about leaking classified information, if you're talking about leaking investigations, I mean -- you've stated

today that there is an FBI investigation going on.
So if the New York Times can be believed, I would think there would have to be somebody from the FBI who is telling them about these purported meetings, which Mr. McCabe said was BS, with the Russian intelligence agencies. Somebody who's familiar with that investigation spoke to the New York Times. And so I'll use that as an example and also, one where there's a small universe.

I think it was on January 6, when yourself, Admiral Rogers, Director Brennan, and General Clapper went to Trump tower to meet with President Trump. The media reports are that at the end of that meeting, Director Comey, you presented president-elect Trump with a copy of the now infamous or famous dossier. And I don't know how many people were in the room, but within hours, that was leaked to the media and that gave the media the excuse or the rationale to publish almost the entire dossier.

Do you -- does that violate any law? I mean you were at a classified briefing with the president-elect of the United States and it had to be a very, very small universe of people who knew that you handed them that dossier and it was leaked out within hours. Are you making any effort to find out who leaked it and do you believe that constitute a criminal violation?

COMEY: I can't say, Mr. King except I can answer in general.

KING: Yes.

COMEY: Any unauthorized disclosure of classified conversations or documents is potentially a violation of law and a serious, serious problem. I've spent most of my career trying to figure out unauthorized disclosures and where they came from. It's very, very hard.

Often times, it doesn't come from the people who actually know the secrets. It comes from one hop out, people who heard about it or were told about it. And that's the reason so much information that reports to be accurate classified information is actually wrong in the

media. Because the people who heard about it didn't hear about it right. But, it is an enormous problem whenever you find information that is actually classified in the media.

We don't talk about it because we don't wanna confirm it, but I do think it should be investigated aggressively and if possible, prosecuted so people take as a lesson, this is not OK. This behavior can be deterred and its deterred by locking some people up who have engaged in criminal activity.

KING: Well, could you say it was -- obviously, Admiral Rogers was in the room, you were in the room, General Clapper was in the room and Director Brennan was in the room. Were there any other people in the room that could've leaked that out?

I mean this isn't a report that was circulated among 20 people. This is an unmasking of names where you may have 20 people in the NSA and a hundred people in the FBI, its not putting together a report or the intelligence agency. This is four people in a room with the president-elect of the United States. And I don't know who else was in that room and that was leaked out, it seemed within minutes or hours, of you handing him that dossier and it was so confidential, if you read the media reports that you actually handed it to him separately.

So believe me, I'm not saying it was you. I'm just saying, it's a small universe of people that would've known about that. And if it is a disclosure of classified information, if you're going to start with investigating the leaks, to me that would be one place where you could really start to narrow it down.

COMEY: And again, Mr. King, I can't comment because I do not ever wanna confirm a classified conversation with a president or president-elect. I can tell you my general experience. It often turns out, there are more people who know about something you expected.

At first, both because there may be more people involved in the

thing than you realized, not -- not this particular, but in general. And more people have been told about it or heard about it or staff have been briefed on it. And those echoes are in my experience, what most often ends up being shared with reporters.

KING: Well, could you tell us who else was in the room that day?

COMEY: I'm sorry?

KING: Could you tell us who else was in the room with you that day?

COMEY: No, because I'm not going to confirm that there was such a conversation because then, I might accidentally confirm something that was in the newspaper.

KING: But could you tell us who was in the room, whether or not there was a conversation?

COMEY: No, I'm not confirming there was a conversation. In a classified setting, I might be able to share more with you, but I'm not going to confirm any conversations with either President Obama or President Trump or when President Trump was the President-elect.

KING: Well, not the conversation or even the fact that you gave it to him, but can you -- can you tell us who was in the room for that briefing that you gave?

COMEY: That you're saying later ended up in the newspaper?

KING: Yes.

COMEY: So my talking about who was in the room would be a confirmation that was in the newspaper was classified information, I'm not going to do that. I'm not going to help people who did something that -- that is unauthorized.

KING: Yeah, but we all know that the four of you went to Trump

Tower for the briefing, I mean that's not classified, is it?

COMEY: How do we all know that, though?

KING: OK.

(LAUGHTER)

COMEY: Yeah.

KING: You know, you can -- you see the predicament we're in, here.

COMEY: I get it. I get it. But we are duty-bound to protect classified information, both in the first when we get it, and then to make sure we don't accidentally jeopardize classified information by what we say about something that appears in the media.

KING: Well, if they're listening, I would just advise that Director Clapper and Director Brennan, we'll be asking them the same questions last week -- next week and perhaps, they can give us some answers.

Mr. Chairman, I -- I yield back.

NUNES: Gentleman yields back...

(CROSSTALK)

KING: Thank you. Thank you for testifying.

NUNES: Mr. Lobiondo is recognized.


LOBIONDO: Thank you, Mr. Chairman.

Director Comey, Admiral Rogers, thank you for your service and thank you for being here. Understanding that what both of you have

been saying about the classified nature of the investigation, the classified nature of the topics we're talking about, can you give us any indication of when we, the committee, may in a classified setting know something from you. Would we have ongoing updates?

COMEY: Mr. LoBiondo, I don't know how long the work will take. I can't commit to updates, as you know. I have briefed the committee as a whole on some aspects of our work and I've briefed in great detail the chair and the ranking.

I don't know -- I can't -- I can't predict or commit to updates. But as your work goes on, we're in constant touch with you and we'll do the best we can, but I can't commit to that as I sit here.

LOBIONDO: So as the House Intelligence Committee and the Senate Intelligence Committee are conducting our bipartisan investigations and looking wherever it may lead with individuals or circumstances.

If you, through the FBI investigation, come across a circumstance with an individual or a situation would we be made aware of that under normal course of business?

COMEY: Not necessarily, but it's possible.

LOBIONDO: OK. So can you, either Director Comey or Admiral Rogers, tell us what we are doing or what we should be doing to protect against Russian interference in future elections or any meddling with our government or for that matter any state sponsor Iranians, North Koreans, Chinese, with any -- any meddling they may be doing?

ROGERS: So first, I think a public discussion and acknowledgment of the activity is a good positive first step because it shines us a flashlight on this, if you will. It illuminates a significant issue that I think we all have to -- have to deal with. There's a variety ongoing efforts both within the government, as well, in the private sector.

In terms of how we harden our defenses, I think we also need to have a discussion about just what for example, does critical infrastructure meeting in the 21st-century. I don't think we traditionally would have thought of an election infrastructure as critical. We traditionally viewed critical infrastructure as something that generated an industrial output, aviation, electricity, finance, I don't think we've traditionally thought about it and informational kind of dynamic.

I think that's a challenge for us coming ahead and then continued partnership between the elements within the government, as well is in the private sector, that's the key to the future to me.

LOBIONDO: So just for the record, I also had a whole list of specific questions about individuals and/or circumstances that don't want to be repetitive and have you say, I can't comment on them. But I would anticipate when we move to classified session that this committee will be able to explore some of those -- some of the situations in a little more depth.

I have a couple of other questions about the -- about the -- the Russian intervention. But I don't have enough time to get into it right now.

Mr. Chairman, if you could give me a couple minutes when we get to the next round.

NUNES: (OFF-MIKE)

LOBIONDO: OK. So very briefly the -- if you can describe the elements of the Russia's active measures in the campaign in the 2016 election. We've only got 35 seconds, but that's the first thing I want to get into about exactly what they were doing if you can tell us anything about that.

ROGERS: So we saw cyber used, we saw the use of external media, we saw the use of disinformation, we saw the use of leaking of information, much of which was not altered.

I mean, we saw several, if you will, common traits that we have both seen over time as well as I would argue that the difference this time was that the -- the cyber dimension and the fact that the release of so much information that they had extracted via cyber is a primary tool to try to drive an outcome.

LOBIONDO: So in this setting, can you talk to us at all about what tools they used?

ROGERS: I'm not going to go into the specifics of how they executed the hacks. I apologize, no sir.

LOBIONDO: We'll try to get into that in classified. I'll hold off for now, thank you.

NUNES: Gentleman yields back.

Mr. Schiff's recognized for 15 minutes.

SCHIFF: Thank you, Mr. Chairman. I just had a couple follow-up questions.

Director Comey, can you tell me what an SF86 is?

COMEY: SF86?

SCHIFF: Yes.

COMEY: It's the standard background clearance form that all of us who are hired by the federal government and want to have access to classified information fill out.

SCHIFF: Would someone who is an incoming national security advisor have to fill out an SF86?

COMEY: Yes, I think so.

SCHIFF: Would that SF86 require that the applicant disclose any payments received from a foreign power?

COMEY: I think so. I mean, the form is the form. I think so and foreign travel as well.

SCHIFF: I'd make a request through you to the Justice Department or whatever IC component would have custody of Mr. Flynn's SF86, I'd make a request that that be provided to the committee.

And I yield now to Mr. Carson.

CARSON: Thank you, Ranking Member.

I'd like to focus my line of questioning on Russia's views toward Ukraine. In March 2014, Russia illegally annexed the Ukrainian territory of Crimea beginning a conflict which has effectively yet to be resolved.

Admiral Rogers, can you please briefly describe, as you understand it, sir, how Russia took Crimea?

ROGERS: I would argue the insertion of military force. They occupied it and physically removed it from Ukrainian control.

CARSON: Sir, we've heard terms like little green men and hybrid warfare. Can you please explain how these relate to Russia and Ukraine?

ROGERS: So on the Ukraine side, what we saw was over time, rather than the kind of overt kind of activity we saw to such a degree on the Crimea side, what we saw was a much bigger effort on the influence and attempts to distance Russian actions from any potential blowback to the Russian state, if you will, and hence the use of the little green men surrogates in military -- unmarked military uniforms, the flow of information, the provision of resources to support forcible separation of the Ukraine.

CARSON: Admiral, has Russia returned Crimea back to Ukraine, sir?

ROGERS: No.

CARSON: Do they have intentions to?

ROGERS: They publicly indicated that they will not.

CARSON: Admiral, why does Russia even care about Ukraine?

ROGERS: I'm sure in their view they view this is a primary national interest for them. It's on the immediate periphery of the Russian state.

CARSON: Am I right, sir, that they see it as a part of their broader objective to influence and impact Russia's -- Ukraine's desire for self-determination?

ROGERS: Yes. I think that's part of it.

CARSON: Sir, as Russia tried to claim stolen territory in Ukraine, the U.S. and the rest of the world saw the annexation for what it was; a crime. Shortly after Russia invaded, the United Nations essentially declared it a crime in a nonbinding resolution. In our own government, recognizing the seriousness of the event instituted new sanctions against Russia, is that right sir?

ROGERS: Yes sir.

CARSON: Now this was a time where much of the world was united but Russia invaded another country and illegally annexed it's territory as we all stood shoulder-to-shoulder with Ukraine. Now one person who didn't see it that way, however, was president Donald Trump.

On July 30, in an interview with ABC News, Mr. Trump said of Putin, and I quote, "He's not going into Ukraine, OK? Just so you understand, he's not going into Ukraine, all right?" end quote.

Now, Admiral, hadn't Putin already gone into Ukraine two years before and hadn't left?

ROGERS: We're talking about the Crimea and influence on the Ukraine generally, yes, sir.

CARSON: And he still hasn't left, correct, sir?

ROGERS: Now we're starting to get into some very technical questions about are the Russians physically in the Ukraine, is it surrogates that the Crimea is a very example of to me. They outright invaded with armed military force and have annexed it.

CARSON: But are they effectively still in Ukraine?

ROGERS: They're certainly supporting the ongoing effort in the Ukraine to split that country.

CARSON: We'll get back to Mr. Trump in a minute. First, tell me sir, what would it mean to Russia and to Putin to have sanctions lifted?
ROGERS: Clearly, even easing of economic impact, greater flexibility, more resources.

CARSON: Now according to NATO analysis, the Russian economy shrunk by as much as 3.5 percent in 2015 and had no growth in 2016 in big part because of western sanctions, especially those against the oil and gas industry.

Now, we're talking about a loss of over $135 billion just in the first year of sanctions. That's a huge sum of money and sanctions aren't meant to push their economy over a cliff, but to put long-term pressure on Putin to change his behavior. Putin, himself, said in 2016 that sanctions are severely harming Russia. So we know they've had success in putting pressure on the Kremlin.

Admiral, what would it mean geopolitically? Would it help

legitimate Russia's illegal land grab?

ROGERS: Sir, I'm not -- I'm not in a position to talk broadly about the geopolitical implications. I mean we have stated previously, from an intelligence perspective, we tried to -- we have tried to outline to policy makers the specifics of the Russian invasion on Crimea, the specifics of the continued Russian support to separatists in the Ukraine that Russians continue to -- to pressure and the keep the Ukraine weak.

CARSON: Would it help cleave the United States from her allies?

ROGERS: If we remove the sanctions?

CARSON: There's a lot of steak -- there's a lot at stake here for Russia. This is big money, big strategic implications. If they can legitimate their annexation of Crimea, what's next? Are we looking at a new iron curtain descending across Eastern Europe? You know, most in our country recognize what is at stake in how the United States, as the leader of the free world, is the only check on Russian expansion.

So back to Mr. Trump and his cohort. At the republican convention in July, Paul Manafort, Carter Page, and Trump himself changed the republican party platform to no longer arm Ukraine. So the same month that Trump denied Putin's role in Ukraine, his team weakened the party platform on Ukraine and as we have and will continue to hear, this was the same month that several individuals in the Trump orbit held secret meetings with Russian officials, some of which may have been on the topic of sanctions against Russia or their intervention in Ukraine.

Now this is no coincidence in my opinion. In fact, the dossier written by former MI6 agent, Christopher Steele alleges that Trump agreed to sideline Russian intervention in Ukraine as a campaign issue, which is effectively a priority for Vladimir Putin. There's a lot in the dossier that is yet to be proven, but increasingly as we'll hear throughout the day, allegations are checking out. And this one

seems to be as accurate as they come.

In fact, there is also one pattern I wanna point out before yielding back, Manafort, fired, Page, fired, Flynn, fired. Why? They were hired because of their Russian connections, they were fired. However, because their connections became public, they were effectively culpable. But they were also the fall guys. So I think after we hear Mr. Quigley's line of questioning, we might guess who could be next.

Mr. Chairman, Mr. Ranking Member, I yield back.

SCHIFF: I yield the balance to Representative Speier.

SPEIER: Thank you, Ranking Member. Thank you gentlemen for your service to our country.

You know, I think it's really important as we sit here that we explain this to the American people in a way that they can understand it. Why are we talking about all of this? So my first question to each of you is, is Russia our adversary? Mr. Comey?

COMEY: Yes.

SPEIER: Mr. Rogers?

ROGERS: Yes.

SPEIER: Is -- do they intend to do us harm?

ROGERS: They intend to ensure, I believe, that they gain advantage at our expense.

SPEIER: Director Comey?

COMEY: Yes, I wanna be -- harm can have many meetings. They're an adversary and so they wanna resist us, oppose us, undermine us, in lots of different ways.

SPEIER: So one of the terms that we hear often is hybrid warfare. And I'd like to just stand give a short definition of what it is. It blends conventional warfare, irregular warfare and cyber warfare. The aggressor intends to avoid attribution or retribution.

So would you say that Russia engaged in hybrid warfare in its effort to undermine our Democratic process and engage in our electoral process? Director Comey?

COMEY: I don't think I would use the term warfare. I think you'd -- you'd wanna ask experts in the definition of war. They engaged in a multifaceted campaign of active measures to undermine our democracy and hurt one of the candidates and -- and hope to help one of the other candidates.

ROGERS: I'd agree with the director.

SPEIER: All right, well, thank you both.
I actually think that their engagement was an act of war, an act of hybrid warfare and I think that's why the American people should be concerned about it.

Now, in -- in terms of trying to understand this, I -- I think of a spider web, with a tarantula in the middle. And the tarantula, in my view, is Vladimir Putin, who is entrapping many people to do his bidding and to engage with him. And I would include those like Roger Stone and Carter Page and Michael Caputo and Wilbur Ross and Paul Manafort and Rex Tillerson.

I'd like to focus first on Rex Tillerson in the three minutes I have, here. He was the CEO of Exxon Mobil. In 2008, he said that the likelihood of U.S./Russia businesses was, in fact, a poor investment, that Russia was a poor investment climate, that was in 2008. In 2011 he closed the $500 billion deal with Rosneft Oil. The CEO of Rosneft is Igor Sechin, who is a confident of President Putin, second most powerful man in Russia and probably a former KGB agent.

The deal gives Exxon access to the Black Sea and the Kara Seas

and Siberia for oil development. Rosneft gets minority interest in Exxon in Texas and the Gulf. Rex Tillerson calls Sechin a good friend. In 2012, Mr. Tillerson and Mr. Sechin go on a road show here in the United States to talk about this great deal that they had just consummated.

Also in 2012 there's a video of President Putin and Mr. Tillerson toasting champagne at the deal. And in 2013, Mr. Tillerson receives the Russian Order of Friendship and he sits right next to President Putin at the event.

So my question to you Director Comey is, is it of value to President Putin knowing what you know of him and that his interest in doing harm to us, is it of benefit to Mr. Putin to have Rex Tillerson as the Secretary of State?

COMEY: I can't answer that question.

SPEIER: Admiral Rogers?

ROGERS: Ma'am I'm not -- I'm not in the position answer that question.

SPEIER: All right. So in 2014 at Igor Sechin is sanctioned and he laments that he no longer will be able to come to the United States to motorcycle ride with Mr. Tillerson. Could you give me an understanding of what are some of the reasons that we impose sanctions, Direct Comey?

COMEY: On Sechin?

SPEIER: Well, just in general.

COMEY: Again, you'd have to ask an expert, but from my general knowledge it's to punish activities that are criminal in nature, that involve war crimes, that involve violations of U.N. resolutions or United States law in some other way, it's to communicate and enforce foreign policy interests and values of United States of America.

That's my general sense, but an expert might describe it much better.

SPEIER: Admiral Rogers?

ROGERS: I would echo the Director's comments. It's also a tool that we use to attempt to drive and shake the choices and actions of others.

SPEIER: So in the case of Igor's session, who was sanctioned by the United States, in part to draw attention to the fact that Russia had invaded Crimea. It's an effort to try and send a very strong message to Russia, is that not true?

COMEY: I think that's right.

ROGERS: Yes ma'am.

SPEIER: With that, Mr. Chairman, I'll yield back for now.

NUNES: Gentleman yields back.

I'm going to yield myself 15 minutes and now yield to the general lady from Florida Ms. Ros-Lehtinen.

ROS-LEHTINEN: Thank you so much Mr. Chairman.

It's never acceptable, we can all agree, for any foreign power to interfere with our electoral process and this committee has long been focused on Russia's reprehensible conduct. And we will remain focused on the threat emanating from Moscow. And I agree with you Director Comey, when you say this investigation that is ongoing, we will follow the facts wherever they lead on a bipartisan level and there will be no sacred cows.

There are many important issues at stake, as you gentlemen have heard. There is bipartisan agreement on the danger of illegal leaks and our ability to reauthorize important programs upon which our intelligence community relies. But I want to assure the American

people that there's also bipartisan agreement on getting to the bottom of Russian meddling in our election which must remain the focus of this investigation and yours.

So Admiral Rogers, I agree in what you said that a public acknowledgement of this foreign meddling to be a problem is important as we move forward. And following on Congressman LoBiondo's questions and based on this theme, I'd like to ask you gentlemen if you could describe what, if anything, Russia did in this election that to your knowledge they did or they didn't do in previous elections, how -- how it was -- were their actions different in this election than -- than in previous ones.

ROGERS: I'd say the biggest difference from my perspective was both the use of cyber, the hacking as a vehicle to physically gain access to information to extract that information and then to make it widely, publicly available without any alteration or change.

COMEY: The only thing I'd add is they were unusually loud in their intervention. It's almost as if they didn't care that we knew what they were doing or that they wanted us to see what they were doing. It was very noisy, their intrusions in different institutions.

ROS-LEHTINEN: And what specifically based on this loudness did the FBI or the NSA do to prevent or counter this Russian active measure that we read about in the intelligence community assessment? As loud as they were, what did we do to counter that?

COMEY: Well, among other things, we alerted people who had been victims of intrusions to permit them to tighten their systems to see if they couldn't kick the Russian actors out. We also, as a government, supplied information to all the states so they could equip themselves to make sure there was no successful effort to affect the vote and there was none, as we said earlier.

And then the government as a whole in October called it out. And I believe it was Director Clapper and then-secretary Jeh Johnson issued a statement saying this is what the Russians are doing, sort of an inoculation.

ROS-LEHTINEN: And the loudness to which you refer, perhaps they were doing these kinds of actions previously in other elections but they were not doing it as loudly. What -- why do you think that they did not mind being loud and being found out?

COMEY: I don't know the answer for sure. I think part -- their number one mission is to undermine the credibility of our entire democracy enterprise of this nation and so it might be that they wanted us to help them by telling people what they were doing.

Their loudness, in a way, would be counting on us to amplify it by telling the American people what we saw and freaking people out about how the Russians might be undermining our elections successfully. And so that might have been part of their plan, I don't know for sure.

ROGERS: I've -- I agree with Director Comey. I mean, a big difference to me in the past was while there was cyber activity, we never saw in previous presidential elections information being published on such a massive scale that had been illegally removed both from private individuals as well as organizations associated with the democratic process both inside the government and outside the government.

ROS-LEHTINEN: And this massive amount and this loudness, now that it's become public knowledge, now that we have perhaps satisfied their -- their -- their thirst that it has become such a huge deal, do you expect their interference to be amplified in future U.S. elections?

Do you see any evidence of that in European elections or do you think that this public acknowledgment would -- would tamper down the volatility?

COMEY: I'll let my -- maybe I'll just say as initial matter they'll be back. And they'll be in 2020, they may be back in 2018 and

one of the lessons they may draw from this is that they were successful because they introduced chaos and division and discord and sewed doubt about the nature of this amazing country of ours and our democratic process.

It's possible they're misreading that as it worked and so we'll come back and hit them again in 2020. I don't know but we have to assume they're coming back.

ROGERS: I fully expect them to continue this -- this level of activity because I -- our sense is that they have come to the conclusion that it generated a positive outcome for them in the sense that calling into question the democratic process for example is one element of the strategy.

We're working closely, we -- our FBI teammates, others working closely with our European teammates to provide the insights that we have seen to try to assist them as they, themselves, France and Germany for example, about to undergo significant national leadership elections over the course of the next two months.

ROS-LEHTINEN: And in terms of the European elections, what -- what have you seen or any information that you can share with us about the Russian interference in that process?

ROGERS: So you see some of the same things that we saw in the U.S. in terms of disinformation, fake news, attempts to release of information to embarrass individuals, you're seeing that play out to some extent in European elections right now.

ROS-LEHTINEN: I look forward to continuing with you.

Thank you so much, Mr. Chairman.

NUNES: Gentlelady yields back.

Mr. Turner is recognized.

TURNER: Thank you, Mr. Chairman.

Mr. Comey, Admiral Rogers, thank you for being here today and for your -- what appears to be attempts at being forthcoming with the committee. I also want to thank the Chairman and the Ranking Member Schiff. This is a bipartisan effort.

I think as you've looked to what this committee is undertaking, everyone wants answers and everyone want answers to all of the questions that are being asked because this does go to such an important issue concerning our elections.

Admiral Rogers, I'm going to begin with a question to you concerning the Foreign Intelligence Surveillance Act. Now Admiral, as you know that the foreign service -- Foreign Intelligence Surveillance Act provides the circumstances or the authority under which the intelligence community may collect or intercept the communication of a foreign person located outside of the United States, or as Mr. Comey's indicated a person who is covered under a FISA court order.

Now, with Mr. Rooney and Mr. Gowdy you discussed the minimization procedures under the Foreign Intelligence Surveillance Act and those minimization procedures are supposed to protect the privacy rights of U.S. citizens. Specifically, it's geared toward the communications of those who maybe inadvertently or incidentally collected as a result of the intelligence community's lawful collection of communications of others.

So Mr. Rogers, is the intelligence community required to cease collection or the interception of communications if the result of the collection or interception includes the communications of an incoming U.S. administration official, the president-elect or the president-elect's transition team.

ROGERS: It depends under what authority work, as I said early on, there's a series of questions we go through, was there criminal associated activity, does the conversation deal about threats to U.S. persons, breaking of the law. So there's no simple yes or no, there's

a series of processes we have in place.

TURNER: Mr. Rogers, is there any provision of minimization that requires you to cease collection? Because that is my question, are you under any circumstances required to cease collection if the collection results in the either inadvertent or incidental collection of an incoming U.S. administration official, the president-elect or the president-elect's transition team?

ROGERS: Purely on the basis of exposure, I wanna make sure I understand the question, is -- is...

(CROSSTALK)

TURNER: Are you required to cease, if you are -- are undertaking lawful collection under the Foreign Intelligence Surveillance Act of a person or individual, either because they're a foreign person located outside the United States or the person that you're collecting against, is the subject of a FISA Court order.

If incidental to that collection or inadvertently, the collection results in the collection of communications of an incoming U.S. administration official, the president-elect or the president-elect's transition team, are you required under the minimization procedures, to cease collection?

ROGERS: Not automatically.

TURNER: Thank you. So the answer's no, correct?

Well, the reason why this is important is because intuitively, we would all know that incoming administration would have conversations with those that the intelligence community may be collecting against, either by making phone calls to them or receiving phone calls to them.

And so it's important for us to understand that the minimization procedures that are intended to collect the privacy rights of Americans, do not inherently include the -- a prohibition of the

intelligence community incidentally or inadvertently, collecting the communications of an incoming administration.

ROGERS: Yes, sir.

TURNER: Yep.

Mr. Comey, are you aware whether or not the Director of National Intelligence Director Clapper, ever briefed the President of the United States, then President Obama, concerning the possible inadvertent or incidental collection or interception by the U.S. intelligence community of any communication of members of the incoming Trump administration?

COMEY: That's not something I can comment on.

TURNER: And then why not, Mr. Comey.

COMEY: A couple of reasons, it might involve classified information, it might involve communications with the president of the United States. On both of those grounds, I can't talk about it here.

TURNER: Mr. Comey, have you previously discussed your conversations with President Obama with this committee?

COMEY: I don't remember. I may have with the chair and ranking, I don't remember with the full committee.

TURNER: Well, we'll have to refresh your memory on those conversations, then.

Mr. Comey, did and am used to combing. I did President Obama ever acknowledge to you of having been briefed, concerning possibly inadvertent or incidental collection or interception by the intelligence community of any communications of members of the incoming Trump administration?

COMEY: I have to give you the same answer, Mr. Turner.

TURNER: Well, Mr. Comey, the first question related to whether or not Mr. Clapper had briefed the president of the United States and we'll certainly be following up with him. He is going to be appearing before us next week and we'll certainly be directing the question to him also.

So Mr. Comey, are you aware of any evidence that General Flynn prior to the inauguration, ever communicated to the Russian government or a Russian government official that the Trump administration in the future would release, resend, or reverse U.S. sanctions against Russia or ever made any offer of a quid pro quo for releasing resending or reversing U.S. sanctions against Russia. Are you aware of any evidence?

COMEY: That's not something I can comment on, Mr. Turner.

TUNER: And why's that?

COMEY: I'm trying very hard not to talk about anything that relates to a U.S. person, or that might rule in or rule out things, might be investigating. I'm trying to be studiously vague here to protect the integrity of the investigation.

So please don't -- as I said in the beginning please don't interpret my no comment as meaning this or meaning that. I just can't comment.

TURNER: Well, Mr. Comey, there are statutes, guidelines and procedures concerning the what does it take for the FBI to open up a counterintelligence investigation into a U.S. citizen.

It is not just subject to discretion. You can't just say well let's go look at somebody, you have to have a basis. You've now informed us that you've opened a counterintelligence investigation into the Trump campaign, members the Trump campaign, concerning Russia
in July of 2006 (sic). Now we're trying to get a picture of what does

it take to tip over for investigation?

Now previously people have said that there been individuals who attended a meeting with Russian officials, individuals who -- a member who was paid to attend a conference, a picture that was taken, traveled to a foreign place. There many people both in -- in all of our administrations and sometimes, you know, certainly members who have left Congress who would all qualify for that.
What -- what is the tipping point? I mean it can't just be that.
Don't you need some action or some information besides just attending a meeting, having been paid to attend a conference, that a picture was taken, or that you traveled to a country before your open to investigation for counterintelligence by the FBI?

COMEY: The standard is, I think there's a couple different at play. A credible allegation of wrongdoing or reasonable basis to believe that an American may be acting as an agent of a foreign power.

TURNER: Well the reason why we're with this, Mr. Comey, is that we obviously have the statements of Mr. Clapper that there is no evidence of collusion with Russia and he just left the intelligence community. And as you are aware, we now sit because this is you said, Admiral Rogers, you know, the Russians wanted to put a cloud over our system.

And Mr. Comey, by your announcement today, I mean, there is now a cloud that undermines our system. There is a cloud that where we're sitting with Mr. Clapper who was obviously in a very important position to know, who stated to us that there is no evidence of conclusion, and you will not give us evidence or -- or -- or give us any -- any substantive evaluation of it.

We now sit with this cloud and it's important that -- Mr.
Chairman I have a few additional questions if I might when we regain time.

NUNES: We'll get back to Mr. Turner.

Mr. Schiff's recognized for 15 minutes.

SCHIFF: Thank you Mr. Chairman.

I recognize representative Jackie Speier.

SPEIER: Thank you Mr. Schiff.

Again, let's go back to this tarantula web. So Mr. Tillerson, in 2014, started to lobby the United States government asking them to shifter or lift the sanctions. Now in his -- his confirmation hearing he says he's -- as he said, I have never lobbied against sanctions, personally, to my knowledge, Exxon Mobil never directly lobbied against sanctions.

And yet there is lobbying reporting that shows that Exxon Mobil actually paid over $300,000 to lobbyists in 2014. And that Mr. Tillerson visited the White House five times in 2014 and treasury with Secretary Lew, seven times.

Is -- is there something disconcerting about a U.S. CEO attempting to undermine The sanctions imposed by our government against another country for acts that we find to be disadvantageous to the world order. Director Comey?

COMEY: That's not a question I can answer. For a variety of reasons, I'm not qualified to answer and I shouldn't be answering questions like that.

SPEIER: All right. OK. How about this then? Is it disconcerting to you as the director of the FBI that a U.S. CEO would say publicly that he is very close friends with President Putin and has had a 17-year relationship with him?

COMEY: That's not a question I can answer.

SPEIER: Would it raise any red flags?

COMEY: That's not a question I can answer.

SPEIER: Admiral Rogers?

ROGERS: Ma'am, lots of American corporations do business in Russia. I have no knowledge of the specifics you're talking about, I am in no way qualified or knowledgeable enough to comment on this.

SPEIER: All right, let's move on to someone else in that web. His name is Michael Caputo. He's a PR professional, conservative radio talk show host. In 1994, he moved to Russia and there he was working for the agency for international development. He was fired from that job because he refused to follow a State Department position.

He then opened a PR firm in Moscow and married a Russian woman. He subsequently divorced her and in 1999 his business failed. Roger Stone, a mentor to him, urged him to move to Florida and open his PR firm in Miami which is exactly what Mr. Caputo did. And then in 2000 he worked with Gazprom-Media to improve Putin's image in the United States.

Now, do we know who Gazprom-Media is? Do you know anything about Gazprom, Director?

COMEY: I don't.

SPEIER: Well, it's a -- it's an oil company. In 2007, he began consulting the Ukrainian parliamentary campaign. There he met his second wife.

So I guess my question is, what possible reason is there for the Trump campaign to hire Putin's image consultant? Any thoughts on that Director Comey?

COMEY: No thoughts.

SPEIER: Admiral Rogers?

ROGERS: Likewise, ma'am.

SPEIER: All right. Do either of you know what Michael Caputo is doing for the Trump effort today?

ROGERS: I have no idea.

COMEY: And I'm not going to talk about U.S. persons.

SPEIER: All right, let's move on now to Carter Page.

Carter Page was the founder of Global Energy, it's an investment fund. He has only one partner and that partner is Sergei Yatsenko who's the former executive of a Russian state-owned Gazprom oil company. Before that, from 2004 to 2007, he worked for Merrill Lynch in Moscow.

In March of 2016, Then-Candidate Trump referred to Carter Page as his foreign policy advisor to the Washington Post. The next day, Page asserts that he's an advisor on Russia and energy. But then subsequently, Candidate Trump says he doesn't know him.

SPEIER: On September 26, he takes a leave of absence from the campaign and then Page publicly supports a relationship with Russia, criticizes U.S. sanctions and NATO's approach to Russia, saying -- and then subsequently says he's divesting his stake in Gazprom in August. In 2014, he writes an article criticizing the U.S. sanctions, praising Sechin in an article and global policy and then rebuked the west for focusing on so-called annexation of Crimea.

In July of 2016, he gives a graduation speech at the new economic school, denies meeting with the prime minister, Christopher Steele, in his dossier, says he met with, again, Igor Sechin, offering a 19 percent interest in Rosneft. It becomes the biggest transfer of public property to private ownership.

Now, Carter Page is a national security adviser to Donald Trump. Do you believe that -- why do we -- I guess, again, here's another company that has had sanctions imposed upon it. Could you again clarify why we impose sanctions on companies?

COMEY: Admiral Rogers did it better than I, so I'm going to (inaudible) him.

SPEIER: OK.

ROGERS: I apologize. I don't remember the specifics of my answer, but I'll stand by my answer...

COMEY: Which was excellent.

SPEIER: All right.

I think at that point, I will yield back, Mr. Chair.

SCHIFF: I now yield to Mr. Quigley.

QUIGLEY: Thank you, Mr. Ranking Member.

Gentlemen, thank you for your service. Thank you for being here. We've talked a little bit about the Russian playboook, right? Extortion, bribery, false news, disinformation, they all sound very familiar, correct? Well, as we talk, without thinking about anybody in the United States, just generally the Russian playbook and how it's worked in particularly Eastern Europe and Central Europe, a lot of it involves trying to influence individuals in that country, correct?

ROGERS: Yes.
QUIGLEY: So what we've talked about a little bit today seems so -- be sort of a black and white notion of whether there was collusion, but does a Russian active measure attempting to succeed at collusion -- does the person involved have to actually know? I mean, does it have to involve knowing collusion for there to be damage?

COMEY: I can answer generally. In the world of intelligence, oftentimes there are people who are called co-optees, who are acting -- don't realize they're dealing with agents of a foreign power and so are doing things for someone they think is a friend or a business associate, not realizing it's for that -- the foreign government. So it can happen, it's actually quite a frequent technique.

QUIGLEY: Is it beyond that sometimes to include things where the -- the actor doesn't necessarily know what they're doing is helping that other government?

COMEY: Exactly.

QUIGLEY: And what are instances, just examples of what that might include in a generic sense, in Europe and so forth?

COMEY: Oftentimes, a researcher here in the United States may think they're dealing with a peer researcher in a foreign government and not knowing that that researcher is either knowingly or unwittingly passing information to a foreign adversary of the United States.

QUIGLEY: And can you explain and elaborate how this sort of -- problems with defining what collusion is -- the differences that might be involved with explicit or implicit collusion?

COMEY: Collusion is not a term, a legal term of art and it's one I haven't used here today, as we're investigating to see whether there was any coordination between people associated with the campaign...

QUIGLEY: Explicit or implicit coordination?

COMEY: I guess implicit, I -- I would think of it as knowing or unknowing. You can do things to help a foreign nation state, as I said, without realizing that you're dealing with. You think you're helping a buddy, who's a researcher at a university in China and what you're actually doing is passing information that ends up with the Chinese government. That's unwitting, I don't know whether it's same

as your implicit.

Explicit would be, you know, I'm sending this stuff to this researcher in China and I'm doing it because I wanna help the Chinese government and I know he's hooked up with the Chinese government.

QUIGLEY: Admiral Rogers, would you give other examples of what you witnessed in your career?

ROGERS: Sometimes, U.S. individuals would be approached by other individuals connected with -- with foreign connections who will misrepresent what not just the researcher, they'll assume an identity if you will, hey I want you to think that I'm actually working for a business, exploring commercial interests, those kinds of things. Create a relationship and then it turns out, there really is no commercial interest, here they're acting as a direct extension of a foreign government...

(CROSSTALK)

COMEY: And romance can be a feature. Somebody dating someone to create a close relationship and the U.S. government person thinks that they're in love with this person and -- and vice versa and the other person's actually an agent of a foreign power, that's sort of a classic example.

QUIGLEY: You describe this as naive acquiescence?

COMEY: I don't -- I'm not sure I know what that means, exactly (ph).

ROGERS: I don't know what that really means (ph).

QUIGLEY: You're -- you're going along with it and without really acknowledging, understanding in your mind or being naive about the issue.

COMEY: Sure, that can happen.

ROGERS: Yeah, you see that at times.

QUIGLEY: OK.

Going on to things that you -- you probably can't comment upon which is of equal concern. We're all, at this point, very familiar with Mr. Sessions's testimony before the United States Senate in which he specifically said he had -- he wasn't one who had this contact with the Russians. And then there was the amended, I guess, testimony in which he acknowledged I believe two such testimonies. The first was in July during the convention and then later in September afterwards.

All the while, that the issues that we are talking about today, the hacking, the dumping of materials were taking placing and certainly, someone in the position of Mr. Senator Sessions would've been aware of this. Perhaps, would've remembered these conversations or might've mentioned or asked the Russian ambassador to knock it off. But apparently, none of those things happened or at least he didn't remember that they happened. Unfortunately, what we're reading now is that there was a third meeting as early as April of last year in Washington, D.C., a meeting which Candidate Trump was present and the Russian ambassador was present.

At some point in time, this goes well beyond an innocent, under the best of circumstances, oh I forgot sort of thing, or that doesn't count. When you correct your testimony in front of the United States Senate, you're still under oath and you're swearing to the American people that what you're saying is true. Well, the third time is well beyond that and is quite simply perjury.
So as we look at this as we go forward, gentlemen, I ask that you take that into consideration. This is far more than what we have talked about just in the general sense, did the Russians hack or not and the scope of this too, a concerted effort and plan to lie to the American public about what took place and what the motivations were beyond these -- this process. Again, I thank you for your service.

And I yield back to the ranking member.

SCHIFF: I yield to Mr. Swalwell of California.

SWALWELL: Thank you, Director Comey and Admiral Rogers.

Director Comey, you've served time in a courtroom as a prosecutor and I'm wondering if you remember the instruction that is read to juries every day that if you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says.

COMEY: Yes, that's familiar to me.

SWALWELL: And your testimony at the beginning of this hearing was that President Trump's claims that former President Obama had wiretapped him is false.

COMEY: I said we have no information that supports them.

SWALWELL: Thank you.

With respect to Donald Trump, do you remember the other instruction relating to truthfulness of a witness or a defendant? If the defendant makes a false or misleading statement relating to the charged crime knowing the statement was false or intending to mislead that conduct may also show he or she were aware of their guilt.

COMEY: Yes, familiar to me from my distant past.

SWALWELL: I want talk about the Kremlin playbook and there are a number of ways that a foreign adversary can seek to influence a person, do you agree with that?

COMEY: Yes.

SWALWELL: Financial?

COMEY: Yes, that can be one.

SWALWELL: Romance you said is another.

COMEY: Yes.

SWALWELL: Compromise?

COMEY: Correct.

SWALWELL: Setting up a compromise?
COMEY: Sure, to execute on a compromise, yes.

SWALWELL: How about inadvertently capturing a compromise, meaning they have vast surveillance and you stumble into that surveillance and are caught in compromise?

COMEY: And then they take that information, try and use it to coerce you? Yes, that's part of the playbook.

SWALWELL: I'll yield back, Chair, and continue once I'm back with us. Thank you, Director.

NUNES: Gentleman's time's expired.

We'll go back to Mr. Turner.

TURNER: Thank you.

I want to go back to the issue of -- Admiral Rogers indicated that the goal of the Russians is to put a cloud on our system to undermine our system. And -- and I would think, certainly today, Mr. Comey, with your announcement of an investigation that the Russians would be very happy with that as an outcome because the cloud of their actions and activities continues and will continue to undermine and until your finished with whatever your investigation is currently in the scope of.

I want to go back to the issue of how does one open an

investigation because again, I'm -- I'm a little confused by -- by some of the things that we hear as to the basis of an investigation. Now, Mr. Comey, if -- if an individual attends a meeting with a foreign leader is -- is that enough to open a counter intelligence investigation?

COMEY: Without more that somebody met with somebody, no.

TUNER: No. OK. Without more than if they had their picture taken with a foreign leader, is that enough?

COMEY: It would depend upon where they were, who took the picture.

TURNER: Well, assume that they're in would (ph) that -- the foreign country, and in that foreign leaders government offices or facilities, if they're having a picture taken with them, is that enough to open a counterintelligence investigation?

COMEY: It would depend.

TURNER: On -- on what? Because I'm saying if there's just a picture. Because I can tell you certainly there's lots of people who have had lots of pictures.

COMEY: Yeah.

TURNER: Is it enough that a person who has just had their picture taken with a foreign leader at the foreign leaders government official offices or place of residence?

COMEY: The reason I said it depends is it would depend. Did the person sneak over to the foreign country and meet them clandestinely, did -- was the picture -- reveal something else about the relationship? It just hard to...

TUNER: Well, let's say it's not clandestine. Let's say it's open, that the person has -- as -- has attended an event and has gone

over to meet with the foreign person, foreign government official and is at their foreign government official facility or their official residence and has a picture taken and has no intention of covertly being present with the foreign person, is that picture enough to open a counterintelligence investigation?

COMEY: Tricky to answer hypotheticals, but I think my reaction to that is that doesn't strike me as enough. And I know your next question's going to be deeper into hypos.

TURNER: No, no, I'm not getting deep into hypos. These are pretty straightforward. So what if you're paid, you know, to attend a conference in a foreign -- in a foreign country and you're paid to attend that conference not directly by the foreign government, but nonetheless payment does occur for you to attend a conference? We know President Bill Clinton attended many such conferences and spoke and received payment.

Is receiving payment by attending to speak at a conference -- again, it's not covert, it's open. They're attending to speak at a conference, they receive payment for the purposes of speaking, is that enough to open a counterintelligence investigation?

COMEY: I can't say as I sit here. It would depend upon a lot of different things.

TURNER: If you had no other information or evidence other than the fact that they attended, is that enough for you, for the FBI to open a counterintelligence investigation of a private U.S. citizen?

COMEY: I can't answer the hypothetical because it would depend upon a number of other things.

TURNER: I limited it to where there would be no other things, Mr. Comey. I said only, if the only information that you had was that they had intended an event in which they were paid which was a conference and it was not covert, is that only sufficient information to open an investigation against a private U.S. citizen?

COMEY: Who paid them? Did they disclose it? What did they discuss when they were there? Who else was sitting with them? There's lots and lots of other circumstances that make that -- even that simple-seeming hypo difficult to answer.

TURNER: Well, let's say that they've traveled to a foreign country and they openly traveled, wasn't covert. Is traveling there enough?

COMEY: Just traveling around the world, no.

TURNER: OK, well I'm very concerned, Mr. Comey, about the issue of how an investigation is opened and -- and how we end up at this situation once again where Mr. Clapper, had (ph) the director of national intelligence, just said that when he left there was no evidence of collusion and yet, as Admiral Rogers said, we're sitting now where the Russians' goal is being achieved of causing a cloud or undermining our electoral process. So I certainly hope that you take an expeditious look at what you have undertaken because it affects the heart of our democracy.

Mr. Comey, I have a question against -- again concerning classified information. Now, I know that if I attend a classified briefing and I receive classified information and I go and tell someone that classified information, if I leak it, I release it, then I've committed a crime. But what if someone goes to a classified briefing, walks out of that briefing, and openly lies about the content of that briefing? Because it's unclear to me what happens then.

And it's important because, as you know, this committee and certainly both of you gentlemen have handled a lot of classified information and recently, more recently, the purported classified information is put out in the press, The Washington Post, The New York Times reports information. And you know and I know and we all know, having handled classified information, that some of that information is not true. Are the sources of that classified

information, if they come out and lie about the content of classified information, have they committed a crime?

COMEY: That's a really interesting question. I don't think so. If all they've done is lie to a reporter, that's not against the law. If they've done it, I don't wanna break anybody's hearts with that but that's not against the law. But it is not and the reason I'm hesitating is, I can imagine a circumstance where it's part of some broader conspiracy or something, but just that false statement to a reporter is not a crime.

TURNER: And I just wanna underscore that for a -- just for a second, because I agree with you. I think it's no crime. And so every reporter out there that has someone standing in front of them and saying oh, I'm taking this great risk of sharing with you U.S. secrets, besides them purporting to be a traitor, are committing no crime if they lie to them. So all of these news articles that contain this information that we know is not -- not the case, are being done so at damage to the United States but without the risk of a crime.

And my next aspect of your question to Mr. Comey, is this. What is the obligation of the intelligence community to correct such falsehoods? Some of this information that we read in the Washington Post and the New York Times, is extremely false and extremely incendiary and extremely condemning of individuals and certainly, our whole system. What is your obligation, Mr. Comey, to be that source to say I can't release classified information, but I can tell you, it's not that?

COMEY: Yeah, it's a great question, Mr. Turner, because there's a whole lot out there that is false. And I suppose some of it could be people lying to reporters. I think that probably happens. But more often than not, it's people who -- who act like they know when they really don't know. Because they're not the people who actually know the secrets, they're one or two hops out and they're passing along (ph) things they think they know.

There is -- we had not only have no obligation to correct that, we can't, because if we start calling reporters and saying hey, this

thing you said about this new aircraft we've developed, that's inaccurate actually, it's got two engines. We just can't do that because we'll give information to our adversaries that way and it's very, very frustrating but we can't start down that road. Now, when it's unclassified information, if a reporter misreports the contents of a bill that's being debated in Congress or a policy, we can call him and say hey, you ought to read it more carefully. You missed this or missed that. We cannot do that with classified information.

It's very, very frustrating because I have read a whole lot of stuff, especially in the last two months, this is just wrong. But I can't say which is wrong and I can't say it to those reporters.

TURNER: Mr. Comey, if you could help us on this issue, I would greatly appreciate it because what happens, is that you come into a classified briefing with us and you tell us, perhaps what something that is absolutely false, it really shouldn't be classified because you're telling us it's not true. But yet, we can't go tell it's not true because you told us in a classified setting. If there's a way that we can at least have some exchange as to what's not true so the American people don't listen to false stories in The Washington Post and The New York Times that we all know are not true, that would be helpful.

COMEY: Yeah, I don't...

TURNER: If you could think about how you could help us with that.

COMEY: I'd love to invent that machine, but we can't because where do you stop that on that slope?

TURNER: Well, false is false, Mr. Comey.

COMEY: Because then, when I don't call The New York Times to say you got that one wrong, bingo, they got that one right. And so I -- it's just an enormously complicated endeavor for us. We have to stay clear of it entirely.

TURNER: Thank you, Mr. Comey, one last question. So we all read in the press that Vice President Pence publicly denied that General Flynn discussed sanctions with Russia. And I'm assuming that you saw those news reports. Did the FBI take any action in response to the vice president statements?

COMEY: I can't comment on that, Mr. Turner.

TURNER: Mr. Comey, The New York Times reported on February 14th, 2017, that General Flynn was interviewed by FBI personnel. Is that correct?

COMEY: I can't comment on that, Mr. Turner.

TURNER: Mr. Comey, I do not have any additional questions, but I thank you both for your participation. And again, I thank for the -- the chairman and ranking member for the bipartisan aspect of this investigation.

NUNES: Gentleman yields back.

Dr. Wenstrup is recognized.

WENSTRUP: Thank you, Mr. Chairman.

Thank you gentlemen for being here, I appreciate your endurance in this effort today. One question, how long has Russia or the Soviet Union been interfering or attempting to interfere with our election process?

ROGERS: In the report we've feebly (ph) talked about, we have seen this kind of behavior to some degree attempting to influence outcomes for decades.

(CROSSTALK)

WENSTRUP: Going back to -- going back the Soviet Union...

ROGERS: Right. Not to the same level necessary, but the basic trend has been there.

WENSTRUP. So I'm curious also about what triggers a counterintelligence investigation of a government official. And in some ways, I'm asking for myself. For example, last week I spoke at an event on form policy with Atlantic Council. Unbeknownst to me, the Iraqi ambassador of the United States was there. He comes up to me afterwards, introduces himself and says he'd like to meet with me at some time. So this isn't a theoretical, this is real and this is what I'm asking is this.

Will be in trouble or under investigation if I meet with him?

COMEY: This is the slope I tried to avoid going down with Mr. Turner. Dr. Wenstrup, I -- I don't think I should be answering hypotheticals. The question is...

WENSTRUP. It's not hypothetical because I'm asking you in advance because I want to know if I can meet with him and be under investigation or not and I don't think that's an unrealistic question. This is real. This is right now.

COMEY: I get that. The FBI does not give advisory opinions, and so if you're asking about your particular case, I just can't do that.

WENSTRUP. So you'll tell me afterwards?

COMEY: No, I'll -- I'll never tell you.

(LAUGHTER)

WENSTRUP. Well, you might. Somebody might, somebody might tell the press, right? And that's where I'm going next because I want to know what -- what can I discuss? What am I allowed to discuss? And what -- what triggers the investigation is really what we're trying to get to in general. You know, maybe not with the Iraqi ambassador, but

what about with the Russian ambassador? What are my obligations? What am I -- do I need to advise someone that I'm meeting with them? Do I have to discuss the agenda before I meet with them?

You know, just so we're clear. I mean, this is really what it's coming down to, is a lot about what we're talking about. You know, so I don't think it's unnecessary or ridiculous for me to ask that. And so in intelligence reporting, if the identity of a U.S. official is disseminated to those on an as needed basis -- or those that need to know basis. Does that generally lead to a counterintelligence investigation of that individual?

So in -- in general, if a U.S. official is -- is -- is in this report and it's disseminated, does that lead to an investigation of the individual?

COMEY: No, not in general, not as a rule. No.

WENSTRUP. OK. That answers...

(CROSSTALK)

COMEY: It would depend on lots of the circumstances.

WENSTRUP. Next, I want to go to the article from February 14 in The New York Times which I believe we're all familiar. And you may not be able to answer any of these, but the article sites four current and former American officials. Do you know -- know the identity of those four officials?

COMEY: Not going to comment on an article.

WENSTRUP. OK. Well, it's not necessarily on the article, but OK. Do you know for a fact that the four current and former American officials provided information for the story?

COMEY: I have to give you the same answer.

WENSTRUP. OK. With or without an investigation going on, has anyone told you that they know who leaked the information or who leaked any information on Russian involvement in the U.S. elections or Russian involvement with the Trump election team?

COMEY: I'm not going to comment on that.

WENSTRUP. Is it possible that The New York Times misrepresented its sourcing for this February 14 article? Possible.

COMEY: I can't comment on that.

WENSTRUP. Is it possible that The New York Times was misled by individuals claiming to be current or former American officials.

COMEY: I'll give you the same answer, Dr. Wenstrup.

WENSTRUP. Can I ask why you can't comment on that?

COMEY: I think a number of reasons. I'm not confirming that the information in that article is accurate or inaccurate. I'm not going to get in the business of -- that we talked about earlier...

WENSTRUP. OK. Is it -- then let me ask you this.

COMEY: And there's other reasons.

WENSTRUP. Sure.

COMEY: That I'm also not going to confirm whether we're investigating things, and so if I start talking about what I know about a particular article, I run the risk of stepping on both of those landmines.

WENSTRUP. I guess one more question before the time is up and we'll come back to me, but I am curious, is it possible -- and nothing to do with this article. Is it possible that a so-called source to a media outlet may actually be a Russian advocate? Nothing to do with

this story per say, just is it possible that a Russian surrogate could actually be the source that a newspaper is relying on?

COMEY: In general, sure, somebody could always be pretending to be something they're not.

WENSTRUP. Thank you.

And I yield back at this time.

NUNES: Gentleman yields back.

Mr. Schiff's recognized for 15 minutes.

SCHIFF: Thank you, Mr. Chairman.

Just a couple follow-up questions and then I'll pass it to Mr. Quigley for entering something into the record.

COMEY: Mr. Chairman, can I ask you for an estimated time? I'm not made of steel, so I might need to take a quick break.

NUNES: Would you like to do that now?

COMEY: If you can, I didn't know how much longer you planned to go.

NUNES: I think we want to keep going until the members have asked all their questions.

COMEY: OK. Just a quick rest stop?

NUNES: Yes. So we'll break for about 10 minutes.

COMEY: That's plenty.

(CROSSTALK)

(RECESS)

NUNES: I'm gonna call the hearing back into order after a brief recess. I wanna get on with questions. I'm gonna yield 15 minutes to the gentleman from California, Mr. Schiff.

SCHIFF: Director Comey, just a couple follow-up questions before I pass it to Mr. Quigley to enter something in the record. You've been asked a number of questions today about is it enough to open an investigation because someone travels or is enough because they have their photograph taken or enough because they attend a conference. I would imagine that you get so many leads, so many people writing to you with information that they're convinced shows (ph) a crime that if you investigated everything that people sent you, you would be squandering your investigative resources in a way you can't afford to do.

My understanding, and correct me if I'm wrong, is that in order for you to open an investigation, you need to see credible information or evidence that someone has either committed a federal crime or become an agent of a foreign power. Is that an accurate understanding?

COMEY: Yeah, that's a fair statement. And as you said, Mr. Schiff, we have to also choose which -- we get a lot of referrals, which ones align with the threats that the FBI is trying to prioritize because we have limited resources.

SCHIFF: Exactly. So even when those criteria are met, that enough may not be -- that in and of itself may not be enough because you have so many other cases you need to investigate and you have to prioritize.

COMEY: Correct.

SCHIFF: I also wanna ask you, you mentioned that it wouldn't be appropriate for you to be telling reporters that stories they're writing are accurate or inaccurate when they may involve an

investigation. That's not an appropriate thing for you to do.

COMEY: Correct, especially if the story involves classified information.

SCHIFF: And that's because you would either be disclosing classified information potentially in what you're confirming, or by rebutting a story that was inaccurate, you may be suggesting other stories that contain classified information or then (ph) accurate?

COMEY: Correct.

SCHIFF: Now, it's inappropriate for you to be batting down inaccurate stories. Would you also agree it's -- if it's inappropriate for you to be batting down inaccurate stories, would you also agree it's inappropriate for the White House to be asking the FBI to be rebutting stories they don't like?

COMEY: Yeah, that's when I don't wanna answer, Mr. Schiff, because I don't wanna talk about communications within the executive branch. I can speak for the FBI, that's not something the FBI can or should do.

SCHIFF: And if you were appearing up before the Senate for confirmation and they asked you as director of the FBI, if you were asked by the White House to refute or acknowledge press stories that they liked or didn't like, what would you tell the Senate in your confirmation hearing? Would that be appropriate for your office?

COMEY: I would figure out what was the right thing for the FBI to do and then do that thing.

SCHIFF: And that right thing would be not to be in the business of confirming or denying stories about classified information?

COMEY: Correct, that's what -- that's with the right thing is for the FBI.

SCHIFF: Let me recognize Mr. Quigley for purposes of entering something in the record.

QUIGLEY: Thank you, Mr. Ranking Member. As I do that, I'm reminded of what Hugo Black said, "Only a free and unrestrained press can effectively expose deception in government." I respectfully ask to enter a March 8th article entitled, "Jeff Sessions Likely Met Russian Ambassador a Third Time."

SCHIFF: I now yield to Mr. Swalwell.

SWALWELL: Thank you to our ranking member.

And thank you again to -- to our director and Admiral Rogers. Director, would you agree that the FBI, when it's considering the counterintelligence investigation, views contacts between U.S. persons and say Russia differently than it would view contacts between U.S. persons and the U.K. or France or Germans?

COMEY: Yes, very much so.

SWALWELL: And that's because they're a foreign adversary?
COMEY: Correct.

SWALWELL: And so to land on Russia's radar as somebody that they may want to recruit, would you agree that being a businessperson, a prominent business person is something that would be attractive to them?

COMEY: Could be. Might depend upon what industry you're in.

SWALWELL: Could it also -- could also being a politician be something that would be attractive to them?

COMEY: Sure.

SWALWELL: And how about somebody who does business with Russians, would that be attractive to them?

COMEY: Could be. It would depend upon other things as well though.

SWALWELL: And we were starting to discuss this, efforts to recruit include investing in a U.S. person, is that correct?

COMEY: Efforts by Russia to invest typically?

SWALWELL: Yes.

COMEY: In their tradecraft, that can be one of the ways in which they cultivate a relationship, sure.

SWALWELL: And if you are a U.S. person with a business, could it also include investing in your business or being a partner in some of your endeavors?

COMEY: Lots of different ways someone could try and establish a relationship.

SWALWELL: And going back to compromise, can we assume that any prominent U.S. person traveling to Russia would probably be covered by Russian surveillance?

COMEY: Depend upon how you define prominent, but they have an extensive surveillance operation of foreign visitors. So no matter who you are, you ought to assume it, but whether that's true in reality is harder for me to answer.

Or do you want to answer that differently?

ROGERS: No, I agree.

SWALWELL: And Russia is attempting to recruit and persuade individuals that we've discussed before, just as other foreign adversaries are because they want to get something out of them, is that right?

COMEY: Correct.

SWALWELL: And in many cases, it could be if that person is ever in a position of power that they could be in a position to influence policy in the United States.

COMEY: To influence policy or to supply them with information that's useful to them and maybe other purposes.

SWALWELL: Now, with respect to your counterintelligence investigations, would be important for you if you were concerned that a U.S. person had financial entanglements with a foreign adversary to see that persons tax returns?

COMEY: That's a hypothetical I really want to avoid answering, but the answer is it would depend really. It would depend upon a whole lot of circumstances.

SWALWELL: That would be one of the pieces of evidence that you would consider looking?

COMEY: Maybe, maybe. You -- you might be able to get the picture you need from other financial records that are more readily available.

SWALWELL: And you're aware director that President Trump has refused, breaking with tradition of the past 40 years to show the American people his tax returns?

COMEY: Not something I want to comment on. I'm aware of it from the media.

SWALWELL: Now, Russia also in their efforts to recruit individuals and develop individuals, praying on or following someone's financial distress is also an avenue number may pursue, is that right?

COMEY: Potentially, if it offers an avenue for leverage on someone.

SWALWELL: And Director, would you consider six bankruptcies that an individual may have as been a point of leverage?

COMEY: I can't say. I don't know.

SWALWELL: And Director, you're aware that President Trump is at six prior bankruptcies?

COMEY: That's not something I'm going to comment on.

SWALWELL: And Director, when your agents are conducting a counterintelligence investigation with respect to a foreign adversary in their efforts to recruit or cooperate with a U.S. person, would you look at the U.S. person's travel to that country?

COMEY: As part of evaluating whether there is an illicit relationship?

SWALWELL: Yes.
COMEY: Sure.

SWALWELL: And are you familiar that President Trump has traveled at least three times to Russia?

COMEY: That's not something I'm going to comment on.

SWALWELL: Are you aware that his son, Donald Trump Jr., has traveled at least six times to Russia?

COMEY: Same answer.

SWALWELL: Donald Trump has said a number of times that he has had nothing to do with Russia and I want to ask you, Director, if you're familiar with Deutsche Bank and its $300 million loan to Donald Trump and his organization.

COMEY: That's not something I'm going to comment on.

SWALWELL: Director, are you aware that Deutsche Bank has been investigated and fined over $400 million by New York State for failing to stop the corrupt transfer of more than $10 billion out of Russia?

COMEY: I think generally from press accounts.

SWALWELL: So an individual's association with the bank that has had dealings with Russian money laundering, that would be something that would be a red flag for a counterintelligence investigation I would assume.

COMEY: That's a hypo I don't want to answer.

SWALWELL: Director, would a U.S. businessperson who is associated with a foreign adversary having tenants in their office building that do business with that foreign adversary, would that be a red flag that a counterintelligence agent would look at?

COMEY: I can't answer that.

SWALWELL: Are you aware that in Trump Tower were two tenants, Vadim Trincher and Anatoly Golubchik, who ran a high-stakes illegal gambling ring that was run out of Trump Tower?

COMEY: Same answer.

SWALWELL: And are you aware that the prosecutor in that case was U.S. attorney Preet Bharara?

COMEY: Same answer.

SWALWELL: Are you aware, Director, that that U.S. attorney was recently fired?

COMEY: Yes.

SWALWELL: By the president of the United States?

COMEY: Well, I don't know who fired him. I know from press accounts that he was asked to leave.

SWALWELL: Director, are you aware of Felix Sater, a former Soviet official and adviser to the Trump Organization?

COMEY: I'm not going to comment on it.

SWALWELL: And Director, outside of Mr. Sater's relationship with the Trump Organization, are you aware that the FBI knew of Mr. Sater because of a $40 million stock fraud case that was prosecuted by the federal government?

COMEY: Same answer.

SWALWELL: Director, would a U.S. person having multiple trademarks in addition to the other relationships that I just described be a red flag for a counterintelligence investigation if those trademarks were in Russia?

COMEY: Multiple trademarks?

SWALWELL: Yeah, registering trademarks in a foreign adversary's country.

COMEY: I don't know what to make of that.

SWALWELL: OK. Were you aware that Donald Trump had six trademarks in Russia?

COMEY: Not going to comment on that.

SWALWELL: Were you aware that Donald Trump tried to market his Trump Vodka brand in Russia?

COMEY: Same answer.

SWALWELL: Were you aware that Donald Trump ran Ms. Universe 2013

out of Moscow?

COMEY: Same answer.

SWALWELL: Are you aware that Donald Trump Jr. said on a number of occasions that Russian money is pouring into the Trump Organization and that there is a disproportionate cross-section of the company's revenue coming from Russian money?

COMEY: Same answer, Mr. Swalwell.

SWALWELL: So hypothetically speaking though, would a foreign adversary and its oligarchs having a disproportionate cross-section of a company's revenue coming from that country, would that be a red flag for a counterintelligence agent?

COMEY: I'm not -- I'm trying to be helpful, but I'm not going to answer that hypo...

SWALWELL: I understand. Thank you, Director. Director, are you familiar with a 2004 home purchase by President Trump in Palm Beach County for about $40 million?

COMEY: Not going to comment on that.

SWALWELL: Are you familiar with a 2008 sale of that same property for 129 percent increase at about $98 million?

COMEY: Same answer.

SWALWELL: Are you aware that the buyer in 2008 was a Russian businessman?

COMEY: Same answer.

SWALWELL: And under the earlier hypothetical, would a foreign adversary's oligarch purchasing a home in the United States for 129 percent more than the home was purchased four years before. Would that be a tool that a foreign adversary would use to try and recruit,

develop or bring somebody onto their side?

COMEY: Same answer as before.

SWALWELL: You said that it's likely or somebody should assume they're being surveilled when they were in Russia. Would you assume that Donald Trump was being surveilled in 2013 when he was in Moscow?

COMEY: I'm not gonna answer. I -- I was trying to confine my answer to prominent people should assume, not you know, students and all those people who might go there for a brief holiday, I don't think I'd ask them to assume that.

SWALWELL: Right. Would it be safe to say that if Donald Trump was doing something he shouldn't have been doing while he was in Russia, the Russians probably saw it?

COMEY: Same answer as before.

SWALWELL: Would it be safe to assume that if a prominent person was doing something they shouldn't have been doing while they're in Russia, the Russians probably saw it?

COMEY: Yeah, I would stick to what I said before about prominent people should assume.

SWALWELL: Mr. Director, was Donald Trump under investigation during the campaign?

COMEY: Same answer as before. I'm not gonna answer that.

SWALWELL: Is he under investigation now?

COMEY: I'm not gonna answer that. Please don't over interpret what I've said as -- as the chair and ranking know, we have briefed him in great detail on the subjects of the investigation and what we're doing, but I'm not gonna answer about anybody in this forum.

SWALWELL: Director, from our perspective on the committee, the dots continue to connect. President Trump, his team, people in his orbit, to Russia. And the questions that we have, it's quite simple. Are these merely 100 different coincidences or is this a convergence where you're seeing deep personal, political and financial ties, meeting Russia's interference in our campaign?

So I'm wondering, Director, with your extensive counterintelligence expertise and in view of the Russian intelligence campaign to influence the election in which Donald Trump was candidate, do you consider this -- these number of connections between well-connected Russians and Donald Trump, the Trump Organization, the Trump family and the Trump campaign, to be a coincidence or a convergence?

COMEY: I'm not gonna answer, Mr. Swalwell.

SWALWELL: From your perspective, Director, have you ever seen in the history of American politics or at least since you've been alive, any political candidate have this many connections, personal, political and financial, to a foreign adversary?

COMEY: Same answer.

SWALWELL: Mr. Director and Admiral Rogers, this past election, our country was attacked. We were attacked by Russia. It was electronic. It was nearly invisible. Thanks to the hard work of the men and women who serve in our intelligence community, we know that the attack came from Russian. It was ordered by Vladimir Putin. He sought to help Donald Trump and to take down Hillary Clinton. The most disturbing finding for me and my fellow committee members is that Russia intends to do this again.

And I see this as an opportunity for everyone on this committee, Republicans and Democrats, to not look in the rearview window but to look forward and do everything we can to make sure that our country never again allows a foreign adversary to attack us. Because I think, Director, you and Admiral Rogers would agree that it's not only Russia

that is sharpening the knives to go back at us or to go at our allies. It's also other countries who have similar capabilities. And so, I think the best thing we can do now is unite around this investigation, have also a parallel, independent commission to make sure we get to the bottom of what happened, why we were so vulnerable and to assure the American people we'll never let this happen again.

And I yield back.


NUNES: Dr. Wenstrup?

WENSTRUP. Thank you, Mr. Chairman.

If I can, gentlemen, go back to what we were talking about a little bit before with interference from the Russians possibly in through our media. Have Russians or Soviets historically attempted to spread this information through the U.S. media? As (ph) you -- you mentioned they've been there in over decades trying to interfere, they use media as a resource.

ROGERS: We see them use media writ large as a resource to disseminate disinformation, false information.

WENSTRUP. And is that -- been pretty much regardless of who's in the White House?

ROGERS: It doesn't seem to tie to a particular political party, that tactic, if you will.

WENSTRUP. Thank you.

Mr. Comey, have you ever formed -- this is going back to the article from February 14 in the New York Times, have you ever formed an articulated opinion about the article from February 14 in the New York Times?

COMEY: Have I ever formed and articulated opinion?

WENSTRUP. Formed an opinion or articulated an opinion on that article?

COMEY: I don't want to say, Dr. Wenstrup.

WENSTRUP. OK. Thank you. When I look at your jobs and thank you for being there and doing your jobs. And I mean that sincerely, your job, you -- you observe and you investigate and you assess and you try to predict and you sometimes have to act, would that be correct?

COMEY: Sure.

WENSTRUP. In what you do. My question is, as far as predictions and actions, Hillary Clinton won the 2016 election for the United States presidency. Which certainly most had predicted, I would conject (ph) that even the Russians predicted that she would win. What -- what were the Russians planning for November 9 and beyond that had she won. You mentioned before, and the reason I ask that -- you mentioned before you said they'll be back.

My question is have they left? Because I -- I would contend they haven't left. This isn't something they their turning on and off. This is a constant. So any -- any idea what -- what may have happened November 9 and beyond that had she won?

COMEY: Hard to say.

WENSTRUP. The pattern has been to interrupt us regardless of who is in the White House.

COMEY: Yes. They want to mess with us and in a continuing and general way. It's hard to answer the counterfactual. I assume they would've continued their efforts to undermine President-Elect (sic) Clinton as they had begun doing during the summer, especially with European allies to create a divide there and probably lots of other things. What I meant by they'll be back is, they're not going away.

But in the -- in the -- I mean that that in the sense of their next opportunity to mess with our election is two years from now and in four years. That's what I meant by back.

WENSTRUP. Thank you. I think your job is -- is difficult because there's a lot of conjecture about any relationship with Russians in general and questions from me and others about, can I meet with the Russian ambassador? Does that get me investigated? Business ties here and there, you know, I mean currently we share a space station with Russians. We buy engines from the Russians for -- for our rockets and in the '90s we had joint military exercises with the Russians. It gets a little bit tough as -- for you guys decide what and -- and when do we investigate and I appreciate you taking the time with us today.

And I yield back.

NUNES: Gentleman yields back.

Mr. Stewart?

STEWART: Thank you, Mr. Chairman.

And to the witnesses, thank you both. You know, I'm impressed. I was a B-1 pilot, when I took off one of the first certain (ph) thoughts I had was how long is it going to be until I get to go to bathroom? You guys went almost 4 hours. Our plan was to keep you here until you are in such pain that you would just answer all of our questions.

(LAUGHTER)

I have a list of questions here but I want to divert a little bit and -- and follow up on some of things that have been said here today. Mr. Comey, you confirmed that there's an investigation in the Trump campaign officials. The fact that there is an open investigation does not indicate guilt though, does it?
COMEY: Certainly not.

STEWART: And in fact many times in an investigation may find that there is no wrongdoing.

COMEY: That's one of the reasons we don't talk about it, so we don't smear people who don't end up charged with anything.

STEWART: I appreciate that and I would say that is especially likely to have, when I say especially talking about have the finding of no wrongdoing when there is a political motive. And if there's one thing that we've seen here today, I think, from some of the line of questions is clearly been a certain political motive in some of the questions that have been asked to you.

Mr. Clapper, the former DNI, and we all know who he is, this is someone who should know. I want to read what he said just a few weeks ago. Mr. Clapper then went on to say that to his knowledge there was no evidence of collusion between members of the Trump campaign and the Russians. We did not conclude any evidence in our report and when I say "our report," that is the NSA, FBI, and CIA with my office, the director of national intelligence said anything -- any reflection of collusion between the members of Trump campaign and the Russians, there was no evidence of that in our report.

Was Mr. Clapper wrong when he said that?

COMEY: I think he's right about characterizing the report which you all have read.

STEWART: Well, I want you to know I agree with Mr. Clapper. And at this point, everyone on this dais should agree with Mr. Clapper because we in the committee have seen no evidence, zero, that would indicate that there was collusion or criminal wrongdoing between any members of the previous administration or campaign and Russian officials.

And I'm going to comment very quickly on the leaks. You've said very clearly that it is a crime, both of you have said that, you've

indicated it endangers national security which I certainly agree with. It makes it hard for us to reauthorize very important tools that we will need in order to protect our national security and many times, it's inaccurate.

And I would ask you then if someone in intelligence community has some concerns, if they feel like there's been an overreach or the government is doing something they shouldn't be doing, any government official, is there a process they can go to where they could make that known and express their concerns?

COMEY: Yes. All of us, the intelligence community have robust whistleblower provisions that we educate our folks on and part of the whistleblower track is they can bring information to the appropriate committee of Congress.

STEWART: That's exactly right and are both of your agencies capable of handling accusations agree with me on that. I'd like to shift quickly if I could to the integrity of the report which the previous DNI when he determined along with your acquiescence, I might add, both of you, that Russia developed a clear preference for Mr. Trump and this is a huge deal. I mean, think about this story the American people have been told and some believe that our president was elected maybe because of the influence of a foreign government.

And I love you guys, you know that, and I defend you and we respect what you do but I do need to make this point and that is the intelligence community is not perfect, is it?

COMEY: Not perfect?

STEWART: Yes.

COMEY: Certainly not.

STEWART: Certainly not. We...

COMEY: I can speak for me, I don't -- he might be perfect.

(LAUGHTER)

STEWART: Mr. Rogers, I'll allow you to answer the same question.

ROGERS: I am not -- same as the Director.

STEWART: And as has been indicated here, and look again, that's not a criticism, it's just the human endeavor. We sometimes make mistakes as do agencies sometimes make mistakes and all of us can think of examples of that including meaningful mistakes, by the way. Mistakes that had clear implications for our policy. And as has been indicated here as well, there's a difference in the level of confidence.

Now, Mr. Comey, you have a higher degree of confidence in this report than you do, don't you Mr. Rogers?

ROGERS: To be specific, a different level of content on one specific assessment or judgment...

STEWART: Understanding (ph)...

ROGERS: But a concurrent overall, in that judgment.

STEWART: But that one judgment, that one is in a very important part of this report. And if I could make just this last point and this is an important point, I think. And that is the difficulty of determining motive. I mean, we can go back, we can look at facts. We can look at what happened. We can often determine who did it, who they did it with, when they did it. But to determine motive, you've got to crawl inside someone's head. And that's much, much more difficult.

And in fact, quoting from the preamble in this report, talking about a leader's intentions. It says, this objective is difficult to achieve when seeking to understand complex issues in which foreign actors go to extraordinary lengths to hide and obfuscate their

activities. Once again, we're trying to determine motive, which is very different -- difficult. Do you agree with that? The determining motive is one of the most difficult challenges when it comes to an intelligence analysis?

COMEY: I -- I do Mr. Stewart. And I should -- I should emphasize something that Admiral Rogers said earlier, we made no judgment on whether the Russians were successful in any way and having an impact on the election, I just wanna be clear. That -- that's not in report because we didn't opine on it. We didn't -- that's not within our -- our...

STEWART: I understand that, but we're looking at Russian activities. And we're making a conclusion of why they did that. In this case, that they preferred one -- one candidate over the other. I was in Moscow last August. I came home and I did some media interviews and talked to some folks. And I said, they're gonna mess with our elections. And that wasn't based on any intelligence analyst or specific information, this was just based on history, we knew that they would. And I was always asked, well, who do they want to win?

And I said then, I don't think they care. I don't think they A, could believe they could determine who would win and others (ph), as we've said here a number of times, they just want to break down the foundation, they just want to break the trust in our institutions. They want to take away that faith we have in our electoral process. And by the way, the intelligence community agreed with us, with me, on that analysis. For a long, long time, up until December. And then suddenly, they didn't.

And was when the president asked for this report and he asked for it to be concluded very quickly and then the analysis changed entirely. And -- and it went from no, no, no, they don't really care to no, no, they want Mr. Trump to win. And I think there's another plausible explanation, which is what I want to talk about in the few minutes that I have remaining. Let me begin by asking you, do you think that the Russians expected Secretary Clinton to win the election?

COMEY: Yes, as of August certainly, August, September.

STEWART: OK.

Mr. Rogers?

ROGERS: Yes.

STEWART: OK. Well, look, Mr. Comey you indicated as of August, September, do you believe they ever came to a conclusion that you know what? Mr. Trump's going to win.

COMEY: No, our -- the assessment of the intelligence community was that early on, they thought he might have a shot. And so they wanted to mess with our election, hurt our country in general, that's always the baseline. They hated her, Secretary Clinton, wanted to harm her and thought they might have a chance to help Mr. Trump. And then later, concluded that Mr. Trump was hopeless and they would focus then on just trying to undermine Secretary Clinton, especially with the European allies.

STEWART: Got that, so up -- up until summer and through the fall, they believe that Secretary Clinton would win, is that true?

COMEY: I think the assessment was, late in the summer, they concluded based on the polling I think a lot of people were reading, that Mr. Trump didn't have a chance. And they shifted to just focusing on just trying to undermine her.

STEWART: And I tell you, if you were to tell me and I know you didn't but I'm just saying, if anyone were to tell me that they concluded Mr. Trump is going to win. I'd just say they're nuts, because there was no one in the world who thought that. Every media organization, every political organization, every government organization that I'm familiar with last fall thought that Secretary Clinton would be the next President of the United States.

COMEY: I think the Russians agreed.

STEWART: I -- absolutely they did agree. Then this is the point and this is such a fine line, but it's such an important point, and that is how can you know for certain if the Russians were motivated by hurting the person they thought in fact, fully expected was going to be the next President of the United States and comparing that with a mode (ph) of this kind of a Hail Mary pass. You know what, maybe this guy's got a shot. Let's try and help him get elected because those motives would be -- and that's -- that' again coming back to my original point, determining motives is very difficult.

You have to either have very direct information or you have to be able to get inside someone's head and really figure out what it is that's driving them. And knowing the Russians expected Secretary Clinton to win, would you see that some of those things that they've done would be consistent with undermining her presidency, not necessarily because they thought Mr. Trump was going to win and they wanted help.

COMEY: Again, I think it's too close related sides of the same coin. I mean, to put it in a homely metaphor, I hate the New England Patriots and no matter who they play, I'd like them to lose. And so I'm at the same time rooting against the Patriots and hoping their opponent beats them. Because only two teams on the field but what the intelligence community concluded was early on, the hatred for Mrs. Clinton was -- was all the way along.

When Mr. Trump became the nominee, there was some sense that it'd be great if he could win, be great if we could help him. But we need to hurt her to matter what and then it shifted to he has no chance so let's just focus on undermining her. That was the judgment of the intelligence community.

ROGERS: Well, I'd also if I could highlight, I acknowledge the challenge at times about trying to understand intent, but the level -- we're not going to go in any specifics in an open unclassified forum. But the level of sourcing, the multiple sources we had, which were

able to independently corroborate the judgment. And there's a reason why we were high confidence in everything, except just one issue.

STEWART: Yeah.

ROGERS: To include the intent.

STEWART: I understand. I spent some time out at the CIA last week. I went -- was with the staff as best we could, through the 2000 some odd pages and by the way, not many people did. And some people are casting, you know, aspirations (ph) and not making the effort to go out there and actually look at that.

But I'm telling you that having done that, I think a reasonable person could say what I've said here today, that there is another -- another element to this. That there is another, as you said Mr. Comey, another side of the coin. And this is a very, very difficult to, in my opinion, thing to say with high levels of confidence. Which is why, once again the intelligence community isn't perfect sometimes. And we do make mistakes.

And Mr. Chairman, I yield back. I'd like to come back for just a few minutes if we could after.

NUNES: Gentleman yields back.

Mr. Schiff's recognized. SCHIFF:

Thank you. Just a couple of quick follow up questions by myself and Mr. Himes and then we'll go to Mr. Castro.

Director, you were asked about the Director Clapper's comments and I think your response indicated that they were correct as far as the unclassified intelligence assessment goes.

COMEY: Yes. I understood the question to be about the report itself.

SCHIFF: I want to make it clear to people though the intelligence assessment -- the unclassified intelligence assessment doesn't discuss the issue of U.S. person coordination with the Russians. And I assume that's because at the time of the report in January of this year that was under an investigation that you have now disclosed, is that right?

COMEY: Correct. The counterintelligence investigation is the FBI's business. The IC report was about what the intelligence community had about what Russia had done. So there is nothing in the report about coordination writing like that. It's a separate responsibly the FBI to try and understand that, investigate it and -- and assess it.

SCHIFF: So we shouldn't read Mr. Clapper's comments as suggesting that he takes a different view of whether you had sufficient -- sufficiently credible information and evidence to initiate a FBI counterintelligence investigation.

COMEY: I don't know exactly what he meant. All I can say is what -- what the fact is which as we just laid out. There's the report and then there's our investigation.

SCHIFF: And the report doesn't cover the investigation?

COMEY: Correct.

SCHIFF: Mr. Himes?

HIMES: Thank you, Mr. Schiff.

Gentlemen, in my original questions to you, I asked you whether the intelligence community had undertaken any sort of study to determine whether Russian interference had had any influence on the electoral process and I think you told me the answer was -- was no.

COMEY: Correct.

ROGERS: Correct, we said the U.S. intelligence community does not do analysis or reporting on the U.S. political process or U.S. public opinion, that is not our...

(CROSSTALK)

HIMES: OK. So thanks to the modern technology that's in front of me right here, I've got a tweet from the president an hour ago, saying the NSA and FBI tell Congress that Russia did not influence the electoral process so that's not quite accurate, that tweet?

COMEY: I'm sorry, I haven't been following anybody on Twitter while I've been sitting here...

HIMES: I can read it to you. It says the NSA and FBI tell Congress that Russia did not influence electoral -- the electoral process. This tweet has gone out to millions of Americans, 16.1 million to be exact. Is the tweet, as I read it to you, the NSA and FBI tell Congress that Russia did not influence the electoral process. Is that accurate?

COMEY: Well, it's hard for me to react to that, let me just tell you what we understand the -- the state of what we've said is. We've offered no opinion, have no view, have no information on potential impact because it's never something that we looked at.

HIMES: OK. So it's not too far of a logical leap to conclude that your -- that the assertion that you have told the Congress that there was no influence on the electoral process is not quite right?

COMEY: Right, it wasn't -- it certainly wasn't our intention to say that today because we don't have any information on that subject. And that's not something that was looked at.

HIMES: Right.
Admiral Rogers, before I -- before I yield back to the ranking member, there's another tweet that says NSA Director Rogers tells Congress unmasking individuals endangers national security. My

understanding was, as a member of the committee, that there is a lengthy and very specific process for the unmasking but that it does not inherently in of itself endanger national security.

ROGERS: I assume the comment is designed to address the leaking of such information, but again, I -- I have not read what you're saying to me so I'm not in a position to comment on it, sir.

HIMES: Thank you, I'll yield back to the ranking member.

SCHIFF: Mr. Castro?

CASTRO: Thank you. And thank you gentlemen for your service to the nation and for your testimony today. I wanna take a moment to turn the Christopher Steele dossier, which was first mentioned in the media just before the election and published in full by media outlets in January. My focus today is to explore how many claims within Steele's dossier are looking more and more likely, as though they are accurate. First, let me ask you, can you describe who Christopher Steele is?

COMEY: No, I'm not gonna comment on that.

CASTRO: Are you investigating the claims made in the dossier?

COMEY: I'm not gonna comment on that, Mr. Castro.

CASTRO: OK. Well, the reputation of the author, Christopher Steele is a former accomplished British intelligence officer with a career built on following Russia is important. This is not someone who doesn't know how to run a source and not someone without contacts. The allegations it raises about President Trump's campaign aids connections to Russians, when overlaid with known established facts and timelines from the 2016 campaign are very revealing. So let's begin.

In general, as my colleagues have discussed before, is it true

that a large number of oligarchs and wealthy businessman in Russia have profited from their continuing close relationships or cooperation with the Kremlin?

ROGERS: Can you say that one more time sir...

CASTRO: Sure.

ROGERS: I want to make sure I understand.

CASTRO: Have oligarchs and wealthy folks in Russia profited from their connection to the Kremlin?

ROGERS: Yes.

CASTRO: And, there are no free lunches in Russia. If you get wealthy under Putin, it's because you support Putin and are expected to support him. Is that fair to say?

ROGERS: I would assume there's a perception of his banage (ph), but I would assume it also varies by the specifics and the particular...

CASTRO: Sure.

ROGERS: ... individual and relationship we're talking about.

CASTRO: OK. But Putin never distrusts, he verifies, right? As a former KGB man, he wants to keep tabs on his wealthiest citizens, especially those that could ever pose a challenge to him. Is that right?

ROGERS: I assume he maintains knowledge of the situation around him to include particular centers of influence within Russia.
CASTRO: Thank you. So, is it likely that the Kremlin would accept or actively trade favors or other valuable or sensitive information, intelligence from foreign figures about Russian oligarch or wealthy businessmen living abroad?

ROGERS: Is it possible? Yes, but again, it depends on the particulars of the situation. I don't know that I would make a flat statement...

CASTRO: But it's certainly a possibility.

ROGERS: It's a possibility.

CASTRO: OK. Well, the dossier definitely seems right on these points. A quid pro quo relationship seems to exist between the Trump campaign and Putin's Russia.

A July 19, 2016 entry for example asserts that Russians were receiving intel from Trump's team on Russian oligarch and their families in the United States. An entry from June 20, 2016 states quote, "Trump and his inner circle have accepted regular flow of intelligence from the Kremlin, including on his democratic and other political rivals," which is something for something.

A July 30 entry likewise states that a source close to the Trump campaign confirms a regular exchange with the Kremlin has existed for at least eight years, including intelligence being fed back to Russia on oligarch activities in the United States. Is it generally true that Moscow actively seeks and supports, whether through the oligarch, overt Russian officials or undeclared intelligence officers, sympathetic or cooperative foreign figures abroad, whether through business dealings or political backing or a combination of the two.

COMEY: (OFF-MIKE)

ROGERS: Generally, it's a tactic we have seen over time, but again, I would caution us -- we're talking about very specific cases theoretically here and I'm not prepared to get into any of the specifics.

CASTRO: And I know that my colleagues have touched upon this, but I think it's important in the context of Christopher Steele's

dossier to bring it up again. So, my question is, is it likely or plausible that the Russians might seek out Americans for Moscow's purposes.

COMEY: It is one of the focuses of our counterintelligence mission to try to understand the ways in which they try to do that, that's at the core of their intelligence gathering, is trying to coop recruits -- Americans -- to give them information.

CASTRO: So, the dossier states in an entry dated August 10, 2016, that a quote "Kremlin official involved in U.S. relations" suggested that Moscow might offer assistance to quote "sympathetic U.S. actors." Does this sound like a plausible tactic out of the Russian playbook?
COMEY: I'm not going to comment on that, Mr. Castro.

CASTRO: OK. Now, let's get even more specific. Among the U.S. actors, this Kremlin official mentions a Carter Page and Michael Flynn, whom my colleagues have already discussed at length and which the dossier describes as quote "examples of successes by the Kremlin official."

We know that Carter Page went to Moscow on July 7 to give a speech to the new economic school. We're in possession of the slide deck from his speech there. And we know Carter Page obtained approval from the Trump camp from Trump campaign manager at the time, Corey Lewandowski, as reported in Politico, citing national security campaign official, J.D. Gordon.


CASTRO: Now, let me ask you another question with respect to somebody else. Is it correct that Igor Sechin, the president of Russian oil giant, Rosneft, is a former member of Russian intelligence and a long-time aide and confident of Vladimir Putin.

COMEY: Not going to answer that, Mr. Castro.

CASTRO: In an October 18, 2016, entry, the dossier states that,

during Page's visit to Moscow, he met with Igor Senchin, offering, quote,"Page and Trump's associate, the brokerage of up to 19 percent stake in Rosneft," which Page conferring (ph) that, quote, "If Trump were elected U.S. President, sanctions on Russia would be lifted."

And although fortunately the White House hasn't been so naive as to (inaudible) unilaterally lift sanctions on Russia, it was widely reported that on January 27th of this year, Rosneft sold a 19.5 percent stake in Rosneft in what Reuters calls, quote,"one of its biggest privatizations since the 1990s." Furthermore, Reuters reported that, quote, "Public records show the ownership structure of the -- of the stake ultimately includes a Cayman Islands company whose beneficial owners cannot be traced." What a coincidence.

Is this the subject of your investigation? One of the subjects of your investigation?

COMEY: Same answer.

CASTRO: OK.

COMEY: Meaning -- meaning I'm not going to comment.

CASTRO: I understand.

So, let's move to WikiLeaks for a moment, who played such a prominent role in the 2016 election. As has established before and reestablished at this hearing, WikiLeaks was at a minimum an unwitting pawn and, at a maximum, an active co-conspirator of the Kremlin's in publishing stolen DNC and senior Democratic officials' e-mails. And so you agree this was done in order to offer Moscow some measure of separation as to mask its hand in having hacked and stolen the data in the first place, but so it could still have it publicly posted to inflict damage on the Clinton campaign?

COMEY: Yes, I think that's fair.

ROGERS: Yes.

CASTRO: OK. An entry from July 19, 2016, in the dossier states that a Trump associate knew that the Kremlin was using WikiLeaks in order to maintain quote, "plausible deniability of its involvement." Three days after this entry, WikiLeaks carries out the Kremlin's wishes and publishes upwards of 20,000 stolen DNC e-mails, and 8,000 associated e-mail attachments, and the rest, as they say, is history.

Another entry dated August 17th has Carter Page and a Russian associate discussing WikiLeaks publishing e-mails in order to swing Sanders' supporters away from Clinton and to Trump. And again, from a September 14th entry in the dossier, quote, "Kremlin has further compromising material on Clinton in form of e-mails and considers disseminating after parliamentary elections in late September." And on October 7th, WikiLeaks publishes John Podesta's hacked e-mails. So the coincidences keep piling up.

Let's turn, in the few minutes that I have remaining, again to Paul Manafort, as a follow-up to Mr. Himes' questioning. Suffice it to say, Paul Manafort was a major part of the Trump campaign, including serving as its chairman, convention manager, and chief strategist, before departing the campaign in disgrace in August 2016. It's also established the fact that Paul Manafort was a long-time official adviser to pro-Russian Ukrainian political leadership.

Is Paul Manafort -- Manafort a subject in your investigation?

COMEY: I'm not going to comment on that.

CASTRO: All right. Director, can you describe to the American people the Russian concept of kompromat?

COMEY: It's a technique that they use to gather information on people that may be embarrassing or humiliating, and using it to coerce cooperation.

CASTRO: In your career, have you known instances where that has been successfully leveraged?

COMEY: Yes, I believe our counter-intelligence division has encountered it a number of times.

CASTRO: Does that include private places, including places such as hotels that are wired for audio and video?

COMEY: I don't think I remember enough about the particulars to say, but in theory, sure.

CASTRO: Thank you.

I yield back. I yield back to Ranking Member Schiff.

SCHIFF: I recognize Mr. Heck.

HECK: Admiral Rogers, before I get into my main body in my remarks, I want to go back to your earlier comment about that there is no evidence to indicate that there was a successful Russian hacking of voter results or tabulations. What I did not hear you say is whether or not there had been any attempts to hack into election systems of any kind.

ROGERS: Yes.

COMEY: I can answer that because the FBI's responsibility's in the United States. We saw no indication of that. We saw efforts to penetrate voter registration databases, state Boards of Elections, at that level. We saw no efforts aimed at the vote itself.

HECK: But you did see efforts to penetrate registration roles?

COMEY: Correct.

HECK: Did you see efforts to penetrate any other portions of election systems, other than registrations? In this country it's a highly-decentralized system and, as a consequence, you will recall, then-Secretary of Homeland Security, Jeh Johnson, indicated that election systems should become a part of our critical infrastructure

for cybersecurity purposes.

COMEY: Their efforts were aimed at the voter registration systems in various states, and it takes different forms in various states. Sometimes there's a private vendor, sometimes it's state. But it -- that's where it was focused, and not on the -- the vote itself, vote machines, vote tabulation, vote transmission, that we've seen.

HECK: Thank you. I yield back to the Ranking Member (inaudible).

SCHIFF: Time's -- time's expired, but let me go quickly to Mr. Turner.

TURNER: Thank you, Mr. Chairman.

There's been a lot of statements that have been made up here that is opposed to questions. And we don't certainly feel the need to clarify all of them, but there is one aspect that does need to be clarified because it's also involved both of your testimonies.

There's been discussion up here concerning the statements by James Clapper and, rather than do the conjecture as it has been made, I'm going to just read it. Chuck Todd said, "Let me ask you this. Does intelligence exist that can definitively answer the following question whether there were improper contacts between the Trump campaign and Russian officials?" James Clapper said, "We did not include any evidence in our report.

I say 'our,' that's NSA, FBI, and CIA, with my office and the Director of National Intelligence, that had anything, that had any reflection of collusion between members of the Trump campaign and the Russians. There was no evidence of that included in our report." Chuck Todd followed up. "I understand that, but does it exist?" James Clapper answered, "Not to my knowledge." So the text is not merely related to the report.
I yield back.

NUNES: Mr. Crawford's recognized.

CRAWFORD: Thank you, Mr. Chairman.

Thank you, gentlemen, for being here today. I'll start with Director Comey. Despite your expressed disdain for the New England Patriots, I think that Tom Brady would probably like to express his gratitude for the FBI's assistance in recovering his stolen Super Bowl jersey, so I'll do that on his behalf now.

COMEY: Thank you. By the way, I -- if I'm honest with myself, the reason I don't like the Patriots is they represent sustained excellence and, as a Giants' fan, that drives me crazy.

CRAWFORD: Director Comey, are you familiar with an article, July 18, 2016, from The Washington Post entitled "Trump Campaign Guts GOP's Anti-Russia Stance on Ukraine"?

COMEY: I'm not familiar with that article. I don't -- I don't remember it.

CRAWFORD: I'd ask (you) now to consent to add this to the record, just for your edification, Director. There's an allegation contained in that article that at a National Security Committee platform meeting Trump staffers wrote an amendment to an amendment that stripped out platform's call -- call for providing, quote,"Lethal defensive weapons," and replace it with softer language, calling for, quote, "Appropriate assistance."

Are you familiar with a March 18, 2017, story in the Washington Examiner entitled "How Pundits Got Key Parts of the Trump Russia Story All Wrong"? Are you familiar with that?

COMEY: I don't think I am.

CRAWFORD: I'd ask you now to consent to add that to the record, and also for your edification I'll go to some of the -- the meat of

that story. There -- are you aware of an allegation that Trump staffers gutted the Ukraine plank of the platform?

COMEY: Am I aware of the article on that?

CRAWFORD: Are you aware of any -- anything of that nature, the article or any -- any activity that -- that (inaudible)?

COMEY: Do you want to talk about anything -- I'm willing to comment on whether I've seen different things in the media. I don't want to talk about anything beyond that.

CRAWFORD: OK. So, then, say you're not aware of the final platform that retained all of the language from the original platform, plus the portion of the amendment offered by the platform committee member?

COMEY: I don't want to comment.

CRAWFORD: OK. Then I'll go through -- I know that you're limited on what you comment on. I'll go through some of the -- some of the -- as I said, the meat of this. Reading from the platform, it says, quote, "We will meet the return of Russian belligerence with the same resolve that led to the collapse of the Soviet Union. We will not accept any territorial change in Eastern Europe imposed by force in Ukraine or elsewhere, and we'll use all appropriate measures to bring to justice the practitioners of aggression and assassination," end quote.

Does that sound to you as a -- like a pro-Russian or a pro-Putin statement, in your assessment?

COMEY: That's not for me to comment on.

CRAWFORD: OK. Further, in the platform it says quote "We support maintaining and if warranted increasing sanctions together with our allies against Russia and less and until Ukraine's

sovereignty and territorial integrity are fully restored. We also support providing appropriate assistance to the Armed Forces of Ukraine and greater coordination with NATO defense planning." And again, that sounds like fairly clear language in their relationship to Russia.

Would you agree?

COMEY: Same answer Mr. Crawford.

CRAWFORD: OK, thank you.

The final language I'll get to here in just a second -- there was -- there was an amendment but the final language regarding that plank of a platform with regard to national security relating to Russia. It says "we support maintaining and if warranted, increasing sanctions together with our allies against Russia and less and until Ukraine's sovereignty and territorial integrity are fully restored. We also support providing appropriate assistance to the Armed Forces of Ukraine and greater coordination with NATO defense planning."

And again, that -- to me that sounds fairly clear and straightforward that that is not conducive to a Putin administration. Would you agree?

COMEY: Give you the same answer, Mr. Crawford.

CRAWFORD: Thank you, sir.

It's also important to note that that platform was adopted in coordination with and in concert with the Trump administration as they met at the convention and they went through the platform process. The Trump campaign agreed to the platform condemning Kremlin belligerence, calling for continued and perhaps increased sanctions against Russia as I indicated in the text of that platform. For the full restoration of Ukrainian territory, for refusing to accept quote "any territorial change in Eastern Europe imposed by force, Ukraine or elsewhere and pledging to aid Ukraine's armed forces."

So I -- I bring that up just to -- just to highlight and note the fact that none of that appears to be pro-Putin or pro-Russian language.

NUNES: Mr. Crawford, will you yield that to me?

CRAWFORD: Yes.

NUNES: So, Mr. Comey, I just want to make sure -- I know you're not going to comment on this, but I hope that you'll take this back to your investigators because there seems to be the -- the line out there that somehow the Republican Party watered down it's platform. And that's not true. That didn't happen, and in fact, what happened is -- is that the platform was actually increased. Increased its certainty against what the Russians were up to and it actually amended the platform to make it stronger than what it initially was.

So, you know, I know there's a lot of circumstantial evidence out there about all these supposed people that knew -- that knew the Russians, but the reality is and remains the case, Republican Party had a very strong platform that was against the Russians and it was increased in its -- its strength not decreased like has been reported. So I know that you won't comment, but I hope that at least you will -- we'll provide this to your investigative team so that we can at least get this off the table. Will you -- will you take this back?

COMEY: Sure.

NUNES: OK, we'll give it to you.

Sorry, Mr. Crawford. We'll go back.

CRAWFORD: Not at all. Thank you, Mr. Comey, I appreciate that.

Admiral Rogers, would you like to make a comment about the New England Patriots before I move forward?

ROGERS: I'm a Chicago Bears guy, born and (inaudible).

CRAWFORD: Admiral, our employees -- you mentioned this before but I just want to go through this list. Are employees of intelligence community -- intelligence community agencies required to disclose visits with foreign nationals?

ROGERS: Yes, broadly, although I'd be the first to admit not all foreign international interactions are the same. Interactions with the British, for example, are in a very different place than other countries for example.

CRAWFORD: OK, appreciate that clarification. To your knowledge, are elected officials required to disclose contact with foreign nationals?

ROGERS: I don't know what the specifics are across the federal government because clearly in many jobs, that's part -- interaction with foreign counterparts is part of your job. I'm the first to acknowledge that. I interact with foreign counterparts as does Director Comey, regularly, in the course of our duties.

CRAWFORD: Are federal campaign employees required to disclose contacts with foreign nationals to your knowledge?

ROGERS: I apologize, I just don't know.

CRAWFORD: OK. Are private citizens required in any way to disclose or to report contact with foreign nationals? That you know of?

ROGERS: I don't know.

CRAWFORD: Is it customary for transition teams for a presidential campaign -- for transition team members to meet with foreign nationals to your knowledge? Is that customary?

ROGERS: It's an area I just don't have any knowledge.

CRAWFORD: Is that unusual?

ROGERS: I don't have any -- I don't have any knowledge on it.

CRAWFORD: Has it happened before?

ROGERS: I've never been part of a transition team. I don't know.

CRAWFORD: Are transition team members required by law to disclose contacts with foreign nationals?

ROGERS: I apologize, I don't know the law there.

CRAWFORD: Thank you.

I yield back to the Chairman.

NUNES: Thank you Mr. Crawford.

Ms. Stefanik's recognized.

STEFANIK: Thank you, Mr. Chairman.

Thank you, Director Comey and Admiral Rogers for your testimony today. My first set of questions are directed at Director Comey. Broadly, when the FBI has any open counter-intelligence investigation, what are the typical protocols or procedures for notifying the DNI, the White House, and senior Congressional leadership?

COMEY: There is a practice of a quarterly briefing on sensitive cases to the chair and ranking of the House and Senate Intelligence Committees. And the reason I hesitate is, thanks to feedback we've gotten, we're trying to make it better. And that involves a briefing of the Department of Justice, I believe the DNI, and the -- some portion of the National Security Council at the White House...

STEFANIK: So if that's quarterly...

COMEY: ... to brief them before Congress is briefed.

STEFANIK: So it's quarterly for all three then, senior congressional leadership, the White House, and the DNI?

COMEY: I think that's right. Now that's by practice not by rule or by written policy which is why, thanks to the chair and ranking giving us feedback, we're trying to tweak it in certain ways.

STEFANIK: So since, in your opening statement, you confirmed that there is a counter-intelligence investigation currently open and you also referenced that it started in July. When did you notify the DNI, the White House, or senior congressional leadership?

COMEY: It's a good question. Congressional leadership, some time recently. They were briefed on the nature of the investigation in some detail as I said. Obviously the Department of Justice has been aware of it all along. The DNI, I don't know what the DNI's knowledge of it was because we didn't have a DNI until Mr. Coats took office and I briefed him his first morning in office.

STEFANIK: So just to drill down on this, if -- if the open investigation began in July and the briefing of congressional leadership only occurred recently, why was there no notification prior to the recent -- to the past month?

COMEY: I think our decision was it was a matter of such sensitivity that we wouldn't include it in the quarterly briefings.

STEFANIK: So when you state our decision is that your decision? Is that usually your decision what gets briefed in those quarterly updates?

COMEY: No, it's usually the decision of the head of our counter-intelligence division.

STEFANIK: And just again, to get the detailed -- on the record, why was the decision made not to brief senior congressional leadership until recently when the investigation had been open since July? A very serious investigation -- why was that decision to wait months?

COMEY: Because of the sensitivity of the matter.

STEFANIK: Stepping back more broadly, in the case of Russia, we know that cyber hacking is just one tactic that's typically part of a broader influence or information warfare campaign and we know the Russian government is ready and willing to employee hacking as but one of many tools in their toolkit to obtain information for use against the United States. Is there any evidence that Russia tried to hack other entities associated with the 2016 presidential campaign in addition to the DNC or the Clinton campaign operatives?

COMEY: Yes, many others.

STEFANIK: Can you specify those others? Did that include the RNC? Did that include any of the other campaigns of candidates in the primaries, either Democrats or Republicans?

COMEY: I think what we can say in an unclassified setting is what we have in the report that there were efforts to penetrate organizations associated with the Republican party and that -- I think that is what we said in the report. And that there were not releases of material taken -- hacked from any Republican associated organizations.

STEFANIK: But the hacking -- the use of cyber tools as part of their broader, whether you call it hybrid warfare or information warfare campaigns, it was done to both parties.

COMEY: Correct.

STEFANIK: Thank you. Taking a further step back of what's been in the news recently, and I'm referring to the Yahoo! hack, the Yahoo! data breech, last week the Department of Justice announced that it was

charging hackers with ties to the FSB in the 2014 Yahoo! data breech. Was this hack done to your knowledge for intelligence purposes?

COMEY: I can't say in this forum.

STEFANIK: Press reporting indicates that Yahoo! hacked targeted journalists, dissidence and government officials. Do you know what the FSB did with the information they obtained?

COMEY: Same answer.

STEFANIK: OK, I understand that. How -- how did the administration determine who to sanction as part of the election hacking? How -- how familiar with that decision process and how is that determination made?

COMEY: I don't know. I'm not familiar with the decision process. The FBI is a factual input but I don't recall and I don't have any personal knowledge of how the decisions are made about who to sanction.

STEFANIK: Looking forward -- and this is for both of you -- what is the NSA and the FBI doing to keep Americans safe, to keep campaign entities -- to keep any entity associated with a major campaign, save from aggressive Russia cyber measures that were utilized in this past election?

ROGERS: So, we continue to maximize the insights. We're generating about an activity -- for example, this started with the NSA initially gaining access, in the summer of '15, we became aware of that activity, shared it with our FBI teammates. That continues, we try to make sure that the insights we generate our shared with our law enforcement teammates, who then re-interact with the private sector.

We're trying to work broadly across the U.S. government to increase cybersecurity, as you heard discussed -- on-going discussions about what's the role of the voting infrastructure in the United

States, in terms of critical infrastructure. Do we need to bring that within the critical infrastructure framework? I know that topic has been ongoing for some period of time.

STEFANIK: Director Comey?

COMEY: Yeah, I think that's right and just making sure that we are sharing information when we get it that someone's being hit, but more importantly we're showing people what we've learned from this cycle, so they can tighten up.

STEFANIK: Thank you. It seems to me in my first line of questioning, the more serious a counterintelligence investigation is. That would seem to trigger a need to update not just the White House, the DNI, but also Senior Congressional Leadership. And you stated, it was due to the severity. I think moving forward, it seems that the most severe and serious investigations should be notified to the Senior Congressional Leadership.
And with that, thanks for the lenience, Chairman, I yield back.

(CROSSTALK)

COMEY: That's good feedback, Ms. Stefanik. The challenge for us is sometimes we want to keep it tight within the executive branch, and if we're going to go brief congressional leaders, the practice has been, then we brief inside the executive branch. And so, we have to figure out how to navigate that in a good way.

NUNES: We may have to update the law on that. Gentlelady (ph) yields back.

Mr. Schiff is recognized for 15 minutes and I think -- then we'll come back to our side for 15 and that should be it.

SCHIFF: Thank you, Mr. Chairman. Just a couple of questions before I hand it back to Mr. Heck.

Do the Russians favor the United States provision of lethal,

defensive weapons to Ukraine, Admiral?

ROGERS: No.

SCHIFF: They would strongly oppose such an idea, would they not?

ROGERS: They've been opposed to it to date.

SCHIFF: And I can tell you that the idea of providing lethal defensive weapons to Ukraine has bipartisan support here on the Hill, including Senator McCain, certainly myself, I would imagine many members of this committee.

There was an effort at the convention to strengthen the platform by including a provision that would provide lethal defensive weapons to Ukraine. That was defeated. The campaign manager for the Trump campaign at the time, Paul Manafort, denied the campaign was involved in defeating that amendment. But the delegate who offered the amendment later disclosed to the press that in fact it was dropped at the insistence of the Trump campaign.

J.D. Gordon, a national security adviser for the Trump campaign was forced later to admit that in fact, he had weighed in against the amendment that would have provided that the U.S. should give lethal defensive weapons to Ukraine.

So, I would join my chairman in asking you to look into this, particularly since we know that Ambassador Kislyak attended the convention and if there was any communication between the Russians and the Trump campaign, that had the effect any coordination that resulted in the defeat of an amendment that was against Russian interests, the committee would certainly like to know and we welcome that inquiry.

Mr. Heck?

HECK: Thank you, Ranking Member.
There a lot of emotions kicking around in this room today. I perceive anger and outrage and subdued somberness, one I feel

overwhelmingly is sadness. We've heard nothing but terribly disturbing evidence of what has happened to our country at the hands of arguably our greatest advisory.

And what's worse, the evidence we've heard so far all seems -- all seems to lead to the conclusion that they help from the inside. That this was, in part, an inside job from U.S. persons -- willing American accomplices or terribly naive ones, or probably both -- who helped the Russians attack our country and our democracy.

We're both still at the early stages of our investigation. We're not indicting anyone, merely laying out some of the evidence and the facts, dirty though they be, sleazy though they be. And no matter what, we can safely conclude at this point that never in the modern era has a President and his Administration had so many foreign entanglements.

Entanglements that continue to push American foreign policy away from its core roots -- beliefs, interests and alliances towards unprecedented positions that only Putin himself could approve of. How else can we explain the modification to the Republican Party platform in such a decidedly pro-Russian way.

Republicans who are always so strong against geopolitical foes like Russia, I know my colleagues on this committee take the Russia threat very seriously. Why wouldn't the people who inhabit the White House? How else can we explain an Administration that beats up our oldest allies, like Australia and Britain, and our strongest and most sacrosanct alliance, like NATO, but never, ever say a bad word about Putin. In fact, they say a lot of good words about Putin.

An administration that we have heard decisively makes up baseless wiretapping charges against a former United States President, equates our intelligence agencies to Nazi Germany, and argues moral equivalents between a repressive, authoritarian states with an abhorrent human rights record like Russia in our free and open democracy. And yet, this Administration never, ever utters any criticism of Russia.

Let's be clear though. This is not about party. It's not about relitigating the election. It's not as if anything we do here will put a President from a different political party in the Oval Office. So, I hope that it's clear that it's about something much more important. And no, it's not about political motivation, to my friend who said and suggested that earlier, this is about patriotism, about something way more important than party.

This is about country and the very heart of what this country is built on, which is open, free, fair, trusted elections. We don't take our investigation lightly and I know you don't. Indeed, you go through a process to even decide to do that, whether to extend the resources, to begin with credible allegations and reason to believe that there's something that warrants it. And I no doubt believe you've talked to lawyers in and out of the prosecution divisions about whether or not this warrants an investigation. I know you don't take this lightly.

What we have seen is damning evidence today of what Russia did. We've also seen damning evidence of how they did it. Russia has a history of using active measures, many of which we have heard about today. Let's recap them, we're getting near the end.

Hacking and dumping information to damage or embarrass their enemies. We heard about this, of course, with respect to WikiLeaks and Guccifer 2.0. Using third-party and cutouts, business people, oligarchs (ph) and other ostensibly private individuals to cultivate relationships.

We've discussed Ambassador Sergey Kislyak, CEO Igor Sechin, and of course, Vladimir Putin himself. We're also heard about Russia's use of companies like (inaudible), the Bank of Cyprus, (inaudible) and a confusing web of offshore shell companies used it would seem to hide or to launder money.

We've also heard how Russia released disinformation to spread rumors and confused the public and to sow distrust and the ability to

even know truth objectively, using propaganda, media outlets, whether they're owned directly by Russia or not, to release such disinformation in order to claim plausible deniability of Russia's hands.

Here again, we see WikiLeaks and Guccifer 2.0, but we also see the use of propaganda outlets like RT. And of course, the use of U.S. persons of influence. Whether through active collision or coordination or naive acquiescence, we don't yet know the full extent to further Russia's attempts to undermine our elections and ultimately, weaken our democracy.

HECK: On that last point, we've heard about quite a few individuals in the Trump orbit who feel somewhere on that spectrum from mere naivete, disturbing enough if this naivete is a feature of those who are supposed to be running our country and foreign policy, to unwitting Russian dupes, to willing blindness, to active coordination. This rogues galleries includes those already fired -- Roger Stone, adviser to Donald Trump; Paul Manafort, adviser to Donald Trump; Michael Flynn, national security adviser to Donald Trump; Carter Page, adviser to Donald Trump.

But the cloud of deep suspicion in Russian entanglements extends to those still in power. Rex Tillerson, Secretary of State to Donald Trump; Michael Caputo, adviser to Donald Trump; Jeff Sessions, Attorney General for Donald Trump; and members of the Trump family itself.

This matters. It's serious. Our battleships weren't sunk and our towers didn't collapse a la 2011 (sic). But make no mistake, 2016 is a year that we should mark on our calendars, and it's still going on. The attack didn't end on Election Day. And it will continue as you have suggested unless we, all of us in this room, stop it.

Admiral Rogers, you've proudly worn that uniform your entire career. I am proud of your service and grateful for it. But I would ask you, sir, not even with respect to this specific investigation, to

use your own words as someone who no doubt has been in theater, who's lost brothers and sisters in combat, to explain to me, but more importantly to the American people -- don't assume they know the answer. Tell them in your words why we should care about Russia's active measures campaign aimed as destabilizing our democracy and that of our allies. In your words, sir, why should they care?

ROGERS: I don't think it's best interests of our nation for any external entity to attempt to manipulate outcomes, to shape choices. That should be the inherent role of a democracy.

The investigation we're going through I think is a positive in the sense it will help illuminate to all of us, regardless of party, what are the implications here and what does it mean for us. Because I think our conclusion and that of the intelligence community broadly here is, this absent some change, this behavior is not likely to stop. Absent some change in the dynamic, this is not likely to be the last time we'll be having these discussions about that kind of activity. I don't think that's in anybody's best interest for us as a nation.

HECK: Director Comey, parallel question. Again, in general terms, not with respect to the specific investigation you have revealed here today, not asking you to go into specifics on any individuals, but please, explain briefly to me, and more importantly to the American public, why we should care about Russia's use of U.S. persons of Americans helping Russia destabilize our democracy.

COMEY: Well, like Admiral Rogers, I truly believe we are shining city on a hill, to quote a great American. And one of the things we radiate to the world is the importance of our wonderful, often messy, but free and fair Democratic system and the elections that undergird (ph) it. And so when there's something by a foreign nation state to mess with that, to destroy that, to corrupt that, it's very, very serious, threatens what is America.

And if any Americans are part of that effort, it's a very serious matter. And so you would expect the FBI to want to understand, is that so? And if so, who did what? But again, I want to be very

careful to people who over0interpret my words, to preserve our ability to answer those questions, we're not talking about our work.

I'm not here voluntarily. Right? I would rather not be talking about this at all. But we thought it was important to share at least that much with the committee and the American people, and now we're going to close our mouths to do our work to see if we can answer those questions, because the answers matter.

HECK: They do indeed. I thank you both for those answers. And I thank you both for your service to our country. I would like to think that we can turn this from a sad event into a positive one. This country has stood up and fought on behalf of its own health and welfare and that of its citizens and met any number of challenges throughout our nation's history. The worst thing we could do is underestimate the nature of this challenge before us today.

HECK: With that, ranking member, I would appreciate it if I could yield to my friend from Texas, Mr. Castro, briefly.

SCHIFF: Mr. Castro.

CASTRO: I thank you. One more question with respect to Lee (ph) because I know that's been a big topic of the line of questioning and of course is a concern to all of us. Regardless of political party. But I want to ask you director, is it possible that some of those leaks could come from not the intelligence community, but from members of the White House staff for example?

COMEY: Sure it could come from lots of different places. And it's often one of the things that is challenging as I said about a leak investigation. You think it's going to be a small circle, but it turns out a lot of people either knew about it, or heard echoes of it and it's stories to tell to journalists about it. So in my experience trying to figure these things out for decades, it's often coming from places you didn't anticipate.

CASTRO: No and the reason I asked the question is because the President has berated the FBI and the intelligence community on the issue of leaks. And others have berated the intelligence community in the press because of these leaks. But I think it's worth considering that it's quite possible that there are folks who have a kind of political Munchausen by proxy syndrome, where they leak information because they want to be the savior once it blows up. You know they're all sorts of individual's that serve on political staff and I think that we ought to consider the possibility that perhaps it is somebody at the White House.

Thank you. I yield back.

NUNES: (inaudible). The gentleman yields back.

The gentleman yields back to Mr. Hurd.

HURD: Thank you, Chairman.

And gentlemen, thank you all for being here. And thank you for your continued service to your country. I've learned recently the value of sitting in one place for a long period of time and listening and today I'm has added to that understanding and I'm going to try to ask questions that y'all can answer in this format and are within your areas of expertise.
And Director Rogers, my first question to you -- the exploit that was used by the Russian's to penetrate the DNC, was it sophisticated? Was it a zero day exploit? A zero day being some type of -- for those that are watching, an exploit that has never been used before?

ROGERS: In an open unclassified forum, I am not going to talk about Russian tactics, techniques or procedures about how they executed their hacks.

HURD: If members of the DNC had not -- let me rephrase this, can we talk about spear fishing?

ROGERS: Sure, in general terms, yes sir.

HURD: Spear fishing is when somebody sends an email and they -- somebody clicks on something in that email...

ROGERS: Right, the user of things (inaudible) they're receiving an email either of interest or from a legitimate user, they open it up and they'll often click if you will on a link -- an attachment.

HURD: Was that type of tactic used in the...

ROGERS: Again, I'm not in an unclassified forum just not going to be...

HURD: Copy, I apologize. Director Comey, when was the first time the FBI notified the DNC of the hack? Roughly.

COMEY: I think august of 2015.

HURD: And was that prior to information being leaked to -- being sent on -- put on WikiLeaks?

COMEY: Yes the -- the first Russian directed releases where middle of June of the next year by D.C. leaks and this Guccifer 2.0 persona and then that was followed by Wikileaks. So about a year. A little less than a year really.

HURD: So there was about a year between the FBI's first notification of some potential problems with the DNC network and then that information getting on -- getting on Wikileaks.

COMEY: Yes, sir.

HURD: Have you been able to -- when did the DNC provide access for -- to the FBI for your technical folks to review what happened?

COMEY: Well we never got direct access to the machines themselves. The DNC in the spring of 2016 hired a firm that ultimately shared with us their forensics from their review of the

system.

HURD: Director Rogers, did the NSA ever get access to the DNC hardware?

ROGERS: The NSA didn't ask for access. That's not in our job...

HURD: Good copy. So director FBI notified the DNC early, before any information was put on Wikileaks and when -- you have still been -- never been given access to any of the technical or the physical machines that were -- that were hacked by the Russians.

COMEY: That's correct although we got the forensics from the pros that they hired which -- again, best practice is always to get access to the machines themselves, but this -- my folks tell me was an appropriate substitute.

HURD: The -- at what point did the company and the DNC use -- share that forensic information to you?

COMEY: I don't remember for sure. I think June. I could be wrong about that.

ROGERS: The company went public in June of 16, with their conclusions. I would assume it was around that time.

COMEY: I think it was about the time -- I think it was a little bit before the announcement, but I'll say approximately June.

HURD: So -- so that was -- how long after the first notification of -- that the FBI did of the DNC?

COMEY: Ten months.

HURD: Ten months? So the FBI notified the DNC of the hack and it was not until 10 months later that you had any details about what was actually going on forensically on their network?

COMEY: That's correct, assuming I have the dates about right. But it was -- it was some months later.

HURD: Knowing what we know now, would the FBI have done anything different in trying to notify the DNC of what happened?

COMEY: Oh Sure.

HURD: What -- what -- what measures would you have done differently?

COMEY: We'd have set up a much larger flare. Yeah we'd have just kept banging and banging on the door, knowing what I know now. We made extensive efforts to notify, we'd have -- I might have walked over there myself, knowing what I know now. But I think the efforts we made, that are agents made were reasonable at the time.

HURD: Good copy. And do you have a ball park of the number of private sector entities that you have to notify of these types of breaches?

COMEY: Hundreds and thousands. In this particular case we had to notify hundreds, I think maybe more than 1,000 entities that the Russians were hitting at the same time.

HURD: Admiral Rogers, do you have anything to add to that?

ROGERS: No, because as we pass the information to the FBI, what started all this was a pretty massive effort on the part of our Russian counterparts.

HURD: I've said this many times. The outcome of grizzly staff (ph), what the intelligence community as the Russian hacking, has been the wedge, whether real or perceived between the executive branch, the intelligence community and the public.

And this is an asymmetrical tool, that the Russians are using to destabilize liberal democratic institutions. And I think it is important that we do everything we can to review this, which I fully

believe federal law enforcement, is doing as y'all have talked to here. And I would like to end before yielding back to the chairman, that my colleague from California, the Ranking Member said in his opening statement, the question that most people have is whether we can really conduct this investigation, in the kind of thorough nonpartisan manner that the seriousness of the issues merit, or whether the enormous political consequences of our work will make that impossible.

And he adds, the truth is, I don't know the answer. I do. We must. The American people demand this. The future of our democratic institutions demand it and I'm glad we have two people like y'all involved in this. Mr. Chairman I yield back my time to you.

NUNES: Gentleman yields back.

And Mr. Gowdy's got a follow up.

GOWDY: Thank you, Mr. Chairman. And Mr. Chairman I want to thank you and Ranking Member Schiff for having this. Here Mr. Chairman you were talking about Russia far before it became -- long before it became fashionable to talk about Russia. If memory serves me correctly, you referred to Russia as possibly our greatest national security threat post 9/11. And as you know Chairman I come from a state with a fellow name Graham, who is also no fan of Russia.

So Director Comey, Admiral Rogers, people in your line of work are incredibly respected both your current line of work and the work that you came from and people in my line of work are not and there's a reason. The justice system is respected and the political process is not. So this is -- while this hearings important. What's really important is what you do after this hearing.


GOWDY: And I want you to go find every single witness who may have information about interference, influence, motive, our response, collusion, coordination, whatever your jurisdiction is, wherever the facts may take you, though the heavens may fall, go do your jobs

because nature abhors a vacuum. And right now you can't answer most of the questions, either by policy, by law, or because the investigation has not been complete. Therefore, a vacuum exists which people in my line of work are more than happy to fill. So I need you to fill. I need you to do it with all deliberate speed.

Director Comey, I think it's also important for my fellow citizens to take note of why the system that you come from, the one that I come from, is respected, and this system that I'm in now is not.

What is hearsay?

COMEY: Information you don't know of your own personal knowledge but learn from someone else.

GOWDY: It's an out of court statement offered to prove the truth of the matter asserted.

COMEY: I was trying to be a little less lawyerly.

GOWDY: All right. Well, we'll go with your answer. And it is almost never admissible in court. How about anonymous sources? When you were in the southern district could you ever call on an anonymous source to testify in one of your proceedings?

COMEY: No.

GOWDY: You couldn't even use hearsay, unless there was some widely accepted exception. It would never -- a newspaper article would never, ever be admitted as evidence in a courtroom. So the system we respect would laugh you out of court if you came in armed with a newspaper article. But in the political process, that's enough.

Let me ask you this. Cross examination. Why are you able to cross examine witnesses in trial? Why do we have a right to confront witnesses?

COMEY: Well, it's embedded in our Constitution, and the reason it makes great sense is, it's the crucible out of which you get truth.

GOWDY: It is the single best way to elucidate the truth -- to test and to probe and to challenge, and to test someone's personal exposure to the facts. Cross examination's the best tool that we have. How do you cross examine an anonymous source? How do you cross examine hearsay? I hope that you go find every single witness that you need to talk to, and examine every single document.

People are counting on you two and your line of work to find the facts. And people are welcome to draw whatever conclusions they want from the facts. But when I hear the word evidence, as I've heard lots and lots this morning, let me ask you this, Director Comey, did you ever -- are you familiar with any trials where one witness may have said the light was red and one witness may have said the light was green?

Has that ever happened?

COMEY: Yes, that's why you have a trial.

GOWDY: Does it ever happen where one bank teller said the assailant was 5'10" and one said the assailant was 6'2"?

COMEY: Sure.

GOWDY: So that's evidence. You've got evidence he's 6'2" and evidence he's 5'11", he just can't be both. The light can't be red and green. So the word evidence, while fancy and legal, the reality is you find facts and then the finder of the fact can draw conclusions and inferences from those facts.

So I wish you luck as you begin this process. It is all important. The fact that someone may have had a line of questions about leaks does not mean that they're not interested in all aspects of Russia. And vice versa, the fact that they may not have asked questions about leaks doesn't mean they're not interested in them.

You have jurisdiction over all of it. So, God bless you as you go on this journey for the facts. And then people can draw whatever conclusions they want. I hope that you will fill (ph) the vacuum that is created when you all are not able to answer questions.

With that, I will yield back to the chairman.

NUNES: The gentleman yields back.

Mr. Comey, this is my final list of questions here. I just want to make sure we get this on the record. Do you have any evidence that any current Trump White House or administration official coordinated with the Russian intelligence services?

COMEY: Not a question I can answer.

NUNES: I figured you were going to say that, but I just wanted to make sure we got it on the record. How about counselor to the president, Kellyanne Conway?
COMEY: It's the same answer. And as I said earlier, I constantly want to ask people, don't over interpret the fact that I say I can't comment. I'm not going to comment on anybody.

NUNES: Well, I think -- I understand that. But here's the challenge. Is that you've announced that you have this big investigation, but now you've got people that are involved in our government that are -- the Secretary of State, for example -- these are important players. And the longer this hangs out here, the bigger the cloud is.

And I know that you're not going to tell me whether or not you have any evidence, but I can tell you that we don't have any evidence. And we're conducting our own investigation here, and if you have some -- if you have evidence I'd -- especially as it relates to people in the White House that are working in the White House or the administration, I mean, that would be something that we really should

know about and we should know about quickly.

And so if you can't give it to the entire committee, I hope you can at least give it myself and Mr. Schiff because you know, there is a big gray cloud that you have put over people who have very important work to do to lead this country. And so the faster you can get to the bottom of this, it's going to be better for all Americans.

COMEY: I understand. Thank you.

NUNES: All right. With that, I want to thank the members today and especially our witnesses. It was a long day, but I think a good discussion.

END

---

## Copyright

Copyright 2017 Roll Call, Inc. All Rights Reserved.

---

# Exhibit 7

January 12, 2017

The Honorable James B. Comey, Jr.
Director
Federal Bureau of Investigation
935 Pennsylvania Avenue, N.W.
Washington, D.C., 20535

Dear Director Comey:

We write today to ask you to respond to several previous inquiries and confirm that the Federal Bureau of Investigation is investigating a connection between the Russian government and President-Elect Donald Trump.

On August 30, 2016, the Ranking Members of several House committees wrote to ask you whether the FBI was investigating any of the reported connections between the Russian government and its proxies and Donald Trump's presidential campaign.[1]  To date, your office has provided no response.

On September 28, 2016, during a House Judiciary Committee hearing, Ranking Member John Conyers, Jr. (D-MI) asked: "Is the FBI investigating the activities of Mr. Trump or any adviser to the Trump campaign with respect to any line of communication between the campaign and the Russian government?"  You declined to answer the question.[2]

During that same hearing, Rep. Jerrold Nadler (D-NY) noted your extensive public comments on the investigation into Secretary Clinton's use of a private email server.  He asked: "Is there a different standard for Secretary Clinton and Donald Trump?"  You responded: "No. Our standard is we do not confirm or deny the existence of investigations.  There is an exception for that: when there is a need for the public to be reassured; when it is obvious it is apparent, given our activities, public activities, that the investigation is ongoing."[3]

---

[1] Letter from John Conyers, Jr., Ranking Member, H. Comm. on the Judiciary, *et al.*, to James B. Comey, Jr., Director, Federal Bureau of Investigation (Aug. 30, 2016).

[2] *Oversight of the Federal Bureau of Investigation: Hearing Before the H. Comm. on the Judiciary,* 114th Cong. 37 (2016) (Questioning by John Conyers, Jr., Ranking Member, H. Comm. on the Judiciary).

[3] *Id.* (Questioning by Rep. Jerrold Nadler).

On December 20, 2016, Ranking Member Conyers and Rep. Sheila Jackson Lee (D-TX) wrote you with two specific requests. First, they asked that you confirm the existence of an investigation into the recent activities of the Russian government. Second, they asked that you provide the House Judiciary Committee with copies of "all relevant investigative materials . . . including copies of any primary evidence or interview notes" at the conclusion of any such investigation.[4] These materials would, of course, parallel those you provided to the Committee and other offices at the conclusion of your investigation into Secretary Clinton. To date, your office has provided no response to our request.

On January 10, 2017, during an open hearing of the Senate Select Committee on Intelligence, Sen. Ron Wyden (D-OR) referenced comments by a senior Russian diplomat suggesting contact between the Russian government and the Trump campaign.[5] Sen. Wyden then asked you: "Has the FBI investigated these reported relationships and, if so, what are the agencies finding?" You responded: "I would never comment on investigations, whether we have one or not, *in an open forum* like this."[6]

Finally, late on January 10, 2017, breaking reports suggested that Sen. John McCain (R-AZ) personally handed you a file that allegedly documents secret contacts between the Trump organization and the Russian government.[7] Other reports suggest that the Department of Justice and the FBI attempted to target four associates of Donald Trump for electronic surveillance under the Foreign Intelligence Surveillance Act—and eventually obtained a warrant from the Foreign Intelligence Surveillance Court on at least one of those targets in October 2016.[8]

We respect the longstanding tradition of the FBI to decline from commenting about ongoing criminal investigations—but, using your own words, there is now a clear and pressing need for the public to be reassured about the President Elect, and it is "obvious and apparent," given these reports and the public activities of the FBI, that an investigation of some nature is ongoing. Your own standard for public comment on this matter has been met.

We therefore request confirmation that the FBI is investigating any connection between the Russian government and Donald Trump, his business, or the Trump presidential campaign.

---

[4] Letter from John Conyers, Jr., Ranking Member, H. Comm. on the Judiciary, and Sheila Jackson Lee, Ranking Member, H. SubComm. on Crime, Terrorism, Homeland Security, and Investigations to James B. Comey, Jr., Director, Federal Bureau of Investigation (Aug. 30, 2016).

[5] Ivan Nechepurenko, *Russian Officials Were in Contact With Trump Allies, Diplomat Says,* N.Y. TIMES, (Nov. 10, 2016).

[6] Austin Wright and Martin Matinshak, *Comey won't say if FBI is investigating contacts between Moscow, Trump campaign*, Politico (Jan. 10, 2017) (emphasis ours).

[7] Greg Miller *et al.*, *Intelligence chiefs briefed Trump and Obama on unconfirmed claims Russia has compromising information on president-elect*, WASH. POST (Jul. 10, 2016).

[8] Julian Borger, *John McCain passes dossier alleging secret Trump-Russia contacts to FBI*, GUARDIAN (Jan. 10, 2016).

We also request that the FBI provide the House Judiciary Committee with all documentation relevant to this investigation as soon as possible. If additional and relevant evidence becomes available to the FBI over time, we ask that you provide us with those updated materials as well.

If, as your comments suggest, you are able to be more forthcoming in a secure setting, then we ask you to arrange a classified briefing for our members and staff as soon as possible.

Thank you for your time and consideration. We look forward to your response.

Sincerely,

John Conyers, Jr. (MI-13)

Jerrold Nadler (NY-10)

Zoe Lofgren (CA-19)

Sheila Jackson Lee (TX-18)

Steve Cohen (TN-09)

Henry C. "Hank" Johnson, Jr. (GA-04)

Judy Chu (CA-27)

Ted Deutch (FL-22)

Luis Gutierrez (IL-04)

Karen Bass (CA-37)

_____
Cedric Richmond (LA-02)

_____
Hakeem Jeffries (NY-08)

_____
David N. Cicilline (RI-01)

_____
Eric Swalwell (CA-15)

_____
Ted Lieu (CA-33)

_____
Pramila Jayapal (WA-07)

_____
Jamie Raskin (MD-08)

cc: Bob Goodlatte, Chairman, House Committee on the Judiciary